UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


**RANDLE GRIFFIN,**

              Plaintiff,

        v.

**LOUIS CONDON, et al.,**

              Defendants.

_____/

              **HONORABLE JOHN CORBETT O'MEARA**

              **No. 11-14876**


**JURY TRIAL - VOLUME 1**

**Tuesday, January 17, 2017**


Appearances:

Brandon C. Hubbard
Wade Fink
Nolan John Moody
Jessica L. Russell                  Clifton B. Schneider
Dickinson Wright, PLLC              Michigan Dept. of Att. General
500 Woodward Avenue, #4000         P.O. Box 30736
Detroit, Michigan  48226           Lansing, MI  48909
(313) 223-3500                     (517) 373-6434
  On behalf of Plaintiff             On behalf of Defendants

- - -

_To obtain a certified transcript, contact:_
_Sheri K. Ward, Official Court Reporter_
_Theodore Levin United States Courthouse_
_231 West Lafayette Boulevard, Room 219_
_Detroit, Michigan  48226_
_(313)965-4401 · ward@transcriptorders.com_

_Transcript produced using machine shorthand and CAT software._

*Jury Trial*
*Tuesday/January 17, 2017/Vol. 1*

**I N D E X**

                                                    Page    Vol.

Plaintiff's Opening Statement by Mr. Moody ......14     1

Defendants' Opening Statement by Mr. Schneider ..23    1

Plaintiff's Case in Chief
    **Randle Griffin**

    Direct Examination By Mr. Fink:          25     1

Certification of Reporter .......................60

                        -    -    -

*11-14876; Griffin v. Condon, et al.*

*Jury Trial*
*Tuesday/January 17, 2017/Vol. 1*

V1-Page 3

1                              Detroit, Michigan

2                              Tuesday, January 17, 2017

3                              9:07 a.m.

4                               -   -   -

5           **THE CLERK:**  The court calls the matter of

6    *Randle Griffin v. Louis Condon, et al.*, Case Number 11-14876.

7           **THE COURT:**  Counsel, please put your appearances on

8    the record.

9           **MR. FINK:**  Good morning, Your Honor.  Wade Fink on

10   behalf of the plaintiff, Randle Griffin.

11          **THE COURT:**  Good morning.

12          **MR. MOODY:**  Good morning, Your Honor.  Nolan Moody on

13   behalf of the plaintiff, Randle Griffin.

14          **THE COURT:**  Good morning to you.

15          **MR. HUBBARD:**  Good morning, Your Honor.

16   Brandon Hubbard on behalf of the plaintiff, Randle Griffin.

17          **THE COURT:**  Good morning to you.

18          **MS. RUSSELL:**  Good morning, Your Honor.

19   Jessica Russell on behalf of the plaintiff, Randle Griffin.

20          **THE COURT:**  Good morning to all of you.

21       And for the other end of the table here.

22          **MR. SCHNEIDER:**  Good morning, Your Honor.

23   Cliff Schneider from the Attorney General's Office on behalf of

24   Defendants Downard, McMurtrie and Condon.

25          **THE COURT:**  And all three defendants are standing


*11-14876; Griffin v. Condon, et al.*

*Jury Trial*
*Tuesday/January 17, 2017/Vol. 1*

V1-Page 4

1   next to you?

2           **MR. SCHNEIDER:**  Yes, Your Honor.

3           **THE COURT:**  Thank you.  You can sit down for a

4   minute.

5       I understand, and I'm surprised as well as gratified, that

6   the members of the jury who are noticed to be here today are

7   actually here on time even though there's some bad weather out

8   there, and I have some preliminary things to discuss with all

9   of you.  Please, if you have questions about them, raise the

10  questions.

11      Sequestration.  Either, any party asking for sequestration

12  of witnesses?

13          **MR. FINK:**  No, Your Honor.

14          **MR. SCHNEIDER:**  No, Your Honor.

15          **THE COURT:**  No sequestration.

16      Jury instructions.  I know that in the -- have you got

17  something there?

18          **THE CLERK:**  Yeah, hiding under there.

19          **THE COURT:**  Thank you.  They are here.

20      The length of opening may not, may not be much of a

21  problem, I take it, for the defendants.  There is one lawyer

22  and presumably the length would be 15 minutes.  I'll limit you

23  to 15 minutes.

24      While there are four lawyers on the other side, they have

25  one client that is identified as such, and so I take it they

*Jury Trial*
*Tuesday/January 17, 2017/Vol. 1*

V1-Page 5

1    can use 15 minutes of opening, too.

2        Any problem with that on either side?

3            **MR. SCHNEIDER:**  No, Your Honor.

4            **MR. FINK:**  No, Your Honor.

5            **THE COURT:**  All right.  The random jury list of which

6    you have and I have, I want to know if either the plaintiffs or

7    defendant have any problem with it.  It's done with the

8    algorithm and presumably is random, but if you've got a

9    problem, let me know.

10           **MR. SCHNEIDER:**  No issues from the defendants,

11   Your Honor.

12           **MR. FINK:**  No issue from plaintiff either,

13   Your Honor.

14           **THE COURT:**  We will, of course, put eight people in

15   the jury box, and it's my intention, unless I hear very strong

16   convincing argument coming from you, any of you that the jurors

17   shall be -- the jury of eight will be a jury of eight and they

18   will all vote.  If there is some reason to dispute that, then I

19   expect I'll hear it from somebody.  I'm not hearing anything.

20       I guess the last thing I want to say is that I don't want,

21   and won't permit, within limits, maybe I'll let you get the

22   question in, but I don't like once a juror has said I can be

23   fair and impartial that to be followed up with like, "What do

24   you mean by impartial?  You mean you don't have any this or

25   that kind of experience?"  If they say they can be fair and

*11-14876; Griffin v. Condon, et al.*

*Jury Trial*
*Tuesday/January 17, 2017/Vol. 1*

V1-Page 6

1  impartial, that's all you get as far as I'm concerned.  I'm

2  hoping nobody disagrees effectively on that.

3      Is there something else either of the plaintiffs or

4  defendant would -- the plaintiff or defendants would like the

5  record to reflect as a matter of protecting the record for your

6  clients?  Anything else?

7          **MR. SCHNEIDER:**  Nothing for the defense, Your Honor.

8          **MR. FINK:**  Not with regard to jury selection,

9  Your Honor.  We have a few preliminary matters, but we can do

10 them before or after the jury.  Whatever the Court prefers.

11         **THE COURT:**  What are your preliminary matters?  Short

12 answer.

13         **MR. FINK:**  Sure.  There's been a couple stipulations,

14 and there's a couple motions in limine we would like to raise.

15         **THE COURT:**  There are a lot, and as near as I can

16 tell looking at the file and the history, they pretty much have

17 been handled in the same way, denied without prejudice, or they

18 have been resolved.

19         **MR. FINK:**  Yes, Your Honor.  There are some

20 resolutions on some of the issues.  There are four outstanding

21 issues that plaintiff would ask if this Court is inclined to

22 hear it now, we think it's important to hear before a jury

23 hears a certain question or a certain line of questioning.  So

24 for that reason we would like to raise it at some point before

25 we start trial if this Court is inclined to do so.

*11-14876; Griffin v. Condon, et al.*

*Jury Trial*
*Tuesday/January 17, 2017/Vol. 1*

V1-Page 7

1      **THE COURT:**  I am not inclined to do so.  If it comes

2  up at trial -- if somebody wants to raise it, in effect insists

3  that it be dealt with or at least have a chance to be dealt

4  with prior to trial starting, I'll listen to that, a short

5  argument, but I'm not inclined to do that.  If it comes up,

6  it's going to come up in the context that it has behind it and

7  before it at trial.

8      **MR. FINK:**  Yes, Your Honor.  I understand.  Can I

9  place the stipulations on the record that we have agreed to?

10     **THE COURT:**  Yes.  How much stipulation is it?

11     **MR. FINK:**  Just two issues that were in the motions

12  that opposing counsel and I have since agreed to.

13     **THE COURT:**  Oh, sure.

14     **MR. FINK:**  The first, Your Honor, is defendants have

15  agreed in regard to our motion in limine regarding qualified

16  immunity, they certainly don't waive their right to raise it to

17  you, but they will not mention qualified immunity in front of

18  the jury as it is a legal defense.

19     And then the second, Your Honor, plaintiff has agreed not

20  to raise any physical injury as a result of an alleged assault

21  with a Prisoner Reed.  In exchange, the defendants have agreed

22  not to raise anything related to the March 15 assault with

23  Prisoner Reed.  If I'm mischaracterizing it, certainly

24  Mr. Schneider can respond, but those are the two things we have

25  agreed to before trial.

*11-14876; Griffin v. Condon, et al.*

*Jury Trial*
*Tuesday/January 17, 2017/Vol. 1*

V1-Page 8

1          **THE COURT:**  Do you agree?

2          **MR. SCHNEIDER:**  Yes, that is correct, Your Honor.  I

3     agree.

4          **THE COURT:**  All right.  Because you are there, I feel

5     compelled to ask the question.  This is not a challenge to

6     either of the people who are standing in uniform in the back of

7     the -- more or less in the back of the courtroom.  I don't

8     understand -- well, I guess I'm going to ask you.  Have you

9     been given instructions as to where you will stand?

10          **MR. FINK:**  Myself, Your Honor?

11          **THE COURT:**  No, I'm talking --

12          **MR. FINK:**  Oh, to the officers, I'm sorry.

13          **THE COURT:**  -- to the people who I believe are

14     official protectors.

15          **AUDIENCE MEMBER:**  This is your room, sir.  What would

16     you like us to do?

17          **THE COURT:**  I'm sorry?

18          **AUDIENCE MEMBER:**  It's your room.  What would you

19     like us to do?

20          **THE COURT:**  I would like you not to stand where you

21     are now.  I mean, pick a place that you think is adequately

22     protective while you are seated, I believe, not while you are

23     standing.  You can pick the place, but it should not be at the

24     jury box.  I'm not criticizing you.  I'm just saying.

