UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**RANDLE GRIFFIN,**

             Plaintiff,

    v.

**LOUIS CONDON, et al.,**

             Defendants.
_____/

**HONORABLE JOHN CORBETT O'MEARA**

**No. 11-14876**

**JURY TRIAL - VOLUME 2**

**Wednesday, January 18, 2017**

Appearances:

Brandon C. Hubbard
Wade Fink
Nolan John Moody
Jessica L. Russell                Clifton B. Schneider
Dickinson Wright, PLLC            Michigan Dept. of Att. General
500 Woodward Avenue, #4000        P.O. Box 30736
Detroit, Michigan  48226          Lansing, MI  48909
(313) 223-3500                    (517) 373-6434
  On behalf of Plaintiff            On behalf of Defendants

                     -   -   -

*To obtain a certified transcript, contact:*
*Sheri K. Ward, Official Court Reporter*
*Theodore Levin United States Courthouse*
*231 West Lafayette Boulevard, Room 219*
*Detroit, Michigan  48226*
*(313)965-4401 · ward@transcriptorders.com*

*Transcript produced using machine shorthand and CAT software.*

*Jury Trial*
*Wednesday/January 18, 2017/Vol. 2*


**I   N   D   E   X**

<u>Plaintiff's Case in Chief</u>                          <u>Page</u>   <u>Vol.</u>

  **Randle Griffin**

    Direct Exam Cont'd By Mr. Fink:            8      2

    Cross-Examination By Mr. Schneider:       39      2

    Redirect Examination By Mr. Fink:         72      2

    Recross-Examination By Mr. Schneider:     78      2

    Redirect Examination By Mr. Fink:         79      2

  **Jessica Zimbelman**

    Direct Examination By Mr. Hubbard:        83      2

    Cross-Examination By Mr. Schneider:      113      2

    Redirect Examination By Mr. Hubbard:     121      2

    Recross-Examination By Mr. Schneider:    122      2

  **Larry Anthony**

    Direct Examination By Mr. Moody:         124      2

    Cross-Examination By Mr. Schneider:      129      2

Certification of Reporter .....................137

- - -

*Jury Trial*
*Wednesday/January 18, 2017/Vol. 2*

Plaintiff's Exhibits

            Number                                          Rcvd  Vol.
              6      ...................................69    2
              7      ...................................69    2
              8      ...................................69    2
              9      ...................................69    2

             44      ...................................105   2
             58      ...................................20    2
             59      ...................................95    2
             61      ...................................73    2

                              -   -   -

Defendant's Exhibits
            Number                                          Rcvd  Vol.
              A      ...................................64    2
              E      ...................................57    2
              F      ...................................65    2
                              -   -   -

*Jury Trial*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 4

1              Detroit, Michigan

2              Wednesday, January 18, 2017

3              9:07 a.m.

4                  -   -   -

5         **THE CLERK:**  The court calls the matter of

6  *Randle Griffin v. Louis Condon, et al.*, Case Number 11-14876.

7         **THE COURT:**  Counsel, please put your appearances on

8  the record to start the day.

9         **MR. FINK:**  Good morning, Your Honor.  Wade Fink on

10 behalf of the plaintiff Mr. Griffin, along with my colleagues

11 Brandon Hubbard, Nolan Moody and Jessica Russell.

12        **THE COURT:**  Thank you.

13        **MR. SCHNEIDER:**  Good morning, Your Honor.

14 Cliff Schneider on behalf of the defendants.

15        **THE COURT:**  Mr. Schneider?

16        **MR. SCHNEIDER:**  Yes, Your Honor.

17        **THE COURT:**  Maybe you have already said it.

18        **MR. SCHNEIDER:**  Yes, Your Honor.  Good morning.

19 Cliff Schneider on behalf of the defendants.

20        **THE COURT:**  Thank you.

21    I don't think we have anything unless you have it for the

22 Court, but we should be ready to go with the jury.  Anything

23 else?

24        **MR. FINK:**  Your Honor, can I bring one matter to the

25 Court's attention just as it relates to cross-exam of

*Jury Trial*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 5

1    Mr. Griffin?

2              **THE COURT:**  Yes.

3              **MR. FINK:**  This was an issue that we brought in a --

4    this is an issue that we had brought in a motion in limine, and

5    the reason that I would respectfully raise it again this

6    morning is it's the type of matter that if it's brought out

7    it's tough to unring the bell.  There's reason to believe,

8    Your Honor, that based upon the depositions and the pleadings

9    in this case that defendants intended to bring up allegations

10   of sexual predation and sexual misconduct by the defendant,

11   Mr. Griffin.  Not only are those unsubstantiated, there is

12   nothing in his file, there's no misconduct tickets, but it's

13   also wholly irrelevant to the issues in this case.  Nothing

14   about the sexual conduct of Mr. Griffin bears on whether or not

15   these officers wrote false tickets for him cooperating in the

16   ombudsman's investigation.  So it would be highly prejudicial

17   and irrelevant to mention something like that that's

18   unsubstantiated, toss it into the jury box for no reason,

19   without any basis, and I just want to make sure before, Your

20   Honor, cross-examination happens I think a ruling now would be

21   the right timing given that that kind of thing once heard by a

22   jury --

23             **THE COURT:**  I'm not going to attempt to resolve all

24   of the questions that may be present in connection with that

25   right now, but I want to suggest that at least there is a

*Jury Trial*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 6

1   shadow of relevance there that -- I mean you can start out

2   with, and you did, with the idea that it has nothing to do with

3   what's at issue here and that may be true, but on the other

4   hand, it may not be true if a relationship with somebody was,

5   depending upon how it happened and who it happened with.   I

6   just want you to understand that I'm not absoluting that.

7   Depending upon how it develops, it could get a different

8   result.

9           **MR. FINK:**  So a delayed ruling, Your Honor, on this

10  issue?

11          **THE COURT:**  I'm sorry?

12          **MR. FINK:**  No, that's okay.   Is there a ruling on the

13  issue or do you want to wait?

14          **THE COURT:**  I want to wait, yes.

15          **MR. FINK:**  Thank you, Your Honor.

16          **THE COURT:**  And if Mr. Barkholz will go get that

17  black box for me, I'll have that.   I always forget it.   That's

18  my hearing aids.   I do a little better with hearing aids.   It's

19  in the briefcase.

20          **MR. FINK:**  Thank you, Your Honor.

21          **THE COURT:**  Thank you.

22      If you'll be seated for a moment, we'll get the next step.

23  Can you go or --

24          **THE CLERK:**  I'm letting Janie know right now.

25          **THE COURT:**  Yes.

*11-14876; Griffin v. Condon, et al.*

*Jury Trial*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 7

1    I appreciate having the time estimates for the witnesses.

2  Of course it's impossible to know exactly, but I'm sure they

3  are as accurate as we can get and we'll rely upon them until

4  we're advised that we should do something else.

5    Did you get her?

6    **THE CLERK:**  She's on her way.

7    **THE COURT:**  One of the things -- there are two things

8  I try to remember every time I come down here for any kind of a

9  hearing.  The first thing is something that involves the men's

10  room, and that could be important, and the other thing is

11  hearing aids, which I remind myself well in advance of coming

12  down here and about half the time I forget them even though I

13  just thought about them.  Anyway, I'm sorry that we're taking

14  time up for that.

15    All right.  If you'll forgive me for the brief delay, are

16  we ready for the jury?

17    **MR. FINK:**  The plaintiff is ready, Your Honor.

18    **THE COURT:**  All right.  Mr. Griffin, you are still on

19  the witness stand, and you may take the witness stand before we

20  get the jury in here unless there's some reason not.

21    Very well, we can continue with Mr. Griffin's testimony.

22  Are we ready for the jury?

23    **MR. MOODY:**  We are, Your Honor.

24    **MR. FINK:**  Yes, Your Honor.

25    **THE CLERK:**  All rise.

*11-14876; Griffin v. Condon, et al.*

*Randle Griffin - Direct Cont'd*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 8

1      (Jury in at 9:18 a.m.)

2          **THE COURT:**  Members of the jury, please be seated.  I

3  think we have got all of you.

4      Thank you for being here pretty much entirely promptly

5  this morning.  You all by yourselves were ready to go as a jury

6  pretty much after seven or eight minutes after 9:00, and the

7  rest of the delay was basically attributed to me so I'm sorry

8  about that.

9      In any event, we have Mr., Mr. Griffin, who is the

10  plaintiff in this case, is in the witness chair and he is still

11  under oath, and you may continue with him.

12          **MR. FINK:**  Thank you, Your Honor.

13                          -   -   -

14                                          (9:18 a.m.)

15                  **DIRECT EXAMINATION CONTINUED**

16  BY MR. FINK:

17  **Q.**   Good morning, Mr. Griffin.

18  **A.**   Good morning.

19  **Q.**   When we last spoke, Mr. Griffin, we were speaking in the

20  time frame of January 2011 and February 2011.  Can you remind

21  the jury what your situation was at the Gus Harrison

22  Correctional Facility in January of 2011 and February of 2011?

23  **A.**   In January 2011 I was housed at the Gus Harrison

24  Correctional Facility and I witnessed RUM Condon assault

25  Prisoner Bryant, and then early January -- February I was

*11-14876; Griffin v. Condon, et al.*

*Randle Griffin - Direct Cont'd*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 9

1   elected to the warden's forum and then shortly after that I

2   obtained a prison job and went about my day.

3          **THE COURT:**  Wait a minute, Mr. Griffin, I -- as has

4   been announced before here this morning, I have some hearing

5   aids in, but usually I can hear everything even better than I

6   would hear it if I didn't have them and I wasn't burdened with

7   this kind of disability, if that's what it is, but right now I

8   can't hear you at least distinctly with everything that you're

9   saying.  Although I have got real time, which means it comes

10  right up here in print --

11         **THE WITNESS:**  Yes, Your Honor.

12         **THE COURT:**  -- I would appreciate it if you would

13  stay closer to the mike and speak a little louder so that gives

14  me pretty much what I need to hear you.

15         **THE WITNESS:**  Yes, Your Honor.

16  **BY MR. FINK:**

17  **Q.**   Mr. Griffin, at some point did you in January 2011 after

18  you witnessed this assault the by RUM Condon, did you take any

19  action with regard to that assault?

20  **A.**   Yes.  Prisoner Bryant asked me to write a letter to the

21  legislative ombudsman about what I had witnessed.

22  **Q.**   And did you eventually speak with the ombudsman?

23  **A.**   Yes.

24  **Q.**   At the prison?

25  **A.**   Yes.

*11-14876; Griffin v. Condon, et al.*

*Randle Griffin - Direct Cont'd*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 10

1   **Q.**   I want to direct your attention now, Mr. Griffin, with all

2   of that context, to the date of March 2nd, 2011.  When I direct

3   your attention to that date, do you remember anything

4   significant happening on that day?

5   **A.**   Yes.  I had at 12:30 went to the warden's forum.  It

6   supposed to have ended at 2:30, but it carried over between

7   2:30, 2:45, and then I went back to the unit after I was able

8   to make it back.

9   **Q.**   What time did your job start on March 2nd, 2011?

10  **A.**   2:30 p.m.

11  **Q.**   Now, are there any situations where you are entitled as a

12  matter of prison policy to be late for your job?

13  **A.**   Yes.  The warden's forum is what is called an excused

14  absence.  It's in the prisoner policy.

15  **Q.**   Does it have a name in prison when you have an ability to

16  be late for your job or you are somewhere else or you have

17  two assignments at once?

18  **A.**   Yes, it's called excused absence.

19  **Q.**   Excused absence.  Now, you said the warden's forum ended

20  at what time that day?

21  **A.**   Between 2:35 and 2:45.

22  **Q.**   Now, where does the warden's forum meetings take place?

23  **A.**   On the other side of the yard.  About 250 yards away on

24  the other side of the yard through two security gates that we

25  have to clear through to get to the chapel where the warden's

*Randle Griffin - Direct Cont'd*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 11

1    forum is held.

2    **Q.**   What is the building called that it's held in?

3    **A.**   The chapel.

4    **Q.**   The chapel?

5    **A.**   Yes.

6    **Q.**   And, in order to get back to your housing unit, what is

7    the process you have to take to get back to the housing unit?

8    **A.**   Well, we have two security gates that we -- once we come

9    out of the chapel, which has a security gate around it, we have

10   to stand there at that gate and wait there until the officer

11   comes out of the school building.  In this case it was cold

12   that day so he was in the school building, below zero, and we

13   waited outside about ten minutes for him to come and open the

14   gate.

15   **Q.**   Is there any other gates or impediments to you getting to

16   the housing unit?

17   **A.**   Yes.  There was one more security gate that he has to open

18   up.  Once we get through that one, we have to walk on the side

19   of the school building to go through the other security gate as

20   well.

21   **Q.**   How long did it take you to get -- to walk back into the

22   housing unit from the warden's forum meeting when it ended at

23   2:30, 2:45?

24   **A.**   About 20 minutes.

25   **Q.**   20 minutes?

*11-14876; Griffin v. Condon, et al.*

*Randle Griffin - Direct Cont'd*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 12

1    **A.**   Yes.

2    **Q.**   What did you do once you got back to the housing unit

3    after it took 20 minutes to get back.

4    **A.**   Well, I immediately went to my cell, took my coat and

5    gloves and my hat off and put down my warden's forum material

6    and immediately went up there and asked Officer McMurtrie to

7    let me in the closet so I could get my cleaning supplies.

8    **Q.**   Which officer was at the desk to get your cleaning

9    supplies?

10   **A.**   Officer McMurtrie.

11   **Q.**   Officer McMurtrie.  And can you identify Officer McMurtrie

12   for the jury?

13   **A.**   Yes, he's the officer sitting right on the end with the

14   glasses on.

15   **Q.**   So on March 2nd, 2011 it's your testimony that Officer

16   McMurtrie let you into the supply closet?

17   **A.**   Yes, sir.

18   **Q.**   And what is the significance of letting you into the

19   supply closet?  Why do you have to do that?

20   **A.**   Because the supply closet is always locked so it's the

21   only way we can get our supplies and then go complete our

22   assignment.

23   **Q.**   What do you need the supplies for?

24   **A.**   I have to get the mop, dust pan and broom and things like

25   that so I can clean the dayroom and do my assignment.

*Randle Griffin - Direct Cont'd*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 13

1  **Q.**   It's for your porter duty?

2  **A.**   Yes, sir.

3  **Q.**   Approximately what time did Officer McMurtrie let you into

4  the supply closet to start your job on March 2nd, 2011?

5  **A.**   Approximately, it was something after three o'clock,

6  sometime after 3:00.

7  **Q.**   Was Officer Downard also present on March 2nd, 2011?

8  **A.**   Yes, he was right there at the desk.

9  **Q.**   Okay.  Did you do your job that day?

10 **A.**   Yes, sir.

11 **Q.**   Did you have any incidents on March 2nd, 2011 regarding

12 your job?

13 **A.**   No, sir.

14 **Q.**   Did anything else appear significant on March 2nd, 2011,

15 that afternoon?

16 **A.**   Yes.  Once I finished my assignment, I think it was

17 somewhere around 3:30, Officer McMurtrie made an announcement

18 that if you want your mail to go to your cell and stand at your

19 door.  And I was like that's not right because RUM Condon and I

20 and the rest of the warden's forum members agreed that the mail

21 would be passed out during count pursuant to MDOC policy.

22 **Q.**   So Defendant McMurtrie makes an announcement about the

23 mail, and you are talking about Defendant Condon when you say

24 that?

25 **A.**   Yes.

*Randle Griffin - Direct Cont'd*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 14

1   **Q.**   So what did you do when you heard this announcement that

2   mail was to be passed out about 3:30?

3   **A.**   Well, as the block rep, block representative, I went and

4   got with the other block representative, which is the white

5   block representative, and I went into his office and I asked

6   him why the mail was being passed out --

7   **Q.**   Let's back up.  So you went and got another inmate?

8   **A.**   Yes.

9   **Q.**   What was his name?

10   **A.**   Larry Anthony.

11   **Q.**   When you say a block rep, what does that mean?

12   **A.**   He's a block representative.  He's another representative

13   of the community that takes issues to the warden.  He's a

14   member of the warden's forum.

15   **Q.**   So you are both on the warden's forum?

16   **A.**   Yes.

17   **Q.**   And you said you went to an office.  Whose office?

18   **A.**   We went to RUM Condon's office.

19   **Q.**   Defendant Condon?

20   **A.**   Yes.

21   **Q.**   Okay.  And what was the discussion with Defendant Condon?

22   **A.**   About the mail.  We had a prior agreement that the mail

23   would be passed out during count.

24   **Q.**   Now, why was it significant that the mail be passed out,

25   from the prisoner population's perspective, why was it

*Randle Griffin - Direct Cont'd*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 15

1  important that the mail be passed out at count as opposed to

2  earlier?

3  **A.**   Well, when the mail is being passed out during count,

4  everybody is in their cell.  During yard time it cuts into our

5  yard.  And so a guy have to forego 10, 15 minutes of the last

6  period of his yard to stand at his door to get mail whether he

7  get it or not so it didn't make any sense for the mail to be

8  passed out at that time.

9  **Q.**   So you thought being in your cell it would make more sense

10 to pass the mail out then?

11 **A.**   Yes.

12 **Q.**   What did RUM Condon, Defendant Condon say when you brought

13 this to his attention?

14 **A.**   He said he didn't remember that agreement.

15 **Q.**   Were there any other incidents with Defendant Condon

16 during that conversation?

17 **A.**   No.

18 **Q.**   What did you do next?

19 **A.**   Well, I just told him that I would get with his

20 supervisor, Deputy DeLeeuw, and I will address the matter with

21 him and then we exited his office.

22 **Q.**   Did anything else significant happen related to Defendant

23 Condon that afternoon?

24 **A.**   Yes.  About ten minutes later he summoned me back in the

25 office.  One of the officers called me over the PA to report to

*11-14876; Griffin v. Condon, et al.*

*Randle Griffin - Direct Cont'd*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 16

1    RUM Condon's office.

2         And I went in his office, and he told me that he was going

3    to instruct his staff to pass the mail out during count, and as

4    I turned around to walk away, he made a statement that my

5    statement to the ombudsman was going to come back to bite me in

6    the ass.  And I looked back at him and I felt like why you

7    threatening me.  And I just kept walking because I'm in the

8    office by myself so I said it's time for me to get up out of

9    here.

10   **Q.**   When he said talking to the ombudsman is going to bite you

11   in the ass, what did you take that to mean?

12   **A.**   My prior statement about him assaulting Bryant.

13   **Q.**   You think he was referencing your cooperation with the

14   ombudsman?

15   **A.**   Yes.

16   **Q.**   What time does count typically occur?

17   **A.**   Between 4:00 and 4:20.

18   **Q.**   So on that day, March 2nd, 2011, were you present for

19   count as far as you remember?

20   **A.**   Yes.

21   **Q.**   Did anything significant happen?  Did anyone tell you

22   anything during count?

23   **A.**   No.

24   **Q.**   Did --

25   **A.**   Are you talking about did an officer tell me something?  I

*11-14876; Griffin v. Condon, et al.*

*Randle Griffin - Direct Cont'd*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 17

1  didn't understand the question.

2  **Q.**   Did anything significant happen during count, any

3  conversations or any incidents?

4  **A.**   Well, once the officers made their count round, Prisoner

5  Larry Anthony, who is also the laundry man, came to my cell and

6  told me what he had just witnessed.

7       And I asked him, I said, "Are you sure about that?"

8       He was like, "Yes."

9       I said, "Okay."  I said, "Can you give me an affidavit?"

10      He said, "Yes --

11  **Q.**   What did you learn from your conversation with Terrance

12  Davis?  Or, I'm sorry, with Larry David.

13      Let me try that again.  What did you learn from your

14  conversation with Larry Anthony?

15  **A.**   That RUM Condon, Officers Downard and McMurtrie had agreed

16  and plotted to get rid of me because they was tired of me

17  changing things.  So they was going to write me a ticket to get

18  me kicked off the warden's forum.

19  **Q.**   What time is count over, count clear approximately?

20  **A.**   Approximately quarter to 5:00 or 5:00 o'clock.

21  **Q.**   What did you do on March 2nd after count cleared?

22  **A.**   I came out of my cell and I went back to the dayroom.

23  **Q.**   And the dayroom, just to remind the jury, is what?

24  **A.**   It's our recreation room.  We have a TV, two recreation

25  rooms.

*11-14876; Griffin v. Condon, et al.*

*Randle Griffin - Direct Cont'd*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 18

1   **Q.**   Did anything significant happen at that time?

2   **A.**   Yes.  Another prisoner came to me and he explained the

3   exact same thing, that he had witnessed the same

4   three defendants, Condon, Downard and McMurtrie, stating that,

5   you know, they was going to write me false tickets because they

6   was tired of me changing things.  And also I said, "Can I get

7   an affidavit from you on that because another guy just told me

8   the same thing."

9   **Q.**   What was that prisoner's name, the second prisoner?

10  **A.**   Terrance Davis.