25          **AUDIENCE MEMBER:**  Okay, yeah.

*11-14876; Griffin v. Condon, et al.*

*Jury Trial*
*Tuesday/January 17, 2017/Vol. 1*

V1-Page 9

1          THE COURT:  Does anybody have any problem with that?

2          MR. FINK:  No.  Thank you, Your Honor.

3          THE COURT:  Thank you.

4      Is there anything else we should discuss as matters to be

5   addressed prior to having prospective jurors enter the jury

6   box?

7          MR. FINK:  No, Your Honor.  The plaintiff is all set.

8          MR. SCHNEIDER:  No, Your Honor.

9          THE COURT:  All right.  Bring in the jury panel.

10          THE CLERK:  I just called.  It will be just a minute.

11      (Discussion held off the record.)

12          THE COURT:  Well, I apologize in advance for this

13   delay.  There apparently is some kind of delay with the jurors,

14   who are up on the second floor.  Anyway, there isn't anything I

15   can do much about it except wait.

16          MR. FINK:  No problem, Your Honor.

17          THE COURT:  I didn't ask, but I will now that we have

18   no prospective jurors in the room, are you, Mr. Fink, are you

19   going to be addressing on opening argument?

20          MR. FINK:  Your Honor, if it's okay with the Court,

21   my colleague, Nolan Moody was planning on doing opening

22   statement, and I was planning on doing closing statement.

23          THE COURT:  That's okay.

24          MR. FINK:  Thank you, Your Honor.  And I'll be doing

25   voir dire.

*11-14876; Griffin v. Condon, et al.*

*Jury Trial*
*Tuesday/January 17, 2017/Vol. 1*

V1-Page 10

1      **THE COURT:**  I have the joint jury instructions, and I

2   appreciate the fact that they are here and they are joint.  I

3   am not being critical of anybody when I say to be complete we

4   need to have a form of verdict.  If there's a problem with

5   that, agreeing to it, I'll be happy to listen to it.

6      **MR. FINK:**  A verdict form, Your Honor?

7      **THE COURT:**  Huh?

8      **MR. FINK:**  Is that what you said, a verdict form?

9      **THE COURT:**  Verdict form.

10      **MR. FINK:**  We have competing verdict forms I can

11   submit to you at any time.

12      **THE COURT:**  I don't want you to do it now, but any

13   time.

14      **MR. FINK:**  Okay.  Thank you, Your Honor.

15     Your Honor, I would just point out, as far as the joint

16   jury instructions, just so it's clear, there are some disputes

17   within the actual instructions.  The ones that are marked

18   "joint" are what we agree on, and then there are some competing

19   instructions within the document.  I just wanted to make sure

20   that was clear.  Thanks, Your Honor.

21      **THE COURT:**  Well, I sat up in chambers predicting to

22   myself at least that it was very unlikely that we were going to

23   get everybody we needed here more or less on time, especially

24   the jurors, because of the weather, and they allegedly arrived

25   all on time and were here, but something else is holding them

*11-14876; Griffin v. Condon, et al.*

*Jury Trial*
*Tuesday/January 17, 2017/Vol. 1*

V1-Page 11

1    up.

2        (The jury voir dire record was excerpted out at this

3        point.)

4            **THE CLERK:**  Would the jurors in the jury box please

5    stand and raise your right hand.

6        (The jury was sworn.)

7            **THE CLERK:**  Thank you.

8            **THE COURT:**  Thank you.  Please be seated again.

9        I'm going to give you a few preliminary instructions and

10   then let you go to the jury room for whatever happens in there.

11   It's there for you, and sometimes they even provide things like

12   coffee and Coke and sometimes more than that.  But if they have

13   those things, then you should be grateful because they are not

14   there always, at least not this early in the process.

15       You had your voir dire.  I think that -- I think we'll

16   just let you go now to the jury room and come back in here in

17   15 minutes and we'll start with my instructions to the jury and

18   then we'll go to the opening statements for the plaintiff and

19   defendant.

20       Thank you.  Thank you for being here.  Thank you for being

21   good citizens.  Be sure you pick up whatever you've got with

22   you, a coat or something else, and take it with you to the jury

23   room.

24       (Jury out at 10:36 a.m.)

25           **THE COURT:**  Is there anything further that either the

*11-14876; Griffin v. Condon, et al.*

*Jury Trial*
*Tuesday/January 17, 2017/Vol. 1*

V1-Page 12

1   plaintiff or the defendants would like the record to reflect at

2   this time?

3           **MR. FINK:**  No, Your Honor, not from plaintiff.

4           **MR. SCHNEIDER:**  No, Your Honor.

5           **THE COURT:**  All right.  Let's take 15 minutes and

6   come back.  Are you generally ready, disposed to do what you've

7   got to do --

8           **MR. FINK:**  Yes, sir.

9           **THE COURT:**  -- after a little bit of instruction from

10  me?

11          **MR. FINK:**  Yes, Your Honor.  We are prepared to

12  proceed.

13          **MR. SCHNEIDER:**  Yes, Your Honor.

14          **THE COURT:**  All right.  Court is in recess.

15      (Recess from 10:37 a.m. to 11:04 a.m.)

16          **THE COURT:**  Please be seated.

17      Are both plaintiff and defendants ready for opening

18  statements?

19          **MR. SCHNEIDER:**  Yes, Your Honor.

20          **MR. MOODY:**  Yes, Your Honor.

21          **THE COURT:**  Very well.  Bring in the jury.

22          **THE CLERK:**  All rise for the jury.

23      (Jury in at 11:06 a.m.)

24          **THE COURT:**  Members of the jury, please be seated.

25      These are brief preliminary instructions, which you heard

*11-14876; Griffin v. Condon, et al.*

*Jury Trial*
*Tuesday/January 17, 2017/Vol. 1*

V1-Page 13

1   parts of before, but to help you as you think about what you're

2   doing in the jury room and listening to witnesses, and what

3   we're going to do after these preliminary instructions is have

4   the opening statements of the plaintiff presumably, if

5   plaintiff proceeds that way and usually they do, and defendant,

6   and then we'll go into the first witnesses for plaintiff, then

7   for defendant.

8        You have now been sworn as the jury to try this case, and

9   by your verdict you will decide the disputed issues of fact.

10  As judge, I will decide the questions of law.  Before you

11  retire to deliberate at the close of the case I will instruct

12  you on the rules of law you must follow and apply in deciding

13  on your verdict.

14       Give careful attention to the testimony and evidence which

15  is presented during the trial.  However, don't form any or

16  express any opinion about the case until you have heard all of

17  the evidence and have had the benefit of the closing arguments

18  of the lawyers and my instructions on the applicable law.

19       Evidence consists of the testimony of witnesses, documents

20  and other things that are received into evidence as exhibits

21  and all facts which are admitted or stipulated by the parties.

22  There are certain things which are not evidence and cannot be

23  considered by you, and they include statements, arguments and

24  questions by lawyers, and objections to questions by lawyers.

25       Lawyers have an obligation to their clients to make an

*11-14876; Griffin v. Condon, et al.*

1    objection when they believe evidence is being offered and it's

2    improper under the rules of evidence.  If an objection is

3    sustained, ignore the question.  If it's overruled, treat the

4    answer like any other response.

5        Any testimony you have been instructed to disregard, of

6    course you disregard and it's not evidence.  Anything you see

7    or hear outside the courtroom is not evidence and must be

8    disregarded.  You must decide the case solely on the evidence

9    presented here in the courtroom.

10       There are, of course, and you know this from television

11   and presumably a lot of other ways, direct and circumstantial.

12   Direct evidence is direct proof of a fact such as testimony of

13   an eyewitness.  Circumstantial is proof of one fact that we may

14   infer or conclude that other facts exist.  I will give you

15   further instructions on these as well as other matters at the

16   end of the case.  However, keep in mind that you may consider

17   both kinds of evidence.

18       I think those are my preliminary instructions, and we are

19   ready now for opening statements if you are prepared, sir.

20            **MR. MOODY:**  We are, Your Honor.  Thank you, sir.

21            **THE COURT:**  You can adjust the lectern if you want

22   to.

23            **MR. MOODY:**  Ladies and gentlemen of the jury, good

24   morning.  My name is Nolan Moody.  As you have previously met,

25   over here is my colleague Wade Fink.  Brandon Hubbard and

*Plaintiff's Opening*
*Tuesday/January 17, 2017/Volume 1*

V1-Page 15

1  Jessica Russell, my other colleagues.  Together the four of us

2  are going to present to you evidence in this mater, but before

3  I begin I want to start just by thanking each of you for your

4  civic duty.

5          **THE COURT:**  Can the members of the jury hear?  As

6  long as you can, that's fine.  As long as I can, that's fine.

7          **MR. MOODY:**  Do you want me to move closer?

8          **THE COURT:**  Go ahead.

9          **MR. MOODY:**  All right.  We wanted to start by

10  thanking each one of you.  Judge O'Meara said it much more

11  eloquently than I will, but this is really the highest form of

12  civic duty that you can perform, and we cannot administer our

13  justice system without your cooperation.  So thank you from all

14  of us for taking time out of your schedules to be here.

15      As I mentioned a moment ago, my colleagues are over to my

16  right.  You will meet each of them throughout this case, as

17  they will all present evidence and testimony of the plaintiff's

18  position in this matter.  It's my anticipation that you are

19  probably going to forget my name.  You are probably going to

20  forget all of my colleagues' names along the way.  That's okay.

21  We are not important to this case.  But there is one name I

22  would ask you to remember, and that's Randle Griffin, the

23  gentleman sitting at counsel table right now.

24      The reason why I want you to remember his name?  Because

25  Mr. Griffin is a person just like you and me that is entitled

1  to defend his right to free speech.  As you heard Judge O'Meara

2  and my colleague, Mr. Fink, mention earlier, our client,

3  Mr. Griffin, is a prisoner so that's why I mention it.  Just

4  because he is a prisoner does not mean he is not entitled to

5  defend his right to free speech.