11  **Q.**   So, to be clear, Larry Anthony and Terrance Davis both

12  told you of a conversation between these three defendants

13  conspiring to write false tickets against you?

14  **A.**   Yes.

15  **Q.**   I want to direct your attention now, Mr. Griffin, to the

16  very next day, which is March 3rd of 2011.  Do you remember

17  anything significant happening in the afternoon of March 3rd,

18  2011?

19  **A.**   Yes.

20  **Q.**   What happened?

21  **A.**   When shift changed at 2:05, I was summoned to the desk by

22  the officers.  And I go to the desk and I get a pass and they

23  tell me --

24       I asked, "Well, what is this for?"

25       They said, "You will find out when you get to the control

*11-14876; Griffin v. Condon, et al.*

*Randle Griffin - Direct Cont'd*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 19

1   center."

2        So I got my coat and went to the control center and saw

3   Sergeant Howard.  She reviewed an out-of-place ticket on me.

4   **Q.**   Now, let's explain to the jury what that means.  You said

5   you got a pass?  Is that what you said?

6   **A.**   Yes.

7   **Q.**   What does that mean?

8   **A.**   A signed authorization slip that gives me permission to go

9   from the housing unit to the control center for ticket review.

10  **Q.**   And you did go to the control center?

11  **A.**   Yes.

12  **Q.**   And what did you learn once you got to the control center?

13  **A.**   That Officer Downard had written me a ticket for being out

14  of place from work.

15  **Q.**   Did someone in the control center, you said Sergeant

16  Howard, hand you a ticket?

17  **A.**   Yes.  First she reads it with you, then she gives you a

18  copy of the ticket.

19  **Q.**   Would you recognize the ticket if you saw it again?

20  **A.**   Yes.

21       **MR. FINK:**  Your Honor, may I approach the witness

22  with Plaintiff's Proposed Exhibit 58?

23       **THE COURT:**  You may.

24       **MR. FINK:**  Thank you.

25

*11-14876; Griffin v. Condon, et al.*

*Randle Griffin - Direct Cont'd*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 20

1   **BY MR. FINK:**

2   **Q.**   Mr. Griffin, do you recognize this document in front of

3   you?

4   **A.**   Yes, sir.

5   **Q.**   What is it?

6   **A.**   This is the misconduct report that I was written by

7   Officer Downard.

8   **Q.**   What is the date on this ticket?

9   **A.**   3-2 of 2011.

10   **Q.**   And this is the ticket you were talking about that you

11   received on March 3rd, 2011?

12   **A.**   Yes.

13          **MR. FINK:**   Your Honor, can I move to admit

14   Plaintiff's Proposed Exhibit 58 as evidence?

15          **THE COURT:**   You just did.  Is there any objection?

16          **MR. SCHNEIDER:**   No objection, Your Honor.

17          **THE COURT:**   It's received as Plaintiff's 50 --

18          **MR. FINK:**   58, Your Honor.

19          **THE COURT:**   58.

20          **MR. FINK:**   Thank you.

21   **BY MR. FINK:**

22   **Q.**   Now, Mr. Griffin, I'm still looking at Exhibit 58 here in

23   front of you, and could you correct me if I'm wrong in reading

24   this, Exhibit 58, it says:

25          "Prisoner Griffin had a detail for the "Housing Unit

*11-14876; Griffin v. Condon, et al.*

*Randle Griffin - Direct Cont'd*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 21

1      Recreation Day Room Only" work detail from 1430 to
2      1600.  Prisoner did not show up for work, nor check
3      in for his detail.  Prisoner had no conflicting
4      details, pass, etc. that would have kept him from
5      checking in and/or working.  Prisoner had no staff
6      authorization to not check in and not work.  Prisoner
7      was warned that he needed to check in and work
8      previously by frequent contact."
9      Did I read that correctly?
10  **A.**  Yes.
11  **Q.**  Who is this ticket written by, Exhibit 58?
12  **A.**  Officer Downard.
13  **Q.**  And that's one of the defendants here, Defendant Downard?
14  **A.**  Yes.
15  **Q.**  Could you identify him for the jury?
16  **A.**  The officer right here, big guy right here.
17  **Q.**  In the middle?
18  **A.**  Yes.
19  **Q.**  Okay.  Did you think this ticket was justified when you
20  received it?
21  **A.**  No.
22  **Q.**  Why not?
23  **A.**  Because I was at the warden's forum and they knew where I
24  was at because they had what is called master call-out, and it
25  show any call-outs you have, any conflicts or anything.  So

*Randle Griffin - Direct Cont'd*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 22

1  they have access to this so this -- and they have that for the

2  purpose of knowing where prisoners at at all times.  So when

3  time, when time for count comes, you will know exactly where

4  the prisoner is at in the facility.

5  **Q.**  And you were permitted to work the day before?

6  **A.**  Yes.

7  **Q.**  In fact, Officer McMurtrie let you into the supply closet

8  along with Officer Downard at the desk, right?

9  **A.**  Right.

10  **Q.**  What time was this ticket written at, Randle, if you look

11  at, Mr. Griffin, Exhibit 58?

12      Date and time under the narrative.

13  **A.**  9:31 p.m.

14  **Q.**  On March 2nd, 2011?

15  **A.**  Yes.

16  **Q.**  So that is the day before you received it, at 9:31 p.m.

17  Officer Downard presumably wrote this ticket?

18  **A.**  Yes.

19  **Q.**  And you received it on March 3rd?

20  **A.**  Yes.

21  **Q.**  After you received the ticket, Randle, excuse me,

22  Mr. Griffin, what did you do after you received the ticket at

23  the control center?

24  **A.**  Well, I tried to explain to Sergeant Howard that I was at

25  the warden's forum so I had an excused absence.

*Randle Griffin - Direct Cont'd*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 23

1    **Q.**   And after that conversation did you leave or what happened

2    next?

3    **A.**   Yes.  She just gave me a copy of the ticket and I went

4    back to the unit.

5    **Q.**   Once you got to the unit, what happened next?

6    **A.**   Well, I went to my cell, took my coat off, put the ticket

7    up, and I proceeded back upstairs to do my assignment and --

8    **Q.**   Your assignment is your job?

9    **A.**   Yes, my job.  And Officer McMurtrie stepped in front of me

10   and told me -- asked me where I thought I was going.  I said,

11   "To work."  He said, "You no longer work for us, you know, you

12   are double O and you are laid in pending double O from

13   classification."

14   **Q.**   Now, what does that mean, you are laid in, double O.

15   Explain to the jury what that means in prison jargon.

16   **A.**   That means that you are fired and that during the time

17   that you are required to work you are not allowed to come out

18   until the resolution of the misconduct that has been written

19   against you.  So you are forced to stay in your cell from -- I

20   was forced to stay in my cell from 2:30 until 10:30 at night.

21   The unit closed at 10:45.  So that's all day.

22   **Q.**   The very same man who let you into the supply closet the

23   day before to go to work, Defendant McMurtrie, said you no

24   longer had a job and go to your cell, correct?

25   **A.**   Yes.


*11-14876; Griffin v. Condon, et al.*

*Randle Griffin - Direct Cont'd*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 24

1  **Q.**   Were you able to do your job that day?

2  **A.**   No.

3  **Q.**   The rest of the day where were you?

4  **A.**   I was in my cell, laid in.

5  **Q.**   You couldn't go to yard in the afternoon?

6  **A.**   No.

7  **Q.**   Did anything else significant happen on March 3rd, 2011?

8  **A.**   Yes.  After four o'clock count Officer Downard came past

9  my cell, stopped at my door, and told me if I didn't like the

10  ticket that was written on me, do something and they will beat

11  my ass and put me in the hole until I healed up.  And then he

12  called me a rat real loud, you know, and then walked off.

13  **Q.**   Officer Downard did this, you said?

14  **A.**   Yes.

15  **Q.**   Is that Defendant Downard sitting at this table?

16  **A.**   Yes.

17  **Q.**   Officer Downard is a big gentleman, correct?

18  **A.**   Yes.

19  **Q.**   He was doing this while you were in your cell?

20  **A.**   Yes.

21  **Q.**   Can you describe the situation under which Officer Downard

22  said what he said?

23  **A.**   He said it in a real aggressive, intimidating tone and

24  left me in fear in the cell.  I was just waiting to get my ass

25  beat, I guess, you know.

*11-14876; Griffin v. Condon, et al.*

*Randle Griffin - Direct Cont'd*
*Wednesday/January 18, 2017/Vol. 2*

1   **Q.**   So you are sitting in your cell?

2   **A.**   Yes.

3   **Q.**   And where is Officer Downard?

4   **A.**   At the entrance of my cell door.

5   **Q.**   Are you sitting down?

6   **A.**   Yes, I was sitting down typing.

7   **Q.**   And what was the first statement he made?

8   **A.**   If I didn't like the ticket that was written on me, do

9   something and more false tickets be written on me.

10  **Q.**   What else?

11  **A.**   That he'll beat my ass and put me in the hole until I heal

12  up.  And then he called me a rat.

13  **Q.**   What does that mean, "he'll beat your ass and put you in

14  the hole"?  What does it mean to be "in the hole"?

15  **A.**   Being "in the hole" is you are just in a cell, confined to

16  a cell in the administrative segregation unit and can't no

17  one see you there.  You are just in a cell.  Just in a hole,

18  just in a hole in the wall, just a cell.  Nothing in there but

19  a window and a toilet.

20  **Q.**   So if you get your ass beat and thrown in the hole, no

21  one is going to see you until you are healed?

22  **A.**   Exactly.

23  **Q.**   He called you a rat?

24  **A.**   Yes.

25  **Q.**   What's the significance of being called a rat in prison?

*11-14876; Griffin v. Condon, et al.*

*Randle Griffin - Direct Cont'd*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 26

1   **A.**   You can't be labeled in rat in prison.  A rat in prison

2   cannot -- he cannot exist in the general population.  If you

3   are considered a rat, then that means that they have what is

4   called a green light.  A green light means wherever you go you

5   get stabbed.  Everything you get get tooken from you.  So after

6   somebody stab you, the rest of them go into your cell and take

7   everything you have.  So this will happen in every facility you

8   go to.  You can't be a rat in the MDOC, period.

9   **Q.**   From your personal knowledge, do guards know the

10  significance of the word "rat"?

11  **A.**   Yes, yes.  They know what it is, and they know exactly

12  what happens to guys.

13  **Q.**   Did you spend the rest of the evening on March 3rd in your

14  cell?

15  **A.**   Yes.

16  **Q.**   Were you able to go to the library like you normally do?

17  **A.**   Yes, we allowed to go to the law library.  That's it.

18  Couldn't do anything else though.

19  **Q.**   Couldn't work?

20  **A.**   No.

21  **Q.**   Couldn't go outside?

22  **A.**   No.

23  **Q.**   Couldn't go to the warden's forum?

24  **A.**   No.

25  **Q.**   I'm going to direct your attention now, Mr. Griffin, to

*Randle Griffin - Direct Cont'd*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 27

1    the very next day.

2    **A.**    Yes.

3    **Q.**    Which is March 4th, 2011.  Do you remember anything

4    significant occurring in the afternoon of that day?

5    **A.**    Yes.  Again, at 2:05, shift change, I was summoned to the

6    desk.  Once again, I was issued a pass by the officers at the

7    desk, told me to go to the control center.  Once again, I said,

8    "For what?"

9         They said, "You will find out when you get there."

10   **Q.**    Do you remember who the officers were at the desk?

11   **A.**    I remember McMurtrie was there.  I don't know who the

12   other officer was.

13   **Q.**    Okay.  What happened once you went to the control center

14   like you did the day before, now on March 4th, the second time?

15   **A.**    Well, when I got there this time, Sergeant Howard, she

16   began reviewing the out-of-place ticket on me.  Once she got

17   through reading the ticket on me, I explained to her, I said,

18   it's impossible for me to be out of place.

19   **Q.**    So you received a ticket on March 4th?

20   **A.**    Yes.

21   **Q.**    And, Sergeant Howard, did she say who wrote the ticket?

22   **A.**    Yes.

23   **Q.**    Who?

24   **A.**    She said Officer McMurtrie.

25   **Q.**    And what was the basis of the ticket written on March 4th?

*Randle Griffin - Direct Cont'd*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 28

**A.**    The same as this, that I was out of place.  I didn't have

any staff authorization to be anywhere else except at my

assignment.

**Q.**    So Officer McMurtrie wrote a ticket that you were not at

work on March 3rd, the day before?

**A.**    Yes.

**Q.**    The same man who said you don't have a job on March 3rd

and the same man who knew you were at work on March 2nd, right?

**A.**    Right.

**Q.**    He wrote you a misconduct ticket?

**A.**    Right.

**Q.**    Did you explain to Sergeant Howard that the ticket was

unjustified?

**A.**    Yes.  It took some convincing, but I, after I explained to

her, I said just yesterday you issued me a misconduct for the

same exact thing.  And I said Officer McMurtrie is the one that

told me I was laid in so how is it possible that I was out of

place in my work assignment, I was out of place in my work

assignment when I was actually laid in by the officer that's

written this ticket that's before you now.

     So she paused for a minute.  She said, "Hold on, I'm going

to go call the unit.  I'm going to go check."

     And so when she called the unit, she came back and she

told me and she said, "Yeah, they said you was laid in."

**Q.**    Did Sergeant Howard take any action with regard to that

*11-14876; Griffin v. Condon, et al.*

*Randle Griffin - Direct Cont'd*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 29

1   ticket?

2   **A.**   Yes, she dismissed that one.

3   **Q.**   Did she tell you that she talked to McMurtrie or no?

4   **A.**   Yes, she told me she talked to him.

5   **Q.**   What did you learn from that conversation?

6   **A.**   She said that he said he was going to write other tickets

7   on me.  And I tried to explain to her, I said I didn't

8   understand what for.

9   **Q.**   So the ticket ended up being dismissed?

10  **A.**   Yes.

11  **Q.**   What happened after this situation at the control center?

12  What did you do next?

13  **A.**   All right.  I went back to the unit and I tried to talk to

14  my counselor, and Officer McMurtrie told me -- he asked what I

15  was doing.  I said I was trying to talk to ARUS Owen.  He told

16  me that I'm not talking to nobody.  "I'm giving you a direct

17  order to go to your cell now."  So I proceeded straight to my

18  cell and I stayed there.

19  **Q.**   This was minutes after Defendant McMurtrie had a ticket

20  dismissed?

21  **A.**   Yes.

22  **Q.**   Wouldn't let you talk to your counselor?

23  **A.**   Yes.

24  **Q.**   Did you eventually speak to Owen?

25  **A.**   Yes, I --

*Randle Griffin - Direct Cont'd*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 30

1  **Q.**    Which is your counselor, correct?

2  **A.**    Yes.  I wrote a note.  I asked him could he call me out

3  and I gave it to a prisoner that was walking past my cell to

4  give it to him.  So he called me out about five minutes later,

5  and I came up there and explained to him what's been going on,

6  officers been harassing me, threatening me, writing me false

7  tickets and so forth and so on.  And he told me that he

8  couldn't take my verbal complaint --

9             **MR. SCHNEIDER:**  Objection, hearsay, Your Honor.

10            **THE COURT:**  What's your objection?

11            **MR. SCHNEIDER:**  Hearsay, Your Honor.  He's testifying

12  as to what somebody told him.

13            **THE COURT:**  I think it is, and I'll grant the motion.

14  I don't think that it's of any particular importance here, and

15  if it becomes that, you may make the objection again and I'll

16  probably react more --

17            **MR. FINK:**  I'm happy to move on, Your Honor.

18            **THE COURT:**  -- more dispositively.

19       Go ahead.

20            **MR. FINK:**  Thank you, Your Honor.

21  **BY MR. FINK:**

22  **Q.**   As a result of these what you said were unjustified

23  misconduct tickets and the threats you have described, has your

24  life in prison changed, Mr. Griffin?

25  **A.**    Yes, it changed significantly.  You know, I lost a job --

*11-14876; Griffin v. Condon, et al.*

*Randle Griffin - Direct Cont'd*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 31

1   the only job I had, which gave me a purpose.  I lost -- you

2   know, I was comfortable at the facility.  I lost all the

3   activity.  I couldn't participate in any of the activities that

4   I was, you know, that I had going on, friends that I made, all

5   of that, I lost everything.  I was forced to sit in my cell and

6   literally do nothing for receiving misconducts that I didn't

7   even earn.

8   **Q.**   Were you removed from the warden's forum?

9   **A.**   Oh, yes, yes.

10  **Q.**   Do you remember the date that you were removed from the

11  warden's forum?

12  **A.**   Yes.  I was removed on March 9th.  I was removed on March

13  9th, and the warden's forum was March 9th in the afternoon at

14  12:30, the rep meeting.  As soon as I got back from being found

15  guilty that morning, one of the officers told me to bring my

16  warden forum supplies up and all of my material so that's what

17  I did.  They let me know it was over with.

18  **Q.**   Did you lose your job?

19  **A.**   Oh, yes.

20  **Q.**   How much did you make at your job?

21  **A.**   $43 a month.

22  **Q.**   $43 a month?

23  **A.**   Yeah.

24  **Q.**   What's the difference between having $43 a month in prison

25  and not having $43 a month in prison?

*11-14876; Griffin v. Condon, et al.*

*Randle Griffin - Direct Cont'd*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 32

1    **A.**    Oh, it's significant because everything that we have in

2    prison we have to buy.  I mean, soap, tooth paste,

3    toothbrushes.

4    **Q.**    How much does a toothbrush cost?

5    **A.**    A toothbrush costs 20 cent.

6    **Q.**    How much does an energy bar cost?

7    **A.**    25 cent.

8    **Q.**    How about Ramen Noodles?

9    **A.**    34 cent.

10   **Q.**    Toilet paper?

11   **A.**    Toilet paper, you get that free.  You can get that free.

12   **Q.**    A bag of chips?

13   **A.**    A bag of chips was like a dollar 32 cent.

14   **Q.**    After these tickets and threats being in Housing Unit 2 of

15   the Gus Harrison Correctional Facility, did you have the same

16   access to the library that you had before?

17   **A.**    Yes, I had to the law library but not to the general

18   library.  See, when you on sanctions like that, you can't go to

19   the general library.

20   **Q.**    How about the same access to the dayrooms, activity rooms?

21   **A.**    Oh, no, you no longer have access to any of that anymore.

22   **Q.**    How about the yard?

23   **A.**    No.

24   **Q.**    You were just confined to your cell?

25   **A.**    Just confined to your cell all day.

*Randle Griffin - Direct Cont'd*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 33

1   **Q.**   During your work detail?

2   **A.**   No.  After you get found guilty of misconduct, then you

3   are confined all day because I had received ten days loss of

4   privileges.

5   **Q.**   When you are incarcerated, Mr. Griffin, as you have been

6   for 26 years, what makes it so it's easy for you -- or not

7   easy, strike that.  What's your purpose for getting out of bed

8   in the morning?

9   **A.**   My purpose was, my purpose was the warden's forum, my job,

10  reading, going to the library, general and law, coming out,

11  helping the young guys learn how to read and write and help

12  prepare them to get their GEDs, and just, you know, going about

13  my daily activities.

14  **Q.**   Why were those activities that you just described so

15  important to you?

16  **A.**   Because in prison you've got to have some type of purpose.

17  If you don't have a purpose in prison, most guys go crazy and

18  some even try to kill themselves because there is really no

19  life in prison.  You are just in a cage.

20  **Q.**   You carved out a small life for yourself?

21  **A.**   Yes.

22  **Q.**   And as a result of these misconduct tickets and threats,

23  the little dignity you had --

24  **A.**   It was gone, it was gone because what can you do?  You

25  know, you've got people threatening you.  I'm a man, first and

*Randle Griffin - Direct Cont'd*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 34

1   foremost.  They took everything.  I had nothing to live for.

2   They took everything, man, you know, and they knew what they

3   was doing.

4       And there was no accountability because everything gets

5   swept up under the rug, everything.  And, and because of that

6   many times -- a lot of prisoners don't like to report the

7   abuses that occur because they are worried about that.  And

8   just for me going through what I have been through, I'm not

9   going to -- I don't think that I ever get involved with an

10  ombudsman like that again either because I lost too much.

11  **Q.**   You said you wouldn't get involved with the ombudsman

12  again, is that what you said?

13  **A.**   Yes.

14  **Q.**   And why is that?

15  **A.**   Because you lose too much.  Because all the things that I

16  went through, all the things that I lost, threats and

17  everything else that came with that.

18  **Q.**   You have written to the ombudsman, you know, after this,

19  but was there hesitation?

20  **A.**   Yes, but that was on behalf of my situation.  I'm talking

21  about if I see abuses as far as with other guys and all of

22  that.  With my situation it's different.  But I'm talking about

23  when I have to put myself on the line for other individuals,

24  trying to help speak out about the abuse that happened to other

25  prisoners.  I'm reluctant to do that.

*Randle Griffin - Direct Cont'd*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 35

1   **Q.**   From your personal knowledge, have you learned of anyone

2   else who might hesitate to get involved with the ombudsman?