6      Mr. Griffin was convicted of second-degree murder 26 years

7  ago and has been incarcerated since.  He has been and will

8  continue to pay for the conviction of that crime, but the

9  conviction of that crime is not why we are here today.  We are

10 not here because Mr. Griffin has spent the majority of his life

11 in the prison system.

12     We are here because of the actions of these

13 three defendants.  We are here because these three defendants,

14 who are all correctional officers at the Gus Harrison

15 Correctional Facility in Adrian, Michigan in 2011, conspired

16 to, and subsequently did, retaliate against our client, who was

17 an inmate at that time at Gus Harrison, for reporting an

18 assault that he witnessed one of the defendants commit on

19 another inmate.

20     We will present to you evidence which shows to you that

21 the Gus Harrison Correctional Facility has a systemic and

22 cultural problem of abusing its prisoners.  The officers

23 verbally and physically harass their prisoners.  They issue

24 false misconduct tickets, and worse, when the prisoners try to

25 stand up against that system, things get even worse for them.

*Plaintiff's Opening*
*Tuesday/January 17, 2017/Volume 1*

V1-Page 17

1   That's what happened to our client, Randle Griffin, in this

2   case.  You are going to hear from Mr. Griffin.  He's going to

3   take the stand shortly after I'm done, and he's going to tell

4   you what happened.

5       You are going to learn about another inmate by the name of

6   Jeffrey Bryant, who suffered the same harassment as many other

7   prisoners have at Gus Harrison.  You are going to learn that

8   Randle witnessed Mr. Bryant state to officers that he wanted to

9   go to protective custody.  And, instead of being allowed to do

10  so, he was physically restrained from going and assaulted by

11  the defendant Officer Condon.

12      What happens from there is truly why we are here.  You

13  will learn that shortly after that incident the inmate,

14  Mr. Bryant, filed a complaint and an investigation was opened

15  by the ombudsman's office.

16      The ombudsman is an arm of the State of Michigan that

17  investigates the actions of officers to determine whether their

18  conduct was appropriate with regard to prisoners.  When that

19  investigation was opened, Mr. Griffin did what few other

20  prisoners are willing to do.  He stood up against the guards,

21  he stood up for his friend, and he reported what he saw.

22      Once these defendants learned about what he had done, they

23  conspired to and retaliated against him for exercising his

24  First Amendment right to report that assault.  That is why we

25  are here.

*Plaintiff's Opening*
*Tuesday/January 17, 2017/Volume 1*

V1-Page 18

1    You will learn through testimony from Mr. Griffin that is

2    then confirmed by other evidence and other witnesses that on

3    March 2nd, 2011 Mr. Griffin had a conversation with the

4    defendant Officer Condon.  Officer Condon told Mr. Griffin that

5    because he was reporting his conduct it was going to "bite him

6    in the ass."

7    No less than a few minutes later you are going to hear

8    witnesses confirm that all three defendants were overheard in

9    the prison conspiring to retaliate against Mr. Griffin.  They

10   were going to write false misconduct tickets against him

11   because he was trying to change the system.

12   You are then going to find out that that very same night

13   another defendant, Officer Downard, in fact wrote a false

14   misconduct ticket against Mr. Griffin.  The next day the other

15   defendant, Officer McMurtrie, wrote another false misconduct

16   ticket against Mr. Griffin.  In fact, that second misconduct

17   was actually dropped just one day later.

18   You are then going to learn perhaps the most egregious

19   conduct of all.  Mr. Griffin was first laid in in his cell for

20   those misconduct tickets.  That means he can't leave his cell.

21   He can't go out in the yard.  He can't go out and use any level

22   of liberty that he has left.  Mr. Griffin lost his prison job

23   as a result of those misconduct tickets.

24   And then, worst of all, Officer Downard went to

25   Mr. Griffin's room, Mr. Griffin's cell.  He cornered

*Plaintiff's Opening*
*Tuesday/January 17, 2017/Volume 1*

V1-Page 19

1    Mr. Griffin, and in a threatening manner he stood over him and

2    told him that because he was reporting Officer Condon he was

3    going to beat his ass, throw him in a hole, and then, as loudly

4    as he could, he yelled for the whole prison to hear that he was

5    "a fucking rat."

6        You are going to hear from Mr. Griffin.  He's going to

7    tell you if you are a rat in prison it's the single-most

8    dangerous thing you can be.  You are immediately in fear of

9    your life when other inmates consider you to be a rat.  That

10   was done by Officer Downard.  All of this conduct was done as a

11   result of Mr. Griffin reporting what he had seen Officer Condon

12   do.

13       Now, what does that amount to?  What does that lead us to

14   ask from you, the jurors?  We are bringing two claims in this

15   case against all three defendants.  The first is retaliation of

16   Mr. Griffin's First Amendment rights.

17       In order for us to prove that, we need to show you

18   three elements.  The first element is that the plaintiff

19   engaged in constitutionally protected activity.  Mr. Griffin

20   participated in the ombudsman's investigation into this case.

21   That is constitutionally protected activity.

22       The second element is that an adverse action was taken

23   against Mr. Griffin that would deter a person of ordinary

24   firmness from continuing that conduct.  We need look no further

25   than all of the actions by the officers that were done to deter

*Plaintiff's Opening*
*Tuesday/January 17, 2017/Volume 1*

V1-Page 20

1   Mr. Griffin from reporting what he had seen.

2        And then, finally, the third element that we need to show

3   you is that there was a causal connection between Mr. Griffin's

4   speech and the adverse action taken by the officers.  Again,

5   the circumstances dictate that this was very clear.

6        Officer Condon told Mr. Griffin it was going to "bite him

7   in the ass" for reporting what he had seen.  Then you have

8   other officers write false misconduct tickets, and they say

9   things to Mr. Griffin to further threaten him for what he has

10  done.  That is a causal connection.

11       The second claim we are going to bring is a charge of

12  conspiracy.  A charge of conspiracy has four elements that we

13  will show you.  The first is that there was a single plan or

14  agreement.

15       Again, you will hear from witnesses.  They will tell you

16  that they overheard all three defendants agreeing to write

17  false misconduct tickets against Mr. Griffin because he was

18  trying to change the system, and this comes only moments after

19  Officer Condon had a conversation with Mr. Griffin about him

20  reporting Officer Condon.

21       We need to show you the second element, which is that the

22  defendants had a conspiratorial objective.  Again, the same

23  circumstances apply.  Based on the time of everything happening

24  over just a three-day period, based on the conversations that

25  Mr. Griffin had with Officer Condon, these are very clearly an

*11-14876; Griffin v. Condon, et al.*

*Plaintiff's Opening*
*Tuesday/January 17, 2017/Volume 1*

V1-Page 21

1    objective on behalf of all of the defendants to deter

2    Mr. Griffin from reporting what he had seen.

3         The third element we need to show you is an overt act, an

4    overt act that is in furtherance of the conspiracy.  Again, I

5    have already listed for you a number of overt acts:  Threats,

6    false tickets, calling someone a rat for the whole prison to

7    hear, laying the prisoner in so they can't leave their cell.

8    Any one of these is an overt act that constitutes a furtherance

9    of the conspiracy.

10        Finally, the fourth element I need to show you is an

11   injury.  Here I need to show you a constitutional injury.  I

12   think many of us know that the Constitution allows all of us to

13   have a right to free speech.  That includes Mr. Griffin.

14   Mr. Griffin had a right to participate in that investigation.

15   When he was retaliated against for participating, he was

16   injured and he suffered a constitutional injury.

17        Those are the two counts.  We need to prove that evidence

18   to you by a preponderance of the evidence.  What that means is

19   we need to show you that it is more likely than not that this

20   occurred than it didn't.  For those that like math, that's

21   50.1 percent more likely that it occurred than it didn't.

22        Now, Mr. Griffin is going to take the stand, as I

23   mentioned.  We are going to provide evidence and witnesses to

24   confirm Mr. Griffin's testimony.  Then, after that, it's my

25   anticipation that the defense is going to call each one of the

1    defendants to the stand, and I can tell you that if they do

2    that those defendants are going to deny to a man every

3    allegation leveled against them.

4        So you jurors are going to have a choice.  You are going

5    to have to make a decision.  Do you believe Mr. Griffin or do

6    you believe the defendants?  As the defense would rather you

7    put it, do you believe the prisoner or do you believe the

8    officers?

9        I can tell you where Mr. Griffin stands on this.  If you

10   listen to the evidence and you decide that we have not proven

11   to you by a preponderance of the evidence that these events

12   occurred, Mr. Griffin is going to be satisfied with the

13   outcome.

14       What Mr. Griffin will not be satisfied with and what we as

15   lawyers will be heartbroken about is if you determine right now

16   before you hear the evidence that Mr. Griffin is not entitled

17   to defend his right to a First Amendment claim simply because

18   he is a prisoner.  Mr. Griffin has that right.

19       They say that a civilization is judged by how we treat our

20   least fortunate, our least able.  Certainly that would include

21   our prisoners.  I'm asking you to treat Mr. Griffin with the

22   respect that these defendants did not.  Give him his day in

23   Court.  Listen with open ears to what he has to say.  Listen to

24   the witnesses that confirm his story.  Listen to the other

25   evidence that confirms his story.  If you do that, I can

1    promise you that the man Randall Griffin, not the prisoner, the

2    man Randall Griffin will be satisfied with whatever judgment

3    you reach.  Thank you.

4            **THE COURT:**  Thank you.

5        For the defendants?

6            **MR. SCHNEIDER:**  Thank you, Your Honor.

7        Good morning.  This is one of two chances that I'm going

8    to have to speak with you directly.  You saw the plaintiff's

9    opening statement.  I get to do mine.  After this you are going

10   to hear the testimony from the witnesses.  I think we will get

11   to a little bit of that this afternoon, and then over the

12   course of the next few days we'll hear other witnesses.  When

13   we're done with that, the attorneys will get back in front of

14   you like this again, and we'll be doing our closing arguments.