3   **A.**   Yes, the majority of prisoners are scared to get involved

4   with the ombudsman.  They are scared of repercussions.

5   **Q.**   From your personal experience being in prison for

6   26 years, is there a danger in prisoners not being able to

7   report things to the ombudsman?

8   **A.**   Yes, you know, there's a significant danger because

9   prisoners get abused a lot.  There's a lot of abuse in prison.

10  But the only difference now is then, back then they have these

11  new cameras that's been catching a lot of officers abusing

12  prisoners, you know.  Case in point --

13  **Q.**   Well, my question is, is, the ombudsman, do you see it as

14  an important function from your standpoint as a prisoner for

15  26 years?

16  **A.**   Oh, yes.  They play a significant role, you know, and if

17  they -- we don't have them, you know, guys are going to really

18  get hurt probably more often.

19  **Q.**   Mr. Griffin, you write a lot of grievances?

20  **A.**   Yes.

21  **Q.**   And a lot of complaints?

22  **A.**   Yes.

23  **Q.**   Why do you do that?

24  **A.**   Because it's the only way you can protect yourself.

25  Because when you, when you complain about something, just say

*Randle Griffin - Direct Cont'd*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 36

1    something as simple as, oh, I need some toilet paper, and the

2    officer, he thinking that he pay for this toilet paper.  You

3    know, you ask him for the toilet, he say no.  So then you like,

4    okay, you go to the counselor, "He won't give me any toilet

5    paper.  Now, I need toilet paper.  This is a basic necessity

6    the policy say you must give us."

7         "Well, what he said."

8         Okay, it's what he said.  Okay, now I have to write a

9    grievance because I can't go make him give me the toilet paper.

10   I have to file a grievance so it can go up to a higher person.

11   Like it goes to the supervisor, then it go to the counselor,

12   then it go to last in step three.

13        So we try to resolve it.  That's the procedure that they

14   have for us to resolve problems in prison.

15   **Q.**   So there are circumstances, without getting into details,

16   there are circumstances where in order to get the most basic

17   human needs, such as toilet paper or a tooth brush or medical

18   care, that you have to write a grievance to get it?

19   **A.**   Yes.

20   **Q.**   Randle, do you accept the strong likelihood, barring

21   something, that you might spend the rest of your life in

22   prison?

23   **A.**   Yes.

24   **Q.**   That being the case, what keeps you motivated?

25   **A.**   Work.  It's like I said, everything I just explained to

*Randle Griffin - Direct Cont'd*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 37

1   you.  Working, going to the library, reading, studying and

2   helping people.  And it was the warden's forum, you know.

3   **Q.**   Now, Mr. Griffin, I want to go back just for a moment to

4   when you said Jessica Zimbelman visited the prison back in

5   January 2011.

6   **A.**   Yes.

7   **Q.**   From your personal knowledge and your observation, do

8   correctional officers know when an ombudsman is in the

9   building?

10  **A.**   Oh, yes, they know when she's building.

11  **Q.**   How do you know that?

12  **A.**   Oh, when the ombudsman come in the building, they go

13  running into supply closets.  They going to act like they real

14  professional, they doing the right thing, and they treating

15  guys right.  "Hey, how you doing?  Do you need anything?  Come

16  on up," you know.  But for the most part they scatter like

17  roaches with the lights on.

18  **Q.**   Hold on just one second, Mr. Griffin.

19       I want to clarify one thing, Mr. Griffin, and then

20  Mr. Schneider is going to come up here and ask you some

21  questions.

22       On March 2nd, that day when you were late to work because

23  of the warden's forum?

24  **A.**   Yes.

25  **Q.**   You described an excused absence?

*11-14876; Griffin v. Condon, et al.*

*Randle Griffin - Cross*
*Wednesday/January 18, 2017/Vol. 2*

1   **A.**   Yes.

2   **Q.**   Does that mean as a matter of prison policy from your

3   personal knowledge that you don't have to be at work at 2:30,

4   but rather when you get back?

5   **A.**   Yes.  Whenever you make it back, that's when you begin

6   your work.

7   **Q.**   All right.  Mr. Griffin, I will probably have a few more

8   questions for you when Mr. Schneider is done, but at this time

9   I'm going to turn it over to him.

10          **THE COURT:**  Mr. Schneider, cross-examination.

11      Before we get to that, there is, as most of us have seen

12  on television, I suppose, people advertising lights that you

13  can throw in the eyes of someone who is otherwise annoying to

14  you, and I have got one of those on me right now.  I haven't

15  bothered anybody about it to this point.  I don't know what it

16  is except --

17          **MR. FINK:**  I apologize, Your Honor.

18          **THE COURT:**  There, it's off.  Thank you.

19          **MR. FINK:**  My apologies, Your Honor.

20          **THE COURT:**  I don't have any idea what it is.  It's

21  probably just as well that I don't.

22      Mr. Schneider, you may cross-examine.

23          **MR. SCHNEIDER:**  Thank you, Your Honor.

24                          -   -   -

25

*11-14876; Griffin v. Condon, et al.*

*Randle Griffin - Cross*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 39

(9:57 a.m.)

**CROSS-EXAMINATION**

**BY MR. SCHNEIDER:**

**Q.**   Good morning, Mr. Griffin.

**A.**   Good morning.

**Q.**   All right.  Do you remember the dates you were housed at the Gus Harrison Correctional Facility?

**A.**   Yes.  I got there in September 2010.

**Q.**   And do you remember when you left?

**A.**   Sometime in 2011.

**Q.**   Was it March 2011?

**A.**   March 2011?  I'm not sure.

**Q.**   Do you remember where you went to after Gus Harrison?

**A.**   Yes.

**Q.**   Where was that?

**A.**   Lakeland Correctional Facility.

**Q.**   All right.  And we have heard you talk a little bit about your crime.  How many felonies do you have?

          **MR. FINK:**  Objection, Your Honor.  This was something that we resolved with counsel before trial, that we would discuss what he's currently serving time for, but to the extent he has any other crimes, they are irrelevant to the case.

          **THE COURT:**  I think that's right.  We were reserving it for a time when it either would or would not be something relevant to what we're doing here.  I so far haven't heard what

*11-14876; Griffin v. Condon, et al.*

*Randle Griffin - Cross*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 40

1   would be relevant to what the jury has to decide in terms of

2   what other crimes this man may have been involved in and may

3   have been accused of and may have been convicted of.  If you

4   can give me some reason, I will listen to it, but right now I

5   am not sure what it would be.

6         **MR. FINK:**  Your Honor, to the extent it is going to

7   be discussed, can we discuss it at a sidebar if we are going to

8   discuss any prior allegations or criminal convictions?

9         **THE COURT:**  He can answer the question I just made.

10        **MR. FINK:**  Thank you, Your Honor.

11        **MR. SCHNEIDER:**  He testified as to his crime,

12  Your Honor.  All I'm trying to ask him is if it was more than

13  one crime.  I'm trying to make an accurate record.

14        **THE COURT:**  That's all you're going to --

15        **MR. SCHNEIDER:**  That's it, Your Honor.

16        **THE COURT:**  Was it more than one crime?  Is that your

17  question?

18        **MR. SCHNEIDER:**  That was the question.

19        **MR. FINK:**  Your Honor, we stipulated to this before

20  trial, that we would ask about the crime.

21        **THE COURT:**  All right.  If it's stipulated to, it

22  isn't a problem.  I'm asking Mr. Schneider if that's the

23  question:  Have you been accused of other crimes more than

24  once?

25        **MR. SCHNEIDER:**  All I want to ask him, Your Honor, is

*11-14876; Griffin v. Condon, et al.*

*Randle Griffin - Cross*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 41

1  if he's currently serving on more than one conviction.

2         **THE COURT:**  That's a little bit different.  You can

3  ask him if he's been convicted of more than one crime and leave

4  it at that unless you've got some other reason.

5         **MR. SCHNEIDER:**  I'll leave it at that.

6  **BY MR. SCHNEIDER:**

7  **Q.**   Have you been convicted of more than one crime?

8  **A.**   On this case here?

9         **THE COURT:**  As I understand the question,

10  Mr. Griffin --

11         **THE WITNESS:**  I don't understand the question.

12         **THE COURT:**  In your life in the area of courts and

13  possible convictions, have you been convicted of more than

14  one crime, period?

15         **THE WITNESS:**  Yes, two.

16         **THE COURT:**  What?

17         **THE WITNESS:**  Two.  Two, sir.

18         **THE COURT:**  All right.  Go ahead.

19  **BY MR. SCHNEIDER:**

20  **Q.**   Okay.  You also discussed your family yesterday.  What

21  year were you married?

22  **A.**   I think it was 2002.

23  **Q.**   What year?

24  **A.**   2002.

25  **Q.**   Are you sure about that?

*11-14876; Griffin v. Condon, et al.*

*Randle Griffin - Cross*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 42

1   **A.**    Man, why you doing that, man?  I just know we get caught

2   up like that, man.  You know she here.

3          **MR. SCHNEIDER:**  Your Honor, may I approach the

4   witness?

5          **THE COURT:**  You may.

6          **MR. FINK:**  Your Honor, I'm going to object to this

7   proposed -- this is not part of Mr. Schneider's exhibit book,

8   nor do I remember it from the Joint Final Pretrial Order.  I

9   haven't seen this exhibit.

10         **THE COURT:**  Well, I haven't seen it either.  Is it

11  something I should see?

12         **MR. SCHNEIDER:**  You may, Your Honor.  Your case

13  manager is not here.  May I approach the bench?

14         **THE COURT:**  Yes.

15         **MR. SCHNEIDER:**  May I respond to the objection?

16         **THE COURT:**  Yeah.  It's not clear to me exactly what

17  relevance this has to what we're doing here or what the jury

18  has got to have in mind when it deliberates.  I don't think

19  they should have what I have been handed as something that says

20  it's a marriage license.  What relevance does that have?

21         **MR. SCHNEIDER:**  It's not an exhibit, Your Honor.  I'm

22  using it to refresh recollection to see if he can remember what

23  year he was actually married.

24         **THE COURT:**  Remember what?  What the date is?

25         **MR. SCHNEIDER:**  The year.  He testified a minute ago

*Randle Griffin - Cross*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 43

1    as to the year.  I'm seeing if this helps him remember what

2    year he was married.

3            **MR. FINK:**  Your Honor, that's fine.  He can look at

4    the marriage license to refresh recollection.

5            **THE COURT:**  You haven't yet accurately remembered the

6    year according to the person.  Are you remembering it now?

7            **THE DEFENDANT:**  Yes, I see it now.

8            **THE COURT:**  And that's the year, that's your

9    testimony?

10           **THE DEFENDANT:**  No, it was 2003.

11           **THE COURT:**  All right.

12   **BY MR. SCHNEIDER:**

13   **Q.**   Okay.  You also testified that you have kids.  How many?

14   **A.**   Four.

15   **Q.**   Okay.  You had those all before you came to prison?

16   **A.**   Yes.

17   **Q.**   All right.  How many different mothers?

18           **MR. FINK:**  Objection, Your Honor.  That is absolutely

19   irrelevant to the case, to ask a question like that, as if, as

20   if that has any bearing on the issues in this case.  I would

21   ask that Mr. Schneider direct his cross to my direct

22   examination on the issues.

23           **THE COURT:**  I -- unless there's something about it

24   that I don't yet understand, that happens once in a while, I

25   don't see how we make that relevant.

*11-14876; Griffin v. Condon, et al.*

*Randle Griffin - Cross*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 44

1          **MR. SCHNEIDER:**  Okay, Your Honor.  I'm just following

2     up on his testimony from yesterday where he was trying to paint

3     himself in a certain light.

4          **THE COURT:**  All right.  That is not a question you

5     need to get an answer from this witness on.

6          **MR. FINK:**  Thank you, Your Honor.

7     BY MR. SCHNEIDER:

8     **Q.**   Okay.  How do you get money in prison, Mr. Griffin?

9     **A.**   By work and occasionally gifts from family.

10    **Q.**   And then you can go spend that in the prisoner store?

11    **A.**   Yes.

12    **Q.**   It's called the commissary?

13    **A.**   Yes.

14    **Q.**   And how do family get money to you in prison?

15    **A.**   Through JPay.

16    **Q.**   JPay is the name of a system set up for that?

17    **A.**   Yes.

18    **Q.**   In 2010, 2011, the time frame here, were you getting more

19    money through working or through family, through JPay?

20    **A.**   Working.

21    **Q.**   You also testified yesterday that you teach other

22    prisoners to read and write.  Have you heard of something

23    called a Reading Writing Assistant in prison?

24    **A.**   No.

25    **Q.**   How many jobs have you had in prison?

*11-14876; Griffin v. Condon, et al.*

*Randle Griffin - Cross*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 45

1   **A.**   Many.

2   **Q.**   Before you came to Gus Harrison did you work?

3   **A.**   Yes.

4   **Q.**   Now, when a prisoner transfers from one prison to another,

5   they always lose their job, right?

6   **A.**   Yes.

7   **Q.**   That's just part of being transferred, you are not there

8   anymore?

9   **A.**   Right.

10  **Q.**   And are you required to either work or go to school in

11  prison?

12  **A.**   Yes, you are required to go to work or school.  But if

13  work or school is available for you.  Most of the time work,

14  they don't have enough jobs for people at the facility.

15  **Q.**   Now, in March of 2011 you had this job, or I'm sorry,

16  strike that, you had a job as a porter in March 2011, right?

17  **A.**   Yes.

18  **Q.**   Do you recall when you got that job?

19  **A.**   No, I don't recall the exact date.

20  **Q.**   You had that job for about four or five days though; is

21  that accurate?

22  **A.**   Yes.

23  **Q.**   And your job was to clean one of the dayrooms in the

24  housing unit?

25  **A.**   Yes.

*Randle Griffin - Cross*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 46

1   **Q.**   There were three dayrooms, correct?

2   **A.**   Yes.

3   **Q.**   You cleaned one of them?

4   **A.**   Yes, sir.

5   **Q.**   And you passed out games?

6   **A.**   Yes, sir.

7   **Q.**   In prison jobs are divided into skilled, semiskilled and

8   unskilled, correct?

9   **A.**   Yes.

10  **Q.**   And there's different pay schedules for each?

11  **A.**   Yes.

12  **Q.**   And this job, this was an unskilled position, correct?

13  **A.**   No.   Each job -- you get paid for your skill set.   I have

14  a custodial maintenance certificate so I get paid a little

15  extra money.

16  **Q.**   Do you have the plaintiff's exhibit book in front of you?

17  **A.**   Yes.

18          **MR. FINK:**   No, that's yours.

19          **MR. SCHNEIDER:**   Your Honor, may I approach the

20  witness?

21          **THE COURT:**   You may.

22  **BY MR. SCHNEIDER:**

23  **Q.**   Okay.   I have just handed you what's been marked as

24  Plaintiff's Exhibit 14.   Do you recognize that document,

25  Mr. Griffin?

*11-14876; Griffin v. Condon, et al.*

*Randle Griffin - Cross*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 47

1   **A.**   No, I never got -- no, I never received this document.

2   **Q.**   Okay.  You have never received this?

3   **A.**   No.

4   **Q.**   Okay.  You can put that aside, and I'll move on.

5        When you went to Lakeland Correctional Facility after you

6   left Gus Harrison, did you get a job there?

7   **A.**   Yes, months later.

8   **Q.**   Okay.  In May of 2011, correct?

9   **A.**   I'm not sure of the exact date.

10  **Q.**   What was that job?

11  **A.**   Porter.

12  **Q.**   And when you got the porter job there, were you classified

13  as skilled, semiskilled or unskilled?

14  **A.**   It's semiskilled.  That's as high as you can go on the

15  porter scale.

16  **Q.**   All right.  And you don't recall the date that you got

17  that next job?

18  **A.**   No, sir.

19  **Q.**   Do you have any reason to doubt that it was in May of

20  2011?

21  **A.**   I wouldn't know one way or the other.

22  **Q.**   Okay.

23        **MR. SCHNEIDER:**   Your Honor, may I approach the

24  witness?

25        **THE COURT:**   You may approach the witness, yes.

*11-14876; Griffin v. Condon, et al.*

*Randle Griffin - Cross*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 48

1      **MR. FINK:**  Your Honor, I'm going to object to this

2   exhibit again because this is not in the exhibits that have

3   been given to us before trial, nor am I aware of it from the

4   Joint Final Pretrial Order.  I have never seen this document

5   from Mr. Schneider.

6      **THE COURT:**  What's your response to that,

7   Mr. Schneider?

8      **MR. SCHNEIDER:**  It's been produced.  It has a Bates

9   number on the bottom of 001360.  It's not an exhibit in this

10   case.  Again, it's just to refresh recollection to see if we

11   can get Mr. Griffin to remember when he got his next job.

12      **THE COURT:**  You can refresh his recollection with it

13   without offering it.

14      **MR. SCHNEIDER:**  That's my intention, Your Honor.

15      **MR. FINK:**  Thank you, Your Honor.

16      **THE COURT:**  Yes.

17   BY MR. SCHNEIDER:

18   **Q.**   Okay.  Mr. Griffin, after looking at this document do you

19   now remember when you got your next job at Lakeland?

20   **A.**   It says May 17th, 2011.  I got a good work report.

21   **Q.**   And that's about two months after you lost your job at Gus

22   Harrison?

23   **A.**   Yes.

24   **Q.**   I'm going to jump over to Prisoner Bryant.  Did you know

25   him well?

*11-14876; Griffin v. Condon, et al.*

*Randle Griffin - Cross*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 49

1   **A.**   No.

2   **Q.**   Do you know how old he was?

3   **A.**   Not exactly.  I knew he had to be about -- I'm just

4   guesstimating.  He couldn't have been older than like 23 and --

5   between 21 and 24.  He was a young kid.

6   **Q.**   And I'm not asking you what he was in for, but I just want

7   to know, did you know what he was in for?

8   **A.**   No.

9   **Q.**   Did you know if he got a lot of tickets?

10  **A.**   Yes.

11  **Q.**   Okay.  And you testified yesterday or earlier today that

12  you said that Condon grabbed Mr. Bryant.  You saw that happen,

13  correct?

14  **A.**   Yes, sir.

15  **Q.**   And all Bryant did was come onto base?

16  **A.**   Yes, with his duffel bag.

17  **Q.**   Okay.  And how long was Bryant there before Condon grabbed

18  him?

19  **A.**   A few minutes.

20  **Q.**   All right.  And your testimony is that Condon roughed him

21  up?

22  **A.**   Yes.  He grabbed him in a violent, aggressive manner.

23  **Q.**   And you said Condon was snatching him around?

24  **A.**   Yes.

25  **Q.**   And shaking him?

*Randle Griffin - Cross*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 50

1    **A.**    Yes.

2    **Q.**    And grabbed his shirt or coat and had it balled up in his

3    hand?

4    **A.**    Yes.

5    **Q.**    But at your deposition you told me he grabbed him on the

6    arm, snatched his duffel bag, and that's it, correct?

7    **A.**    Yes, because that's all you asked me.  You asked me --

8    that's what you asked me.  You didn't ask me to give you the

9    details how he grabbed him, you know.

10   **Q.**    You didn't tell me anything about shaking him around, did

11   you?

12   **A.**    No, sir.

13   **Q.**    Or coming out like a bull?

14   **A.**    No, sir.

15   **Q.**    Or grabbing the shirt and coat and having it balled up in

16   his hand?

17   **A.**    No, sir.

18   **Q.**    And then your attorney asked you about the incident a

19   second time to come back and give more detail; do you remember

20   that?

21   **A.**    Yes.

22   **Q.**    And, again, you didn't mention any of those things, did

23   you?

24   **A.**    No, sir.

25   **Q.**    And you don't know if there were any other witnesses to

*11-14876; Griffin v. Condon, et al.*

*Randle Griffin - Cross*
*Wednesday/January 18, 2017/Vol. 2*

1    this incident?

2    **A.**   No, sir.

3    **Q.**   You didn't tell a single person in the prison about it?

4    **A.**   No, sir.

5    **Q.**   When Bryant came out on base, you didn't hear any

6    conversations between Bryant and anybody else?

7    **A.**   No.

8    **Q.**   And you waited a month to contact the ombudsman?

9    **A.**   Yes.

10   **Q.**   You met with somebody from the ombudsman's office.  You

11   said it was a Ms. Zimbelman?

12   **A.**   Yes.

13   **Q.**   Where did you say that meeting took place?

14   **A.**   In the ARUS office closest to the entrance of the unit.

15   **Q.**   Which ARUS's office was it?  Do you know whose office it

16   was?

17   **A.**   I didn't know that ARUS.

18   **Q.**   How many ARUSs were there in the unit?

19   **A.**   There were two.

20   **Q.**   What time was the meeting?

21   **A.**   In the morning.

22   **Q.**   What does morning mean, just before noon?

23   **A.**   Yes, before noon.

24   **Q.**   And nobody asked you who you were meeting with or why?

25   **A.**   Nobody asked me who I was meeting with, no.