15       Right now what I want to do, I want to briefly summarize

16   what the evidence in this case is going to show, which you are

17   going to see here in court over these next few days.  I want

18   you to keep in mind throughout this trial that it is the

19   plaintiff's burden of proof to prove his case.  It's not the

20   defendants' burden to disprove it.  The judge will instruct you

21   on the law of this case, and that will be part of it.

22       Now, the plaintiff in this case, he claims that the

23   defendants were out to get him because he talked to the

24   ombudsman.  You are going hear from the defendants.  They don't

25   know what the ombudsman is.  They wouldn't recognize any staff

*Defendants' Opening*
*Tuesday/January 17, 2017/Volume 4*

V1-Page 24

1  from the ombudsman's office if they met them on the street.  In

2  addition, even if the plaintiff did have contact with the

3  ombudsman, there's no way that the defendants would know about

4  that.

5      Now, the plaintiff is claiming that as a result of this

6  contact with the ombudsman's office he suffered threats, being

7  called a rat, and tickets.  Now, the defendants are going to

8  testify and the evidence will show that they never made any

9  threats against the plaintiff.  They never called him "rat."

10     On March 2nd, 2011 Officer Downard did write the plaintiff

11 a ticket.  He was supposed to be at his job at work, and the

12 plaintiff wasn't and he didn't show up so Officer Downard wrote

13 him an out-of-place ticket.

14     Now, in prison when you get a ticket like that, you are

15 laid in from your job.  That means you don't get to go to work

16 the next day.  You have to sit in your cell.

17     On that next day, March 3rd, Officer McMurtrie saw that

18 plaintiff wasn't at work and wrote him a second ticket.  That

19 ticket did not go to hearing.  On the subsequent day, Officer

20 McMurtrie talked to the sergeant about it and had the ticket

21 dismissed.  They just ripped it up.  It was gone.  Nothing came

22 of it.

23     Now, at the end of the case, like I said, after you have

24 heard all of the evidence, I'm going to get back up here and

25 summarize the evidence you have heard and seen in light of the

*Randle Griffin - Direct*
*Tuesday/January 17, 2017/Vol. 1*

V1-Page 25

1   law that the judge is going to tell you about.  At that time

2   I'm going to ask you to return a verdict in favor of the

3   defendants and award the plaintiff nothing.  Thank you.

4           **THE COURT:**  Thank you.

5       Your first witness?

6           **MR. FINK:**  Yes, Your Honor.  The plaintiff calls

7   Randle Griffin to the stand.

8                       -   -   -

9                   **RANDLE GRIFFIN,**

10          being first duly sworn to tell the truth,

11          was examined and testified upon his oath

12          as follows:

13                      -   -   -

14                                          (11:26 a.m.)

15                  **DIRECT EXAMINATION**

16  BY MR. FINK:

17  **Q.**   Good morning, Mr. Griffin.

18  **A.**   Good morning.

19  **Q.**   Mr. Griffin, I'm going to ask you questions, and to the

20  extent you don't understand anything or if I wasn't clear,

21  please ask me to repeat the question and I would be happy to do

22  that.

23      Mr. Griffin, where do you currently reside?

24  **A.**   At the St. Louis Correctional Facility, St. Louis,

25  Michigan.

*11-14876; Griffin v. Condon, et al.*

*Randle Griffin - Direct*
*Tuesday/January 17, 2017/Vol. 1*

V1-Page 26

1   **Q.**   Would you speak up just a little bit.

2   **A.**   At the St. Louis Correctional Facility in St. Louis,

3   Michigan.

4   **Q.**   And where were you before that?

5   **A.**   At the Oaks Correctional Facility.

6   **Q.**   How about before that?

7   **A.**   Kinross Correctional Facility.

8   **Q.**   And are these multiple facilities?  Why have you been in

9   so many facilities?

10  **A.**   Because they transfer you whenever they get ready to

11  transfer you.

12  **Q.**   How many times would you say you have been transferred?

13  **A.**   About 15.

14  **Q.**   15 different facilities?

15  **A.**   Yeah.

16  **Q.**   How old are you, Randle?

17  **A.**   Forty-eight.

18  **Q.**   Are you married?

19  **A.**   Yes.

20  **Q.**   When did you get married?

21  **A.**   2002.

22  **Q.**   While you were incarcerated?

23  **A.**   Yes.

24  **Q.**   Do you have kids?

25  **A.**   Yes.

*11-14876; Griffin v. Condon, et al.*

*Randle Griffin - Direct*
*Tuesday/January 17, 2017/Vol. 1*

V1-Page 27

1  **Q.**   How many kids do you have?

2  **A.**   Four.

3  **Q.**   Do they visit you in prison?

4  **A.**   Yes, when I'm closer to home because I don't allow them to

5  come across to prison when I'm up north.

6  **Q.**   Sometimes you are far up north?

7  **A.**   Yes.

8  **Q.**   Do you have friends, Mr. Griffin, inside or outside the

9  correctional system?

10  **A.**   Yes.

11  **Q.**   Can you describe your friendships in prison?

12  **A.**   Friendships, they really are hard to come by, but when you

13  find a good friend in prison, they are there for you, and if

14  you need anything, they will be there for you and vice versa.

15  **Q.**   You do have friends in the correctional facility?

16  **A.**   Yes.

17  **Q.**   As far as your personal life, Randle, Mr. Griffin, in a

18  correctional facility, do you have hobbies or certain things

19  that you enjoy doing?

20  **A.**   Yes.  I enjoy working because it give me a sense of

21  responsibility and allows me to be independent.  I like

22  reading.  I like studying the law.  I like helping the young

23  guys.  I take them under my wing, and I teach them how to read

24  and write.  When I came to prison, I couldn't read or write so

25  the older guys helped me.  So I just pay it forward and help

*Randle Griffin - Direct*
*Tuesday/January 17, 2017/Vol. 1*

V1-Page 28

1   these young guys to get their GEDs so they have a purpose when

2   they get back into society.

3   **Q.**   You taught yourself to read and write?

4   **A.**   Yes.

5   **Q.**   You couldn't read or write at all when you went into

6   prison?

7   **A.**   No.

8   **Q.**   Do you take on any leadership roles as an inmate at the

9   correctional facility?

10  **A.**   Yes.

11  **Q.**   In what capacity?

12  **A.**   As warden forum representative.

13  **Q.**   And we'll get into more of that later, but very briefly,

14  what is the warden's forum committee?

15  **A.**   It's an advisory committee to the warden where we solicit

16  issues from prisoners and take them to the warden to resolve.

17  **Q.**   You speak on behalf of the prisoners?

18  **A.**   Yes.  All the time, yes.

19  **Q.**   Mr. Griffin, do you have any certificates or training type

20  permissions or grants in prison?

21  **A.**   Yes.  I have a food technology certificate, custodial

22  maintenance, food handling certificate, blood borne pathogen

23  certificate, and a few others, a variety of them.

24  **Q.**   How do you get those certificates?

25  **A.**   You have to go through training, vocational classes that

*Randle Griffin - Direct*
*Tuesday/January 17, 2017/Vol. 1*

V1-Page 29

1  they have in the prison.

2  **Q.**  In prison?

3  **A.**  Yes.

4  **Q.**  And you went through those classes and received those

5  certificates?

6  **A.**  Yes.

7  **Q.**  Do you have your GED?

8  **A.**  Yes.

9  **Q.**  Did you get that while you were incarcerated?

10  **A.**  Yes.

11  **Q.**  Mr. Griffin, how old were you when you were first

12  incarcerated?

13  **A.**  22.

14  **Q.**  You've been in prison 26 years?

15  **A.**  Yes.

16  **Q.**  What was your conviction for?

17  **A.**  Second-degree murder.

18  **Q.**  What was your sentence?

19  **A.**  Life.

20  **Q.**  In those 26 years in prison -- you're 48 now, you were 22

21  then -- have you changed at all?

22  **A.**  Significantly.

23  **Q.**  In what ways?

24  **A.**  Although my adjustment to prison was hard, I realized fast

25  that this was my life now so I just learned to accept it, but I

*Randle Griffin - Direct*
*Tuesday/January 17, 2017/Vol. 1*

V1-Page 30

1   understood the likelihood of me being in prison for the rest of

2   my life was probably significant, and I guess I was running

3   with the wrong people so I had to just accept that.  But it's

4   hard.  Excuse me.

5   **Q.**   Take your time.  You are talking about 26 years in prison

6   and to the extent you feel that you've changed in those

7   26 years.

8   **A.**   Yes.  Yes, I have changed significantly.  You know, I've

9   devoted my time to, you know, helping others, and that's mostly

10  what my time go to.  And anytime someone needs my assistance I

11  try to be there for them.

12      Although I am serving a life sentence, by no means do I

13  like it in prison.  I still fight to get out of prison all the

14  time because I still profess my innocence.

15  **Q.**   It's likely the case that you will spend the rest of your

16  life in prison?

17  **A.**   Yeah.

18  **Q.**   What's important to you in your life in prison?

19  **A.**   Well, shoot.  You know, we don't have that much in prison.

20  You learn fast that your life is really small, but you have to

21  find purpose.  If you don't have a purpose in prison, you

22  just -- most guys go crazy, kill themselves or just get on

23  medication and lose their mind.

24      But I find purpose in working.  Every job I have had since

25  I been locked up, I always got good work reports.  I find

*Randle Griffin - Direct*
*Tuesday/January 17, 2017/Vol. 1*

V1-Page 31

1  purpose in, again, you know, helping others, reading, studying,

2  just walking around, you know, just having piece of mind, you

3  know, in the community because we have our own community in

4  prison.  Certain guys, older guys be together, we band

5  together.  We walk around the yard together.  We talk.  When

6  one is down, the other one lift them up.  So my purpose is

7  really, Your Honor, just to try to stay busy and find a place

8  where I can call home, where I can create a life.  You know, in

9  prison it's hard, but you have to create a life in prison.