*Randle Griffin - Cross*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 52

1   **Q.**   This warden's forum I want to talk a little bit about.
2   Does every unit in the prison have representatives on the
3   forum?
4   **A.**   Yes.
5   **Q.**   Within the unit does each wing have representatives or is
6   it just for the unit?
7   **A.**   Just for the unit.
8   **Q.**   And there's a white rep?
9   **A.**   Yes.
10  **Q.**   And there's a non-white rep?
11  **A.**   Yes.
12  **Q.**   I believe earlier you testified it was a black rep,
13  correct?
14  **A.**   Right.
15  **Q.**   But it's actually called non-white?
16  **A.**   No.  On the ballot it says black and white rep.
17  **Q.**   Is that department wide, not just Gus Harrison, that's
18  every prison you've been to?
19  **A.**   No.  Most prisons have like non-white and white.
20  **Q.**   How many units were in the prison; do you recall?
21  **A.**   Five.
22  **Q.**   So how many members on the warden's forum?
23  **A.**   You have ten all together.
24  **Q.**   And you get there by being elected by the other prisoners
25  in the housing unit?

*11-14876; Griffin v. Condon, et al.*

*Randle Griffin - Cross*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 53

1    **A.**   Yes, majority vote.

2    **Q.**   Anybody who wants to run, as long as they are not barred

3    for some reason they can put their name on the ballot and run

4    for that?

5    **A.**   Yes.

6    **Q.**   On March 2nd when you said you were in Condon's office

7    talking about this mail issue, that mail issue, that was

8    something to do with the warden's forum, correct?

9    **A.**   Yes.

10   **Q.**   Okay.  What time was that meeting?

11   **A.**   That meeting was about 3:30.

12   **Q.**   And this was on March 2nd?

13   **A.**   Yes.

14   **Q.**   And then after the meeting you were called back ten

15   minutes later?

16   **A.**   Yes.

17   **Q.**   Who called you back?

18   **A.**   It was an announcement that came over the loudspeaker and

19   told me to report to the RUM's office.

20   **Q.**   And this was the meeting where you say he changed his mind

21   on the mail issue?

22   **A.**   Right.

23   **Q.**   And then just out of the blue made a comment about the

24   ombudsman?

25   **A.**   Yes.

*Randle Griffin - Cross*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 54

1  **Q.**   Also on March 2nd do you know what time you got back from

2  the warden's forum meeting that you had?

3  **A.**   I don't know the exact time that I got back.

4  **Q.**   Let me ask you about this.  The warden's forum, the

5  members meet with the warden once a month, correct?

6  **A.**   Yes.

7  **Q.**   And then in between those monthly meetings there are

8  meetings where it's just the block reps meeting to talk about

9  what issues to give to the warden?

10 **A.**   Yes.

11 **Q.**   And this meeting, which kind of meeting was this on

12 March 2nd?

13 **A.**   This was a rep, just with the block reps meeting.

14 **Q.**   You and the other block reps to talk about what issues to

15 present to the warden the next time?

16 **A.**   Yes.

17 **Q.**   And after you got back, you said you went to work?

18 **A.**   Yes.

19 **Q.**   You didn't tell anybody you were late though, right?

20 **A.**   No.

21 **Q.**   And you don't know how many other prisoners were in the

22 dayroom when you went in there?

23 **A.**   No.  I didn't know the amount of prisoners that were in

24 the dayroom.

25 **Q.**   Was it more than two?

*Randle Griffin - Cross*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 55

1    **A.**    I can't recall.  I just knew it was prisoners -- I

2    remember prisoners being in there.

3    **Q.**    And then you got that ticket at some point for allegedly

4    not showing up to work, correct?

5    **A.**    Yes.

6    **Q.**    Okay.  You had a -- well, let me ask you this first.

7    What's the process with the ticket?  You get a review by

8    somebody in the prison first, right?

9    **A.**    Right.

10   **Q.**    And then do you get a hearings investigator?

11   **A.**    No.  This is a Class 2 misconduct.  These are heard by

12   either an ARUS or a sergeant or something like that.

13   **Q.**    So there's a more serious type of ticket called a Class 1

14   and this is the Class 2 ticket?

15   **A.**    Yes.

16   **Q.**    Okay.  So you do get a review on the ticket first, right?

17   **A.**    Yes.

18   **Q.**    And then you get a hearing by someone in the prison?

19   **A.**    Right.

20   **Q.**    Okay.  Did you meet with Sergeant Howard for the review on

21   that ticket?

22   **A.**    Yes.

23   **Q.**    And that was on March 3rd?

24   **A.**    Yes.

25   **Q.**    Okay.  And you didn't tell Sergeant Howard that you had

*11-14876; Griffin v. Condon, et al.*

*Randle Griffin - Cross*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 56

1   actually worked the prior day, did you?

2   **A.**   No, sir.  I can't recall if I told her, but I don't think

3   I did though.

4   **Q.**   Who, who gave you the hearing on that ticket?

5   **A.**   What's his name?  I fail to recall his name.  It start

6   with a D.  He was an ARUS.

7   **Q.**   Would you flip to Exhibit E in the book in front of you.

8   E.  Let me know when you're there.

9   **A.**   Yes.

10  **Q.**   Okay.

11  **A.**   I'm there.

12  **Q.**   That first page of Exhibit E, that's the ticket, right?

13  **A.**   Yes, that's the ticket.

14  **Q.**   All right.  If you flip the page, is that the hearing

15  report?

16  **A.**   Yes.

17         **THE COURT:**  Is this in evidence?

18         **MR. SCHNEIDER:**  Well, I'll move to admit it,

19  Your Honor.  The ticket is in evidence as Plaintiff's

20  Exhibit 58, I believe it was, but not the hearing report.  That

21  wasn't part of that exhibit, so --

22         **THE COURT:**  Any objection?

23         **MR. FINK:**  I haven't heard any foundation laid or

24  anything about the hearing report.

25         **THE COURT:**  The question I have is any objection?

*11-14876; Griffin v. Condon, et al.*

*Randle Griffin - Cross*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 57

1          **MR. FINK:**  Pending a foundation laid that Mr. Griffin

2    knows what the hearing report is, then no objection.

3          **MR. SCHNEIDER:**  I'll lay the foundation, Your Honor.

4    That's fine.

5          **THE COURT:**  Go ahead.

6    **BY MR. SCHNEIDER:**

7    **Q.**   Okay.  The second page of Exhibit E, have you seen that

8    before?

9    **A.**   Yes.

10   **Q.**   What is it?

11   **A.**   That's the hearing report.

12   **Q.**   From the ticket on March 2nd?

13   **A.**   Yes.

14         **MR. SCHNEIDER:**  All right.  Your Honor, I would move

15   to admit Defendant's Exhibit E.

16         **THE COURT:**  Any objection?

17         **MR. FINK:**  No objection, Your Honor.

18         **THE COURT:**  It's received as Defendant's --

19         **MR. SCHNEIDER:**  E, as in extra.

20         **THE COURT:**  E?

21         **MR. SCHNEIDER:**  E.

22         **THE COURT:**  E.

23         **MR. SCHNEIDER:**  Thank you, Your Honor.

24   **BY MR. SCHNEIDER:**

25   **Q.**   All right.  Mr. Griffin, who conducted the hearing on that

*11-14876; Griffin v. Condon, et al.*

*Randle Griffin - Cross*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 58

1  ticket?

2  **A.**   Evers.

3  **Q.**   What was Evers' position in the prison?

4  **A.**   He was an ARUS, assistant counselor.  He was a counselor.

5  **Q.**   All right.  And he found you guilty of the ticket,

6  correct?

7  **A.**   Yes.

8  **Q.**   And what were the sanctions that he issued you?

9  **A.**   Ten days loss of privileges.

10  **Q.**   Loss of privileges, that was what you were testifying to

11  before about not being able to go out of your cell for a lot of

12  things, correct?

13  **A.**   No -- yes, partly, partly.

14  **Q.**   Okay.  And that sanction from this ticket was ten days?

15  **A.**   Yes, sir.

16  **Q.**   And does the ticket list the dates that you were supposed

17  to serve those ten days?

18  **A.**   Yes.

19  **Q.**   All right.  It was March 17th to March 27th?

20  **A.**   Yes.

21  **Q.**   Do you know if you were still in the prison on March 27th?

22  **A.**   I don't know.

23  **Q.**   You don't know when you left?

24  **A.**   No.

25  **Q.**   On March 3rd -- this is the date you claim that Officer

*11-14876; Griffin v. Condon, et al.*

*Randle Griffin - Cross*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 59

1   Downard made threats to you, correct?

2   **A.**   Yes.

3   **Q.**   All right.  What time did that happen at?

4   **A.**   After the four o'clock count cleared.

5   **Q.**   Were you still in your cell?

6   **A.**   Yes.

7   **Q.**   Describe the doors.  Are they bars or are they actual

8   doors?

9   **A.**   Actual door.

10  **Q.**   Is there a window or something the officer can speak

11  through to you?

12  **A.**   Yes.

13  **Q.**   Was your door open or closed?

14  **A.**   Mine was wide open.

15  **Q.**   Is that up to you to leave it open or closed?

16  **A.**   Yes.

17  **Q.**   Did I hear you testify yesterday you actually had keys to

18  your own cells?

19  **A.**   Yes.

20  **Q.**   All right.  And you don't know of any witnesses to that

21  conversation?

22  **A.**   No.

23  **Q.**   Your cell was next to others though, correct?

24  **A.**   Yes.

25  **Q.**   You also testified earlier today that in segregation you

*Randle Griffin - Cross*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 60

1  are just left in a hole all alone, correct?

2  **A.**   Yes.

3  **Q.**   Okay.  You have actually been in segregation before,

4  correct?

5  **A.**   Yes.

6  **Q.**   All right.  Officers do rounds in segregation?

7  **A.**   Yes.

8  **Q.**   Health care staff does rounds in segregation?

9  **A.**   Yes.

10 **Q.**   When you had this conversation on March 3rd with Downard,

11 it's your testimony that was after you tried to go to work for

12 the day?

13 **A.**   Yes.

14 **Q.**   And when you tried to go to work you already knew about

15 the March 2nd ticket?

16 **A.**   Yes, I had just got back from receiving the

17 March 2nd ticket.

18 **Q.**   All right.  And now you were laid in?

19 **A.**   No, I didn't know I was laid in until Officer McMurtrie

20 told me that I was laid in.

21       **MR. SCHNEIDER:**  Your Honor, may I approach the

22 witness?

23       **THE COURT:**  You may.

24 **BY MR. SCHNEIDER:**

25 **Q.**   All right.  Mr. Griffin, I hand you a copy of your

*11-14876; Griffin v. Condon, et al.*

*Randle Griffin - Cross*
*Wednesday/January 18, 2017/Vol. 2*

1  deposition transcript.  Would you turn to Page 42 please?

2  **A.**   Yes, I'm there.

3  **Q.**   All right.  I'm looking at Lines 15 to 23.

4  **A.**   Yes.

5          **THE COURT:**  Is this in evidence?

6          **THE WITNESS:**  Yes.

7          **MR. SCHNEIDER:**  Impeachment, Your Honor.  Deposition

8  transcript.

9          **THE COURT:**  That's what you are offering it for?

10         **MR. SCHNEIDER:**  Yes.  Not as an exhibit.

11 **BY MR. SCHNEIDER:**

12 **Q.**   All right.  Mr. Griffin, I'm going to read that.  Tell me

13 if I read it correctly.

14     "Q.  Did you ask him why you were laid in?

15     "A.  No.

16     "Q.  Did you know why you were laid in?

17     "A.  Yes.

18     "Q.  How did you know?

19     "A.  I received a ticket."

20     That was your deposition testimony, correct?

21 **A.**   Yes.

22 **Q.**   So you told me at your deposition that you did know that

23 you were laid in?

24 **A.**   Yes.

25 **Q.**   And then you tried to go to work anyway?

*11-14876; Griffin v. Condon, et al.*

*Randle Griffin - Cross*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 62

1    **A.**    That's not exactly it, but yes.

2    **Q.**    On that second ticket, the March 3rd ticket, you were

3    reviewed by Sergeant Howard the next day, March 4th?

4    **A.**    Yes.

5    **Q.**    And you said Sergeant Howard called McMurtrie during that

6    meeting?

7    **A.**    Yes.

8    **Q.**    You couldn't hear the conversation though?

9    **A.**    No.

10   **Q.**    The ticket was dismissed at that point though?

11   **A.**    Yes.

12   **Q.**    You didn't have a hearing on it?

13   **A.**    No.

14   **Q.**    No sanctions from it?

15   **A.**    No.

16   **Q.**    When you had that hearing on the first ticket, the Downard

17   ticket in front of ARUS Evers I think you said, correct?

18   **A.**    Yes.

19   **Q.**    Did you present the defense of, hey, I was at the warden's

20   forum?

21   **A.**    Yes, I did.

22   **Q.**    But the hearing officer rejected that defense?

23   **A.**    Yes.

24   **Q.**    All right.  Now, the warden's forum, you were on it about

25   a month at Gus Harrison; is that right?

*11-14876; Griffin v. Condon, et al.*

*Randle Griffin - Cross*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 63

1   **A.**   Yes.   I came in, I came in in the middle of a session

2   because it had already been going on about three months before

3   I came in.

4   **Q.**   All right.   And then March 9th I believe you testified was

5   when you were removed, correct?

6   **A.**   Yes, sir.

7   **Q.**   And Deputy Warden Chapman told you you were removed?

8   **A.**   No.   Deputy Warden Chapman, yeah, he told me that I

9   couldn't serve no more because of a memo that the warden at the

10  other facility had put out because I wrote a letter -- myself

11  and other forum members wrote a letter to the regional

12  administrator and asked them to monitor the situation I was in

13  and then she didn't like it so she removed us.

14  **Q.**   All right.   So at a prior prison the warden removed you

15  from the forum.   As a result of that you weren't allowed to

16  serve again for a year?

17  **A.**   Yes, that's what they said.

18  **Q.**   Okay.   And you would have been allowed to serve again --

19  do you remember the date that you would have been allowed

20  again?

21  **A.**   I think Deputy Warden Chapman told me I was supposed to

22  been off until 8-18 -- 8-8, 2011.   I didn't know nothing about

23  it.   Didn't nobody tell me.

24  **Q.**   Did Deputy Warden Chapman give you a memorandum about

25  this?

*11-14876; Griffin v. Condon, et al.*

*Randle Griffin - Cross*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 64

1   **A.**   Yes.  On the 10th, yes, he did.

2   **Q.**   Would you turn to Exhibit A in the book in front of you,

3   please.  Just let me know when you've found it.

4   **A.**   I've got it.

5   **Q.**   Is that the memo you received from Deputy Chapman?

6   **A.**   Yes, it is.

7          **MR. SCHNEIDER:**   Your Honor, I would move to admit

8   Defendant's Exhibit A into evidence.

9          **MR. FINK:**   No objection, Your Honor.

10          **THE COURT:**   It's received as Defendant's A.

11   BY MR. SCHNEIDER:

12   **Q.**   And who was Chapman in the prison?

13   **A.**   He was the acting deputy warden.

14   **Q.**   Just so the jury understands the hierarchy within a

15   prison, it goes warden and then directly under that is deputy

16   warden?

17   **A.**   Yes.

18   **Q.**   Was there also something called an assistant deputy warden

19   at the time?

20   **A.**   Yes.

21   **Q.**   And that would be right under the deputy?

22   **A.**   Right.

23   **Q.**   All right.  Would you flip to Exhibit F, please.

24   **A.**   Yes, I'm there.

25   **Q.**   All right.  That prior warden who removed you from the

*Randle Griffin - Cross*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 65

1   forum at a different facility, did she give you a memorandum or

2   something saying you were being removed?

3   **A.**   Yes, she did.

4   **Q.**   Exhibit F, is that the memo that you received?

5   **A.**   Yes.

6          **MR. SCHNEIDER:**  All right.  Your Honor, I would move

7   to admit Defendant's Exhibit F into evidence.

8          **MR. FINK:**  No objection, Your Honor.

9          **THE COURT:**  It's received as Defendant's F.

10  **BY MR. SCHNEIDER:**

11  **Q.**   Okay.  Would you flip to Exhibit D, please.

12  **A.**   Yes, I'm there.

13  **Q.**   All right.  Have you seen this document before?

14  **A.**   Yes.

15  **Q.**   All right.  That's a memo from Inspector Goldberg,

16  correct?

17  **A.**   Yes.

18  **Q.**   All right.  And this document also lists the reason why

19  the inspector was asking to have you removed from the forum,

20  correct?

21  **A.**   Yes.

22          **MR. SCHNEIDER:**  All right.  Your Honor, I would move

23  to admit Defendant's Exhibit D into evidence.

24          **MR. FINK:**  Objection, Your Honor, and if the Court

25  will allow me, I would ask that this issue be discussed at side

*Randle Griffin - Cross*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 66

1    bar.  It involves issues that we discussed before the trial.

2         **THE COURT:**  I think before the trial I informed the

3    parties that I am not fond of sidebar.

4         **MR. FINK:**  I totally understand, Your Honor.

5         **THE COURT:**  If we need to have a sidebar on this,

6    let's have it when we are done with this session.  You can give

7    a reason why we shouldn't do it that way, but that way we'll be

8    able to look at what's going on and make a determination if

9    that appears to be appropriate whether this is admissible or

10   not.

11        **MR. FINK:**  This document, Your Honor, on our first

12   day before we selected the jury was part of the stipulations of

13   conduct that would not be discussed.  Both counsel and I agreed

14   to it so the contents of it I would like to address.

15        **THE COURT:**  I understand.  I have heard that.  We

16   should go on to something else and save that before going to

17   sidebar.

18        **MR. FINK:**  Thank you, Your Honor.

19   **BY MR. SCHNEIDER:**

20   **Q.**   All right.  Will you flip back to Exhibit C, please.

21   **A.**   Yes, I'm there.

22   **Q.**   All right.  And have you seen that document before?

23   **A.**   Yes.  I received both of them.

24   **Q.**   And this is a document from the warden, correct?

25   **A.**   Yes.  I received this at the other facility.

*Randle Griffin - Cross*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 67

1  **Q.**   All right.   And this document from the warden, that's the

2  warden's recommendation to ban you from the warden's forum,

3  correct?

4  **A.**   Yes.

5         **MR. SCHNEIDER:**   All right.   Your Honor, I move to

6  admit Exhibit C into evidence.

7         **MR. FINK:**   I have the same objection about this

8  document, Your Honor, that I do about the last one.

9         **THE COURT:**   All right.   Unless it's important to

10 something that we're going through right now in the courtroom,

11 I would just as soon have a sidebar on this outside the

12 presence of the jury later on.   Is this something that we need

13 to --

14        **MR. SCHNEIDER:**   What I can do, Your Honor, is we can

15 discuss whether or not they are admissible later and if they

16 are I can go over these documents to the jury in closing.   I

17 would be fine with that rather than asking the witness

18 questions.

19        **THE COURT:**   Okay.   Thank you.

20        **MR. FINK:**   Thank you, Your Honor.

21 **BY MR. SCHNEIDER:**

22 **Q.**   So when you were on the warden's forum you attended one of

23 the warden's forum meetings, one of the actual meetings with

24 the warden?

25 **A.**   Yes.

*11-14876; Griffin v. Condon, et al.*

*Randle Griffin - Cross*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 68

1        **MR. SCHNEIDER:**  Your Honor, I'm just asking for a

2   copy of the plaintiff's exhibit book on the witness stand, if I

3   could just have a moment, please.

4        **MR. FINK:**  Your Honor, may I approach with this?

5        **THE COURT:**  You may.

6   **BY MR. SCHNEIDER:**

7   **Q.**   All right, Mr. Griffin.  That's the plaintiff's exhibit

8   book.  Would you flip to Exhibit 6, please.

9        All right.  Exhibit 6, do you recognize that document?

10  **A.**   Yes.

11  **Q.**   That's the grievance you filed about this, the allegations

12  in this suit, correct?

13  **A.**   Yes.

14  **Q.**   All right.  And if you flip through Exhibit 7 -- I'm

15  sorry, just the first page of Exhibit 7, is that the response

16  you got at step one?

17  **A.**   Yes.

18  **Q.**   Now, in prison when you file a grievance you write

19  whatever you want, they issue a response, the prison does,

20  correct?

21  **A.**   Yes.

22  **Q.**   If you're not happy with it, you can appeal to step two?

23  **A.**   Yes.

24  **Q.**   And if you're not happy with that response, you can go to

25  step three?

*Randle Griffin - Cross*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 69

1   **A.**   Yes.

2   **Q.**   And you did that with this grievance, you went through the

3   three steps?

4   **A.**   Yes.

5   **Q.**   All right.  Exhibit 6 is your grievance, right?

6   **A.**   Yes.

7   **Q.**   Exhibit 7 is a step one response?

8   **A.**   Yes.

9   **Q.**   Exhibit 8 is the step two response?

10  **A.**   Yes.

11  **Q.**   And Exhibit 9 is the step three response?