10  **Q.**  You said your work gave you purpose.  Can you explain what

11  you mean by your job gave you purpose?

12  **A.**  Well, the job gave me purpose because every day that I got

13  up I had a sense of responsibility that I knew I had to

14  complete this job.  And I took pride in every job that I had,

15  whether they tell me to clean the floors, cook in the kitchen

16  or go in the yard and rake leaves up or just go outside and,

17  you know, help out with shoveling snow.  Whatever job I have, I

18  try to do my best, and that gives me purpose.

19  **Q.**  The warden's forum that you described earlier, which is

20  kind of a leadership council, does that give you purpose?

21  **A.**  Yes.  It allows me to have a voice and, you know, help

22  others that -- because most of the guys that come to prison,

23  they don't know how to resolve their issues in a more peaceful

24  manner so that's why we have the warden's forum so we can

25  resolve before anything get out of hand.

*11-14876; Griffin v. Condon, et al.*

*Randle Griffin - Direct*
*Tuesday/January 17, 2017/Vol. 1*

V1-Page 32

1    So I go up and I speak on behalf of the guys in my block.

2    That's why it's called block representative.  I go up and

3    discuss the issues with the warden.

4    **Q.**   We'll get more into that later.  As a general matter in

5    your prison life, what's been your experience with correctional

6    officers?

7    **A.**   In my experience most of them is good guys.  Most

8    corrections officers are good guys.  They treat you humanely,

9    you know, but there are some mean-spirited folks who try to

10   treat you like you're not human.

11   **Q.**   Mr. Griffin, do you remember where you resided

12   approximately September 2011?

13   **A.**   September I was at the Adrian correctional facility.

14   **Q.**   What is that facility called, if you know?

15   **A.**   Gus Harrison.

16   **Q.**   Gus Harrison Correctional Facility?

17   **A.**   Yes.

18   **Q.**   Do you remember being transferred around September of

19   2011?

20   **A.**   Yes, I was transferred from there to the Lakeland

21   Correctional Facility.

22   **Q.**   In September of 2011 when you first arrived at the Gus

23   Harrison Correctional Facility in Adrian, Michigan, the

24   correctional facility at issue in this case, what did you

25   observe about the environment there?

*11-14876; Griffin v. Condon, et al.*

*Randle Griffin - Direct*
*Tuesday/January 17, 2017/Vol. 1*

V1-Page 33

1   **A.**   Well, I was transferred there in September of 2010.

2   **Q.**   I'm sorry, you are correct.  2010 is what I meant to say.

3   September 2010.

4   **A.**   Yes.

5   **Q.**   What did you observe about the environment in September of

6   2010 when you were transferred to the Gus Harrison Correctional

7   Facility?

8   **A.**   Well, actually, as far as I was concerned, it was a

9   peaceful environment.  I had no problems with other prisoners,

10  officers, anything.  It was peaceful.  I kind of settled in and

11  made it my home.  And I just -- it was all right.  No problem.

12  **Q.**   How would you describe your relationship in the

13  September 2010 time frame over those next months that came

14  after, how would you describe your relationship with

15  correctional officers at the Gus Harrison Correctional

16  Facility?

17  **A.**   When I got there?

18  **Q.**   When you first got to the Gus Harrison Correctional

19  Facility and, as you said, you were building your life, what

20  was your relationship with the corrections officers when you

21  first got there?

22  **A.**   Oh, I had a beautiful relationship with the corrections

23  officers.  They respected me.  I would greet them, you know,

24  they would greet me back.  Good morning, good morning.  And I

25  go about my way.  It was okay, good, you know.  Nice, nice

*Randle Griffin - Direct*
*Tuesday/January 17, 2017/Vol. 1*

V1-Page 34

1   relationship.

2   **Q.**   Let's get in a little bit about your life at Gus Harrison.

3   If you know, Mr. Griffin, how does a housing unit work at a

4   correctional facility such as Gus Harrison?

5   **A.**   Well, you are assigned a housing unit, and that's where

6   you reside.  You are in a lock, which is a cell, and that's

7   where you are.

8   **Q.**   Where did you reside at Gus Harrison Correctional

9   Facility?

10   **A.**   I locked in 2 unit.

11   **Q.**   Housing Unit 2?

12   **A.**   Excuse me, yes.

13   **Q.**   And, if you know, what are the distinctions between

14   housing units, like why would one person be assigned to

15   one unit and another person to a different unit?

16   **A.**   Well, they have, they have two different levels.  Actually

17   they have three different levels.  They had Level 1, Level 4,

18   and Level 2.  Level 1 is the lowest you have.  Then you have

19   Level 2 housing, which is next like medium security, where you

20   have a lot more freedom.  We have a lot more freedom.  We walk

21   around.  We have keys to our cell.

22   **Q.**   So when you say -- I'm sorry to interrupt you -- when you

23   say levels, is that security classification?

24   **A.**   Yes.

25   **Q.**   And what was your security classification at Gus Harrison

*Randle Griffin - Direct*
*Tuesday/January 17, 2017/Vol. 1*

V1-Page 35

1  Correctional?

2  **A.**  Level 2.

3  **Q.**  Level 2?

4  **A.**  Yes.

5  **Q.**  Which is on the lower end of the spectrum?

6  **A.**  Yes.

7  **Q.**  What is the highest?

8  **A.**  Well, let's see.  I think it's just 5 now.

9  **Q.**  And the lowest is 1?

10  **A.**  One.

11  **Q.**  You started to describe it and I interrupted you, so

12  please explain.  What comes with being security classification

13  2, privileges?  What is your life like as a security 2

14  classification?

15  **A.**  Security 2 classification, you are allowed to have a key

16  to your cells, two men in a room.  You are allowed to go and

17  come as you please when the unit and yard is open.

18      We have three different dayrooms.  We are allowed to go to

19  the dayrooms.  We have a TV room and two recreation rooms.  We

20  are allowed to go and watch TV, you know, sports and things

21  like that together.  The other rooms, you can go play card

22  games.  The other room is like a quiet room.  You can play

23  chess, things like that.  We have a few microwaves.  You know,

24  that's basically what we have, what's going on.

25  **Q.**  Let's discuss, to the extent you remember, the setup,

*Randle Griffin - Direct*
*Tuesday/January 17, 2017/Vol. 1*

1  which is important in this case, of Housing Unit 2.

2  **A.**   Okay.

3  **Q.**   Can you describe very broadly, and then we'll go into

4  specifics, how Housing Unit 2 of Gus Harrison is set up?

5  **A.**   Well, when you first get to the unit, you have, you have

6  the officers there.  As soon as you come in the unit, you have

7  the counselor's office here, as soon as you come in the unit.

8  You have an officer desk sits here.  Then you have the RUM's

9  desk, which is the unit supervisor.  Then you have another

10  counselor here.  And then between those two counselors' offices

11  you have wings.  You have an upper and lower on this side, and

12  you have an upper and lower on this side.  And each one of

13  these counselors' office, these counselors' job is to manage

14  the prisoners on each wings.

15  **Q.**   So the wings, is that where the cells are?

16  **A.**   Yes.

17  **Q.**   Okay.  And the wings feed into this central location that

18  you are describing?

19  **A.**   Yes.

20  **Q.**   Does the central location have a name?

21  **A.**   Base.

22  **Q.**   It's called base?

23  **A.**   Base, yes.

24  **Q.**   So on base -- you said the officers' desk.  Where is the

25  officers' desk as far as the base?

*Randle Griffin - Direct*
*Tuesday/January 17, 2017/Vol. 1*

V1-Page 37

1  **A.**   The officers' desk sits in the center of base.

2  **Q.**   Is it like a circle?

3  **A.**   No, it's a square desk that sits in the center of base so

4  they can see each wing, and then the dayrooms are directly

5  behind it.

6  **Q.**   What does the officers' desk look at if you're facing

7  forward at the desk?

8  **A.**   Oh, they look at the counselors' office, all

9  three counselors' office and the wings.

10  **Q.**   Okay.  Now, if you remember the distinctions between the

11  types of correctional officers, when you describe these

12  offices, do you know which offices were on base, what it was

13  called by the MDOC?

14  **A.**   Yes.  You have the ARUS office.

15  **Q.**   What does ARUS stand for?

16  **A.**   Assistant Unit Manager.

17  **Q.**   Okay.  Is that a counselor?

18  **A.**   Yes, a counselor.

19  **Q.**   And is there another type of office on base?

20  **A.**   Yes, you have the RUM office.  I forgot what the

21  abbreviation stands for.

22  **Q.**   You called it?

23  **A.**   The RUM.

24  **Q.**   RUM?

25  **A.**   RUM, and that's just the unit supervisor.  He's over all

*11-14876; Griffin v. Condon, et al.*

*Randle Griffin - Direct*
*Tuesday/January 17, 2017/Vol. 1*

V1-Page 38

1   the counselors.

2   **Q.**   So the RUM is in charge of the housing unit?

3   **A.**   Yes.

4   **Q.**   And then you have two other offices that belong to the

5   ARUS, if I understood?

6   **A.**   ARUS, yes.  One in the front and one in the back.

7   **Q.**   And this is what the officers' desk is looking at?

8   **A.**   Yes.

9   **Q.**   What's behind officers' desk?

10  **A.**   The dayrooms.

11  **Q.**   And can the officers see the dayroom if they were to turn

12  around from their desk?

13  **A.**   Yes.  It's all glass.  As soon as they turn around, it's

14  all glass.  You can see everything.  There's nothing that would

15  inhibit them from seeing everything going on.

16  **Q.**   An officer who is at the officers' desk on base, from your

17  personal observation and personal knowledge, can see everything

18  in the housing unit, correct?

19  **A.**   Yes.

20  **Q.**   Is there more than one level to the cells, the wings you

21  described that come off the base?