12  **A.**   Yes.

13         **MR. SCHNEIDER:**  Your Honor, I would move to admit

14  Plaintiff's Exhibits 6 through 9.

15         **THE COURT:**  Any objection?

16         **MR. FINK:**  No objection, Your Honor.

17         **THE COURT:**  It's received as Plaintiff's Exhibits 6

18  through 9.

19  **BY MR. SCHNEIDER:**

20  **Q.**   All right.  You testified earlier you filed a lot of

21  grievances in prison, correct?

22  **A.**   Yes.

23  **Q.**   All right.  Normally when you file a grievance do you get

24  some kind of response as to the substance of the claim?

25  **A.**   No, typically each response is primarily the same.

*Randle Griffin - Cross*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 70

1  **Q.**   This particular response here was a rejection, correct?

2  **A.**   Yes.

3  **Q.**   They said you somehow violated the policy and had to redo

4  the grievance?

5  **A.**   No.  Yes, they said I had multiple issues.  That's what

6  they said.

7  **Q.**   All right.  Did you try to refile that grievance?

8  **A.**   No.

9  **Q.**   So with this grievance that you filed, nobody responded to

10  the merits in the prison, correct?

11  **A.**   No.

12  **Q.**   Did anybody respond to the merits?

13  **A.**   No, they just do like they always do.

14  **Q.**   When you had the loss of privileges for ten days from the

15  ticket?

16  **A.**   Yeah.

17  **Q.**   The Downard ticket.  You testified you were still allowed

18  to go to the law library?

19  **A.**   Yes.

20  **Q.**   How about meals, did you get fed in your cell or were you

21  allowed to go down to the chow hall?

22  **A.**   I was allowed to walk to the chow hall.

23  **Q.**   Anything else aside from meals and the law library?

24  **A.**   Yes.  I couldn't go to the warden's forum no more.  That

25  was over with.  I couldn't work anymore.  I couldn't

*Randle Griffin - Cross*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 71

1    participate in any of my leisure-time activities so I was

2    forced to stay in my cell from the time he laid me in until the

3    time I was found guilty.

4    **Q.**   So what I'm asking is, aside from going to law library and

5    meals, was there anything else that you were allowed to leave

6    your cell to go do?

7    **A.**   No.

8    **Q.**   How about the restroom.  Did you have a bathroom in your

9    cell or was that separate?

10   **A.**   That was down the hall.  You had to ask permission to go

11   to the bathroom.

12   **Q.**   Showers?

13   **A.**   You had to shower in the morning.  Again, you had to ask

14   for permission with your LOP for permission to take a shower.

15   **Q.**   Again, just to be clear, since this lawsuit or these

16   incidents, you have written to the ombudsman on behalf of

17   yourself for other issues, correct?

18   **A.**   Yes.

19   **Q.**   You have continued to file grievances, correct?

20   **A.**   Yes.

21   **Q.**   And lawsuits, correct?

22   **A.**   Yes.

23        **MR. SCHNEIDER:**  All right.  I have no further

24   questions.  Thank you.

25        **THE COURT:**  Does plaintiff have anything?


*11-14876; Griffin v. Condon, et al.*

*Randle Griffin - Redirect*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 72

1     **MR. FINK:**  Just a very narrow redirect, Your Honor,

2   if I may.

3          **THE COURT:**  Go ahead.

4          **MR. FINK:**  Thank you.

5       One moment, Your Honor.  I just want to pull a document.

6                        **-   -   -**

7                                        (10:37 a.m.)

8                **REDIRECT EXAMINATION**

9   **BY MR. FINK:**

10  **Q.**   Mr. Griffin, Mr. Schneider asked you if you were removed

11  from the warden's forum at a prior facility for I believe you

12  said threatening the good order of the facility?

13  **A.**   Yes.

14  **Q.**   Was that based on a letter you wrote?

15  **A.**   Yes.

16  **Q.**   Do you remember writing the letter?

17  **A.**   Yes.

18  **Q.**   If you saw the letter, would you recognize it?

19  **A.**   Yes.

20          **MR. FINK:**  Your Honor, may I approach with what I'm

21  going to put a label on as Plaintiff's Proposed Exhibit 61 as a

22  rebuttal to what was brought up on cross-exam?

23          **THE COURT:**  You may.

24          **MR. FINK:**  Thank you.

25          **THE COURT:**  Is Mr. Schneider going to object?

*11-14876; Griffin v. Condon, et al.*

*Randle Griffin - Redirect*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 73

1          **MR. SCHNEIDER:**  No, Your Honor.  It's fine.

2          **THE COURT:**  All right.  It's going to be received as

3    61.

4          **MR. FINK:**  Thank you.  So this is in evidence as

5    Exhibit 61 now.

6    **BY MR. FINK:**

7    **Q.**   Randle, do you recognize this document?

8    **A.**   Yes.

9    **Q.**   Is this the letter that you wrote to the regional prison

10   administrator?

11   **A.**   Yes, it is.

12   **Q.**   And this is the reason that you threatened the good order

13   of the facility according to the prison?

14   **A.**   Yes.

15   **Q.**   Could you read the letter to the jury, please.

16   **A.**   Yes.

17              "Dear RPA:

18                   "A newly elected warden forum is taking office

19              and many fear retaliation for redressing legitimate

20              complaints, e.g. retaliatory transfer, etc.

21                   "We have a very committed Forum and intend on

22              diligently challenging issues of concern to the

23              population, staying within the boundaries of

24              PD-O4-01-150.  Our job to represent the prisoner

25              population regardless if Administrative Staff might

*Randle Griffin - Redirect*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 74

1          want certain issues addressed.

2                  "Collectively, we are asking that the situation

3          be monitored closely.  It is not up to MDOC Staff to

4          conclude what they think is best for the prison

5          population, e.g., the current cable contract,

6          improper ventilation in the housing units, food

7          quality, etc.  We desire change and plan on achieving

8          such through diligent and professional redress.

9                  "No LRF Representative should be retaliated

10         against."

11      That's the only thing the letter said.

12  **Q.**   Threatening the good order of the facility?

13  **A.**   Yes, because I wrote this letter.

14  **Q.**   Did you say professionally and diligently address

15  grievances, is that what you said?

16  **A.**   Yes, sir.

17  **Q.**   And the warden of that prior facility said that that

18  letter was threatening the good order of the facility?

19  **A.**   Yes, yes.

20  **Q.**   And that was at least the pretextual reason for your

21  removal from the warden's forum at Gus Harrison, correct?

22  **A.**   Yes, that's what they used.

23  **Q.**   Did anyone say that to you before you ran for the warden's

24  forum before telling the ombudsman that Defendant Condon

25  assaulted a prisoner?

*11-14876; Griffin v. Condon, et al.*

*Randle Griffin - Redirect*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 75

1   **A.**   No.

2   **Q.**   No one ever said anything about your prior threat to the

3   good order of the facility?

4   **A.**   No they didn't.

5   **Q.**   Based on that letter?

6   **A.**   No.  No, they didn't.

7   **Q.**   In that letter you cite policy directives that you were

8   pursuing, right?

9   **A.**   Yes.

10   **Q.**   Is that the function of the warden's forum, to bring

11   issues that are of concern to the prisoner population in a

12   professional manner?

13   **A.**   Yes.  The policy, that same policy requires us to solicit

14   information and issues from the prison population to present to

15   the warden.

16   **Q.**   Do you remember who that warden was who removed you at the

17   prior facility?

18   **A.**   It was Mary Berghuis, but Deputy Warden Southerby was the

19   one that actually did it.  He just put her name down.

20   **Q.**   That letter was the reason that you were threatening the

21   good order of the facility?

22   **A.**   Yes.  That's the only thing I did was write this letter.

23   **Q.**   Mr. Griffin, Mr. Schneider asked you if you knew you were

24   laid in, and you had said at your deposition that you knew you

25   were laid in or knew why you were laid in.  What's the

*Randle Griffin - Redirect*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 76

1    reason -- or when did you come to learn that you were laid in?

2    **A.**   I came to learn I was laid in when I came up to do my

3    assignment, and Officer McMurtrie stopped me and asked what I

4    thought I was doing.  I said I was going to go to work.  He

5    said, "No, you no longer work for us.  Report back to your

6    cell.  You are laid in pending --

7    **Q.**   So once Officer McMurtrie told you, you knew the reason

8    you were laid in?

9    **A.**   Yes.

10   **Q.**   Is that what you meant by "I knew why I was laid in"?

11   **A.**   Yes.

12   **Q.**   Does the warden's forum representative have more

13   responsibilities than just attending the monthly meeting?

14   **A.**   Yes.  Yes, it does.

15   **Q.**   What else do you do throughout the month other than just

16   the meetings?

17   **A.**   Well, we have to -- we have different committees.  We have

18   the food service committee.  We have recreation, PBF.  There is

19   a lot of money involved in the PBF because we have what is

20   called a Prisoner Benefit Fund where the prisoners generate our

21   own money.  So when we get things in prison, the public is not

22   paying for it.  It's just money that we earn and we raise from

23   fundraisers and things like that.  So we have to figure out

24   ways that would best help the prison to spend this money.  And

25   when you are dealing with things such as large sums of money, I

*Randle Griffin - Redirect*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 77

1   mean like hundreds of thousands of dollars and you try to

2   address certain issues, they don't like that.

3   **Q.**   So the warden's forum, in sum, has more responsibilities

4   on a day-to-day basis than just going to the meetings?

5   **A.**   Oh, yes, yes, yes.

6   **Q.**   Randle, are you familiar with prison policy?

7            **THE COURT:**  Mr. Griffin.  That's at least the second

8   time you have done it.

9            **MR. FINK:**  I apologize, Your Honor.

10  **BY MR. FINK:**

11  **Q.**   Mr. Griffin, I apologize.

12  **A.**   Yes.

13  **Q.**   Are you familiar with the policy directives and prison

14  guidelines?

15  **A.**   Yes, very.

16  **Q.**   Mr. Schneider asked you about refiling your grievance on

17  the issues in this case.  Do you remember that?

18  **A.**   Yes.

19  **Q.**   Why couldn't you refile your grievance?

20  **A.**   Because MDOC policy states that -- 03021130 clearly states

21  that you cannot refile the same grievance, it would be

22  duplicate, it says.  Now, if they reject the grievance, you

23  still have the right to appeal it to step two and to step

24  three.

25  **Q.**   So your choices, if I understand you correctly, are either

*Randle Griffin - Recross*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 78

1    appeal it or drop it?

2    **A.**    Exactly.

3    **Q.**    And if they decide that you are wrong, it's too bad?

4    **A.**    Yes.

5           **MR. FINK:**  That's all I have, Your Honor.

6           **THE COURT:**  Any recross as far as you are concerned,

7    Mr. Schneider?

8           **MR. SCHNEIDER:**  Yes, Your Honor, just a couple of

9    questions.

10                        **-  -  -**

11                                          (10:44 a.m.)

12                   **RECROSS-EXAMINATION**

13   **BY MR. SCHNEIDER:**

14   **Q.**   Mr. Griffin, it's true that organized protests are not

15   allowed in prison, correct?

16   **A.**    Yes, it's not.

17   **Q.**    And your duties on the warden's forum involved raising

18   issues to the warden, correct?

19   **A.**    Yes, but we have to present them to the administrative

20   assistant as well.

21          **MR. SCHNEIDER:**  Okay.  Thank you.

22          **THE WITNESS:**  Okay.

23          **MR. FINK:**  Your Honor, may I ask one question and

24   that's it on redirect?

25          **THE COURT:**  I just want to invite the jury to reflect

*11-14876; Griffin v. Condon, et al.*

*Randle Griffin - Redirect*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 79

1    upon the fact, and I have been doing this quite a while myself,

2    what Mr. Fink is doing, and I certainly am as guilty as anyone,

3    but lawyers are terrible liars.  They get up and say they want

4    to ask one question and they always, they always -- well, not

5    always --

6              **MR. FINK:**  I would stipulate to one question, Your

7    Honor.

8              **THE COURT:**  All right.

9              **MR. FINK:**  Thank you.

10                         -    -    -

11                                             (10:45 a.m.)

12                      **REDIRECT EXAMINATION**

13   **BY MR. FINK:**

14   **Q.**   Mr. Griffin, at any point were you trying to organize a

15   protest at the facility that you were removed from the warden's

16   forum?

17   **A.**   No, sir.

18             **MR. FINK:**  Thank you.

19             **THE COURT:**  Anything from you, Mr. Schneider?

20             **MR. SCHNEIDER:**  No, Your Honor.  No questions.

21             **THE COURT:**  Very well.  We're going to take a break.

22   We're leaving Mr. Griffin as a witness in the witness box.  We

23   may excuse you when we get the jury back, but right now you are

24   still under oath.

25        Please go to the jury room.

                    *11-14876; Griffin v. Condon, et al.*

*Randle Griffin - Redirect*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 80

1          (Jury out at 10:46 a.m.)

2               **THE COURT:**  Can we have a sidebar?

3               **MR. FINK:**  Sure.

4               **THE COURT:**  Mr. Griffin, you can return to counsel

5      table if you prefer.

6               **MR. MOODY:**  Your Honor, with the Court's permission,

7      may I excuse myself?

8               **THE COURT:**  Yes.

9               **MR. MOODY:**  Thank you.

10          (At side bar on the record out of the hearing of the jury,

11          as follows:)

12               **MR. FINK:**  I'm a liar.

13               **THE COURT:**  Not seriously.

14               **MR. FINK:**  I know.  I'm kidding.

15               **MR. SCHNEIDER:**  All right.  So, Your Honor, a big

16      thing that's at issue in this case is why the plaintiff was

17      removed from the warden's forum.  We have evidence of that,

18      that the inspector was investigating him for numerous

19      instances.  One of the exhibits I have offered is the actual

20      memo from the inspector.  Not to prove the proof of the matter.

21      We don't know, we don't care whether or not Mr. Griffin was

22      actually involved in these things, but that is the reason that

23      they used to remove him from the forum, and the warden issued

24      this permanent ban on him as a result of that.

25               **MR. FINK:**  Your Honor, two issues.  The first issue

*11-14876; Griffin v. Condon, et al.*

*Randle Griffin - Redirect*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 81

1  is this.  When we first came to trial and made a stipulation,

2  we agreed that so long as we didn't introduce evidence of any

3  physical injury, nothing related to the March 15th alleged

4  assault would come into evidence.  Both of these documents

5  reference an assault that Mr. Schneider agreed that he would

6  not submit evidence on.

7       But even further, Your Honor, Mr. Griffin, as now the

8  document in evidence indicates, was removed from the forum on

9  March 10th.  These documents are subsequent to that assault so

10 they have no relevance because he had already been removed from

11 the forum before March 15th when this alleged assault occurred.

12 Therefore, it becomes unfairly prejudicial to mention some

13 alleged incident he had with another inmate, and it's also

14 something Mr. Schneider agreed to before.

15      **THE COURT:**  I'm not going to stick Mr. Schneider with

16 something he already agreed to.

17      **MR. FINK:**  Okay.

18      **THE COURT:**  But I agree with the plaintiff on this.

19 I don't think it's relevant, and it's prejudicial or at least

20 potentially so, which doesn't mean we can't come back to it,

21 but I'm not going to allow it right now.  I don't see its

22 connection.

23      **MR. FINK:**  Thank you, Your Honor.

24      **THE COURT:**  Okay.  Thank you.

25      **MR. FINK:**  Are we in recess for a moment?

*Randle Griffin - Redirect*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 82

1      **THE COURT:**  Yes, we are.

2      **MR. FINK:**  Thank you, sir.

3      (End of discussion at side bar.)

4      **THE COURT:**  Court is in recess.

5      **THE CLERK:**  All rise.

6      (Recess from 10:49 a.m. to 11:10 a.m.)

7      **THE CLERK:**  All rise.  The Court is reconvened in the

8  case of *Randle Griffin v. Louis Condon, et al.*, Case Number

9  11-14876.

10      **THE COURT:**  Are we ready to proceed or is there

11  something else?

12      **MR. HUBBARD:**  Plaintiff is ready, Your Honor.

13      **MR. SCHNEIDER:**  Ready, Your Honor.

14      **THE COURT:**  Bring in the jury.

15      There's somebody new at plaintiff's table.  I suppose we

16  don't have to get into it now.

17      **MR. HUBBARD:**  Lynne Hess from the Dickinson Wright

18  law firm.  She's a paralegal and has accompanied me on many

19  trials before.

20      **THE COURT:**  Welcome.

21      **MS. HESS:**  Thank you.

22      **THE CLERK:**  All rise for the jury.

23      (Jury in at 11:11 a.m.)

24      **THE COURT:**  Members of the jury, please be seated.

25  Thank you for your patience, and thank you for being

*11-14876; Griffin v. Condon, et al.*

*Jessica Zimbelman - Direct*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 83

1   cooperative.  We are getting a lot done so far today with the

2   witness who is the plaintiff in this case, who has now been

3   excused from the stand and gone back to counsel table, and

4   plaintiff will call their next witness.

5           **MR. HUBBARD:**  Yes indeed, Your Honor.

6       Your Honor, plaintiff now calls Ms. Jessica Zimbelman to

7   the stand.

8           **THE COURT:**  Come right here and take the oath,

9   please.

10                          -   -   -

11                     **JESSICA ZIMBELMAN,**

12          being first duly sworn to tell the truth,

13          was examined and testified upon her oath

14          as follows:

15          **THE COURT:**  Ms. Zimbelman, welcome.  Please be

16   seated.

17      You may examine.

18          **MR. HUBBARD:**  Thank you, Your Honor.

19                          -   -   -

20                                          (11:12 a.m.)

21                      **DIRECT EXAMINATION**

22   **BY MR. HUBBARD:**

23   **Q.**  Ms. Zimbelman, first, thank you very much for being here

24   today.  I understand that you are a lawyer and you are of

25   course juggling a busy schedule so thank you.

*11-14876; Griffin v. Condon, et al.*

*Jessica Zimbelman - Direct*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 84

1    You are indeed a current lawyer, but where are you

2    employed?

3    **A.**   I work for the State Appellate Defender Office.

4    **Q.**   And is that abbreviated SADO, S-A-D-O?

5    **A.**   Yes.

6    **Q.**   Thank you.  What exactly do you do while working with

7    SADO?

8    **A.**   I represent indigent criminal defendants on the appeal of

9    their convictions whether by trial or guilty plea.

10   **Q.**   And when you say indigent, what do you mean?

11   **A.**   An individual who cannot afford an attorney, to hire an

12   attorney for their appeal.

13   **Q.**   And you say you argue for their appeal.  Is it safe to say

14   that you have appeared before the Michigan Court of Appeals?

15   **A.**   Yes.

16   **Q.**   In fact, you have actually appeared before the

17   United States Supreme Court, correct?

18   **A.**   Correct.

19   **Q.**   On your we'll call it "down time" you also happen to be an

20   adjunct professor for Michigan State University College of Law,

21   correct?

22   **A.**   Correct.

23   **Q.**   And what do you teach there?

24   **A.**   I teach two classes.  I teach a moot court class

25   essentially instructing second-year law students about

*11-14876; Griffin v. Condon, et al.*

*Jessica Zimbelman - Direct*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 85

1   appellate law, and I teach a first-year writing and advocacy

2   course.  That's what I'm currently teaching this semester.

3   **Q.**   How long have you been employed with SADO?

4   **A.**   Since August of 2012.

5   **Q.**   And did you have an occupation before that?

6   **A.**   Yes.

7   **Q.**   And can you please tell me what that was?

8   **A.**   I was a senior analyst with the Legislative Ombudsman's

9   Office.

10  **Q.**   When you say the ombudsman's office, what do you mean?

11  **A.**   I worked as a staff member for that office.  I guess I

12  don't really understand what you're looking for.

13  **Q.**   Sure.  Is it fair to say that you have an appreciation and

14  understanding as to what the ombudsman's office actually is and

15  the duties that it performs, correct?

16  **A.**   Yes.

17  **Q.**   Okay.  Can you tell us what your understanding is as to

18  what the ombudsman's office actually does?

19  **A.**   The ombudsman's office was created by state statute, and

20  the task, I suppose, was to investigate and monitor the

21  Michigan Department of Corrections on behalf of the state

22  legislature.  That wasn't particular to representing prisoner

23  complaints exclusively.  There were staff issues.  We certainly

24  had the authority to investigate those as well.  Primarily what

25  we ended up doing on a day-to-day basis was fielding letters

*Jessica Zimbelman - Direct*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 86

1  and complaints from prisoners about things that were occurring

2  in the Michigan Department of Corrections.

3  **Q.**   So it's fair to say then that you would actually

4  investigate prisoner complaints, correct?

5  **A.**   Correct.

6  **Q.**   And while you worked with the ombudsman's office, that was

7  part of your job duties?

8  **A.**   Correct.

9  **Q.**   And during such investigations would you investigate the

10  security and the safety of prisoners?

11  **A.**   Yes.

12  **Q.**   And what about their living conditions.  That as well?

13  **A.**   Yes.