22  **A.**   Yes, you have an upper and lower.  You have two upper and

23  two lower on each side.  You have one on each side, one upper

24  and one lower.

25  **Q.**   Can you describe for the jury, Mr. Griffin, your typical

*Randle Griffin - Direct*
*Tuesday/January 17, 2017/Vol. 1*

V1-Page 39

1   day at Gus Harrison Correctional Facility before all the

2   conduct that's at issue in this case, a typical day at Gus

3   Harrison prison from the time you wake up to the time you go to

4   bed?

5   **A.**   Oh, okay.   I usually get up about eight o'clock.   I would

6   go wash up in the community bathroom, go back to my cell, get

7   dressed.   Get a cup of tea.   I drink tea every morning.   Go to

8   the dayroom, heat that up.

9        Then I would walk outside, get some air, walk around.   I

10  would go back in the unit and socialize with friends.   Then we

11  had a set time where I would help the youngsters learn how to

12  read and write, prepare for their GED test.

13       Then when shift change I would get ready to do my

14  assignment.   Then from there, once I complete my assignment, I

15  would go to the law library later on that night and then back

16  to the unit, shower, and then the unit is closed.

17  **Q.**   Do you remember the approximate times that you were

18  permitted to do these things that you described?

19  **A.**   Yes.

20  **Q.**   So, for example, what time was morning yard?

21  **A.**   Morning yard was like from I think like 6:30, 7:00 o'clock

22  to about 10:30.

23  **Q.**   And what time was lunch or chow?

24  **A.**   Chow runs from about 11:00, 11:30, 11:45, so yard usually

25  open back up about 1:00, 1:15.   Sometimes earlier.

*Randle Griffin - Direct*
*Tuesday/January 17, 2017/Vol. 1*

V1-Page 40

1  **Q.**  And do you remember what time your assignment or job was?

2  **A.**  Yes.  It was from 2:30 to 10:30.

3  **Q.**  In the afternoons/evening?

4  **A.**  Yes.

5  **Q.**  Do you remember when dinnertime was, chow, dinner?

6  **A.**  Yes.  Dinner was around 5:00, 5:30-ish.

7  **Q.**  Randle, Mr. Griffin, can you go outside whenever you want

8  in prison?

9  **A.**  Yes.  As soon as the yard is open, yes.

10  **Q.**  Well, I meant at any time.  If you wanted to go at

11  6:00 a.m., could you choose the time you go outside or does it

12  have to be --

13  **A.**  It has to be a particular time whenever the yard is open.

14  **Q.**  So you can't go whenever you want?

15  **A.**  No.

16  **Q.**  Can you turn out the lights in your cell at any time?

17  **A.**  Yes.

18  **Q.**  You could do that in the Housing Unit 2?

19  **A.**  Yes.

20  **Q.**  Did you at some point become comfortable at Gus Harrison

21  Correctional Facility before this incident happened?

22  **A.**  Oh, yes, I did.  Like I said, I made a life for myself.  I

23  had friends.  I had a good job, no worries.  You know, I was

24  content living there.  That's all basically I had to live, my

25  job and the few activities that I had.  Other than that, I

*11-14876; Griffin v. Condon, et al.*

*Randle Griffin - Direct*
*Tuesday/January 17, 2017/Vol. 1*

V1-Page 41

1  didn't have anything else, wasn't nothing else to live for.  In

2  prison that's all we have got, dignity that we have, these jobs

3  and the privileges that we earn for being in that hell.

4  **Q.**   You became comfortable with that at some point?

5  **A.**   Yes, very comfortable.

6  **Q.**   Is racial tension a part of prison life?

7  **A.**   It depends on what facility you are at, but yes, it is.

8  **Q.**   Did these defendants further the racial tensions at the

9  facility?

10  **A.**   Yes, they did, yes.

11  **Q.**   The representatives of the warden's forum in Housing Unit

12  2, they had titles, right, certain reps?

13  **A.**   You had a white rep and you've got a black rep.

14  **Q.**   And that literally means a black person and a white person

15  would serve on the warden's forum?

16  **A.**   Yes.

17  **Q.**   And that was the designation?

18  **A.**   Yes.

19  **Q.**   Do you hear correctional officers use racial slurs?

20  **A.**   No, I never heard.  Not lately, but years ago, I heard it

21  before.  When I first got locked up, yes, I was called a porch

22  monkey, all types of ...

23          **MR. SCHNEIDER:**  Your Honor, I'm going to object to

24  lack of relevance.  That's not related to this case here.

25          **MR. FINK:**  I'll move on, Your Honor.

*11-14876; Griffin v. Condon, et al.*

*Randle Griffin - Direct*
*Tuesday/January 17, 2017/Vol. 1*

V1-Page 42

1    **THE COURT:**  I'm sorry, I didn't hear what your

2  objection was.

3    **MR. SCHNEIDER:**  Yes, Your Honor.  Lack of relevance.

4    **MR. FINK:**  I'll move on, Your Honor.

5    **THE COURT:**  As far as we are at this break, I want to

6  make sure that you are all right.

7    **JUROR NO. 4:**  I'm okay.  Do you have a tissue?

8    **THE COURT:**  Excuse me?

9    **JUROR NO. 4:**  Do you have a tissue?

10    **THE COURT:**  Yes.  Would you ...

11    **JUROR NO. 4:**  Sorry.  Thank you.  Just a little cold

12  going on.  I apologize.

13    **MR. FINK:**  Should I present the juror with some

14  water?

15    **JUROR NO. 4:**  I have water.  Thank you.

16    **THE COURT:**  Thank you.

17  BY MR. FINK:

18  **Q.**   Mr. Griffin, do you know one of the defendants in this

19  case, Defendant Condon?

20  **A.**   Yes, I do.

21  **Q.**   And can you identify him for the jury, please?

22  **A.**   The gentleman in the suit with the blue shirt, glasses.

23  **Q.**   That's Defendant Condon?

24  **A.**   Yes.

25  **Q.**   How did you come to know Defendant Condon?

*11-14876; Griffin v. Condon, et al.*

*Randle Griffin - Direct*
*Tuesday/January 17, 2017/Vol. 1*

V1-Page 43

1   **A.**   Well, he was the unit manager.

2   **Q.**   Is that the RUM that you described earlier?

3   **A.**   Yes.

4   **Q.**   What was your impression of Defendant Condon before

5   January of 2011, so the first few months that you were at

6   Gus Harrison?

7   **A.**   He was really standoffish.  He really didn't like

8   socializing with prisoners.  He used to always have his door

9   closed.  He always had a sign up like he was busy.  So he

10  didn't like to associate with prisoners.

11  **Q.**   What did you observe of his relationship with other

12  correctional officers, if anything?

13  **A.**   It was, it was real blue blind, you know, like the police

14  have.  He always had their back, no matter what they did.

15  Whether it was right or wrong, he had their back.

16  **Q.**   Do you remember any significant incidents involving

17  Defendant Condon in approximately January of 2011?

18  **A.**   Yes.  In late January, sometime around there, I was in the

19  dayroom and I saw a young kid Bryant trying to go to protective

20  custody, and he went to the officers' desk.  They called for

21  backup.  Other officers came.  The kid was just trying to lock

22  up in fear for his safety.  So he stood there with his duffle

23  bag.  He had some envelopes for his mother and family.

24      And I saw Condon come out of his office and grab the kid

25  and roughed him up and then snatched his duffle bag out of his

*11-14876; Griffin v. Condon, et al.*

*Randle Griffin - Direct*
*Tuesday/January 17, 2017/Vol. 1*

V1-Page 44

1  hand.  He was just a little kid.  He was not a real big guy.

2  In a real aggressive manner.  I was looking like, wow, why is

3  he doing this kid like that?  He's not trying to hurt nobody.

4  So that's what I remember happening.

5  **Q.**   How big is Jeffrey Bryant, if you remember?

6  **A.**   He's a little guy.  If I remember right, he couldn't have

7  been no taller than 5'6", weigh about 140 pounds.  Little guy.

8  He was not a real big guy.

9  **Q.**   What is protective custody?  You described he wanted to go

10  to protective custody.  What is that, as far as you know?

11  **A.**   Protective custody is when you in fear for your safety or

12  your life, it's a right that you have to go to protective

13  custody no matter if it's from other prisoners or staff.  You

14  have that right to go to protective custody if you invoke it,

15  and they supposed to accommodate you and allow you to go to

16  protective custody.

17  **Q.**   Do you know why he wanted to go to protective custody?

18  **A.**   Yes.  He told me why he wanted to go.

19  **Q.**   What did he say?

20          **MR. SCHNEIDER:**  Object to hearsay.

21          **MR. FINK:**  It's not hearsay, Your Honor, because it's

22  offered for what he told Mr. Griffin as opposed to whether it's

23  true or not.

24          **THE COURT:**  The question was?

25          **MR. FINK:**  The question is why did he want to go to

*11-14876; Griffin v. Condon, et al.*

*Randle Griffin - Direct*
*Tuesday/January 17, 2017/Vol. 1*

V1-Page 45

1  protective custody or what did he state was the reason why he

2  wanted to go to protective custody.  It's goes to show that

3  Mr. Griffin heard it and complete the story as to why he

4  helped.

5  **THE COURT:**  Well, overruled for the time being, but

6  if it goes much farther, it will be a problem.

7  **MR. FINK:**  Understood, Your Honor.  Thank you.

8  **BY MR. FINK:**

9  **Q.**  What was your understanding of why he wanted to go to

10  protective custody?

11  **A.**  Well, he was in fear for his safety from the officers

12  because they had been writing him multiple, multiple

13  misconducts.  The kid had parole.  He was trying to go home,

14  you know, and he was scared.  He said he was trying to go to

15  protective custody.  He was trying to go home.

16  **Q.**  That is one way to keep someone from parole is to write

17  tickets?

18  **A.**  Oh, yeah.  They will take your parole away.

19  **Q.**  Did you take any action following this incident that you

20  observed?

21  **A.**  Yes.

22  **Q.**  What did you do?