14  **Q.**   Medical treatment?

15  **A.**   Yes.

16  **Q.**   And it's an office created by statute, you said, correct?

17  **A.**   Yes.

18  **Q.**   What do you mean when you say that?

19  **A.**   The legislature passed a bill, which the governor signed

20  into law, to create and fund our office.  So it is an office

21  that the state legislature and governor presumably wanted to

22  exist.

23  **Q.**   And while you were employed there, is it fair to say that

24  you were carrying out the purpose of that statute?

25  **A.**   To the best of my ability, yes.

*Jessica Zimbelman - Direct*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 87

1    **Q.**   And while -- well, strike that.

2         While you were employed there, did you actually undergo

3    investigations of prison facilities?

4    **A.**   Yes.

5    **Q.**   And you did that under the authority of the statute,

6    correct?

7    **A.**   Correct.

8    **Q.**   So it was an authorized investigation by law, correct?

9    **A.**   Yes.

10   **Q.**   Did you take your job seriously?

11   **A.**   Yes.

12   **Q.**   Were you proud of the work that you did?

13   **A.**   Yes.

14   **Q.**   Ms. Zimbelman, being here today is actually a bit

15   difficult for you, isn't it?

16   **A.**   Yes.

17   **Q.**   Could you explain to us why?

18   **A.**   When I worked for the ombudsman's office, I had a very

19   different role or my job was very different than it is now.  So

20   some discussions about my work or investigations that I did

21   five, six, seven years ago I would, I would hate to see any

22   damage come to relationships that I have built in my new role

23   as an assistant defender with SADO because of work that I did

24   when I was operating under a different job.

25   **Q.**   So from your perspective being here today talking about

*11-14876; Griffin v. Condon, et al.*

*Jessica Zimbelman - Direct*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 88

1   the investigations that you underwent causes you concern

2   regarding your current professional role at SADO, correct?

3   **A.**   Correct, in addition to concern about the mission of the

4   ombudsman's office being -- I don't want to say harmed, but

5   there being some effect to that mission by certain things being

6   made public.

7   **Q.**   Notwithstanding those concerns, do you stand by the work

8   that you did while employed by the ombudsman's office?

9   **A.**   I do.

10  **Q.**   Do you know how many prison facilities there actually are

11  in the State of Michigan?

12  **A.**   I think we're down to about 35.  I know that when I

13  started with the ombudsman's office there were more prisons,

14  but several have closed.

15  **Q.**   Located in both the lower peninsula and the upper?

16  **A.**   Yes.

17  **Q.**   In your role as an investigator for the ombudsman's office

18  did you have occasion to visit all 35 of those prisons?

19  **A.**   I did.

20  **Q.**   And when you actually undertook an investigation, was it a

21  regular practice of yours to record with whom you spoke, where

22  you visited and the activities which you undertook?

23  **A.**   Yes.  My practice when I was doing that would be to take

24  handwritten notes while visiting and talking with the

25  individual prisoners that I was interviewing.  You can't take

*Jessica Zimbelman - Direct*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 89

1   computers into a correctional facility so I used handwritten

2   notes on a legal pad, and then I would subsequently when I was

3   back in the office transcribe those notes into our database

4   that we had to track the complaints that we received.

5   **Q.**   And when you're undergoing that process, because of the

6   inability to actually physically carry a computer into the

7   prison facility, you of course strived to accurately record

8   what were originally handwritten notes into the database,

9   correct?

10  **A.**   Yes.

11  **Q.**   And that database serves a purpose, correct?

12  **A.**   Yes.

13  **Q.**   And is that so that you can recall upon the visit and the

14  investigations that you have historically had to refresh your

15  memory as to what actually occurred?

16  **A.**   Yes.

17  **Q.**   Before you would actually go and visit a prison facility,

18  so, for example, if you know you are going to be visiting a

19  prison facility in the following week, would you prearrange for

20  your visit?

21  **A.**   Yes.

22  **Q.**   How so?

23  **A.**   Our -- I was going to say yes, to the best of my

24  recollection.  I don't believe, while the statute allowed us to

25  show up at a correctional facility, I don't actually remember

*Jessica Zimbelman - Direct*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 90

1   doing that unannounced, but I may have.  But the normal process

2   for me when I was going into a facility would be to email the

3   administrative assistant, which is an individual that works

4   usually in the warden's office.  And I would usually be

5   accompanied by a colleague of mine.  We initially were called

6   investigators.  We changed our title to analyst.  So

7   two investigators or analysts would go.  I would usually email

8   the administrative assistant and give them a list of prisoners

9   we wanted to speak to.

10  **Q.**   Why would you do that?

11  **A.**   To make it as easy as possible on correctional staff.

12  Usually we would be talking to about 12 -- 10 to 15 prisoners

13  in a day.  That's a logistical burden on the MDOC staff and

14  facility staff so we were trying to be as accommodating as

15  possible.

16  **Q.**   So, by and large, it was your regular practice to arrive

17  announced rather than unannounced, correct?

18  **A.**   Correct.

19  **Q.**   And the prison facility staff was aware of that because

20  you would communicate with them regarding your upcoming visit?

21  **A.**   I cannot say who knew what besides the single individual

22  that we would email to set up these appointments.  I don't know

23  what that individual then told other staff.

24  **Q.**   In your experience and observation -- well, strike that.

25       How many years did you undergo investigations for the

*Jessica Zimbelman - Direct*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 91

1   ombudsman's office?

2   **A.**   I worked there from February 2009 until July of 2012.

3   Approximately 3 1/2 years.

4   **Q.**   From your experience in doing the investigations at the 35

5   prison facilities throughout the State of Michigan and coming

6   in announced, was it your understanding and perception that

7   word that you were coming spread pretty quickly?

8   **A.**   I would say yes, that is my impression.  It was a little

9   bit different facility to facility.  Sometimes we would be --

10   the prisoners themselves would be called out and we would meet

11   with them in the visiting room so we weren't actually in the

12   housing units, but other prisons the staff would accompany us

13   to the housing units to meet with these individuals in an

14   office within the housing unit.  So in those cases where they

15   were called up to the front to the visiting room I can't say

16   for sure what the housing unit staff might have known.  I have

17   to assume that if we were in the housing units the housing unit

18   staff knew who were in their units.

19   **Q.**   In my mind I picture working at a restaurant and the

20   health department is coming in and those who are working in the

21   kitchen appreciate that indeed the health department will be

22   coming soon.  Is that a safe analogy?

23   **A.**   I think that's a safe analogy.

24   **Q.**   You mentioned the housing unit, and I want to follow up on

25   that.  You would have one way in which you would undergo an

*Jessica Zimbelman - Direct*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 92

1    investigation would be to visit the housing unit actually in a

2    room within the housing unit, correct?

3    **A.**    Correct.

4    **Q.**    Did you also ever arrange to have a tour of the housing

5    unit?

6    **A.**    I believe, from my recollection, I took a tour of each

7    correctional facility in the state over the course of those

8    three and-a-half years.  Usually the MDOC staff who was guiding

9    the tour would take us through a housing unit, usually not

10   every housing unit in a facility.  But I have been in many and

11   toured many housing units across the state.

12   **Q.**    You don't specifically recollect which ones you did or did

13   not?

14   **A.**    No.

15   **Q.**    Is that because there's so many?

16   **A.**    Yes.

17   **Q.**    Is it fair to say also that undergoing investigations you

18   don't specifically recollect with whom precisely you visited

19   with, whom you talked with, and the allegations that were made

20   with regard to each of the visits?

21   **A.**    That's certainly true.

22   **Q.**    In fact, that's a reason why you record what actually

23   happens during your visit, correct?

24   **A.**    Correct.

25   **Q.**    Ms. Zimbelman, I'm going to switch gears now from your

*Jessica Zimbelman - Direct*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 93

1   actual general background and your job duties at the

2   ombudsman's office to this case.  Are you aware in this case

3   that my client, Mr. Griffin, is alleging that he met with you

4   during one of your investigations and that as a result of

5   participating in that investigation the three defendants

6   sitting to my left retaliated against him, among other ways, by

7   verbal abuse and then also by writing misconduct tickets?

8   **A.**   I am aware that that's the base and substance of the

9   claim.

10  **Q.**   Now, because you did so many prison visits and

11  investigations, you don't actually have a mental picture of

12  Mr. Griffin walking in or speaking with you, correct?

13  **A.**   Correct.

14          **MR. HUBBARD:**   Permission, Your Honor, to approach the

15  witness?

16          **THE COURT:**   You may.

17  **BY MR. HUBBARD:**

18  **Q.**   Ms. Zimbelman, I have handed to you an exhibit that's been

19  marked as Plaintiff's Proposed Exhibit 59.  If you could just

20  take a brief moment and look at it.  There's two pages there.

21      My first question for you is simply, do you recognize this

22  document?

23  **A.**   Yes.

24  **Q.**   Will you please tell the jury what it is.

25  **A.**   This is a printout from the database we use to track cases

*11-14876; Griffin v. Condon, et al.*

*Jessica Zimbelman - Direct*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 94

1   as well as with the ombudsman's office.  There are several

2   fields that are filled out regarding who the prisoner is making

3   the complaint, where he or she is now, what happened, a brief

4   description of the case, and several fields for different

5   contacts or steps that were taken in the investigation.

6   **Q.**   And you see in the upper left-hand corner where it says

7   "Case Information"?

8   **A.**   Yes.

9   **Q.**   And immediately below that is reference to a "Case

10  Number," correct?

11  **A.**   Correct.

12  **Q.**   And this is important, but below that is the name of a

13  prisoner; do you see that?

14  **A.**   I do.

15  **Q.**   And can you please tell the jury what the name of that

16  prisoner is.

17  **A.**   Jeffrey Bryant.

18          **THE COURT:**  Is this document in evidence?

19          **MR. HUBBARD:**  I'm sorry, Your Honor?

20          **THE COURT:**  Is it in evidence?

21          **MR. HUBBARD:**  Your Honor, we have established

22  authenticity.  I'm pleased to offer the exhibit into evidence

23  as Exhibit 59.

24          **THE COURT:**  Anybody object from either side?

25  Mr. Schneider.

*11-14876; Griffin v. Condon, et al.*

*Jessica Zimbelman - Direct*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 95

1      **MR. SCHNEIDER:**  Just one moment.  I'm reading the

2  document, Your Honor.

3      No objection, Your Honor.

4          **THE COURT:**  It's received as -- 59?

5      **MR. HUBBARD:**  Yes, Your Honor.

6          **THE COURT:**  It's received, Plaintiff's 59, in

7  evidence.

8      Go ahead.

9      **MR. HUBBARD:**  Thank you, Judge.

10  **BY MR. HUBBARD:**

11  **Q.**  The prisoner's name that's on the document in the upper

12  left-hand corner says "Jeffrey Bryant."  You would agree with

13  that?

14  **A.**  Yes.

15  **Q.**  And what was the location just below that?

16  **A.**  The location the issue arose from was Gus Harrison

17  Correctional Facility.

18  **Q.**  What's the significance of Jeffrey Bryant's name being

19  right next to "Prisoner"?  I mean why is that entry there?

20  **A.**  It's, it's one of many fields.  If I recall, when this

21  database was being created we wanted to be able to run reports

22  and to do that you had to have different fields, and having a

23  prisoner's name would allow us as staff to be able to search

24  any other complaints, I mean, and you call people by their

25  names.  We definitely corresponded with our individual people

*Jessica Zimbelman - Direct*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 96

1   that were complaining, and I'm not going to call them by a

2   prison number.  I'm going to call him Mr. Bryant.

3   **Q.**   And is it because this particular case that we're looking

4   at on Exhibit 59 is about Prisoner -- Mr. Bryant?

5   **A.**   Can you repeat that?

6   **Q.**   You would agree that the document that we're looking at

7   here and the entries that follow actually relate to Mr. Bryant,

8   correct?

9   **A.**   Yes.

10  **Q.**   Okay.  And that's because in the upper left-hand corner

11  where it says "Case Information," that's what this is about,

12  Mr. Bryant?

13  **A.**   Yes.

14  **Q.**   Below that, about the middle of the page, it says

15  "Actions."  Do you see that?

16  **A.**   Yes.

17  **Q.**   And below that is "Contactor," and to the right, "Date,

18  Action, Contact Type, Contactee."  Do you see all of that?

19  **A.**   Yes.

20  **Q.**   Could you please turn to Page 2.

21  **A.**   Yes.

22  **Q.**   The second entry so happens to start with your name,

23  Ms. Zimbelman.  Do you see that?

24  **A.**   I do.

25  **Q.**   And can you tell the jury what the date is to the right of

*Jessica Zimbelman - Direct*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 97

1    that?

2    **A.**   February 9, 2011.

3    **Q.**   And two more columns to the right, what does it say?

4    **A.**   "Visit."

5    **Q.**   What does that signify?

6    **A.**   It means that I did an in-person visit with the prisoner.

7    **Q.**   And below your name there are two paragraphs.  Do you see

8    it?

9    **A.**   I see four paragraphs.

10   **Q.**   Forgive me.  You are indeed correct.  I say two because I

11   desire to have you look at the second.

12   **A.**   Okay.

13   **Q.**   And the second paragraph reads, "Griffin -- Mr. Griffin,

14   my client -- Prisoner Number 196968, stopped in during the

15   interview and said they were really harassing Bryant," and it

16   goes on to say that, "ADW Chapman said it was a racist facility

17   but there was nothing they could do."  Do you see that?

18   **A.**   I do.

19   **Q.**   And these are notes that you actually placed into this

20   document, correct?

21   **A.**   Correct.

22   **Q.**   And they are essentially done contemporaneously with your

23   visit once you got back to the office and taken from your

24   notepad, correct?

25   **A.**   Yes, but there were times when I would do visits on

*Jessica Zimbelman - Direct*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 98

1   Fridays and I would not enter my notes into the computer until

2   Monday.  I have no specific recollection of sitting at my

3   computer typing my notes in with this particular entry so I

4   can't say for sure when I did that, but it would usually be the

5   next business day I was in the office.

6   **Q.**   Perhaps more importantly is my next question.  Do you have

7   any reason to believe that the notes that you placed in here

8   regarding Mr. Griffin coming in to visit you on February 9th,

9   2011 to be untrue?

10  **A.**   No.

11  **Q.**   So you believe them to in fact be true, correct?

12  **A.**   Yes.

13  **Q.**   Ms. Zimbelman, after three and-a-half years at the

14  ombudsman's office and after investigating and visiting 35

15  different prison facilities, how many facilities in the State

16  of Michigan did you actually undergo and produce a report on?

17  **A.**   If your question is how many reports I did about a

18  facility-wide issue, I would say that to the best of my

19  recollection it was one.

20  **Q.**   And when you say a facility-wide issue, what do you mean?

21  **A.**   There were a lot of reports or letters or actions I would

22  take and reports I would write that may be about a discrete

23  issue.  For example, I remember one case I worked on that was a

24  medical issue about an individual that needed a knee

25  replacement.  There was a lot of investigation and report

*11-14876; Griffin v. Condon, et al.*

*Jessica Zimbelman - Direct*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 99

1   writing done there, and it was a problem with a facility

2   position so that would be a facility investigation in my mind,

3   but it wasn't about the whole -- it was a very discrete issue.

4   I also did one report on the Michigan Department of Corrections

5   security classification system.  That was more of a central

6   office report type issue.

7       So there were various reports done on discrete issues or

8   more policy based, but about a facility in and of itself and

9   repetitive issues that we were hearing from prisoners, one.

10  **Q.**   And when you say "widespread" I believe is your word, do

11  you use that terminology because the report was relative to

12  issues and problems that you viewed permeated the entirety of

13  the facility?

14          **MR. SCHNEIDER:**  Your Honor, I'm going to object to

15  lack of relevance.  I think she's here to testify about this

16  one investigation.

17          **THE COURT:**  I think I will agree with Mr. Schneider.

18  I don't -- maybe there's something here I don't understand, but

19  right now I don't understand why declaring something widespread

20  is going to help the jury.

21          **MR. HUBBARD:**  Your Honor, that's actually --

22          **THE COURT:**  So I'm, I'm accepting the objection.

23          **MR. HUBBARD:**  I think for now, Your Honor, that's a

24  fair comment and ruling by the Court, but I'll cut right to the

25  chase and it's because of a question that I actually haven't

*Jessica Zimbelman - Direct*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 100

1   asked yet and I think it will make it directly relevant to this

2   particular case.

3   **BY MR. HUBBARD:**

4   **Q.**   The one report that you did, Ms. Zimbelman, out of all of

5   the investigations regarding a facility, what facility was

6   that?

7   **A.**   Gus Harrison Correctional Facility.

8   **Q.**   That's the same facility that Mr. Griffin was actually

9   located in.  You are aware of that, correct?

10  **A.**   Correct.

11  **Q.**   And the report that you did was for the time period 2009

12  until February 2011 is when you actually issued the report,

13  correct?

14        **MR. SCHNEIDER:**   Same objection, Your Honor, as to

15  relevance.  The report has nothing to do with this case.

16        **MR. HUBBARD:**   It certainly does have something --

17        **THE COURT:**   Overruled at least now unless we go into

18  waters that are undisturbed thus far.  You can go ahead.

19        **MR. HUBBARD:**   Thank you, Your Honor.  The testimony

20  will establish as we go forward that the permeating problem at

21  the same facility in which my client was located in at the time

22  of the alleged allegations happens to be reported on as the

23  same exact conduct that my client complains of.  So I

24  appreciate the objections by counsel, but counsel knows exactly

25  where I'm going with this and he knows exactly what the report

*Jessica Zimbelman - Direct*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 101

1   is, and soon I will seek to admit the report.

2         **MR. SCHNEIDER:**  Your Honor, I had an objection, we

3   had a ruling, and I don't know what this is now so if we could

4   move on with the questioning I would appreciate that.

5         **THE COURT:**  What did you say?

6         **MR. SCHNEIDER:**  Your Honor, I had an objection.  We

7   already had a ruling.  I object now to the speech by counsel

8   here.

9         **THE COURT:**  I, I'm not sure I understand where it's

10  going here, but I won't overrule you right now, but I don't

11  know that I'll let you go much farther.

12        **MR. HUBBARD:**  Permission to approach the witness,

13  Your Honor, with the report.

14        **THE COURT:**  Yes.  Are you offering this in evidence

15  or is it for the purpose of refreshing recollection?

16        **MR. HUBBARD:**  If I may, Your Honor, actually

17  establish a foundation, then I'll seek to have it admitted as

18  an exhibit into evidence.

19        **MR. SCHNEIDER:**  What exhibit?

20        **MR. HUBBARD:**  Exhibit Number 44.

21  BY MR. HUBBARD:

22  **Q.**   Ms. Zimbelman, the one report that you did relative to Gus

23  Harrison Correctional Facility, I have presented to you Exhibit

24  Number 44.  Do you recognize that document?

25  **A.**   I do.

*Jessica Zimbelman - Direct*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 102

1  **Q.**   And can you please explain for us what that document is?

2  **A.**   This is a report that I wrote.  It's dated February 14th,

3  2011.  It is on Gus Harrison Correctional Facility, the south

4  side.  There are two sides to Gus Harrison Correctional

5  Facility that are essentially different prisons.  This report

6  was focused by and large on the south side.

7       This is a report that I compiled over a couple of years,

8  according to my notes.  I don't have any independent

9  recollection of the time frame of this investigation, but it

10  was about a large number of complaints coming from prisoners

11  about their treatment at Gus Harrison Correctional Facility

12  South.

13  **Q.**   And before we get into the specific allegations and just

14  to lay further foundation, Your Honor, as to the relevance of

15  the document, does this particular report contain allegations

16  directed at any of the defendants?

17  **A.**   Yes.

18       **MR. HUBBARD:**   Your Honor, at this time I move to

19  admit this particular exhibit into evidence.  If Your Honor

20  desires to have a sidebar relative to counsel's objections, I'm

21  pleased to have that.

22       **THE COURT:**   Not necessarily about this, but I

23  certainly will let this go at this point.  I'm a little bit

24  puzzled as to what, what evidence this has that the jury is

25  going to be helped by, but maybe there's something in review

*11-14876; Griffin v. Condon, et al.*

*Jessica Zimbelman - Direct*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 103

1  will be there as a result of reading or reporting on this

2  document we'll know, and Mr. Schneider is objecting.

3      **MR. SCHNEIDER:**  I am, Your Honor.  Do you want my

4  objection on the record?

5      **THE COURT:**  It can be on the record later if you want

6  it to be, but I don't need it on the record right now.

7      **MR. SCHNEIDER:**  Okay.

8      **THE COURT:**  So go ahead.  Overruled.

9      **MR. HUBBARD:**  Thank you, Your Honor.

10     If I may, I would actually like to present the document up

11  here, and Ms. Hess has the capability of doing that so that

12  when I'm asking the witness as to particular documents I would

13  like for the jury to actually be able to see it.

14     **THE COURT:**  I'm confused, and maybe this information

15  has just come into my possession and I'm -- I have no right to

16  be confused about it, but did this just get admitted?