23  **A.**  Bryant asked me to give the ombudsman a statement about

24  what happened so I wrote the ombudsman on his behalf.

25  **Q.**  What is the ombudsman as far as you know?

*11-14876; Griffin v. Condon, et al.*

*Randle Griffin - Direct*
*Tuesday/January 17, 2017/Vol. 1*

V1-Page 46

**A.**    It's a legislative government agency who oversees, watches

other the prisoners and respond to any prisoner abuses.  That's

what they are.

**Q.**    Do you know the full name of it?

**A.**    Legislative ombudsman.

**Q.**    It's an arm of the State?

**A.**    Yes.

**Q.**    Had you had any experience with the ombudsman in the past?

**A.**    Yes, I had experience with them.

**Q.**    How was your experience with communicating with the

ombudsman in the past?

**A.**    Well, any time you write the ombudsman they always

respond.  It's hard to really prove any wrongdoing, but they

will respond and send a letter, let you know, okay, we did an

investigation, we can't prove it.  They let you know that

someone there, someone cares, you know.  They always look into

any claims.  If you have a medical issue, if you have abuse,

they will look into that as well.

**Q.**    Do you see the ombudsman from your perspective as an

incarcerated prisoner as serving an important function?

**A.**    Oh, yeah.  They are our heros in prison.

**Q.**    They are what?

**A.**    Our heros because they are the only ones who are allowed

to come in the prison and address our issues with us in the

prison.  Other than that, there is nobody else.  We wouldn't

*Randle Griffin - Direct*
*Tuesday/January 17, 2017/Vol. 1*

V1-Page 47

1   have anybody.  We would just be at the mercy of whatever goes

2   on in the prison.

3   **Q.**   So they are a watchdog of the prison?

4   **A.**   Yes.

5   **Q.**   Now, you said you wrote the ombudsman on Bryant's behalf.

6   Can I just step back just for a moment, Mr. Griffin.  You said

7   it was a "violent" assault was the word you used.  Can you

8   describe exactly what Defendant Condon did to 5'6", 145-pound

9   Jeffrey Bryant that was violent?

10  **A.**   Oh, yeah.  He came out of his office like a bull.  I'm

11  like wow.  He ran up, grabbed the kid by the arm and grabbed

12  his bag trying to separate him and his bag.  He was snatching

13  him around by his -- he had his coat and shirt, ball it up in

14  his hand.  He was just shaking the kid.  I didn't understand

15  it.  The kid was just trying to go to protective custody.

16  **Q.**   Because he was in fear of the guards?

17  **A.**   Yes.

18  **Q.**   You said you wrote the ombudsman on Bryant's behalf.

19  What, if anything, do you remember happening next related to

20  the ombudsman?

21  **A.**   The ombudsman sent an investigator into the facility.

22  **Q.**   Do you remember who that investigator was?

23  **A.**   Yes, Jessica Zimbelman.

24  **Q.**   One more time.

25  **A.**   Jessica Zimbelman.

*Randle Griffin - Direct*
*Tuesday/January 17, 2017/Vol. 1*

V1-Page 48

1   **Q.**   Jessica Zimbelman.  How do you know she came to the

2   facility?

3   **A.**   Because I was asked to interview with her.

4   **Q.**   You were asked by the ombudsman's investigator to

5   interview with her?

6   **A.**   Yes.

7   **Q.**   Do you remember what Jessica Zimbelman looks like?

8   **A.**   Tall, slim white female.  Young, about mid to late 20s.

9   **Q.**   Okay.

10  **A.**   Yes.

11  **Q.**   Do you remember approximately when, and I know you might

12  not remember particular dates, but approximately when she came

13  to the Gus Harrison Correctional Facility to investigate this

14  assault?

15  **A.**   I'm thinking early February.  Yes, early February.

16  **Q.**   Of which year?

17  **A.**   2011.

18  **Q.**   Early February 2011.

19  **A.**   Yes.

20  **Q.**   You described the housing unit earlier.

21  **A.**   Yes.

22  **Q.**   Where did Jessica Zimbelman come to interview you, which

23  we'll talk about?

24  **A.**   In the first counselor's office when you get into the

25  unit.  The first office right there when you get into the unit.

*11-14876; Griffin v. Condon, et al.*

*Randle Griffin - Direct*
*Tuesday/January 17, 2017/Vol. 1*

V1-Page 49

1   **Q.**   So what you described earlier was an ARUS office?

2   **A.**   Yes.

3   **Q.**   Now, just for clarification and so the jury is aware of

4   your testimony, what does the officers' desk look at when

5   facing forward in the base of the housing unit?

6   **A.**   Oh, they see, they can look at each ARUS office and the

7   RUM office as well as each wing.

8   **Q.**   So the correctional officers in the housing unit are

9   looking directly at these offices?

10  **A.**   Yes, they are glass.

11  **Q.**   Now, where is Defendant Condon's office in relationship to

12  where you met with Jessica Zimbelman?

13  **A.**   Right next door.

14  **Q.**   You met with Jessica Zimbelman in the room next door to

15  Defendant Condon's office?

16  **A.**   Yes.

17  **Q.**   How did that come to happen?  How were you interviewed?

18  How did you find out you were going to be interviewed?

19  Describe that situation.

20  **A.**   I was in the dayroom.  An officer called and said did I

21  have an interview with the ARUS, I mean with the ombudsman.  I

22  said, "Yes."  He said, "Well, get over there."

23          So I went over there and stood by the window while she was

24  talking with the young kid Bryant who had been assaulted.  And

25  then Bryant waived me into the office, and I went into the

*Randle Griffin - Direct*
*Tuesday/January 17, 2017/Vol. 1*

V1-Page 50

1  office and explained to her what I had witnessed.

2  **Q.**   What did you tell her?

3  **A.**   I told her that I witnessed they had been writing the kid

4  false misconducts and I watched RUM Condon assault the kid.

5  The kid didn't do anything.

6      I explained to her that the guys in the unit was in an

7  uproar about it, they was really upset, and she told me to tell

8  the guys to calm down, that nothing was going to happen.

9  **Q.**   How long would you say you were in there interviewing with

10  Jessica Zimbelman?

11  **A.**   About ten minutes.

12  **Q.**   Did anything happen when you came out the door?

13  **A.**   No.

14  **Q.**   Did Jessica Zimbelman do anything further as far as you

15  know?

16  **A.**   Yes.  When she left out of that office, she went into the

17  middle dayroom behind the officers' desk, which is the rec

18  room, and asked questions of other prisoners freely, asked them

19  did they have problems getting their statements and things like

20  that.

21  **Q.**   So this is a female in plain street clothes that is just

22  wandering the housing unit?

23  **A.**   No, she's not wandering.  She's accompanied by the

24  administrative assistant.

25  **Q.**   But she's in the housing unit?

*Randle Griffin - Direct*
*Tuesday/January 17, 2017/Vol. 1*

V1-Page 51

1  **A.**   She's in the housing unit walking around, yes.

2  **Q.**   Have you ever observed in the past, notwithstanding this

3  interaction with the ombudsman, have you ever observed in the

4  past the ombudsman visiting a correctional facility?

5  **A.**   Yes, they visit all the time.

6  **Q.**   Where do they tend to have visits?

7  **A.**   In the unit.

8  **Q.**   The unit being?

9  **A.**   The housing unit.

10 **Q.**   Where presumably the correctional officers who watch the

11 housing unit are, correct?

12 **A.**   Yes.

13 **Q.**   Now, taking you forward, Mr. Griffin, after the

14 ombudsman's meeting about the assault by Defendant Condon, did

15 you at some point obtain a job at the prison?

16 **A.**   Yes, I had -- it was called a rec porter.  My job was to

17 pass out the rec equipment and to keep the dayroom clean, to

18 keep track of all the games and things like that.

19 **Q.**   What did you call the job?

20 **A.**   A recreational porter.

21 **Q.**   You basically clean up the dayrooms?

22 **A.**   Yeah.

23 **Q.**   How much did you make at that job as a rec porter?

24 **A.**   I think like $43 a month.

25 **Q.**   $43 a month.  How does it work to be a porter?  Strike

*Randle Griffin - Direct*
*Tuesday/January 17, 2017/Vol. 1*

V1-Page 52

1   that.  Let's back up.

2        You testified earlier, what time was your porter detail or

3   your job to be a porter, what times?

4   **A.**   2:30 to 10:30 p.m.

5   **Q.**   On a typical day for a porter, 2:30 p.m., how do you start

6   your job and what do you do?

7   **A.**   Well, when you come up on base, you have to ask the

8   officer to allow you to get into the supply closet to get your

9   supplies because it's always locked.  So you go to the desk,

10  ask the officers, "I need to get my supplies, will you let me

11  in."  They do that, then I get my assignment.

12  **Q.**   So you have to have an officer's cooperation to open the

13  supply closet for you?

14  **A.**   Yes.

15  **Q.**   So is that how you check in?

16  **A.**   Yes, I guess.  I guess that is the check-in, I guess.

17  **Q.**   Was there any -- did you have to write your name down

18  anywhere?

19  **A.**   No.

20  **Q.**   Did you have to say anything to the guards like, "Hey, I'm

21  here for work"?

22  **A.**   No.

23  **Q.**   So the only thing you would do at 2:30 p.m. when your

24  porter job starts, you needed to get into the supply closet?

25  **A.**   Yes.

1  **Q.**   Nothing was written down?

2  **A.**   No.

3  **Q.**   Has Officer Condon ever opened up the supply closet for

4  you?

5  **A.**   Yes.

6  **Q.**   Has Officer McMurtrie ever opened up the supply closet for

7  you?

8  **A.**   Yes.

9  **Q.**   So after this period you had your job.  Did you at some

10  point get elected to the warden's forum?

11  **A.**   Yes, I was elected to the forum.  I was going to the

12  weekly meetings.

13  **Q.**   Approximately when did you get -- are we still in

14  February?  What time frame?

15  **A.**   It was like early February.