17     **MR. HUBBARD:**  I moved for its admission, Your Honor,

18  counsel I believe stated its objection, and I think the

19  document is indeed admitted into evidence.

20     **MR. SCHNEIDER:**  Your Honor, I would like to place my

21  objection on the record.  It's hearsay, and Rule 403 requires

22  exclusion of this document.  If you have a copy of the

23  plaintiff's exhibit book up there, I would request that you

24  review the document before ruling on it.  I don't think that it

25  has anything to do with this case.

*11-14876; Griffin v. Condon, et al.*

*Jessica Zimbelman - Direct*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 104

1          **MR. HUBBARD:**  Your Honor, if I may --

2          **THE COURT:**  I'm not going to review it with the jury

3    sitting here.  I might review it later and give the corrective

4    instruction to the jury, but I think this is getting too

5    complicated.  I know what we're talking about on both sides of

6    this and the issue is something reported in a document that

7    happened that's relevant to what the parties are arguing about

8    here and if indeed it's admissible and if indeed it's not

9    admissible, and if it turns out that this is objectionable for

10   some reason, I am confident an effective corrective instruction

11   can be given to the jury.

12          **MR. HUBBARD:**  Thank you, Your Honor.  Just to follow

13   up, given the significance of this document, I actually have a

14   pocket brief for the Court's consideration.  It's just

15   five pages.

16          In response to the hearsay objection, the pocket brief

17   sets forth that indeed the document is not hearsay underneath

18   803(8) because this is a public report.  This is a report that

19   was done via authorized investigation by a statute.  Under

20   803(8) that document comes in.

21          Regarding the objection of relevance and probative value,

22   underneath 404(b) the document comes in again.  Underneath

23   404(b) you can introduce evidence regarding a plan or

24   conspiracy or scheme regarding which the conspiracy pertained

25   to.  So, for example, if there are or is a larger plan or

*Jessica Zimbelman - Direct*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 105

1   scheme going on, which this document reports about, of which

2   the allegations that are being made in this case are a part of,

3   then indeed the document is admissible for that purpose.

4       So I appreciate Your Honor allowing me to state that for

5   the record, but I can assure the Court and the jury that indeed

6   this document is very relevant to this case.

7          **THE COURT:**  Very well.  You have made your record and

8   I think Mr. Schneider pretty much has indicated what problem he

9   has with it, and to the extent there's an objection, it's

10  overruled.

11  **BY MR. HUBBARD:**

12  **Q.**   Ms. Zimbelman, this is a report that was actually prepared

13  by you, correct?

14  **A.**   Correct.

15  **Q.**   And the date you will see at the upper left-hand corner is

16  February 14, 2011, correct?

17  **A.**   Correct.

18  **Q.**   And you will recall that the date of Mr. Griffin's visit

19  with you at that particular facility was dated February 9th,

20  2011, correct?

21  **A.**   Correct.

22         **MR. HUBBARD:**  I would like to -- Your Honor, for ease

23  of the process, may I approach the screen and step away from

24  the podium just to assist Ms. Hess in terms of which portions I

25  would like for her to zoom in on?

*Jessica Zimbelman - Direct*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 106

1      THE COURT:  You can at least preliminarily.  I,
2  especially where there's a jury present, we are asking the jury
3  to do something, which we are, I am very reluctant to say this
4  paragraph has 350 words in it, will you read it or maybe it has
5  several more pages and I'm not going to let that go to the jury
6  as something that they implicitly have to grasp and understand.
7  If this does something and it can be described in a fairly
8  brief way, certainly this witness or someone else or whatever
9  is appropriate can happen to describe it, but if you're headed
10  toward taking a five-page document and putting it in the record
11  by somebody reciting it, I'm a little bit, little bit
12  antagonistic to that if you understand what I'm saying.
13      MR. HUBBARD:  I certainly do, and I respect the
14  Court's comments.  Your Honor, I think that this will take no
15  more than five minutes.
16      THE COURT:  Okay.
17      MR. HUBBARD:  Thank you, Judge.
18      THE COURT:  It's certainly not five pages.
19      MR. HUBBARD:  No, but I'll cut right to the chase.
20      Ms. Hess, could you please zoom in on the first
21  two sentences, please.  Three actually.
22  BY MR. HUBBARD:
23  Q.  Ms. Zimbelman, you have a computer screen in front of you?
24  A.  Yes.
25  Q.  And it says here, "Background:  The Corrections Ombudsman

*11-14876; Griffin v. Condon, et al.*

*Jessica Zimbelman - Direct*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 107

1  office has been engaged in an ongoing investigation of

2  ARF-South since March 2009."

3      Do you see that?

4  **A.**  I do.

5  **Q.**  And, "Through multiple interviews with prisoners early on,

6  a pattern of staff misconduct and verbal abuse became

7  apparent."

8      Do you see that?

9  **A.**  Yes.

10  **Q.**  Do you stand by that statement?

11  **A.**  Yes.

12        **MR. HUBBARD:**  Could you go down, Ms. Hess, to "it is

13  our position."

14  **BY MR. HUBBARD:**

15  **Q.**  And do you see just below that, Ms. Zimbelman, where it

16  says, "It is our position that the similarity and volume of the

17  complaints indicate their accuracy"?

18  **A.**  Yes.

19  **Q.**  Do you stand by that statement?

20  **A.**  Yes.

21  **Q.**  And it goes on, "While some of the staff members may only

22  have one complaint listed, it appears there is a widespread

23  problem with attitude and humane treatment of prisoners."

24      Do you see that?

25  **A.**  Yes.

*11-14876; Griffin v. Condon, et al.*

*Jessica Zimbelman - Direct*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 108

1   **Q.**   And you stand by that?

2   **A.**   Yes.

3          **MR. HUBBARD:**  The next page, please, Ms. Hess.  And

4   if you could please zoom in there, Ms. Hess.

5   **BY MR. HUBBARD:**

6   **Q.**   If you could turn to the next page, Ms. Zimbelman.  In

7   fact, I think you have a copy of it in front of you or on the

8   computer screen, and it says, "RUM Condon (ARF-North)."  Do you

9   see that?

10  **A.**   Yes.

11  **Q.**   And you know that RUM Condon appears to be a defendant in

12  this case, correct?

13  **A.**   Yes.

14  **Q.**   And during your investigation RUM Condon received a

15  "generalized complaint of harassment" and that he "grabbed a

16  prisoner by the wrist."  Do you see that?

17  **A.**   Yes.

18  **Q.**   Do you stand by the fact that you received those

19  complaints?

20  **A.**   Yes.

21          **MR. HUBBARD:**  Mr. McMurtrie, please.

22  **BY MR. HUBBARD:**

23  **Q.**   Do you see where it says "Mr. McMurtrie"?

24  **A.**   Yes.

25  **Q.**   "Officer McMurtrie," sorry.  I don't mean to be

*Jessica Zimbelman - Direct*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 109

1  disrespectful.

2      "Officer McMurtrie (ARF-North).  1, Generalized complaint

3  of harassment," and then it goes on to say, "Correctional

4  Officer McMurtrie told other prisoners that a certain prisoner

5  was 'bad news' and he was going to get 'his ass.'  Corrections

6  Officer McMurtrie wrote several tickets on him and told the

7  prisoner it didn't matter if he wrote grievances because they

8  wouldn't 'stick.'"

9      Do you see that?

10 **A.**   Yes.

11 **Q.**   Do you stand by the fact that you actually received those

12 complaints while undergoing your investigation?

13 **A.**   Yes.

14         **MR. HUBBARD:**   If you could go straight to the

15 conclusions.

16 **BY MR. HUBBARD:**

17 **Q.**   Now, while we're going to the conclusion, Ms. Zimbelman,

18 and I'm not going to question you on it, but you would agree

19 that within this report that there are over 40 correctional

20 officers that are listed in here as having complaints made

21 against them, correct?

22 **A.**   I have not read the report in its entirety lately, and I

23 don't -- I haven't counted the number of officers so I can't

24 answer that.

25 **Q.**   Fair enough.

*11-14876; Griffin v. Condon, et al.*

*Jessica Zimbelman - Direct*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 110

1        **MR. HUBBARD:**  If you could highlight the "Summary of

2   Observations" all the way up to 4, please.

3   **BY MR. HUBBARD:**

4   **Q.**   Ms. Zimbelman, on Page 13 of the report there is a

5   "Summary of Observations," and is it fair to say that those are

6   the summary of your observations as having undergone the

7   investigation at Gus Harrison Facility?

8   **A.**    Correct.

9   **Q.**    And it says, "While the number of isolated incidents of

10  harassment is disturbing, there are some general trends, excuse

11  me, some general patterns and trends at ARF-South that the

12  Ombudsman's office feels must be addressed."

13       Do you see that?

14  **A.**    Yes.

15  **Q.**    Do you stand by that statement today?

16  **A.**    Yes.

17  **Q.**    "Furthermore," it goes on to say, "this attitude appears

18  to be permeating ARF-North in recent months."

19       Do you see that?

20  **A.**    Yes.

21  **Q.**    And do you stand by that statement?

22  **A.**    Yes, that I, at the time I wrote this, I believed that --

23  I believed that, yes.

24  **Q.**    "1.  Prisoners are retaliated against for filing

25  grievances.  The retaliation forms include verbal abuse,

*11-14876; Griffin v. Condon, et al.*

*Jessica Zimbelman - Direct*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 111

1    constant shakedowns and minor tickets."

2         Do you see that?

3    **A.**   Yes.

4    **Q.**   And do you stand by that conclusion that you drew?

5    **A.**   Yes.

6    **Q.**   "2.  Officers use minor tickets as a weapon to keep many

7    prisoners on constant sanctions and threaten their paroles,

8    based on resulting major tickets, like Out of Place tickets."

9         Do you see that?

10   **A.**   Yes.

11   **Q.**   Do you stand by that today?

12   **A.**   Yes.

13   **Q.**   "4.  Sex offenders and African Americans appear to be the

14   most frequent target of verbal abuse."

15        Do you see that?

16   **A.**   Yes.

17   **Q.**   And you stand by that statement?

18   **A.**   Yes.

19        **MR. HUBBARD:**   One last section, Ms. Hess.  Underneath

20   "Recommendation," if you could pull that up.

21   **BY MR. HUBBARD:**

22   **Q.**   "Recommendation."  It says, "While we realize some of the

23   involved officers now work on the north side, it does not

24   appear the attitudes on the ARF complex -- that's Gus

25   Harrison -- will change with a simple move next door."

*Jessica Zimbelman - Direct*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 112

1    Do you see that?

2    **A.**    Yes.

3    **Q.**    And you stand by that statement?

4    **A.**    Yes.

5    **Q.**    And you would agree with me that when we looked at the

6    specific complaints made against Officer Condon and Officer

7    McMurtrie that immediately next to them was in parentheses

8    "ARF-North"?

9    **A.**    Correct.

10   **Q.**    And that's because they were indeed at the time you wrote

11   this report either already there or to your knowledge being

12   placed there to the north side, correct?

13   **A.**    My understanding or recollection is that they were working

14   on the north side at the time the complaints came in from the

15   prisoners.

16   **Q.**    Understood.  Ms. Zimbelman, one final question for you,

17   and, again, thank you for being here because I do know that

18   it's difficult.  Did you write the report because you felt you

19   were compelled to do it and that underneath the statute you had

20   to do it?

21   **A.**    I did not feel -- that almost makes it seem like the

22   statute made me an unwilling participant.  I felt that the, as

23   indicated in the introductory paragraph of the report, I felt

24   that the number of complaints, their similarity, that it needed

25   to be brought to the attention of the facility staff of the

*Jessica Zimbelman - Cross*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 113

1   Gus Harrison Correctional Facility, the warden and that people

2   in the MDOC needed to be aware of what prisoners were saying

3   was happening.

4   **Q.**   Ms. Zimbelman, thank you very much.  Opposing counsel may

5   well have questions for you, at which time I may have redirect,

6   but thank you again.

7            **THE COURT:**  Mr. Schneider, cross.

8            **MR. SCHNEIDER:**  Thank you, Your Honor.

9                       **-   -   -**

10                                              (11:59 a.m.)

11                      **CROSS-EXAMINATION**

12  **BY MR. SCHNEIDER:**

13  **Q.**   Ms. Zimbelman, this report that you were just asked about,

14  did you actually submit that to the MDOC?

15  **A.**   I honestly don't remember who exactly I submitted it to.

16  I know that it had the approval of my boss, and I remember

17  having a meeting with the warden.  I don't even remember which

18  warden it was so I don't actually know who received this

19  report.

20  **Q.**   Okay.  Do you remember when you had that meeting with the

21  warden he asked you, well, who is making these complaints?

22  **A.**   I don't remember that.

23  **Q.**   That exhibit book there in front of, can you flip to

24  Exhibit 4, please.

25  **A.**   The report?

*11-14876; Griffin v. Condon, et al.*

*Jessica Zimbelman - Cross*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 114

1    **Q.**   Yeah, it's the report, but if you go beyond the report --

2    so the report is, what, 13 pages long?

3    **A.**   Yes.

4    **Q.**   Okay.  And then just behind that there is some other

5    paperwork there.  Do you see that?

6    **A.**   I do see that.

7    **Q.**   Okay.  Are you familiar with that paperwork at all?

8    **A.**   It looks vaguely familiar, but I haven't seen this in

9    almost six years.

10   **Q.**   Okay.  At any time did you tell the prison who was making

11   these complaints, these allegations?

12   **A.**   I believe in the first paragraph of my report it said the

13   prisoners are.

14   **Q.**   Which prisoners though?  Did you tell the prison which

15   prisoners?

16   **A.**   I believe the report says we kept them anonymous to keep

17   them from further retaliation.

18   **Q.**   Okay.  So nobody at the prison knew who was talking to

19   you?

20   **A.**   I don't know what the department knew about who was

21   talking to me.  As I discussed earlier, if I was going to a

22   prison, I would send a list of names and numbers to the

23   administrative assistant.

24   **Q.**   At Gus Harrison who was your contact person?

25   **A.**   I don't remember the name.

*11-14876; Griffin v. Condon, et al.*

*Jessica Zimbelman - Cross*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 115

1   **Q.**   But it was the administrative assistant?

2   **A.**   Usually.

3          **MR. HUBBARD:**  Objection, Your Honor, asked and

4   answered.

5   **BY MR. SCHNEIDER:**

6   **Q.**   When you would do these interviews with the prisoners --

7          **THE COURT:**  I think he went right on, but go ahead.

8          **MR. SCHNEIDER:**  I did, Your Honor.

9   **BY MR. SCHNEIDER:**

10  **Q.**   You called this an investigation, correct?

11  **A.**   Yes.

12  **Q.**   All right.  You would interview the prisoners, correct?

13  **A.**   Are you talking about my general practice or --

14  **Q.**   I want to talk specifically about this Gus Harrison report

15  that you did.  You interviewed the prisoners, correct?

16  **A.**   My recollection is, yes, I interviewed them.

17  **Q.**   Okay.  And they would have some kind of allegation some

18  officer mistreated me, correct?

19  **A.**   That's my general recollection.

20  **Q.**   Okay.  Would you then go talk to the officer?

21  **A.**   No.

22  **Q.**   Would you go get video to see if the incident really

23  happened?

24  **A.**   I believe that in some cases if there -- you know, the

25  video capability of the Michigan Department of Corrections are

*Jessica Zimbelman - Cross*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 116

1  safely guarded, not disclosed, but our office had access to

2  those.  Again, I'm speaking I don't have any specific

3  recollection of investigating any particular claim made by a

4  prisoner besides what I have seen in this report, but if there

5  is relevant video, we would certainly request that.

6  **Q.**   With regard to prisoner Bryant, do you have Exhibit 59

7  still there?

8  **A.**   Yes.

9  **Q.**   Okay.  Those are your notes about that particular

10  incident, right?

11  **A.**   Yes.

12  **Q.**   Okay.  Did you note anywhere in there that you requested

13  video about this?

14        **THE COURT:**  If there is or there isn't, we don't have

15  to search for it.

16        **THE WITNESS:**  I don't believe that I did.

17  **BY MR. SCHNEIDER:**

18  **Q.**   Just to be clear again, this report, this 13-page report

19  that you wrote, these allegations are listed out by the name of

20  each corrections officer, correct?

21  **A.**   Correct.

22  **Q.**   And these allegations, it's just what prisoners told you?

23  **A.**   Yes.

24  **Q.**   You didn't witness any of these things happening?

25  **A.**   Correct.

*11-14876; Griffin v. Condon, et al.*

*Jessica Zimbelman - Cross*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 117

1   **Q.**   You received a letter from a prisoner and it goes in the

2   report?

3   **A.**   No, I would say that I believe -- again, this is to the

4   best of my recollection -- I believe that in the report it also

5   says that there were over 100 claims made that were too

6   specious to include in the report.  Those might have been based

7   on just letters.  I believe on all of the allegations I

8   included in the report I actually spoke to these prisoners to

9   the best of my recollection.

10  **Q.**   Okay.  Do you know how many prisoners you spoke to?

11  **A.**   No, but I believe the report indicates there were

12  47 complaints or something like that.

13  **Q.**   Did you ever meet any of those officers whose names you

14  put in this report?

15  **A.**   I did not meet with them to discuss things, but I may have

16  run into them in the housing unit or while I was otherwise

17  visiting Gus Harrison.

18  **Q.**   Could you identify any of them if you met them?

19  **A.**   I don't think so.  Probably not now.

20  **Q.**   How about these three fellas sitting over here, can you

21  identify any of them?

22  **A.**   No.

23  **Q.**   At Page 2 of the report, this is where there's the

24  two allegations listed against RUM Condon.  Number one, it

25  says, "Generalized complaint of harassment."  So who made that

*Jessica Zimbelman - Cross*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 118

1   claim against RUM Condon?

2   **A.**   I don't know.

3   **Q.**   What was the complaint because "generalized complaint of

4   harassment" doesn't tell us much.

5   **A.**   I don't remember.

6   **Q.**   You have no idea what happened?

7   **A.**   Six years later I don't know.

8   **Q.**   The same is true with Officer McMurtrie?  Yeah, Officer

9   McMurtrie is in here as well.  The same is true of that, you

10  don't remember who made the complaint or what those facts were?

11  **A.**   That's correct.

12  **Q.**   You have testified you have been around to other prisons

13  in the state.  Did you receive letters from prisoners across

14  the state?

15  **A.**   Oh, yeah.

16  **Q.**   When you were in that job?

17  **A.**   Yes.

18  **Q.**   Is that common for a prisoner to write you, for instance,

19  we are getting retaliatory tickets?

20  **A.**   Yes.

21  **Q.**   All across the state though, not just --

22  **A.**   Yes.

23  **Q.**   You said that in the conclusion of your report one of the

24  prisoner's complaints that you came across a lot was that they

25  were getting minor tickets that would essentially delay their

*Jessica Zimbelman - Cross*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 119

1   parole, correct?

2   **A.**   Yes.

3   **Q.**   Do you know, are you familiar with how the parole system

4   works?

5   **A.**   Yes.

6   **Q.**   And major tickets are those that affect the parole,

7   correct?

8   **A.**   Well, actually the misconduct system in the Michigan

9   Department of Corrections was recently -- well, not recently --

10   while I was with the ombudsman's office switched from being

11   called major tickets and minor tickets to where now they have a

12   class system where it's Class 1, Class 2, Class 3.  So it's a

13   little bit of a different system now as when this report was

14   written when they were still called majors and minors.

15   **Q.**   Back then they were majors and minors?

16   **A.**   Uh-huh.

17   **Q.**   But minor tickets did not affect the parole, did they?

18   **A.**   I don't believe that's a fair statement.  The effect of a

19   minor ticket on a prisoner's stay and general work reports and

20   other -- there's so many repercussions of those in the

21   department that I do believe that a minor ticket could affect a

22   parole decision.

23   **Q.**   There's a point system for major tickets in the prison,

24   correct?

25   **A.**   Yes.

*11-14876; Griffin v. Condon, et al.*

*Jessica Zimbelman - Cross*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 120

1   **Q.**   And a parole decision looks at the past six months of

2   major tickets, correct?

3   **A.**   I don't think that's a fair statement.

4   **Q.**   Do you know what the policy directive, what the number is

5   for the policy directive on parole?

6   **A.**   No.

7   **Q.**   Are you familiar with that policy directive?

8   **A.**   I'm familiar with it, but I can't specifically say what a

9   parole board member reviews or takes into account in making a

10   parole decision.

11   **Q.**   There's a policy though that specifies the points that

12   they get for major tickets, correct?

13   **A.**   Well, I know there's points on the security classification

14   screen, and I believe there's points in the parole guideline

15   score.  Those are simply, however, factors, from my

16   understanding, and I'm not an expert on the parole process.  I

17   have been around it a lot, but my understanding is that the

18   parole guideline score is one tool that the parole board uses

19   to determine whether a prisoner has a high probability of

20   parole or a low probability of parole or an average

21   probability.