16  **Q.**   Okay.

17  **A.**   Early -- I think February the 5th I was elected to the

18  warden's forum.

19  **Q.**   Sometime around February 5th you were elected to the

20  warden's forum?

21  **A.**   Yes.

22  **Q.**   Now, you said earlier the warden's forum -- well, I'll let

23  you describe it briefly, the warden's forum role in the prison.

24  **A.**   It's just to take issues that prisoners have so that they

25  can have a voice to the warden.  First we got to take them to

*Randle Griffin - Direct*
*Tuesday/January 17, 2017/Vol. 1*

V1-Page 54

1   the RUM.  You've got to take it to him first.  If he can't

2   resolve it, then you take it to the warden.  So that's what we

3   do.

4   **Q.**   Kind of like a student council?

5   **A.**   Yes.

6   **Q.**   Are there elections?

7   **A.**   Yes, there are elections.  We have -- they pass out

8   ballots and then the guys -- you have to get the majority vote.

9   **Q.**   And you won the majority vote?

10  **A.**   Yes.

11  **Q.**   Do you guys have meetings?

12  **A.**   Yes, we have four representative meetings and one warden's

13  forum meeting.

14  **Q.**   Do you follow any rules at the meeting, have agendas?

15  **A.**   Yeah, we follow Robert's Rules of Order.

16  **Q.**   Did you say you use Robert's Rules?

17  **A.**   Yeah, Robert's Rules of Order.  Yeah, I had to teach them

18  that because they didn't know it.  I had to teach them that.

19       Then we get together.  Everybody comes.  We have what's

20  called an agenda to be presented to the warden.  We all agree

21  on it, then we submit it to the warden assistant or whoever is

22  there because he's right there with us all the time.  So when

23  we get through with our agenda, we give it to him, and he takes

24  it up front to be processed so when we go to the actual meeting

25  the warden will have a copy of these issues.


*11-14876; Griffin v. Condon, et al.*

*Randle Griffin - Direct*
*Tuesday/January 17, 2017/Vol. 1*

V1-Page 55

1   **Q.**   Did the warden's forum give you purpose?

2   **A.**   Yes.  Yes, it gave me purpose.

3   **Q.**   In what way?

4   **A.**   It allowed me to feel as if I had a purpose in life doing

5   something other than just jail.  You know, I was able to help

6   other prisoners when they had a problem.  You know, I felt like

7   what I was doing meant something, you know, and you was able to

8   affect change in ways that was positive and help the prisoner

9   population so I liked that.

10      And it also allowed me to learn how to speak with

11   administrators and things of that nature, and I really, you

12   know, I really liked that.  So it gave me purpose.

13   **Q.**   So at this point, Randle, through your testimony here, as

14   we talked about the assault that you allegedly witnessed and

15   the ombudsman and your porter duty and the warden's forum, at

16   this point in February 2011 how would you describe your

17   circumstances at Gus Harrison?  Were you comfortable or not?

18   **A.**   At what time?

19   **Q.**   Were you comfortable at Gus Harrison at that point?

20   **A.**   I didn't get the dates you said.

21   **Q.**   In February of 2011 you've got the warden's forum, your

22   job, and all of this.  Were you comfortable at Gus Harrison at

23   that point before any of the relevant conduct happened?

24   **A.**   Yes, I was real comfortable, but as time went on, that

25   dissipated fast.

*Randle Griffin - Direct*
*Tuesday/January 17, 2017/Vol. 1*

V1-Page 56

1      **MR. FINK:**  Your Honor, I'm about to get into the

2  relevant conduct, which will be probably about 45 minutes to an

3  hour of testimony.  I'm happy to start it.  I just thought I

4  would bring it to the Court's attention that this was a shift

5  in the plaintiff's testimony.

6      **THE COURT:**  I think I understand what you're saying.

7  You're saying that from the point of view of putting your case

8  in you would prefer to start fresh tomorrow morning and not go

9  into it right now.

10      **MR. FINK:**  I don't think it will extend the trial any

11  longer, and if the Court is agreeable to that, I think this is

12  a logical time to stop.

13      **THE COURT:**  Unless there's some objection on

14  Mr. Schneider's side.

15      **MR. SCHNEIDER:**  No, if he says it's not going to

16  extend the trial, I'm fine with that, Your Honor.

17      **THE COURT:**  Very well.  Anything you want to do to

18  wind down here?

19      **MR. FINK:**  I think I'm comfortable with this stopping

20  point, Your Honor, and we'll pick up his testimony first

21  thing --

22      **THE COURT:**  All right.  Then why don't, why don't we

23  have the witness leave -- you are not excused, but leave the

24  witness box and go back to counsel table.

25      **THE WITNESS:**  Okay.


*11-14876; Griffin v. Condon, et al.*

1   **THE COURT:**  Thank you.  It's going to get you out of

2   here a little bit earlier than you might get out, but let me

3   give you some instructions about what you do when you're not

4   here.  You must not discuss the case with anyone, including

5   your family, neighbors, friends, business associates and fellow

6   jurors at any time during this trial.  You must not permit

7   anyone to attempt to discuss it with you or in your presence.

8   If anyone persists in talking with you about the case despite

9   your request not to do so, report this to me by a note as soon

10  as possible.  However, don't discuss such a matter with any of

11  your fellow jurors.

12      Furthermore, in order to avoid the appearance of

13  impropriety, you must not have any conversation with the

14  parties, lawyers, with the witnesses or anyone else who you may

15  come to recognize as having some connection with this case in

16  or out of the courtroom during your service as a juror.

17      Do not talk with anyone who is associated with the case,

18  not even to pass the time of day.  In no other way can all of

19  the parties be assured of the impartiality with which they are

20  entitled to from you as jurors.

21      With that in mind, you may not communicate with anyone

22  about this case by your cell phone or Blackberry or email or

23  iPhone.  You can't do any text messages or Twitter or through

24  any blog or website, through any internet chat room or by way

25  of social networking.  At least somebody has told us that

*Randle Griffin - Direct*
*Tuesday/January 17, 2017/Vol. 1*

V1-Page 58

1    anyway.  You may not permit anybody to communicate with you or

2    accept any communications that are directed to you having

3    anything whatsoever to do with this trial.

4        You must also avoid reading any newspaper articles that

5    might be published.  If a newspaper headline catches your eye,

6    don't read it.  Refrain from listening to or observing any news

7    program on television or radio which mentions this case.  Media

8    accounts may be inaccurate and may contain matters which are

9    not proper evidence for your consideration.  You must base your

10   verdict solely on what is presented in the courtroom.

11       Don't conduct any research or undertake any investigation

12   of this case on your own.

13       Finally, don't form any opinions until all of the evidence

14   has been presented.  Keep an open mind until you start

15   deliberations at the end of the case.

16       The reason for these cautions, of course, is because it's

17   your duty to decide the case solely on the basis of the

18   testimony and the evidence that is presented during the trial

19   without any consideration of any other matters.

20       I may, although I haven't got into it very much, I hope I

21   don't, telling lawyers for one side or the other or both sides

22   that they shouldn't be doing what they want to do, that they've

23   got to stop it.  I say I haven't had a lot of occasion to do

24   that in this case, but I might.  If I do that, don't take that

25   as any evidence of the culpability of the person represented by

*Randle Griffin - Direct*
*Tuesday/January 17, 2017/Vol. 1*

V1-Page 59

1   the lawyer.  It has nothing to do with that.  It should not be

2   given that consideration in your mind.  And I, as I said, there

3   may not be any of it at all.  It's going pretty well at this

4   point.

5       Thank you for your patience.  Be here at nine o'clock

6   tomorrow morning.  I may -- not just you but everybody --

7   seeing as the members of the jury panel got here, got here on

8   time, was ready to go, I hope you will be tomorrow too at

9   nine o'clock, all of us ready to go and get this case moving.

10      And I will commit to you that I will do my very best to

11  keep the case moving at a good speed assuming I can do it in

12  fairness to the parties, to the defendant and to the

13  plaintiff -- to the defendants.  If I can do it in fairness to

14  everybody seated at the table over there, tables, I will, but

15  if I can't, I'll have to spend a little time letting the

16  counsel know whatever it is I need them to do, but I don't

17  think I'm going to need to based on what I have seen so far,

18  the lawyers and what they are doing here.  I don't think I will

19  do that very much.  Maybe not at all.

20      Please, I hope it's not raining out.  I hope.  Be careful.

21  By now it might be pretty slippery.  If it is, be careful.  See

22  you tomorrow morning at 9:00.  Please go to the jury room.  You

23  are now excused for the day to come back here at 9:00 tomorrow.

24  Thank you.

25      And it would be -- I want to be sure you, Ms. Quinkert,

*11-14876; Griffin v. Condon, et al.*

*Randle Griffin - Direct*
*Tuesday/January 17, 2017/Vol. 1*

V1-Page 60

1   are all right.

2            **JUROR NO. 4:**  I am.  Thank you.

3            **THE COURT:**  If you are not, say so.

4        (Jury out at 12:14 p.m.)

5            **THE COURT:**  Do either plaintiff or defendants wish

6    the record to reflect anything right now?

7            **MR. FINK:**  Not at this time for plaintiff.

8            **MR. SCHNEIDER:**  Not for the defense, Your Honor.

9            **THE COURT:**  All right.  Have a good safe night out

10   there.  I hope you stay dry out there.  Thank you.

11           **MR. FINK:**  Thank you, Your Honor.

12           **MR. SCHNEIDER:**  Thank you.

13       (Proceedings adjourned at 12:15 p.m.)

14                         -   -   -

15

16                    **C E R T I F I C A T I O N**

17       I certify that the foregoing is a correct transcription of

18   the record of proceedings in the above-entitled matter.

19

20   s/ Sheri K. Ward_____               2/6/2017
     Sheri K. Ward                         Date
21   Official Court Reporter

22                         -   -   -

23

24

25

*11-14876; Griffin v. Condon, et al.*