22        So my understanding would be that, yes, the points, if you

23   are specifically asking about points for tickets, my

24   recollection is that on the parole guideline score, which is

25   the only parole tool that uses points, that that would focus on

*Jessica Zimbelman - Redirect*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 121

1    majors.

2    **Q.**    And that parole guideline score, that's the score that

3    determines whether they are at a high probability of parole,

4    average or low?

5    **A.**    Correct.

6    **Q.**    All right.

7              **MR. SCHNEIDER:**  I don't have any further questions.

8    Thank you.

9              **THE COURT:**  Anything further of this witness?

10             **MR. HUBBARD:**  Just one question, Your Honor.  Well,

11   actually two.

12             **THE COURT:**  That's probably more accurate.

13             **MR. HUBBARD:**  Back to the lawyer comment.

14                           -    -    -

15                                              (12:09 p.m.)

16                    **REDIRECT EXAMINATION**

17   **BY MR. HUBBARD:**

18   **Q.**    Mr. Schneider asked you is it fairly common to get

19   complaints from prisoners.  Do you recall that?

20   **A.**    Yes.

21   **Q.**    To which you responded with, yes, it is fairly common,

22   correct?

23   **A.**    Yes.

24   **Q.**    But what's not common is that the complaints are so

25   similar in kind that you write a report on a particular

*Jessica Zimbelman - Recross*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 122

1   facility, and in this case you only did one of those in three

2   and-a-half years, correct?

3   **A.**   I myself only did one report like this, correct.

4   **Q.**   Thank you.

5          **MR. HUBBARD:**  No further questions, Judge.

6          **THE COURT:**  Do you have any further, Mr. Schneider?

7          **MR. SCHNEIDER:**  Yes, Your Honor.

8                          **-  -  -**

9                                              (12:10 p.m.)

10                    **RECROSS-EXAMINATION**

11  BY MR. SCHNEIDER:

12  **Q.**   How many analysts worked in the Legislative Corrections

13  Ombudsman's office back then?

14  **A.**   It varied, and I can't tell you exactly how many.  When we

15  started, there were only two of us.  When I started in

16  February 2009, there was only one other analyst.  I believe it

17  was that way for quite some time.  There's been anywhere from

18  two to eight analysts.

19  **Q.**   Between the period February 2009 and July 2012, it varied

20  between two and eight?

21  **A.**   Yes, to the best of my recollection.

22          **MR. SCHNEIDER:**  All right.  Thank you.

23          **THE COURT:**  Anything further from the plaintiff's

24  point of view?

25          **MR. HUBBARD:**  Your Honor, other than to thank

*11-14876; Griffin v. Condon, et al.*

*Jessica Zimbelman - Recross*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 123

1  Ms. Zimbelman again, nothing further.

2          **THE COURT:**  Thank you.  You are excused.

3          **THE WITNESS:**  Thank you.

4          **THE COURT:**  And it would be time for another witness

5  if we had time for one.  I don't know what, what the

6  plaintiff's pleasure is.

7          **MR. MOODY:**  Your Honor, may we request just a very

8  quick recess to confirm our next witness is out in the hallway?

9  I haven't spoken to them since the last break.

10          **THE COURT:**  I'm sorry, a recess?

11          **MR. HUBBARD:**  Just a five-minute recess, Your Honor,

12  if we could.

13          **THE COURT:**  I didn't understand.  You want a recess?

14          **MR. MOODY:**  Yes, Your Honor, a short break to confirm

15  the next witness is in the hallway so that we may call him.

16          **THE COURT:**  Oh, you can call him if he's out there.

17  We always wait for whoever.

18          **MR. MOODY:**  All right.  Thank you, Judge.  I'll be

19  right back.

20          **THE COURT:**  Everybody here, we have basically gotten

21  away with quite a bit today with no coffee, and that's better

22  than it was before and we'll get another witness in if you --

23          **MR. MOODY:**  All right.  Thank you.

24          **THE COURT:**  This witness is going to be

25  Larry Anthony?

*11-14876; Griffin v. Condon, et al.*

*Larry Anthony - Direct*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 124

1     **MR. FINK:**  I'm sorry, Your Honor?

2     **THE COURT:**  It's going to be Larry Anthony?

3     **MR. FINK:**  Larry Anthony will be next, Your Honor.

4     **THE COURT:**  Thank you.

5     Would you come in, please, and take the oath from the

6  court reporter.

7     **MR. MOODY:**  Your Honor, Plaintiff calls

8  Larry Anthony.

9     **THE COURT:**  Thank you.

10                     -   -   -

11                  **LARRY ANTHONY,**

12     being first duly sworn to tell the truth,

13     was examined and testified upon his oath

14     as follows:

15     **THE COURT:**  Thank you.  Please be seated.

16     You may proceed.

17                     -   -   -

18                                      (12:13 p.m.)

19                **DIRECT EXAMINATION**

20  BY MR. MOODY:

21  **Q.**   Good afternoon, Mr. Anthony.

22  **A.**   Good afternoon.

23  **Q.**   Please just state your name for the record.

24  **A.**   Larry Lee Anthony, Jr.

25  **Q.**   Mr. Anthony, have you ever been incarcerated in a Michigan

*Larry Anthony - Direct*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 125

1    prison?

2    **A.**    Yes.

3    **Q.**    Were you ever an inmate at the Gus Harrison Correctional

4    Facility?

5    **A.**    Yes.

6    **Q.**    What time period was that?

7    **A.**    From 2009 to 2016.

8    **Q.**    Are you currently incarcerated?

9    **A.**    No.

10   **Q.**    You are a free man?

11   **A.**    Yes.

12   **Q.**    Do you know the plaintiff in this matter, Randle Griffin?

13   **A.**    Yes.

14   **Q.**    How do you know Mr. Griffin?

15   **A.**    He was the black rep committee.

16   **Q.**    You said the black rep committee?

17   **A.**    Yes.

18   **Q.**    Is that also called the warden's forum?

19   **A.**    Yes.

20   **Q.**    Were you a member of the warden's forum?

21   **A.**    Yes.

22   **Q.**    What position did you hold on the warden's forum?

23   **A.**    I think I was in charge of health care issues.

24   **Q.**    Okay.  Were you a member of the warden's forum between the

25   time period of January to March 2011?

*11-14876; Griffin v. Condon, et al.*

*Larry Anthony - Direct*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 126

1  **A.**   Yes.

2  **Q.**   Okay.  I want to direct your attention specifically to

3  March 2nd, 2011.  Do you remember that date?

4  **A.**   Not really.  Not exact date, but ...

5  **Q.**   Good point.  In early March 2011 do you recall having a

6  conversation with RUM Condon regarding issues raised at the

7  warden's forum?

8  **A.**   Yes.

9  **Q.**   Okay.  Where did you have that conversation?

10  **A.**   In the RUM's office.

11  **Q.**   Who was present?

12  **A.**   Just me and Griffin and RUM, RUM Condon.

13  **Q.**   Okay.  And then did you discuss issues raised at the

14  warden's forum?

15  **A.**   Yeah.  That's where we discuss them before we go up.

16  **Q.**   And after that meeting concluded, did you and Mr. Griffin

17  leave RUM Condon's office?

18  **A.**   I did.

19  **Q.**   And where did you go from there?

20  **A.**   To the laundry room.

21  **Q.**   Okay.  And after you went over to the laundry room, did

22  you happen to hear any other conversations between officers?

23  **A.**   Yeah.  I was standing -- after that it was my job to be

24  laundry man.  I was standing in the doorway, and RUM Condon

25  come out of his office.  He was kind of upset.  Griffin come

*11-14876; Griffin v. Condon, et al.*

*Larry Anthony - Direct*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 127

1  out, RUM Condon.  Condon went to the desk and said that he

2  pretty much wanted to get rid of Griffin, and I don't know why,

3  but ...

4  **Q.**   Who did he say that to?

5  **A.**   Mr. McMurtrie and Mr. Downard.

6  **Q.**   Those are the two defendants sitting at the table over

7  here?

8  **A.**   Yeah.

9  **Q.**   And did Officer McMurtrie and Officer Downard have any

10  response to that?

11  **A.**   Yeah.  They said they could write him a ticket and get him

12  out of there, a misconduct.

13  **Q.**   By write him a ticket, is it your understanding that they

14  were writing false misconduct tickets?

15  **A.**   Yeah.

16  **Q.**   Was it your understanding that it was as a result of RUM

17  Condon telling them that he was tired of Mr. Griffin?

18  **A.**   Yeah.

19  **Q.**   Did you say anything in response to that?

20  **A.**   Yeah.  I said, "That's kind of bogue."  They told me to

21  shut up and go back and do the laundry or I would get a

22  misconduct ticket.

23  **Q.**   They told you you would get a false misconduct ticket if

24  you kept talking?

25  **A.**   Yes.

*11-14876; Griffin v. Condon, et al.*

*Larry Anthony - Direct*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 128

1   **Q.**   Do you recall which officer said that specifically?

2   **A.**   No.

3   **Q.**   But it was either Officer Downard or Officer McMurtrie?

4   **A.**   Yes.

5   **Q.**   In your time at Gus Harrison was there a culture amongst

6   the officers in your opinion of writing false misconduct

7   tickets?

8   **A.**   Yes.

9   **Q.**   Did you ever spend time in other prisons across the State

10  of Michigan?

11  **A.**   Yes.

12  **Q.**   Would you say that it was a larger problem at Gus Harrison

13  than at those other institutions?

14  **A.**   Yes.

15  **Q.**   After the incident, the conversation you overheard, did

16  you execute an affidavit as to what you saw?

17  **A.**   Yes.

18  **Q.**   And did that affidavit lay out everything that you just

19  testified to?

20  **A.**   Yes.

21  **Q.**   After you did that, were you at all concerned about being

22  retaliated against by the officers?

23  **A.**   No, they wrote him up beyond that so I didn't really fear

24  nothing beyond that.  I never thought it would go this far.

25  **Q.**   Is it fair to say that if you report officers inmates, or

*Larry Anthony - Cross*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 129

1  you specifically, may fear retaliation for that conduct?

2  **A.**   Oh, yeah.

3       **MR. MOODY:**  No further questions.

4       **THE COURT:**  Thank you.

5     Mr. Schneider, cross-examination.

6       **MR. SCHNEIDER:**  Thank you, Your Honor.

7                  **-   -   -**

8                              (12:18 p.m.)

9              **CROSS-EXAMINATION**

10 BY MR. SCHNEIDER:

11 **Q.**   All right.  When did you say you got out of prison?

12 **A.**   About 2016.

13 **Q.**   Are you still on parole?

14 **A.**   I'm on parole.

15 **Q.**   You are on parole?

16 **A.**   Yes.

17 **Q.**   When does that end?

18 **A.**   Next year.  January of next year.

19 **Q.**   Okay.  And you served in prison from 2009 to 2016, you

20 testified?

21 **A.**   Yes, sir.

22 **Q.**   All right.  You were in on first-degree criminal sexual

23 conduct and --

24       **MR. MOODY:**  Objection, Your Honor.

25       **THE COURT:**  What is your objection?

*11-14876; Griffin v. Condon, et al.*

*Larry Anthony - Cross*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 130

1          **MR. MOODY:**  There's no relevance to Mr. Anthony's

2  prior convictions.

3          **THE COURT:**  I think that's true, and I will, I will

4  agree with plaintiff on that.

5          **MR. MOODY:**  Judge, may I also ask that the testimony

6  be stricken?

7          **THE COURT:**  Oh, well, okay.  You can put it in the

8  jury instructions if you want to.

9          **MR. MOODY:**  Okay.  Thank you.

10          **MR. SCHNEIDER:**  Your Honor, do you want my response

11  on the record?

12          **THE COURT:**  What?  I don't.

13          **MR. SCHNEIDER:**  Sure.  Rule 609 says the evidence

14  comes in.  I'll leave it at that.

15          **THE COURT:**  Okay.  You got it on the record.

16  **BY MR. SCHNEIDER:**

17  **Q.**   All right.  On this date when you went into RUM Condon's

18  office, you actually went in there with Mr. Griffin?

19  **A.**   Yes.

20  **Q.**   All right.  And when you left you said you went to the

21  laundry room?

22  **A.**   Yes.

23  **Q.**   Where was the laundry room?

24  **A.**   Right across there's a little kitchenette in there.  It's

25  about four-foot wide.  You just walk across that to the laundry

*Larry Anthony - Cross*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 131

1  room.

2  **Q.**   And how long after that did RUM Condon come out?

3  **A.**   I'm going to guess 20 minutes later, 15, 20 minutes later.

4  I ain't for sure the exact time.

5  **Q.**   Was Mr. Griffin in the office with him that whole

6  20 minutes?

7  **A.**   I believe so.  I'm not for sure.

8  **Q.**   What time did all of this occur?

9  **A.**   I don't know.  I can't, I can't remember that.

10 **Q.**   You don't know what time of the day even?

11 **A.**   No.

12 **Q.**   Before or after lunch?

13 **A.**   I don't know.

14       **MR. MOODY:**  Asked and answered, Your Honor.  He's

15 testified he doesn't know what time of day it was.

16       **THE COURT:**  I'm sorry, what was your objection?

17       **MR. MOODY:**  Asked and answered.  Counsel has asked

18 him questions about what time of day.  He said he doesn't know.

19 He continues to ask him.

20       **THE COURT:**  Okay.  I will not rule on that now.  I

21 guess it's unnecessary.

22    Do you have another question?

23       **MR. SCHNEIDER:**  Yes, Your Honor.

24 **BY MR. SCHNEIDER:**

25 **Q.**   All right.  The conversation that you had in the office

*11-14876; Griffin v. Condon, et al.*

*Larry Anthony - Cross*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 132

1    with RUM Condon, that was about the meal issue from the

2    warden's forum?

3    **A.**    I believe it was, yes.

4    **Q.**    Okay.  That's all you talked about when you were in there?

5    **A.**    That and some leaky pipes.  It was just housing unit

6    issues.  I ain't quite for sure every agenda or every question

7    that we had.

8    **Q.**    It was warden's forum business though?

9    **A.**    Right.  It was a while ago, yeah.

10   **Q.**    And the conversation that you heard, this was RUM Condon,

11   he came up to the officers' desk?

12   **A.**    Yes.

13   **Q.**    All right.  And he said -- well, what did he say?  Go

14   ahead and tell me.

15   **A.**    He just said he was tired of him and that he wanted to get

16   rid of him pretty much.

17   **Q.**    He didn't say why he wanted to get rid of him though?

18   **A.**    No.

19   **Q.**    Anything else about that conversation that you can recall?

20   **A.**    No.

21   **Q.**    Were you working in the laundry room?

22   **A.**    Yeah, I was the laundry man.

23   **Q.**    What time was your detail for?

24   **A.**    24-hour detail.

25   **Q.**    I'm sorry?

*11-14876; Griffin v. Condon, et al.*

*Larry Anthony - Cross*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 133

1    **A.**   I had a 24-hour-a-day detail.

2    **Q.**   What does that mean, just work any time?

3    **A.**   Any time.

4    **Q.**   Did you stay at the laundry room or did you walk over to

5    the officers' desk?

6    **A.**   When?

7    **Q.**   When you heard this conversation occurring.

8    **A.**   I was standing at the laundry room door.

9    **Q.**   You didn't go to the desk for some reason?

10   **A.**   No.

11   **Q.**   How far from the desk is the laundry room door?

12   **A.**   About --

13          **THE COURT:**   I'm not exactly clear as to what that is,

14   if you get an answer to it, it's going to help the jury with.

15   I think you are asking questions now that are really a waste of

16   time and take up time that doesn't need to be taken, but if you

17   think they are very important, I'll let you go ahead for a

18   while.

19   **BY MR. SCHNEIDER:**

20   **Q.**   So how far was it from the laundry room door to the

21   officers' desk?

22   **A.**   Maybe ten feet.

23   **Q.**   You did an affidavit, two affidavits in this case,

24   correct?  One in 2015?

25   **A.**   2015?  I might.  It's been a while.

*11-14876; Griffin v. Condon, et al.*

*Larry Anthony - Cross*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 134

1    **Q.**   Okay.  In your affidavit do you remember saying that you

2    walked to the officers' desk to ask for a permanent marker?

3    **A.**   Oh, for a laundry bag probably, yeah.

4    **Q.**   And in your affidavit you said that's why you were there

5    to hear the conversation?

6    **A.**   Right, right, right.

7    **Q.**   Your testimony today was that you were at the laundry room

8    door?

9    **A.**   It's been a while, it's been four years, but I know what I

10   heard.

11          **MR. SCHNEIDER:**  All right.  I don't have any further

12   questions.

13          **THE COURT:**  Any further questions from the plaintiff?

14          **MR. MOODY:**  No, Your Honor.  Thank you.

15          **THE COURT:**  Mr. Anthony, you are excused, and

16   thank you.

17          **THE WITNESS:**  Thank you.

18          **THE COURT:**  I think we are kind of at the end of the

19   day unless someone has something that needs to be put on the

20   record.  Otherwise, I think you've got another night before you

21   come back here at nine o'clock tomorrow morning.  I'm happy

22   that apparently there's no, no physical problem for which I was

23   worried about before.  It looks like a healthy group.  I hope

24   it is.

25      These are the same instructions I gave you yesterday.

*11-14876; Griffin v. Condon, et al.*

1          **MR. HUBBARD:**  Just listening, Your Honor.  I'll take

2     a seat.

3          **THE COURT:**  Okay.  -- I gave you yesterday.  Don't

4     let anybody discuss it with you.  If they try to do it and

5     won't stop, let me know by sending me a note.  Avoid the

6     appearance of impropriety.  You must do that.  Don't have any

7     conversation with anybody associated with the case, the

8     parties, the lawyers, the witnesses, and people who you may

9     come to recognize as having some connection with the case in or

10    out of the courtroom.  Don't talk with anybody about it even to

11    pass the time of day because somebody may look at you and think

12    you are doing something you are not doing because you know you

13    can't do it.

14         Don't communicate with anybody or let anybody communicate

15    with you by cell phone, email, iPhone -- that's the same thing,

16    I guess -- text messaging, with Twitter, anything like a blog

17    or website, chat room, any other kind of what is commonly

18    called social networking.

19         Don't read any newspaper articles.  Avoid watching any

20    television stories which might be about the case.  Don't do any

21    research or conduct any investigation of the case on your own.

22         Thank you for your attention and for being here at

23    nine o'clock tomorrow morning.  I think we are moving ahead

24    pretty fast.  I won't make any predictions like we'll be done

25    tomorrow because I don't think we will, but we're moving, and

*Larry Anthony - Cross*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 136

1    have a good night, safe night.

2            **THE CLERK:**  All rise for the jury.

3        (Jury out at 12:26 a.m.)

4            **THE COURT:**  Do the parties have anything they would

5    like the record to reflect at this time?

6            **MR. SCHNEIDER:**  Yes, Your Honor.  As to Plaintiff's

7    Exhibit 44, I think you said you would let them ask the

8    questions and then instruct the jury later if you decide that

9    that exhibit was not proper.  The defense still has objections

10   to that exhibit being admitted into evidence.  I don't know if

11   the Court wants to make that ruling now or save it for another

12   day, but I wanted to bring that to the Court's attention.

13           **THE COURT:**  I think probably the best thing to do is

14   to give me a chance to look at 44 and to prepare to be

15   responsive in a credible way.  We'll do that tomorrow.

16       Anything else?

17           **MR. HUBBARD:**  While the Court is undergoing that

18   consideration, I do have a pocket brief that is only five pages

19   long.  I can provide to counsel a copy of that that explains

20   underneath Sixth Circuit precedent exactly why that document

21   comes into evidence.  I would appreciate if the Court would

22   receive that memorandum of law when undergoing its

23   consideration as to whether or not --

24           **THE COURT:**  I'll receive it.

25           **MR. HUBBARD:**  Thank you, Your Honor.

*11-14876; Griffin v. Condon, et al.*

*Larry Anthony - Cross*
*Wednesday/January 18, 2017/Vol. 2*

V2-Page 137

1      **THE COURT:**  I assume that Mr. Schneider has a copy of

2   it, too.

3      **MR. HUBBARD:**  I just handed it to him, Your Honor.

4      **THE COURT:**  And we can determine whether we agree or

5   not on what it says.

6      **MR. HUBBARD:**  Thank you, Judge.

7      **THE COURT:**  Anything else?

8      All right.  Have a safe night out there on the roads.

9   Stay away from ice.  I hope there isn't any.  We'll see you

10  tomorrow morning at nine o'clock.  Thank you for your courtesy

11  and your patience.  The Court is in recess, and Mr. Griffin is

12  remaining.

13      (Proceedings adjourned at 12:29 p.m.)

14                        -   -   -

15

16            **C E R T I F I C A T I O N**

17      I certify that the foregoing is a correct transcription of

18  the record of proceedings in the above-entitled matter.

19

20  s/ Sheri K. Ward_____                2/6/2017
    Sheri K. Ward                          Date
21  Official Court Reporter

22                        -   -   -

23

24

25

*11-14876; Griffin v. Condon, et al.*