UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


**RANDLE GRIFFIN,**

Plaintiff,

**HONORABLE JOHN CORBETT O'MEARA**

v.

**No. 11-14876**

**LOUIS CONDON, et al.,**

Defendants.
_____/


**JURY TRIAL - VOLUME 3**

**Thursday, January 19, 2017**


Appearances:

Brandon C. Hubbard
Wade Fink
Nolan John Moody
Jessica L. Russell                    Clifton B. Schneider
Dickinson Wright, PLLC                Michigan Dept. of Att. General
500 Woodward Avenue, #4000            P.O. Box 30736
Detroit, Michigan  48226             Lansing, MI  48909
(313) 223-3500                       (517) 373-6434
  On behalf of Plaintiff               On behalf of Defendants

                          -   -   -

*To obtain a certified transcript, contact:*
*Sheri K. Ward, Official Court Reporter*
*Theodore Levin United States Courthouse*
*231 West Lafayette Boulevard, Room 219*
*Detroit, Michigan  48226*
*(313)965-4401 · ward@transcriptorders.com*

*Transcript produced using machine shorthand and CAT software.*

*Jury Trial*
*Thursday/January 19, 2017/Vol. 3*


**I N D E X**

Plaintiff's Case in Chief                               Page   Vol.

   **Terrance Davis**

      Direct Examination By Ms. Russell:         11      3

      Cross-Examination By Mr. Schneider:        18      3

      Redirect Examination By Ms. Russell:       22      3

Plaintiff Rests ...............................26      3

Motion for Judgment as a Matter of Law .........26      3

Argument by Mr. Schneider  .....................27      3

Argument by Mr. Fink  ..........................29      3

Defendant's Case in Chief

   **Brian Evers**

      Direct Examination By Mr. Schneider:       33      3

      Cross-Examination By Mr. Hubbard:          36      3

   **Gary McMurtrie**

      Direct Examination By Mr. Schneider:       42      3

      Cross-Examination By Mr. Fink:             52      3

      Redirect Examination By Mr. Schneider:     75      3

   **Joseph Downard**

      Direct Examination By Mr. Schneider:       78      3

      Cross-Examination By Ms. Russell:          84      3

      Redirect Examination By Mr. Schneider:     94      3

      Recross-Examination By Ms. Russell:        96      3

*Jury Trial*
*Thursday/January 19, 2017/Vol. 3*

Defendants' Case in Chief (Cont')                    Page  Vol.

   **Louis Condon**

     Direct Examination By Mr. Schneider:      99    3

Certification of Reporter .....................118

- - -

Plaintiff's Exhibits

    Number                                       Rcvd  Vol.

     20        .................................73    3

     26        .................................85    3

- - -

*11-14876; Griffin v. Condon, et al.*

*Jury Trial*
*Thursday/January 19, 2017/Vol. 3*

V3-Page 4

1                          Detroit, Michigan

2                          Thursday, January 19, 2017

3                          9:28 a.m.

4                          -   -   -

5          **THE CLERK:**  The court calls the matter of

6   *Randle Griffin v. Louis Condon, et al.*, Case Number 11-14876.

7          **THE COURT:**  You can sit down for a minute if you want

8   to.

9       The so-called pocket brief which I was handed at the end

10  of the day yesterday I have read and absorbed, and I'm prepared

11  to grant the motion based upon what I'm told in the brief.  I

12  think it makes clear that under the rules, the rules that apply

13  to a situation like this and make it relevant to a fact finder

14  that this kind of analysis is permitted to be given to the fact

15  finder.

16      If there's something further defendants want to say, I

17  would suggest that they say it in paper, and I will deal with

18  it, if at all, in connection with corrections or explanations

19  in jury instructions.

20      Then we have issues, which I just heard about, that's not

21  anybody's fault, which is based upon the fact that we -- if the

22  predictions are anyplace near accurate, we might be in a

23  position to move to conclusion in some way this morning, and

24  I'm wary of that and I don't want to make a decision on that

25  right now, and I want to hear the parties, if they have any

*Jury Trial*
*Thursday/January 19, 2017/Vol. 3*

V3-Page 5

1  different opinions about it, as I suspect they might.  Maybe

2  their opinions are all favorable, but I'm worried about giving

3  something to the jury on Friday.  I have had it happen when I

4  was practicing law, and it usually leads one to suspect that

5  the juries move faster to a conclusion than they might have

6  otherwise when looking at the end of the day and the end of a

7  period of time.  I don't if it's a persuasive reason, but it's

8  a reason that I might hesitate to change the schedule in a way

9  that presented the case to the jury the first thing tomorrow

10  morning or whatever.

11      But I don't mean that I'm through thinking about it.  I

12  will think about it and listen to you if there's strong

13  opinions or even weak opinions having to do with what the

14  parties would like to have happen here.

15      And we, we have, in addition to Mr. Davis, we have I take

16  it, at least as is contemplated right now, if Mr. Davis

17  testifies, it would predictably be the last plaintiff's

18  witness, although there might be rebuttal.  And we have a few

19  relatively short predictably periods of testimony for

20  defendants' witnesses.  And if they really go in that fast, we

21  might indeed be standing around waiting for jury instructions

22  and closing arguments this morning.

23      But, again, I would hesitate to do that and to say come on

24  in here and start deliberating tomorrow morning.  That doesn't

25  feel right, and it hasn't been right in my experience.

*Jury Trial*
*Thursday/January 19, 2017/Vol. 3*

V3-Page 6

1      All right.  I have been doing all of the talking, and if

2  somebody wants to say something, you can say it.  I don't know

3  what more there is to say about what we're talking about, but

4  go ahead.

5           **MR. HUBBARD:**  Nothing from the plaintiff, Your Honor.

6           **MR. SCHNEIDER:**  Just for clarity of the record, Your

7  Honor, my response to the plaintiff's brief regarding the

8  admissibility of Exhibit 44, you want that in writing tonight?

9           **THE COURT:**  I'm sorry?

10          **MR. SCHNEIDER:**  Yes, Your Honor.  My response, the

11 defense response to the plaintiff's pocket brief regarding

12 Exhibit 44, you want my response in writing filed tonight?

13          **THE COURT:**  I would like a response if you have one.

14 It doesn't have to be in writing, but you might prefer it that

15 way.  And what did you ask?  Do I want it overnight?

16          **MR. SCHNEIDER:**  Your Honor, I thought what you had

17 said is you don't want my verbal response, you want my response

18 in writing, so I suspect you would need that before we get to

19 the jury obviously.

20          **THE COURT:**  Okay.  If I left you with the impression

21 that I wanted something in writing, I don't "diswant."  I don't

22 want to discourage you from presenting something in writing,

23 but it doesn't have to be that.

24          **MR. SCHNEIDER:**  I can present my response orally

25 right now if the Court prefers.

*11-14876; Griffin v. Condon, et al.*

*Jury Trial*
*Thursday/January 19, 2017/Vol. 3*

V3-Page 7

1      **THE COURT:**  I don't know what you anticipate would be

2  the length of that argument now.

3      **MR. SCHNEIDER:**  Five to ten minutes, Your Honor.

4  Closer to five.

5      **THE COURT:**  Then we've got to have some time for, if

6  they want it, as far as the other side of this with

7  Mr. Hubbard.

8      Why don't we go until we have a break in the other

9  activity here this morning, on a recess, and we'll, if you

10  still want to, we'll let you argue what you want to say then

11  and the plaintiff can rebut if plaintiff has a rebuttal.

12      **MR. SCHNEIDER:**  Thank you, Your Honor.

13      **MR. HUBBARD:**  Thank you, Judge.

14      **THE COURT:**  Oh, there is one other thing, and that is

15  there's been a request, if that's what you want to call it, by

16  the Marshals Service, the Deputy Marshals who are regularly

17  with us.  We have got some other people doing the same work,

18  and we admire them for doing it.  The Marshals are concerned

19  about the rules that are usually in place for non-party

20  witnesses who are incarcerated, and they want there to be

21  limits on -- it would be Mr. Davis.  He's incarcerated, I'm

22  told, and they would like limits to be placed upon his mobility

23  when he's in the witness chair.

24      We haven't had a back and forth on this, and it would be a

25  mistake if I were suggesting something that would lead one to

*Jury Trial*
*Thursday/January 19, 2017/Vol. 3*

V3-Page 8

1    the conclusion that there has been an argument.  There hasn't

2    been any argument.  But there has been a conviction, a

3    conclusion, I guess, that I came to, and I think the Marshals

4    agreed to, that they would put Mr. Davis in the witness chair

5    before the jury comes in and he would be hindered in his motion

6    while he's there with shackles, which would be on his legs but

7    would not be visible.  I don't know if it makes an awful lot of

8    difference.  If it makes any difference, I'm inclined to agree

9    with it.  If anybody wants to object, they can.  If they don't

10   want to object, they can be quiet.

11        Yes.

12        **MS. RUSSELL:**  Your Honor, that works well for us.  We

13   would just respectfully ask that when Mr. Davis leaves jury box

14   that the jury not be present.

15        **THE COURT:**  Yes.  I didn't say that, but that would

16   be consistent.

17        **MS. RUSSELL:**  Okay.  Thank you, Your Honor.

18        **THE COURT:**  All right.  Do we have anything else?

19   Are we ready for the jury?

20        Bring in the jury.

21        **MR. HUBBARD:**  Thank you, Judge.

22        **THE CLERK:**  Judge, do you want to bring in Mr. Davis

23   first?

24        **THE COURT:**  Maybe I'm confused about that.  Mr. Davis

25   is being called as a witness for the plaintiff so we better

*Jury Trial*
*Thursday/January 19, 2017/Vol. 3*

V3-Page 9

1   bring him in.  I didn't realize he was going to come right now,

2   but bring in Mr. Davis.

3         (Mr. Davis entered the courtroom.)

4             **THE COURT:**  You are Mr. Davis?

5             **MR. DAVIS:**  Yes, sir.

6             **THE COURT:**  And do you have shackles on your feet at

7   this time?

8             **THE WITNESS:**  Yes, sir.

9             **THE COURT:**  All right.  We're ready for the jury.

10  We'll bring in the jury.

11        We want you to stay invisible as far as what you've got on

12  your feet, which I'm not sure exactly how you do that, but

13  maybe you need to be seated, maybe you don't need to be seated,

14  but you'll know what.

15            **THE CLERK:**  All rise for the jury.

16        (Jury in at 9:39 a.m.)

17            **THE COURT:**  Member of the jury, please be seated.  I

18  believe that some kind of an award, we don't have a monetary

19  award unfortunately for this kind of thing, is due you for

20  getting here as promptly as you did even with a lot of

21  confusion as I understand there has been on the road.

22  Thank you for being here.

23        I'll say one other thing before we go to the next witness

24  and that is that we're at the point where we're discussing

25  whether or not we should be in session tomorrow.  I know you've

*11-14876; Griffin v. Condon, et al.*

*Jury Trial*
*Thursday/January 19, 2017/Vol. 3*

V3-Page 10

1  heard from Mr. Barkholz on this, and I should tell you in

2  advance that I'm not inclined to do that for reasons that I

3  hope make sense, but whether they do or not, they make sense to

4  me.  But I'm thinking about it, and if you have strong

5  opinions, you can talk to Mr. Barkholz.  I'm sure you have

6  already.

7      Anyway, thank you for your patience, and we're moving the

8  case obviously or we wouldn't be talking about this, but

9  whether we move it really fast and try to take care of it

10  tomorrow or go as far as we can and then wait until Monday for

11  the conclusion, jury instructions and everything else, final

12  arguments of the parties.

13      I guess I have said what needs to be said, and we have

14  another witness called by plaintiff and you may examine.

15          **MS. RUSSELL:**  Thank you, Your Honor.

16          **THE COURT:**  We have not had Mr. Davis sworn yet.  If

17  you would do that, please.

18                       -   -   -

19                    **TERRANCE DAVIS,**

20          being first duly sworn to tell the truth,

21          was examined and testified upon his oath

22          as follows:

23          **THE COURT:**  Is that a yes?

24          **THE WITNESS:**  Yes, sir.

25          **THE COURT:**  Okay.  Go ahead.

*11-14876; Griffin v. Condon, et al.*

*Terrance Davis - Direct*
*Thursday/January 19, 2017*

1                    **-    -    -**

2                                                    (9:42 a.m.)

3                        **DIRECT EXAMINATION**

4    **BY MS. RUSSELL:**

5    **Q.**   Good morning, Mr. Davis.

6    **A.**   Good morning.

7    **Q.**   How are you today?

8    **A.**   I'm all right.

9    **Q.**   I'm going to start off with some basic questions.  So

10   where do you currently reside?

11   **A.**   Where do I currently?

12   **Q.**   Where do you currently live?

13   **A.**   Jackson.

14   **Q.**   And do you live in a correctional facility?

15   **A.**   Yes, ma'am.  Cotton Correctional Facility.

16           **THE COURT:**  I don't -- I'm here equipped with --

17           **MS. RUSSELL:**  I'll speak louder, Your Honor.

18           **THE COURT:**  -- really world-famous hearing aids and

19   I'm still not getting it.  I don't think the microphone is --

20   I'm hearing Mr. Davis, but I haven't had much challenge on

21   that.  If you can get closer to the mike, it would be helpful.

22           **MS. RUSSELL:**  I'll speak closer to the mike,

23   Your Honor.  Is that better?

24           **THE COURT:**  Yes, it is.

25           **MS. RUSSELL:**  Okay.  Thank you.


                    *11-14876; Griffin v. Condon, et al.*

*Terrance Davis - Direct*
*Thursday/January 19, 2017*

1  **BY MS. RUSSELL:**

2  **Q.**   So you currently reside at a correctional facility?

3  **A.**   Yes, ma'am.

4  **Q.**   And how many years have you been incarcerated?

5  **A.**   Ten years.

6  **Q.**   And in that ten years have you been incarcerated at

7  multiple facilities?

8  **A.**   Yes, ma'am.

9  **Q.**   Approximately how many facilities?

10  **A.**   Seven.

11  **Q.**   Seven.  At any time were you incarcerated at Gus Harrison

12  Correctional Facility?

13  **A.**   Yes.

14  **Q.**   And when you were at Gus Harrison Correctional Facility,

15  were you housed in Housing Unit 2?

16  **A.**   Yes, ma'am.

17  **Q.**   When you were at Gus Harrison Correctional Facility, did

18  you know Defendants Condon, McMurtrie and Downard, who are

19  seated over here?

20  **A.**   Yeah.  I knew them as regular unit officers.

21  **Q.**   Okay.  So they worked in your unit?

22  **A.**   Yes, ma'am.

23  **Q.**   And while you were at Gus Harrison, did you also know

24  Plaintiff Randle Griffin?

25  **A.**   Yes.

*11-14876; Griffin v. Condon, et al.*

*Terrance Davis - Direct*
*Thursday/January 19, 2017*

1   **Q.**   At what time period were you at Gus Harrison, to your

2   recollection?

3   **A.**   I want to say like -- I know 2010 to like 2011.  I wasn't

4   there that long.

5   **Q.**   Okay.  Were you there from January to March 2011?

6   **A.**   Yes, ma'am.

7   **Q.**   What was your experience like at Gus Harrison compared to

8   other facilities that you were previously incarcerated or now

9   currently incarcerated in?

10           **MR. SCHNEIDER:**  Object to lack of relevance.

11           **MS. RUSSELL:**  Your Honor, this goes directly to the

12   facility's culture.

13           **THE COURT:**  Overruled.

14   **BY MS. RUSSELL:**

15   **Q.**   What was your experience like at Gus Harrison?

16   **A.**   Well, do you mean like how was it?

17   **Q.**   Compared to other facilities that you'd been in.

18   **A.**   I would rather be at other facilities than be there.

19   **Q.**   You would rather be at other facilities?

20   **A.**   Yes, ma'am.

21   **Q.**   Is there a particular reason why?

22   **A.**   Just the atmosphere, it was, it was foul how officers

23   treated, you know what I'm saying, us inmates.

24   **Q.**   Do you have any examples of how they treated inmates that

25   might have differentiated from other facilities?

*11-14876; Griffin v. Condon, et al.*

*Terrance Davis - Direct*
*Thursday/January 19, 2017*

1          **MR. SCHNEIDER:**  Objection, relevance, Rule 404 and

2     Rule 403.

3          **THE COURT:**  Overruled for purposes of answering that

4     question or having it answered.  I'm not sure how far I want

5     you to go with this though.

6          **MS. RUSSELL:**  I understand, Your Honor.  That was my

7     last question.

8          **THE WITNESS:**  Could you repeat your question, please?

9     **BY MS. RUSSELL:**

10    **Q.**   I said, could you provide some examples as to how the

11    facility was problematic for you?

12    **A.**   I didn't like myself how the officers, you know what I'm

13    saying, treated us, how they would talk to us in any type of

14    way.

15    **Q.**   Okay.  When you were at Gus Harrison, did you notice a

16    discrepancy as to the number of tickets that were issued to

17    prisoners compared to a different facility?

18    **A.**   They wrote a gang of tickets for any and everything.

19    Minute stuff you received a ticket.

20    **Q.**   Was that unusual compared to other facilities?

21    **A.**   Yeah, because anywhere else where I may have been, like

22    say if I was at Carson City Correctional Facility and I left a

23    book on my bed or whatever or my bed wasn't made, the CO

24    wouldn't -- you know what I'm saying, they may tell me, "Man,

25    your bed is supposed to be made at eight o'clock, could you go

*Terrance Davis - Direct*
*Thursday/January 19, 2017*

1  make your bed."  But there at Gus Harrison you are going to

2  receive a misconduct ticket.

3  **Q.**  I'm going to move into the specifics now.  Do you remember

4  any events that occurred on March 2nd, 2011?

5  **A.**  Yeah.

6  **Q.**  And what happened that day to your recollection?

7  **A.**  On that day I was coming in from the yard and I was

8  walking, as I was walking past the officers' desk, the

9  counselor was coming out of his office and he was frustrated,

10  you know.

11  **Q.**  Who was the counselor?

12  **A.**  It was RUM Condon.

13  **Q.**  Is that the defendant seated over here?

14  **A.**  Yes, ma'am.  He came out of his office --

15       **THE COURT:**  It was one of the defendants.  If it is

16  one, would you point out who?  Which one?

17       **THE WITNESS:**  Uhm, I don't really remember which one,

18  sir.

19       **THE COURT:**  You don't know.  All right.  If it's

20  important, we'll ask again.

21  **BY MS. RUSSELL:**

22  **Q.**  So you don't remember specifics.  You recognize the

23  three individuals here?

24  **A.**  I recognize the three faces, but I never really dealt with

25  them on a day-to-day basis other than me having been housed in

*Terrance Davis - Direct*
*Thursday/January 19, 2017*

1    the unit with them.

2    **Q.**   Okay.  But you do recognize the three defendants seated

3    over here, you just don't necessarily know which face goes to

4    which name?

5    **A.**   Right.

6    **Q.**   Okay.  And one of the defendants seated over here or to

7    your recollection somebody named Officer Condon was angry and

8    he walked out of his office?

9    **A.**   Yeah, he was upset about whatever, whatever he said

10   Griffin was doing as far as trying to change how they ran the

11   unit.

12        You know, I was trying to hear what they was saying

13   because I heard a guy's name, you know what I'm saying, who I

14   know, but I wasn't trying to let them know that I was paying

15   attention to what they was saying so I was trying not to look

16   directly at them.

17        And as I was walked past, he was telling them, you know

18   what I'm saying, he was just tired of this guy trying to change

19   how they run things, you know what I'm saying, in his unit.

20        The officer told him, "Well, you know, I can solve that,

21   you know, as far as just write him some tickets, you know what

22   I'm saying, get him kicked off the warden's forum, you know,

23   and do what you've got to do."

24        They started laughing and --

25             **THE COURT:**  I think the witness is in need of a

*11-14876; Griffin v. Condon, et al.*

*Terrance Davis - Direct*
*Thursday/January 19, 2017*

1   question or two rather than just rambling on.

2       **MS. RUSSELL:**  Okay, Your Honor.  I apologize.

3   **BY MS. RUSSELL:**

4   **Q.**  So to your recollection Officer Condon walked out of his

5   office and seemed upset, correct?

6   **A.**  Yes.

7   **Q.**  And after he walked out of his office he walked up to

8   two other individuals?

9   **A.**  Yes.

10  **Q.**  And when he spoke to those two individuals, he expressed

11  his frustration?

12  **A.**  Yes, ma'am.

13  **Q.**  And after expressing that frustration, the other

14  two defendants indicated that they had a solution, right?

15  **A.**  Yes, ma'am.

16  **Q.**  And that solution was writing misconduct tickets that were

17  false against Mr. Griffin?

18  **A.**  Yes, ma'am.

19  **Q.**  After you heard that conversation, did you inform

20  Mr. Griffin?

21  **A.**  Yes.  We had lockdown for count, you know what I'm saying,

22  after the yard was closed.  We all came in the unit.  So when

23  it was cleared, I immediately, you know what I'm saying, told

24  him what I overheard, you know what I'm saying.

25      **MS. RUSSELL:**  Okay.  No further questions at this

*11-14876; Griffin v. Condon, et al.*

*Terrance Davis - Cross*
*Thursday/January 19, 2017*

V3-Page 18

1   time, Your Honor.

2           **THE COURT:** Very well. Thank you.

3       For the defendants, Mr. Schneider.

4                   - - -

5                                       (9:49 a.m.)

6                   **CROSS-EXAMINATION**

7   **BY MR. SCHNEIDER:**

8   **Q.** Good morning, Mr. Davis.

9   **A.** Good morning.

10  **Q.** You know who Randle Griffin is, correct?

11  **A.** Yes.

12  **Q.** You are friends with him, right?

13  **A.** Yes.

14  **Q.** Can you identify any of these people over here at the

15  table?

16  **A.** I can't remember exactly which one is which, but I know, I

17  think this is Downard, the CO.

18  **Q.** Which one are you identifying?

19  **A.** This guy right here with -- right here in front of me.

20          **THE COURT:** Which guy, on the right side?

21          **THE WITNESS:** To my left.

22          **MR. SCHNEIDER:** Okay.

23          **THE COURT:** To your left. I just want to be sure we

24  know who he is identifying, and I think it was the person on

25  the right of the table here.

                *11-14876; Griffin v. Condon, et al.*

*Terrance Davis - Cross*
*Thursday/January 19, 2017*

1    **THE WITNESS:**  Yes, sir.

2    **THE COURT:**  If I'm wrong, it should be corrected.  Is

3  that correct?

4    **THE WITNESS:**  Yes.

5    **THE COURT:**  Is that your understanding, too?

6    **MR. SCHNEIDER:**  That was my understanding,

7  Your Honor, but then I think it changed to the person on the

8  left so I'm not sure at this point.

9    **THE COURT:**  Oh, well, whoever, let's get the record

10  reflecting.

11    **THE WITNESS:**  My left, your right.

12    **MS. RUSSELL:**  Objection, Your Honor.  Perhaps we

13  could change the line of questioning so it's more clear who

14  Mr. Davis is identifying.

15    **MR. SCHNEIDER:**  I think I'm going to move on,

16  Your Honor, at this point so ...

17    **THE COURT:**  All right.  On redirect you can get some

18  more information if you want it.

19    **MS. RUSSELL:**  Yes, Your Honor.

20  **BY MR. SCHNEIDER:**

21  **Q.**  All right.  Mr. Davis, you are currently serving on

22  second-degree murder?

23    **MS. RUSSELL:**  Objection, Your Honor.  We already

24  discussed this, and defense counsel knows that this is not

25  relevant.

*11-14876; Griffin v. Condon, et al.*

*Terrance Davis - Cross*
*Thursday/January 19, 2017*

1      **MR. SCHNEIDER:**  Rule 609, Your Honor.  The evidence

2  comes in.

3      **THE COURT:**  I don't understand how you fit this in

4  the socket that goes relevant.  I don't get it.  If you want to

5  explain it, you can.

6      **MR. SCHNEIDER:**  Thank you, Your Honor.  Federal Rules

7  of Evidence --

8      **MS. RUSSELL:**  Your Honor, you already ruled on this

9  yesterday.  I don't know how many more times this is going to

10  be brought up, but it's completely irrelevant.

11      **THE COURT:**  If this is something that I have ruled on

12  and we are now getting the Federal Rules of Civil Procedure

13  out, it better be something I haven't ruled on or there is

14  going to be a response from me if I've ruled on it already.

15      **MR. SCHNEIDER:**  This is different, Your Honor.  Under

16  Rule 609 evidence of a criminal conviction must be admitted

17  subject to 403.  You had a 403 ruling yesterday as to a

18  different witness.  This is a different crime, different

19  analysis under 403.

20      **THE COURT:**  Despite 403, I'm still not clear on how

21  this is relevant.

22      **MR. SCHNEIDER:**  Your Honor, since Rule 609 says that

23  a witness -- specifically says, "A witness may be impeached by

24  evidence of a criminal conviction.  The evidence must be

25  admitted subject to Rule 403."  No discretion unless 403 keeps

*11-14876; Griffin v. Condon, et al.*

*Terrance Davis - Cross*
*Thursday/January 19, 2017*

1  it out, Your Honor.

2      **MS. RUSSELL:**  Your Honor, it has no bearing on his

3  credibility for truthfulness, and under Sixth Circuit law it

4  does not come in in this particular circumstance.

5      **THE COURT:**  I'm not, I'm not sure that it is relevant

6  to impeachment.  However, I take it the question has been

7  asked.  Implicitly the silence probably answers it.  If you

8  have an answer to the question, which I guess, Mr. Schneider,

9  was weren't you convicted of something.

10      **MR. SCHNEIDER:**  Correct, Your Honor.  Do you want me

11  to repeat the question or no?

12      **THE COURT:**  Well, I just want it to be clear.

13      **MR. SCHNEIDER:**  That was the question.  You are in

14  prison for and then the name of his conviction.

15      **THE COURT:**  And if you've got an answer to the

16  question or if you need to hear it again, please say so.

17      **THE WITNESS:**  Yes, that's what I'm incarcerated for.

18  BY MR. SCHNEIDER:

19  Q.  Okay.  When you were walking past the desk and you heard

20  this alleged conversation, where were you coming from?

21  A.  Yard.  Coming from outside.

22  Q.  Yard is just where you are allowed to go outside and do

23  whatever is out there?

24  A.  Yes, sir.

25  Q.  What time was this?

*11-14876; Griffin v. Condon, et al.*

*Terrance Davis - Redirect*
*Thursday/January 19, 2017*

V3-Page 22

1   **A.**   Like around, like in between like 3:45, 3:50, somewhere in

2   there.

3   **Q.**   In the afternoon?

4   **A.**   Yes, sir.

5       **MR. SCHNEIDER:**  I don't have any further questions.

6   Thank you.

7       **THE COURT:**  Any redirect from the plaintiff?

8                           -    -    -

9                                           (9:54 a.m.)

10                  **REDIRECT EXAMINATION**

11  **BY MS. RUSSELL:**

12  **Q.**   Hi, Terrance.

13  **A.**   Hello.

14  **Q.**   Just to assist the jury, you pointed out Officer Downard

15  previously and you said the individual right in front of me and

16  you said the left, your left initially.

17  **A.**   My left, your right.

18  **Q.**   So on my right -- well, if I was standing behind them --

19  my right, your left is Officer Downard, correct?

20  **A.**   Yes, ma'am.

21      **THE COURT:**  To make sure that -- maybe it's difficult

22  for me for some reason to understand, but which person sitting

23  at the table is that?

24      He just raised his hand, and I think we now know who has

25  been identified and the record is clear on that.

*11-14876; Griffin v. Condon, et al.*

*Terrance Davis - Redirect*
*Thursday/January 19, 2017*

V3-Page 23

1    **MS. RUSSELL:**  Thank you, Your Honor.

2    BY MS. RUSSELL:

3    **Q.**   Mr. Davis, do you recall authoring an affidavit on or

4    around the day of the events that you've testified to?

5    **A.**   Yes.

6    **Q.**   And if you looked at that affidavit, would that -- you

7    know, that is an accurate reflection of what happened that day,

8    correct?

9    **A.**   Yes, ma'am.

10   **MS. RUSSELL:**  Your Honor, may I approach the witness?

11   **THE COURT:**  You may.

12   BY MS. RUSSELL:

13   **Q.**   Mr. Davis, do you recognize this document?

14   **A.**   Yes, ma'am.

15   **Q.**   It's the affidavit that you completed and signed on

16   March 2nd, 2011?

17   **A.**   Yes.

18   **Q.**   And on this you stated, "I, Terrence Davis, swear under

19   the penalty of perjury that on March 2nd, 2011 --

20   **THE COURT:**  Is this going to be admitted or --

21   **MS. RUSSELL:**  I was going to provide a prior

22   consistent statement.

23   **THE COURT:**  Excuse me?

24   **MS. RUSSELL:**  I'm providing a prior consistent

25   statement to bolster the witness's testimony, but I can move

*11-14876; Griffin v. Condon, et al.*

*Terrance Davis - Redirect*
*Thursday/January 19, 2017*

V3-Page 24

1   this into evidence if you'd like.

2         **THE COURT:**  It doesn't have to be admitted,

3   especially if it's submitted to the witness for the purpose of

4   refreshing memory, but you should say that if that's what it

5   is, and you've got Mr. Schneider on his feet.

6         **MR. SCHNEIDER:**  Objection, Your Honor.  You're not

7   allowed to use a prior consistent statement until there has

8   been some impeachment with a prior inconsistent statement.  I

9   also object to the affidavit as hearsay.

10        **THE COURT:**  All right.  On the basis that the Court

11  has permitted it for the reasons stated, you can go ahead.

12        **MS. RUSSELL:**  I can go ahead and read it, Your Honor?

13        **THE COURT:**  Yes.

14  BY MS. RUSSELL:

15  **Q.**   You stated:

16             "I, Terrance Davis, swear under penalty of perjury

17             that on March 2nd, 2011 as I was walking past the

18             officers' station into Housing Unit 2 I heard RUM

19             Condon, RUO McMurtrie and RUO Downard state that they

20             were tired of Griffin trying to change the way that

21             they run the unit.  RUO Downard stated to RUO

22             McMurtrie and RUM Condon that he knew how to get rid

23             of Griffin.  He said that he would write him a ticket

24             to get him removed from the warden's forum.  They all

25             agreed and started laughing out loud as if this was

*11-14876; Griffin v. Condon, et al.*

*Terrance Davis - Redirect*
*Thursday/January 19, 2017*

V3-Page 25

1          funny.  After four o'clock count, I immediately

2          informed the block representative Griffin, ID Number

3          196968, about what I heard.  If called as a witness,

4          I'm willing to testify as to the facts contained in

5          this declaration."

6     Is that correct?

7  **A.**   Yes, ma'am.

8  **Q.**   And at the time that you completed this affidavit you knew

9  what the defendants looked like and you were very familiar with

10 them, weren't you?

11 **A.**   Somewhat, like I said, from being in the unit with them,

12 yes.

13 **Q.**   Because you completed this affidavit on the very day of

14 the alleged incident, correct?

15 **A.**   Yes.

16          **MS. RUSSELL:**  Thank you.

17          **MR. SCHNEIDER:**  No further questions, Your Honor.

18          **THE COURT:**  All right.  You are going to be excused

19 as soon as we get the jury out of here, but we want to ask a

20 couple more questions.

21     You will please go to the jury room.  You won't be there

22 long.  Thank you for your patience.

23     (Jury out at 9:59 a.m.)

24          **THE COURT:**  Unless anybody objects or has a different

25 idea, now would be the time Mr. Davis can go back to lockup and

*Motion for Judgment as a Matter of Law*
*Thursday/January 19, 2017/Volume 3*

V3-Page 26

1   stand up despite the fact you've got your shackles on.  Anybody

2   have any problem with that?

3         **MR. SCHNEIDER:**  No.

4         **MS. RUSSELL:**  No.

5         **THE COURT:**  Okay.  Thank you.  You are excused.

6         **THE WITNESS:**  Thank you.

7         **THE COURT:**  And what does the plaintiff have in the

8   way of a next witness?

9         **MS. RUSSELL:**  No further witnesses, Your Honor.  We

10  rest.

11        **THE COURT:**  I take it what you're telling me is that

12  that's the plaintiff's case in chief?

13        **MS. RUSSELL:**  Yes, we rest our case in chief,

14  Your Honor.

15        **THE COURT:**  Thank you.  And we're ready then for

16  defendant.  If you are ready to call a witness, you can do it.

17  If this is the time you would like a break for five or ten

18  minutes, we can do that, too.

19        **MR. SCHNEIDER:**  Your Honor, I'm ready to move for a

20  judgment as a matter of law and a directed verdict.

21        **THE COURT:**  All right.  You are ready to make such a

22  motion, and I'm sure you are ready for my response, which is

23  going to be not favorable to your motion at least now.  The

24  motion, of course, can be renewed as you move through this

25  trial.  Do you have something to say that you want to use to

*11-14876; Griffin v. Condon, et al.*

*Motion for Judgment as a Matter of Law*
*Thursday/January 19, 2017/Volume 3*

V3-Page 27

1    bolster that motion?

2         **MR. SCHNEIDER:**  Sure.  I can put my motion on the

3    record, Your Honor.  Is that what you're asking me to do?

4         **THE COURT:**  Yeah, I'm asking you if you have

5    something to say.

6         **MR. SCHNEIDER:**  Yes, I do, Your Honor.  I don't want

7    to waive that so I'll put it on the record.

8         The defendants want to move for judgment as a matter of

9    law.  The plaintiff hasn't presented any evidence of protected

10   conduct.  We have Exhibit 43 showing that he just dropped in.

11   These were the notes from the ombudsman that state that

12   Mr. Griffin just dropped in on an interview with another

13   prisoner.  That's not protected conduct under clearly

14   established law back in 2011.  For that reason the defendants

15   are entitled to qualified immunity.

16        As to adverse action, Your Honor, the plaintiff has

17   alleged one minor ticket in which he was found guilty.  I

18   believe he was "fact bound" by that ticket and "checkmated"

19   under the Checkmate Rule from testing that ticket.

20        The law also states that minor tickets are not adverse

21   action.  There was no clearly established law in 2011 stating

22   that it was.  For that reason the defendants are entitled to

23   qualified immunity.

24        As for the second ticket, again, it was a minor ticket and

25   it was torn up the next day.  That clearly is not adverse

*11-14876; Griffin v. Condon, et al.*

*Motion for Judgment as a Matter of Law*
*Thursday/January 19, 2017/Volume 3*

V3-Page 28

1   action under any clearly established law.  The same is true

2   with threats, not an adverse action.

3       The defendants are entitled to qualified immunity for

4   those reasons.  I understand that the Sixth Circuit, in

5   reversing this Court's prior dismissal of this case the Sixth

6   Circuit said, well, a ticket can be an adverse action.  The

7   defendants were found by the record at the time, which was

8   undeveloped prediscovery, the plaintiff claimed this was a

9   major misconduct ticket, and the Sixth Circuit for that reason

10  said, yeah, a major ticket can be an adverse action, send it

11  back to discovery.

12      Well, we now know and have evidence that these are minor

13  tickets, Your Honor, Class 2 tickets, and there is clearly

14  established law that a Class 2 ticket is not an adverse action.

15  That's just the way it is, and the defendants are entitled to

16  qualified immunity as a result.

17      As to causation, the plaintiff has presented no evidence

18  that the defendants were aware of this contact with the

19  ombudsman.  There's absolutely zero evidence of that in this

20  case.  The whole causation aspect, that they retaliated against

21  him because of his contact with the ombudsman, fails because he

22  can't show any causation.  He had the burden of proof and did

23  not present that evidence.

24      We also have the forum removal.  We have Exhibits A, C, D

25  and F.  C and D have been excluded thus far.  I'll be asking

*Motion for Judgment as a Matter of Law*
*Thursday/January 19, 2017/Volume 3*

V3-Page 29

1   the Court to reconsider that for another reason as to another

2   witness, but as for right now, the Court at least can look at

3   those exhibits.  A and F are in evidence.  Those, along with C

4   and D, show that the defendants had nothing to do with removal

5   from the forum.  The plaintiff was being investigated back in

6   February and was removed for another reason.  It had nothing to

7   do with these defendants.  All four of those exhibits clearly

8   show that.

9        As far as loss of the job, the defendants have no power to

10  remove the plaintiff from his job.  He was removed because he

11  was found guilty on a ticket.  He had a hearing on that ticket.

12       And for all of those reasons the defendants are entitled

13  to qualified immunity.  Alternatively, for the same reasons

14  essentially, the defendants request a directed verdict in their

15  favor.  Thank you, Your Honor.

16            **THE COURT:**  Thank you.  If the plaintiff has a

17  response, the plaintiff can make the response, but briefly

18  because I'm going to deny the motion.

19            **MR. FINK:**  Okay.  Thank you, Your Honor.  I'll be

20  very brief in that case, and thank you, Your Honor.

21       The three elements here to prove a First Amendment

22  retaliation claim are protected conduct, adverse action, and

23  causation.  The facts that we proposed to show in our response

24  to their summary judgment motion, which was denied by this

25  Court, we have indeed shown a reasonable juror could conclude

*Motion for Judgment as a Matter of Law*
*Thursday/January 19, 2017/Volume 3*

V3-Page 30

1  and believe Randle Griffin, could believe our two witnesses

2  that witnessed the defendants conspiring to write these

3  tickets, can believe Randle Griffin that the conversation with

4  Defendant Condon was indeed about talking to the ombudsman.

5       The ombudsman herself said that it is very likely that

6  guards know when she is in the building.  It's also the

7  testimony of Randle Griffin that she met in the office right

8  next to Defendant Condon.

9       So the main defense here, that we haven't proven that they

10  knew the ombudsman was there, there is a lot of evidence on

11  which a reasonable juror could conclude that indeed the

12  defendants did know and indeed that the defendants did

13  retaliate against plaintiff.

14       As for the two -- this is the last thing I'll say, Your

15  Honor.  As to the two damages categories, the warden's forum,

16  plaintiff was removed eight days after he got the ticket and at

17  no time before was any of these reasons for excluding him ever

18  mentioned.

19       The job, defendants knew, defendants knew he would lose

20  his job if he received a ticket.  That was the whole point of

21  giving the ticket, and that's something a reasonable juror

22  could conclude.

23       For those reasons, Your Honor, the JNOV motion and

24  qualified immunity motion should be denied.  Thank you.

25            **THE COURT:**  Very well.  The motion for defendants is

*11-14876; Griffin v. Condon, et al.*

*Motion for Judgment as a Matter of Law*
*Thursday/January 19, 2017/Volume 3*

V3-Page 31

1   denied, as the Court explained it would be, and it may be

2   renewed, of course, as we move along in this case.

3          Are you ready to put the defendants' case in?

4                **MR. SCHNEIDER:**  I am, Your Honor.

5                **THE COURT:**  Any reason defendant should not call

6   witnesses now?  Because he's going to do it, but it doesn't

7   have to be right now.  It can be delayed a little, like

8   five minutes.

9                **MR. SCHNEIDER:**  Your Honor, I could use a restroom

10  break.  Is that what the Court is getting at?

11               **THE COURT:**  I'm sorry?

12               **MR. FINK:**  Whatever Your Honor prefers, we are ready

13  to go.

14               **MR. SCHNEIDER:**  Exactly.

15               **MR. FINK:**  But we're happy to take a break.

16               **THE COURT:**  We have had the jury out for maybe ten

17  minutes, and we could give them another five or ten minutes.

18               **MR. FINK:**  Absolutely, Your Honor.

19               **THE COURT:**  The Court is in recess.

20               **MR. FINK:**  Thank you, Your Honor.

21               **MR. SCHNEIDER:**  Thank you.

22          (Recess from 10:07 a.m. to 10:13 a.m.)

23               **THE COURT:**  Okay.  Are these witnesses any witnesses

24  that will need special identification and security or are

25  they -- we have got our defendants and one other person, I

*Brian Evers - Direct*
*Thursday/January 19, 2017/Volume 3*

V3-Page 32

1    guess, have we not?

2         **MR. SCHNEIDER:**  He's not a prisoner, Your Honor.

3         **THE COURT:**  Okay.  The answer is no.  Let's bring in

4    the jury.

5         **THE CLERK:**  All rise for the jury.

6         (Jury in at 10:14 a.m.)

7         **THE COURT:**  Please be seated.  Thank you for your

8    patience.  We have now heard the plaintiff's case in chief,

9    which means plaintiff is probably pretty much through with what

10   they want to present to the jury, maybe altogether through

11   depending upon what happens, they might have rebuttal

12   witnesses, too, but we will now hear from the defendants, their

13   side of the case.

14        And, Mr. Schneider, you may call your first witness.

15        **MR. SCHNEIDER:**  Thank you, Your Honor.  The defense

16   calls Brian Evers.

17        **THE COURT:**  Please come forward and take the oath

18   from the court reporter.

19                        -   -   -

20                    **BRIAN EVERS,**

21        being first duly sworn to tell the truth, was

22        examined and testified upon his oath

23        as follows:

24        **THE COURT:**  Thank you.  Welcome.

25                        -   -   -


                *11-14876; Griffin v. Condon, et al.*

*Brian Evers - Direct*
*Thursday/January 19, 2017/Volume 3*

1                                                    (10:15 a.m.)

2                        **DIRECT EXAMINATION**

3  **BY MR. SCHNEIDER:**

4  **Q.**   Good morning.

5  **A.**   Good morning.

6  **Q.**   Will you state your name for the record, please.

7  **A.**   Brian Evers.

8  **Q.**   Where are you currently employed, Mr. Evers?

9  **A.**   Gus Harrison Correctional Facility.

10  **Q.**   All right.  How long have you been there?

11  **A.**   Twenty-four years.

12  **Q.**   What's your position at the prison?

13  **A.**   I'm a Resident Unit Manager.

14          **THE COURT:**  I would appreciate it if both of you

15  would be a little closer to the microphones --

16          **THE WITNESS:**  Is that better?

17          **THE COURT:**  -- if you can do that.

18       Go ahead.

19  **BY MR. SCHNEIDER:**

20  **Q.**   Okay.  And in 2011 which prison did you work at?

21  **A.**   Gus Harrison.

22  **Q.**   All right.  What is your position there?

23  **A.**   Resident Unit Manager.

24  **Q.**   And back in 2011?

25  **A.**   Resident Unit Manager.

*Brian Evers - Direct*
*Thursday/January 19, 2017/Volume 3*

V3-Page 34

1   **Q.**   All right.   There's a small exhibit book in front of you

2   there.   Would you grab that.   Would you flip to Exhibit E,

3   please.   Let me know when you're there.

4   **A.**   I'm there.

5   **Q.**   Okay.   The second page of Exhibit E, do you see that?

6   **A.**   Yes.

7   **Q.**   Okay.   What is that document?

8   **A.**   It's a hearing report for a Class 2 misconduct.

9   **Q.**   We're going to need you to speak up so that everybody can

10  hear you.

11  **A.**   It's a hearing report for a Class 2 misconduct.

12  **Q.**   All right.   And who is the prisoner who got the ticket?

13  **A.**   Griffin.

14  **Q.**   Okay.   And who heard him on the ticket?

15  **A.**   I did.

16  **Q.**   Okay.   So it was your job to decide whether he was guilty

17  or not of that ticket?

18  **A.**   Yes.

19  **Q.**   All right.

20       Okay.   Can you see on the screen the ticket?

21  **A.**   Yes.

22  **Q.**   Okay.   That's the same as Exhibit E that you just

23  identified?

24  **A.**   Correct.

25  **Q.**   Okay.   And this is the hearing report portion of the

*Brian Evers - Direct*
*Thursday/January 19, 2017/Volume 3*

1  ticket, correct?

2  **A.**   Correct.

3  **Q.**   Okay.  Up here in evidence, this is a section --

4         **MR. HUBBARD:**  Your Honor, just a brief objection.

5  Counsel just said, "Up here in evidence."  This document is not

6  in evidence.

7         **THE COURT:**  All right.  It's been noted.

8     Go ahead.

9         **MR. SCHNEIDER:**  Your Honor, the exhibit was admitted

10 into evidence yesterday.

11        **THE COURT:**  All right.  I didn't make any official or

12 significant move as a result of the objection, and you can go

13 ahead.

14        **MR. SCHNEIDER:**  Thank you, Your Honor.

15 **BY MR. SCHNEIDER:**

16 **Q.**   Up here in the box it says, "Evidence and/or prisoner

17 statement."  Do you see that?

18 **A.**   Yes.

19 **Q.**   Okay.  This is what the prisoner's statement to you was at

20 the hearing, correct?

21 **A.**   Correct.

22 **Q.**   All right.  And right here he says that he checked into

23 the unit when he got back to the unit.

24 **A.**   That's what he stated, yes.

25 **Q.**   That's what he told you, correct?

*Brian Evers - Cross*
*Thursday/January 19, 2017/Volume 3*

1   **A.**   Yes.

2   **Q.**   All right.  "Reason for findings."  These are your

3   findings?

4   **A.**   Yes.

5   **Q.**   Okay.  You delayed the hearing so you could check the

6   camera?

7   **A.**   Yes.

8   **Q.**   Did the camera show him going to work at any time that

9   day?

10  **A.**   No.

11  **Q.**   You understand his defense was he had a conflicting

12  warden's forum call-out, correct?

13  **A.**   Correct.

14  **Q.**   If that was true and he was late to work because of that,

15  what would you have done with this ticket?

16  **A.**   If he showed up, I would have dismissed it.

17  **Q.**   You would have dismissed the ticket?

18  **A.**   Correct.

19          **MR. SCHNEIDER:**  Okay.  No further questions.

20          **THE COURT:**  Cross-examination.

21                    -   -   -

22                                      (10:19 a.m.)

23              **CROSS-EXAMINATION**

24  BY MR. HUBBARD:

25  **Q.**   Good morning, sir.


                    *11-14876; Griffin v. Condon, et al.*

*Brian Evers - Cross*
*Thursday/January 19, 2017/Volume 3*

V3-Page 37

1  **A.**   Good morning.

2  **Q.**   My name is Brandon Hubbard, and I represent Mr. Griffin

3  along with my team behind me.

4      You testified about watching a camera.

5  **A.**   Yes.  I had the camera checked, yes.

6  **Q.**   How long was the video?

7  **A.**   He said he arrived --

8  **Q.**   No, no.  Excuse me, sir.  My question to you was how long

9  was the video?

10  **A.**   When you review a video, you can review any time slot you

11  want.  I reviewed over half an hour of the video, 15 minutes

12  prior and 15 minutes after.  I had the video checked.

13  **Q.**   When you say you had the video checked, what do you mean?

14  **A.**   The hearings investigator is the one that actually does

15  the reviewing of the video.  I provide an OTIS face sheet of

16  the prisoner, and there's only a couple of people that are

17  allowed to operate the cameras on the old camera system so I

18  have to go through the hearings investigator.

19  **Q.**   Is that to maintain the integrity of the videos?

20  **A.**   Correct.

21  **Q.**   I just want to be clear.  You personally watched the

22  video?

23  **A.**   No, the hearings investigator.  I had the video checked.

24  That's what I said.

25  **Q.**   Well, I -- just so we're clear, my question to you was how

*11-14876; Griffin v. Condon, et al.*

*Brian Evers - Cross*
*Thursday/January 19, 2017/Volume 3*

1  long was the video that you watched, and you said 15 minutes

2  before and 15 minutes after.  But, to be clear, you never

3  actually looked at the video, did you?

4  **A.**   Correct.

5  **Q.**   You delegated that out to somebody on your staff?

6  **A.**   She doesn't work for me, no.  She's a hearings

7  investigator.  She's an impartial person for the Department and

8  population.  That's her assignment.

9  **Q.**   When you say the Department, you mean the Department of

10  Corrections?

11  **A.**   She's employed by the Department of Corrections, yes.

12  **Q.**   Are you aware that my client's -- actually my firm on

13  behalf of my client served the MDOC with a subpoena nearly

14  two years ago?

15  **A.**   I don't know anything about this case.

16  **Q.**   Fair enough.  In that subpoena we requested surveillance

17  camera footage from Housing Unit 2 at the Gus Harrison facility

18  for March 1st, 2nd, 3rd, 4th and 5th.  Do you have any reason

19  to dispute that?

20  **A.**   No, but there's a retention schedule.  If you just

21  requested it two years ago from something in 2011, it wouldn't

22  have been retained unless there's a critical incident.

23  **Q.**   Are you aware of how long this litigation has been

24  pending?

25  **A.**   No.

*Brian Evers - Cross*
*Thursday/January 19, 2017/Volume 3*

V3-Page 39

1  **Q.**   Would it surprise you to learn that my client filed this

2  lawsuit within that two-year window?

3  **A.**   Okay.

4  **Q.**   And are you aware that, that notwithstanding, in response

5  to the subpoena we didn't receive any video footage?

6  **A.**   Like I said, the video would not have been maintained that

7  long on the retention schedule.  The video is only maintained

8  for -- if there's a critical incident.  Otherwise, it's like on

9  a 30-day time lapse.  It expires if you don't pull it within

10  30 days.

11  **Q.**   So from your perspective there's a video out there that we

12  requested, we didn't receive any response to our subpoena, and

13  it's a video that you never personally reviewed, correct?

14  **A.**   No, there's not a video out there that was available when

15  you asked.

16  **Q.**   Fair enough.

17        **MR. HUBBARD:**   Permission to approach the witness,

18  Your Honor.

19        **THE COURT:**   You may.

20  **BY MR. HUBBARD:**

21  **Q.**   Sir, I have handed to you a document that's been already

22  admitted into evidence.  It's Exhibit Number 44 from the

23  plaintiff, and I'll just cut right to the chase.  It's a

24  document that details a systemic problem at Gus Harrison

25  facility regarding the writing of false misconduct tickets.

*Brian Evers - Cross*
*Thursday/January 19, 2017/Volume 3*

V3-Page 40

1   Did you ever see that report?

2   **A.**   No, no.

3   **Q.**   Have you ever heard anything about Gus Harrison facility

4   writing false misconduct tickets?

5   **A.**   Officially, no.  I mean prisoners make statements all the

6   time.

7   **Q.**   So there's a report out there, the report that's in your

8   hands, that's dated March of '11, excuse me, February of '11,

9   and --

10       You've been at Gus Harrison for how long?

11   **A.**   Almost 24 years.

12   **Q.**   You've been at Gus Harrison for 24 years, which

13   encompasses the year 2011, and then there's a report from the

14   ombudsman's office regarding a systemic problem at Gus Harrison

15   facility regarding the writing of false misconduct tickets and

16   you're not aware of any of that activity?

17   **A.**   These are just accusations.  There's no evidence that it

18   happened.

19   **Q.**   Answer my question, please.

20   **A.**   No, I'm not aware of it so I'm trying to read it while you

21   are talking.

22   **Q.**   Take your time.

23   **A.**   I'm not listed anywhere in here.  I don't know why I would

24   be aware of it.

25   **Q.**   You are not aware at all of the systemic problem at Gus

*Gary McMurtrie - Direct*
*Thursday/January 19, 2017/Volume 3*

V3-Page 41

1  Harrison --

2  **A.**   I'm not aware of this report.

3  **Q.**   Let me finish my question, sir.  Are you aware of the

4  systemic problem at Gus Harrison -- let me finish my question.

5      Are you aware of the systemic problem at Gus Harrison

6  facility regarding the writing of false misconduct tickets?

7  **A.**   For a second time, no.

8          **MR. HUBBARD:**  No further questions, Your Honor.

9          **THE COURT:**  Mr. Schneider, do you have something?

10          **MR. SCHNEIDER:**  No questions, Your Honor.

11          **THE COURT:**  Then you are excused.  Thank you.

12          **THE WITNESS:**  Thank you.

13          **MR. SCHNEIDER:**  Your Honor, the defense calls

14  Gary McMurtrie.

15          **THE COURT:**  Please take the oath before you are

16  seated.  Thank you.

17                        -   -   -

18                  **GARY MCMURTRIE,**

19          being first duly sworn by the Court to tell

20          the truth, was examined and testified upon his

21          oath as follows:

22                        -   -   -

23

24

25

*Gary McMurtrie - Direct*
*Thursday/January 19, 2017/Volume 3*

V3-Page 42

1            (10:27 a.m.)

2                    **DIRECT EXAMINATION**

3    **BY MR. SCHNEIDER:**

4    **Q.**   All right.  Could we get your name for the record, please.

5    **A.**   Gary McMurtrie.

6    **Q.**   Okay.  And you have heard the other witnesses.  You know

7    you need to keep your voice up, right?

8    **A.**   Yes, sir.

9    **Q.**   Okay.  Where are you currently employed, Mr. McMurtrie?

10   **A.**   Gus Harrison.

11   **Q.**   I'm sorry?

12   **A.**   Gus Harrison Correctional Facility.

13   **Q.**   All right.  What's your position there?

14   **A.**   I'm a corrections officer.

15   **Q.**   You have also served as a union steward?

16   **A.**   Yes, for about a year.

17   **Q.**   How long have you been employed there?

18   **A.**   About 15 years, just a little less.

19   **Q.**   When you hired in with the department, did you have to go

20   to the corrections academy?

21   **A.**   Yes.

22   **Q.**   How long did that last?

23   **A.**   I want to say I was there for eight weeks, then I was at

24   the facility for four weeks, and then you go back to the

25   academy for two weeks.  It's different now though.

*Gary McMurtrie - Direct*
*Thursday/January 19, 2017/Volume 3*

1  **Q.**   Okay.  And since then you have also had annual training?

2  **A.**   Yes.

3  **Q.**   All right.  Basically all, all aspects of offender

4  management?

5  **A.**   Yes.

6  **Q.**   You were in the military before prison?

7  **A.**   Yes.

8  **Q.**   Which branch?

9  **A.**   U.S. Army.

10  **Q.**   What are the duties of a corrections officer in the

11  prison?

12  **A.**   Our main, our main -- well, there's corrections officers

13  and then there's -- we're all corrections officers now, but I'm

14  a housing officer.  I have always been a housing officer.

15      In housing our duties are to maintain order in the housing

16  unit, safety and security of the physical plant, prisoners from

17  each other, our safety and security.

18  **Q.**   Okay.  When a person from the outside comes into prison

19  for some sort of visit, do you have any involvement with that

20  process?

21  **A.**   No.

22  **Q.**   You know the other defendants here, correct?

23  **A.**   Yes.

24  **Q.**   All right.  Do you still work with them?

25  **A.**   I work with Downard once in a blue moon.  I haven't

*Gary McMurtrie - Direct*
*Thursday/January 19, 2017/Volume 3*

1    seen -- before we started dealing with this, I hadn't seen

2    Condon in years.

3    **Q.**   Okay.  When did you meet Officer Downard?

4    **A.**   It was in 2011 when he came from the south side over to

5    the north side to 2 block.

6    **Q.**   You were working in Housing Unit 2 already?

7    **A.**   Yes.

8    **Q.**   And that's what you mean when you say 2 block?

9    **A.**   Yes.

10   **Q.**   And then in 2011 Officer Downard came over?

11   **A.**   Yes.

12   **Q.**   And that's when you met him?

13   **A.**   Yes.

14   **Q.**   Do you guys hang out outside of work?

15   **A.**   We have been together once outside of work.  He welded a

16   patch on my muffler on my truck.

17   **Q.**   All right.  When is the last time you two worked together

18   on a regular basis in the same housing unit?

19   **A.**   2 block back in 2011.

20   **Q.**   So since 2011?

21   **A.**   I don't think we have worked together in the same housing

22   unit since then.  I work on the south side now, which has

23   adjoining units, and sometimes he was in the other unit, but

24   they are separate.

25   **Q.**   Okay.  I want to talk about the process of writing a

*Gary McMurtrie - Direct*
*Thursday/January 19, 2017/Volume 3*

V3-Page 45

1   ticket in the prison.  So, step one, you have to see something

2   happen, right?

3   **A.**   Yes.

4   **Q.**   Okay.  And then you write a ticket?

5   **A.**   Yes.

6   **Q.**   Okay.  Do you have any involvement with it after that?

7   **A.**   No, not unless we get a questionnaire or something from

8   the H.I., from the hearings investigator.

9   **Q.**   All right.  You don't decide if the prisoner is guilty or

10  not guilty on the ticket though?

11  **A.**   No.

12          **MR. FINK:**  Excuse me, Your Honor.  I have let it go a

13  lot, but can we let the witness testify?  I mean these are all

14  leading questions.  Every single one is just telling him what

15  the answer is and right.  This is cross-examination basically.

16          **THE COURT:**  Okay.  I don't find anything truly

17  difficult or offensive about what he's been doing so far, but

18  you are on direct examination of your own witness so let him

19  tell you what it is for the most part.

20          **MR. SCHNEIDER:**  I understand, Your Honor.  For

21  preliminary matters usually leading is okay.

22  **BY MR. SCHNEIDER:**

23  **Q.**   For a minor misconduct ticket that's a Class 2 ticket, are

24  you required to write that immediately when you see something?

25  **A.**   No.

*11-14876; Griffin v. Condon, et al.*

*Gary McMurtrie - Direct*
*Thursday/January 19, 2017/Volume 3*

V3-Page 46

1  **Q.**   What was your normal procedure?

2  **A.**   We would, we would wait until the end of the day and write

3  them at the end of the day because you usually have a block of

4  time at the end of the day when there's no convict movement and

5  you've got time.

6  **Q.**   When you talk about convict movement, you are talking

7  about them -- well, what are you talking about?

8  **A.**   I'm talking about there's periods during the day when

9  there's no movement, count time.  They are locked down in their

10  cells.  Or where I work now there is no cells, but they are

11  still locked down.

12  **Q.**   Absent a job or some other requirement, is there a certain

13  time of day when they are required to be back in the housing

14  unit for the night?

15  **A.**   Yes.  When the yard is closed, they have to be in the

16  housing unit unless they have a job somewhere else.

17  **Q.**   Did you have porters back in the unit in 2011?

18  **A.**   Yes.

19  **Q.**   What were the duties of the porters?

20  **A.**   Well, they had different duties.  There were different

21  jobs, like a laundry porter or dayroom porter.  You had guys

22  that cleaned the wings in the unit.  You had a guy that takes

23  trash to the dumpster.

24  **Q.**   All right.  I just want to focus on the dayroom porter.

25  **A.**   Okay.

*11-14876; Griffin v. Condon, et al.*

*Gary McMurtrie - Direct*
*Thursday/January 19, 2017/Volume 3*

1   **Q.**   What were their job duties?

2   **A.**   Keep the dayrooms clean.  There's a little area in there

3   that has a microwave and a toaster and like a small corner

4   table.  They had to keep that area clean.  They had to keep the

5   trash taken out to the dumpster outside the unit.  And there

6   was a locked footlocker in there that was full of board games,

7   and they were responsible for that.  So we would have to go and

8   unlock the footlocker for them.

9   **Q.**   How did the prisoners know what time they had to go to

10  work?

11  **A.**   It's on their call-out.  They are issued it every day.

12  Actually they get it every night on third shift for the next

13  day.

14  **Q.**   Were they required to check in before going to work?

15  **A.**   Yes.

16  **Q.**   Why?

17  **A.**   So I know they showed up on time.

18  **Q.**   If a prisoner has a call-out and they don't show up on

19  time, what happens in prison?

20  **A.**   Well, first I'm going to look at it and see why he didn't

21  show up.  Maybe he was at health care or a visit, something.

22  If he doesn't have a good excuse for why he didn't show up and

23  he was just a couple minutes late, I'm going to give him a

24  warning, but if he's 10, 15 minutes late, I'm going to write

25  the ticket.

*Gary McMurtrie - Direct*
*Thursday/January 19, 2017/Volume 3*

V3-Page 48

1    **Q.**   What kind of ticket is that?

2    **A.**   It's an "out of place."  It's a Class 2 ticket.  It's a

3    minor.

4    **Q.**   All right.  Back in 2011 -- well, let me start like this.

5          You are currently aware that the plaintiff is claiming

6    that Mr. Bryant assaulted Condon, correct?

7    **A.**   I'm aware of it through this lawsuit.

8    **Q.**   Were you aware of that allegation back in 2011?

9    **A.**   No.

10   **Q.**   Were you aware of any investigation into that alleged

11   incident?

12   **A.**   No.

13   **Q.**   Aside from your involvement in this case and the testimony

14   you have heard in the court, do you know what the ombudsman is?

15   **A.**   Just a real general, vague notion.

16   **Q.**   Were you ever aware that the plaintiff claimed that he

17   spoke to the ombudsman?

18   **A.**   Just through this lawsuit.

19   **Q.**   So back in 2011 you were not aware of that?

20   **A.**   No.

21   **Q.**   On March 3rd, 2011 do you recall writing a ticket for

22   Mr. Griffin?

23   **A.**   Yes.

24   **Q.**   What was that ticket for?

25   **A.**   Out of place.

*Gary McMurtrie - Direct*
*Thursday/January 19, 2017/Volume 3*

V3-Page 49

1    **Q.**   What happened?

2    **A.**   He didn't show up for his detail.

3    **Q.**   Did you curse at him at all?

4    **A.**   No.

5    **Q.**   Did you find him to find out why he wasn't there for his

6    detail?

7    **A.**   Yeah, about -- I want to say his detail started at 2:30.

8    I don't remember if it did or not, but that seems to be what I

9    remember.  Excuse me.

10        About 2:45 he hadn't shown up so I went down -- or I

11   called him out of his cell and he came up on base, and I asked

12   him why he didn't show up for his detail.  And he didn't say

13   anything to me.  In fact, I don't remember Griffin ever

14   speaking to me.  He just stood and stared at me.  And I said,

15   "Well, I'm going to write you a ticket.  You're laid in.

16   Return to your cell."

17   **Q.**   And he didn't tell you why he didn't show up for work?

18   **A.**   No.

19   **Q.**   Did you know why he didn't show up for work?

20   **A.**   He was in his cell.  I don't know why.

21   **Q.**   Do you currently know why he didn't show up for work that

22   day?

23   **A.**   I know what the claim is, but ...

24   **Q.**   And what's that?

25   **A.**   That he was in a warden's forum meeting.

*Gary McMurtrie - Direct*
*Thursday/January 19, 2017/Volume 3*

V3-Page 50

1    **Q.**   He had another ticket the day before.

2    **A.**   Oh, yeah, yeah.  I was confused.  Yeah.  Downard wrote him

3    a ticket the day before and laid him in.  I didn't know about

4    the ticket that Downard wrote so my ticket was in error.

5    **Q.**   All right.  You have heard the testimony about this

6    conversation between the three of you, you, Downard and Condon,

7    about writing false tickets, correct?

8    **A.**   Yes.

9    **Q.**   Did that happen?

10   **A.**   No.

11   **Q.**   You never had a conversation of that nature?

12   **A.**   No.

13   **Q.**   Did you ever have any conversation about the ombudsman

14   with Downard or Condon?

15   **A.**   No.

16   **Q.**   When did you become aware of the March 2nd ticket that

17   Officer Downard had written?

18   **A.**   I wrote mine on March 3rd and submitted it that night,

19   which is what we do.  When we walk out at the end of the night,

20   we drop them in the control center window.

21        The next day Griffin got called out to control center to

22   have his ticket review, which would have been the 4th.  I don't

23   remember what time it was, but he got called out to the control

24   center.  He went up there, and I got a call from Sergeant

25   Howard and she said that Downard had just written the same

*11-14876; Griffin v. Condon, et al.*

*Gary McMurtrie - Direct*
*Thursday/January 19, 2017/Volume 3*

V3-Page 51

1  ticket a couple days before.  And I said, okay, then dismiss

2  mine.

3      And then he came back to the unit and a few minutes later

4  Sergeant Howard came out to the unit, and we basically had the

5  same discussion with Griffin standing right there in front of

6  me and I told her to rip the ticket up.  And she ripped it up,

7  and the end.

8  **Q.**   Who is Sergeant Howard?

9  **A.**   She was -- back in 2011 she would have been the yard

10  sergeant pretty much every day.

11  **Q.**   And part of her job was to review tickets?

12  **A.**   Yes.

13  **Q.**   And that happens before a hearing?

14  **A.**   Yes.

15  **Q.**   Did you have any reason at all to be upset or mad at

16  Mr. Griffin?

17  **A.**   No.

18          **MR. SCHNEIDER:**  All right.  No further questions.

19          **THE COURT:**  Cross-examination.

20          **MR. FINK:**  Yes, Your Honor.  Thank you.

21          **THE COURT:**  I'm not being critical of anybody's

22  behavior because I don't know enough about it, but there's

23  something going on immediately next to the jury box.

24          **MR. FINK:**  Yes, Your Honor.  My colleague is looking

25  for an exhibit that's already been admitted.  If you prefer he

*11-14876; Griffin v. Condon, et al.*

*Gary McMurtrie - Cross*
*Thursday/January 19, 2017*

V3-Page 52

1   didn't do that, that's fine.  I asked him to do that.  That's

2   my fault.

3          **THE COURT:**  Well, I would prefer that he not do it

4   for a long period of time.

5          **MR. FINK:**  Understood.  Understood, Your Honor.

6   Thank you.

7                              -   -   -

8                                                    (10:39 a.m.)

9                         **CROSS-EXAMINATION**

10  **BY MR. FINK:**

11  **Q.**   Good morning, Mr. McMurtrie, Officer McMurtrie.  Good

12  morning.

13  **A.**   Good morning.

14  **Q.**   It's true, is it not, Officer McMurtrie, that your

15  philosophy, your words, as a corrections officer is that

16  prisoners get, prisoners get what they have coming to them?

17  **A.**   Yes.

18  **Q.**   That's your philosophy?

19  **A.**   Yes.

20  **Q.**   They get what they have coming to them good or bad is what

21  you said, right?

22  **A.**   Absolutely that's what I said.

23  **Q.**   That's the lens from which you operate as a corrections

24  officer?

25  **A.**   Yes.

*11-14876; Griffin v. Condon, et al.*

*Gary McMurtrie - Cross*
*Thursday/January 19, 2017*

1   **Q.**   Prisoners get what they have coming to them?

2   **A.**   Yes.  If a prisoner comes to me --

3   **Q.**   I understand.  You also, Officer McMurtrie, and correct me

4   if I'm wrong, you also said on direct examination and prior

5   testimony that you don't always write tickets, correct?

6   **A.**   No, we don't always have to write tickets.

7   **Q.**   You will consider certain situations or make a judgment

8   call?

9   **A.**   Progressive discipline.

10  **Q.**   Does that involve asking questions and seeing what the

11  problems are and considering the circumstances?

12  **A.**   Yes.

13  **Q.**   I believe you told me once maybe somebody's mother died so

14  you'll check and see if that guy's all right.  Is that true?

15  **A.**   Yes.

16  **Q.**   In fact, you said nine and-a-half times out of ten you

17  won't write the ticket, you will talk to them and there will be

18  no ticket; is that correct?

19  **A.**   I would rather not write tickets.

20  **Q.**   So you have wide discretion in ticket writing?

21  **A.**   I wouldn't call it discretion.  It's progressive

22  discipline, and you have to take in the totality of the

23  circumstances.

24  **Q.**   Well, the rules require you to write tickets when you see

25  a rule violation; isn't that true?

*11-14876; Griffin v. Condon, et al.*

*Gary McMurtrie - Cross*
*Thursday/January 19, 2017*

1  **A.**   No, not all rule violations.

2  **Q.**   The work department rules don't say that you have to write

3  a ticket any time that you see a rule violation?

4  **A.**   The only tickets we are absolutely required to write are

5  Class 1 tickets, nonbondables, serious tickets.

6  **Q.**   So indeed you do have discretion in when to write tickets

7  was my original question.

8  **A.**   Okay.

9  **Q.**   Yes?

10  **A.**   Sure.

11  **Q.**   So that leads to naturally an arbitrary application of the

12  rules, does it not?

13  **A.**   I wouldn't say that.

14  **Q.**   You didn't say that at your deposition?

15  **A.**   I wouldn't say it's arbitrary.

16  **Q.**   Are you sure, you didn't say that at your deposition?

17  **A.**   I don't recall.

18  **Q.**   Would it surprise you that you said it leads to arbitrary

19  results?

20  **A.**   Okay.

21  **Q.**   Are you familiar with the department work rules, Officer

22  McMurtrie?

23  **A.**   I couldn't recite them, but ...

24  **Q.**   Do you get a book of the department rules?

25  **A.**   Yes.

*11-14876; Griffin v. Condon, et al.*

*Gary McMurtrie - Cross*
*Thursday/January 19, 2017*

V3-Page 55

1    **Q.**   And you've seen them before?

2    **A.**   Yes.

3    **Q.**   You are familiar with them?

4    **A.**   Yes.

5    **Q.**   Could you do me a favor, Officer McMurtrie.   The bigger

6    binder there, the obnoxiously large binder, Exhibit 3, if you

7    could flip to that for me.   Let me know when you're there.

8    **A.**   I'm there.

9    **Q.**   Do you recognize this document?

10   **A.**   Yes.   It's out of the little handbook they give us.

11   **Q.**   The department work rules that you're -- I'm having

12   problems, too.

13   **A.**   Yes.

14   **Q.**   The department work rules that you are given by the

15   department?

16   **A.**   Yes.

17   **Q.**   If you go to Page 15 of the rule book, tell me when you're

18   there.

19   **A.**   It's the first page.

20   **Q.**   Okay.   Do you see a section that says, "Employees are

21   prohibited from treating other employees, offenders, visitors

22   and volunteers in an inhumane manner.   Employee actions must be

23   taken on a rational, objective and nonarbitrary basis."

24         Do you see that?

25   **A.**   Yes.

*Gary McMurtrie - Cross*
*Thursday/January 19, 2017*

V3-Page 56

1   **Q.**   Is that your understanding of the rule?

2   **A.**   Yes.

3   **Q.**   Do you follow that rule?

4   **A.**   Yes.

5   **Q.**   Also on Page 15 there's a section that says, "Using

6   speech, action, gesture or movement that causes physical or

7   mental intimidation or humiliation is improper."

8         Do you see that section?

9   **A.**   Yes.

10  **Q.**   Are you familiar with that rule?

11  **A.**   Yes.

12  **Q.**   If you go for me to Page 29.

13        If you go to Page 29, Section 33, Officer McMurtrie, and

14  let me know when you're there.

15  **A.**   Okay.

16  **Q.**   Tell me if I'm reading Section 33 of your rule book

17  correctly.  "An employee shall immediately report behavior of

18  offenders or employees who are in violation of department

19  rules, policies or procedures to supervisory staff.  Failure to

20  report conduct involving drugs, escape, sexual misconduct,

21  harassment or excessive use of force will aggregate the penalty

22  up to and including dismissal."

23        Did I read that section correctly?

24  **A.**   Yes.

25  **Q.**   Are you familiar with this rule?

*11-14876; Griffin v. Condon, et al.*

*Gary McMurtrie - Cross*
*Thursday/January 19, 2017*

1   **A.**   Yes.

2   **Q.**   And finally on Page 30, Officer McMurtrie, Section 38,

3   please tell me if I'm reading this section correctly.

4   "Employees shall submit accurate and complete oral or written

5   reports when required by department policy or procedure or when

6   requested by a supervisor or authorized personnel.  Failure to

7   provide reports that are accurate and complete as required by

8   policy is a violation of this work rule."

9        Did I read that correctly?

10  **A.**   Yes.

11  **Q.**   Do you understand that rule?

12  **A.**   Yes.

13  **Q.**   You can set aside that book for a moment.

14       You testified that you know Defendant Downard, correct?

15  **A.**   Yes.

16  **Q.**   You shared a shift with him in 2011?

17  **A.**   Yes.

18  **Q.**   Interacted with him every day?

19  **A.**   Yes.

20  **Q.**   Did you get along with Defendant Downard?

21  **A.**   Yes.

22  **Q.**   He was your partner for some time, correct?

23  **A.**   Yes.

24  **Q.**   In fact, you called him a close work friend, right?

25  **A.**   Yeah, a close work friend.

*Gary McMurtrie - Cross*
*Thursday/January 19, 2017*

1  **Q.**   And, like you testified, you went to his house so he could

2  fix your muffler; is that correct?

3  **A.**   Yes.

4  **Q.**   Did he fix it?

5  **A.**   Yes.

6  **Q.**   Did he do a good job?

7  **A.**   It lasted about a year.

8  **Q.**   Did you trust Defendant Downard to have your back in

9  prison situations when it called for it?

10  **A.**   Define "have your back."

11  **Q.**   I imagine in a prison environment there could be dangerous

12  situations, correct?

13  **A.**   Yeah.

14  **Q.**   Yeah.  Did you trust Defendant Downard to have your back

15  in those situations?

16  **A.**   Yeah.

17  **Q.**   You know Defendant Louis Condon as well?

18  **A.**   Yes.

19  **Q.**   In 2011 he was RUM of Housing Unit 2, correct?

20  **A.**   Yes.

21  **Q.**   You interacted with him every day?

22  **A.**   I couldn't say every day because he had another housing

23  unit, but every week we interacted.

24  **Q.**   I believe you said most days, correct?

25  **A.**   Most days, okay.

*11-14876; Griffin v. Condon, et al.*

*Gary McMurtrie - Cross*
*Thursday/January 19, 2017*

V3-Page 59

1   **Q.**   You testified just a moment ago that under the work rules

2   you are required to report any violations committed by an

3   employee of the Michigan Department of Corrections; is that

4   correct?

5   **A.**   Yes.

6   **Q.**   Have you ever observed Defendant Downard committing a rule

7   violation of any kind?

8   **A.**   No.

9   **Q.**   Have you ever observed Defendant Condon committing a rule

10  violation of any kind?

11  **A.**   No.

12  **Q.**   How long have you been a corrections officer again?

13  **A.**   About 15 years.

14  **Q.**   Isn't it true, Officer McMurtrie, that in 15 years as a

15  Michigan Department of Corrections officer that you have never

16  written a complaint against another employee?

17  **A.**   No, that's not true.

18  **Q.**   It's not?

19         **MR. SCHNEIDER:**   Your Honor, I'm going to object to

20  lack of relevance to this line of questioning.

21         **THE COURT:**   I'm not sure what your objection is.

22         **MR. SCHNEIDER:**   Relevance, lack of relevance.

23         **THE COURT:**   I'll accept it as relevant at least up to

24  this point.   Overruled.

25

*11-14876; Griffin v. Condon, et al.*

*Gary McMurtrie - Cross*
*Thursday/January 19, 2017*

V3-Page 60

1  **BY MR. FINK:**

2  **Q.**   So it's your contention this morning -- thank you,

3  Your Honor.  It's your contention this morning that you have

4  written a complaint against another employee for violating a

5  policy?

6  **A.**   Once.

7  **Q.**   You wrote a complaint?

8  **A.**   Yes.

9  **Q.**   Are you sure?

10  **A.**   Yes.

11  **Q.**   In those 15 years -- let's rephrase this.  In those

12  15 years as a Michigan Department of Corrections officer you

13  have never written a complaint against another employee for

14  abuse of conduct towards a prisoner; is that correct?

15  **A.**   That's correct.

16  **Q.**   In fact, it's your position that in 15 years at the

17  Michigan Department of Corrections you have never seen a

18  corrections officer abuse an inmate in any way; is that

19  correct?

20  **A.**   No.

21  **Q.**   Fifteen years with the Michigan Department of Corrections,

22  you have never seen a guard insult a prisoner, degrade a

23  prisoner, treat him inhumanely, nothing?

24  **A.**   Not in front of me.

25  **Q.**   You testified at a deposition, Officer McMurtrie, correct

*11-14876; Griffin v. Condon, et al.*

*Gary McMurtrie - Cross*
*Thursday/January 19, 2017*

1  me if I'm wrong, that you write anywhere between 5 and 25

2  misconduct tickets a week, correct?

3  **A.**   I did back then when I was in 2 block.

4  **Q.**   Okay.  So that's anywhere from -- my math is not good --

5  300 to 1300 tickets a year?

6  **A.**   It could have been.

7  **Q.**   And in 15 years one ticket or one complaint against

8  another guard?

9  **A.**   Yes.  I have answered questionnaires from the inspectors

10  about investigations about other people, but I only initiated

11  one.

12  **Q.**   You have never seen a guard call an inmate a derogatory

13  term?

14  **A.**   No.

15  **Q.**   In terms of the housing unit, Officer McMurtrie, just for

16  my clarification, the officers' desk on base faces the RUM's

17  office; is that true?

18  **A.**   Yes, but there's a giant post -- there's a giant

19  three-foot by three-foot concrete post directly in front of his

20  door so we really -- it depends.  If you are sitting in the

21  middle of the desk, you are not going to be able to see

22  anything.  If you are at the end of the desk, you will be able

23  to see around the post.

24  **Q.**   Can you see the ARUS offices from the officers' desk?

25  **A.**   Yes.

*Gary McMurtrie - Cross*
*Thursday/January 19, 2017*

1   **Q.**   Can you see the dayrooms behind you?

2   **A.**   They are behind us.

3   **Q.**   But if you turned you could see them?

4   **A.**   Yes.

5   **Q.**   Inside of them?

6   **A.**   Yes.

7   **Q.**   Also, in terms of logistics, Officer McMurtrie, you

8   testified at your deposition, again, correct me if I'm wrong,

9   it could take up to 20 minutes for a prisoner to walk from the

10  chapel back to Housing Unit 2; isn't that true?

11  **A.**   The timeline could vary because --

12  **Q.**   Did you or did you not say it could take up to 20 minutes?

13  **A.**   That's what I said.

14  **Q.**   Okay.  You said it's about 300 yards of a walk without

15  gates; isn't that true?

16  **A.**   Well, it has gates.

17  **Q.**   300 yards if you were just walking without gates; that's

18  how long you estimated the walk would be, about 300 yards,

19  correct?

20  **A.**   Thereabouts, yeah.

21  **Q.**   But there are two gates, right, on that walk?

22  **A.**   Yes, two.

23  **Q.**   And a prisoner can't open the gate himself, correct?

24  **A.**   No.

25  **Q.**   He would have to wait for staff to open the gates for him?

*Gary McMurtrie - Cross*
*Thursday/January 19, 2017*

V3-Page 63

1   **A.**   Yes.

2   **Q.**   So if staff was on some other duty or there was no staff

3   at that gate at the moment, a prisoner could potentially be

4   waiting a few minutes for the gate to be opened, correct?

5   **A.**   Yes.

6   **Q.**   So in addition to walking 300 yards from the chapel, which

7   you said could take up to 15 minutes or 20 minutes, you also

8   have to wait on the guards to open the gates for you, correct?

9   **A.**   Sure.

10  **Q.**   Okay.  And you are aware of the rule, Officer McMurtrie,

11  that if you are at the warden's forum you have an excused

12  absence from work?

13  **A.**   Yes.

14  **Q.**   You always inquire, right, as to why someone doesn't show

15  up to work, you don't just write a ticket?

16  **A.**   Yes.

17  **Q.**   Always?

18  **A.**   Yes.

19  **Q.**   Without fail?

20  **A.**   Yes.

21  **Q.**   You categorically ask why someone wasn't at work?

22  **A.**   Yes.

23  **Q.**   You asked Mr. Griffin why he wasn't at work?

24  **A.**   Yes.

25          **THE COURT:**  Question.

*11-14876; Griffin v. Condon, et al.*

*Gary McMurtrie - Cross*
*Thursday/January 19, 2017*

1      **MR. FINK:**  Yes, Your Honor.

2    **BY MR. FINK:**

3    **Q.**   Officer McMurtrie, could you flip to Page 88 of your

4    deposition.  That was Exhibit -- I'll check myself again.

5    Exhibit -- well, now I'm blanking on the exhibit.

6           **MR. FINK:**  May I approach, Your Honor, to see the

7    table of contents on the exhibit book?

8           **THE COURT:**  You may.

9           **THE WITNESS:**  You said Page 88?

10   **BY MR. FINK:**

11   **Q.**   Yes.  Exhibit 24, Officer McMurtrie, and Page 88 of the

12   deposition.  The page numbers are in the top right corner.  Let

13   me know when you are there.

14   **A.**   All right.

15   **Q.**   If you go down to Line 13 of the deposition, I'm going to

16   read this to you and you tell me if this is incorrect.  Were

17   you asked:

18        "Earlier you said, correct me if I'm wrong, but you said

19   Class 2 and Class 3 tickets you take into account the

20   circumstances and you find out exactly what was going on.

21   Maybe Randle Griffin's mother passed away.  You didn't ask, did

22   you?

23        You said, "No."

24        I said, "How come you didn't ask Randle Giffin?

25        "I wouldn't ask anybody.  I would just be aware that

*11-14876; Griffin v. Condon, et al.*

*Gary McMurtrie - Cross*
*Thursday/January 19, 2017*

1   something like that happened."

2       Was that accurate testimony?

3   **A.**   Yes.

4   **Q.**   Were you telling the truth at that deposition?

5   **A.**   Yes.

6   **Q.**   So are you lying here this morning or were you lying at

7   the deposition that you categorically always ask where somebody

8   was when they miss work?

9   **A.**   I did ask him where he was when he missed work.

10  **Q.**   I'm asking were you telling the truth at the deposition

11  that you didn't ask him or are you telling the truth this

12  morning that you always ask where somebody was when they are

13  not at work?  You said you did not ask Randle Griffin, as you

14  just testified to.

15  **A.**   Okay.  In my deposition I said no.

16  **Q.**   So this was the truth at the deposition, but this morning

17  was inaccurate?

18  **A.**   Yes.

19        **THE COURT:**  That is a statement or two statements

20  that are in conflict.  Both can be true.  I just don't want to

21  confuse the record of the witness.  If I understood what he

22  said and the questions you asked, they are not necessarily in

23  conflict.

24        **MR. FINK:**  Thank you.

25        **THE COURT:**  I may be wrong, but that's what I heard.

*11-14876; Griffin v. Condon, et al.*

*Gary McMurtrie - Cross*
*Thursday/January 19, 2017*

1      **MR. FINK:**  Thank you, Your Honor.  The purpose is

2  that he always asks where a prisoner was when he was out of

3  work and in this case he said he did not ask Randle Griffin why

4  he wasn't at work.  I think that is a conflict in the way he

5  operates, but I appreciate Your Honor's comments.  Thank you.

6  **BY MR. FINK:**

7  **Q.**  You did indeed, Officer McMurtrie, write a ticket against

8  Randle Griffin on March 3rd, 2011.  You testified to that?

9  **A.**  Yes.

10  **Q.**  For being out of place?

11  **A.**  Yes.

12  **Q.**  Which means that you're not at your assignment on time?

13  **A.**  Yes.

14  **Q.**  Or otherwise unknown as to your location?

15  **A.**  Yes.

16  **Q.**  Your position, is it not, this morning is that you asked

17  Mr. Griffin where he was, which you said you didn't do in your

18  deposition, but you said this morning that you asked him where

19  he was and he just stood there in silence?

20  **A.**  Yes.

21  **Q.**  You also said that you had no reason to have any problem

22  with Mr. Griffin this morning, correct?

23  **A.**  No.

24  **Q.**  Is that accurate, you didn't have any problems with

25  Mr. Griffin?

*11-14876; Griffin v. Condon, et al.*

*Gary McMurtrie - Cross*
*Thursday/January 19, 2017*

1   **A.**   No.

2   **Q.**   That's not accurate?

3   **A.**   It is accurate.

4   **Q.**   You at that point had no problems with Mr. Griffin?

5   **A.**   No.

6   **Q.**   So you didn't testify at your deposition that he was a

7   troublemaker and that you were watching him and that he had all

8   kinds of tickets and he was a problem for the guards and he was

9   an organizer?  You didn't testify to any of that?

10  **A.**   I don't believe I ever said he had a bunch of tickets.

11  The only ticket I ever wrote him got --

12  **Q.**   Did you testify that he was a problem at your deposition?

13  **A.**   I testified that we were watching him as being an

14  organizer type prisoner.

15  **Q.**   Did you testify he was a problem?

16  **A.**   I don't remember.  I don't remember.

17  **Q.**   Well, which is the truth?  Was he a problem or did you

18  have no problem with him?  This morning you said you had no

19  problem with him.  At your deposition you called him a problem.

20  So I'm just trying to figure out which story is accurate.

21  **A.**   I didn't have any special problem with him, but I was

22  watching him.  I was keeping an eye on him.

23  **Q.**   You had a problem with him, but you didn't have a problem.

24       It's your position that Mr. Griffin, who you called a

25  problem, an organizer, a grievance writer, when confronted with

*Gary McMurtrie - Cross*
*Thursday/January 19, 2017*

V3-Page 68

1    the ticket you wrote on March 3rd, he just stood there and said

2    nothing.  That's your position?

3    **A.**   Yes.

4    **Q.**   You expect the jury to believe that Mr. Griffin, who

5    writes all of these grievances, as Mr. Schneider has pointed

6    out, didn't tell you that he had received a ticket the prior

7    day for the same thing; that's your position?

8    **A.**   He didn't say a word.

9    **Q.**   You are aware of what happens to inmates when you write a

10   misconduct ticket, correct?

11   **A.**   Yes.

12   **Q.**   Loss of privileges, is that one of the sanctions?

13   **A.**   Yes.

14   **Q.**   Being laid in is another sanction perhaps, yes?

15   **A.**   No, being laid in would not be a sanction.

16   **Q.**   That would not be a result of a misconduct ticket?

17   **A.**   Yeah, it would be pending the -- it would be a result

18   pending the outcome, the disposition of the ticket.

19   **Q.**   Indeed, what happens to you when you receive a misconduct

20   ticket, especially out of place from work, is you are laid into

21   your cell for the time period you would have had work, correct?

22   **A.**   Yes.

23   **Q.**   Okay.  You also are aware they can lose their job or as a

24   matter of course they do lose their job if found guilty,

25   correct?

*11-14876; Griffin v. Condon, et al.*

*Gary McMurtrie - Cross*
*Thursday/January 19, 2017*

V3-Page 69

1   **A.**   Yes, it's policy.

2   **Q.**   It can also have an adverse effect on their parole; you

3   are aware of that, right?

4   **A.**   I have nothing to do with paroles.

5   **Q.**   Are you aware that writing a misconduct ticket has an

6   adverse effect on a prisoner's ability to get parole?

7   **A.**   Some of them do.

8   **Q.**   So you are aware of that?  Is the answer yes?

9   **A.**   Sure.

10   **Q.**   For a period of time in Housing Unit 2, Officer McMurtrie,

11   for an extended period of time there was just Downard, you,

12   Condon and another officer, right, four officers on the

13   second shift?

14   **A.**   Condon wasn't an officer.  He was an ARUS.  Actually he

15   was the RUM.

16   **Q.**   How about I rephrase that.  As far as personnel in Housing

17   Unit 2, for a period of time it was the three of you plus

18   another officer, correct?

19   **A.**   Three officers, two ARUSs and a RUM.

20   **Q.**   Okay.  But the three of you were on a shift together for a

21   period of time; is that accurate?

22   **A.**   Yeah.

23   **Q.**   You testified at your deposition about the March 3rd

24   ticket that you walked Randle Griffin down to ticket review,

25   correct?  Did you go with Randle Griffin to Sergeant Howard?

*Gary McMurtrie - Cross*
*Thursday/January 19, 2017*

1   **A.**   No.

2          **THE COURT:**  Question.

3          **MR. FINK:**  Yes, Your Honor.  I'm just finding the

4   page here of the deposition.

5   **BY MR. FINK:**

6   **Q.**   How did it, did it occur then, Officer McMurtrie, that you

7   told Sergeant Howard to rip up the ticket.  Was that a

8   telephone call?

9   **A.**   Yes.  Like I stated earlier, he went up on a hand pass to

10  the control center so Sergeant Howard could review his ticket.

11  I don't know what he said to her up there.  I'm guessing he

12  said Downard --

13  **Q.**   So you did receive a phone call?

14  **A.**   I got a phone call from Sergeant Howard.  She explained

15  that Downard had just written the same -- I wrote a duplicate

16  ticket.  And I said, "Fine, dismiss mine."  Well, then

17  subsequently he came back to the unit and a few minutes later

18  Sergeant Howard came back to the unit --

19  **Q.**   I just want to be clear.  You weren't standing with

20  Griffin at ticket review; you were separate?

21  **A.**   Yes.

22  **Q.**   So you were in like the housing unit; he might have been

23  at the control center?

24  **A.**   Yes.

25  **Q.**   Is that what your testimony is?

*11-14876; Griffin v. Condon, et al.*

*Gary McMurtrie - Cross*
*Thursday/January 19, 2017*

V3-Page 71

1   **A.**   Yes.

2   **Q.**   Okay.  Could you flip to Page 86 of your deposition, which

3   is Exhibit 24.

4   **A.**   Okay.

5   **Q.**   If you go to 86, Line 18, did I ask you the question:  "In

6   other words, it was as if a ticket never existed?"

7       And then your answer is:  "Sergeant Howard came in the

8   next day, which would have been the 4th, to review my ticket.

9   She looked at it.  She said Downard just wrote one of these.  I

10  didn't know.  I said, 'okay, fine, rip mine up.'  Griffin is

11  standing right there.  She ripped my ticket up, threw it away.

12  The end."

13      Was that accurate when you testified to it?

14  **A.**   Yes.

15  **Q.**   So Griffin was right there with you?

16  **A.**   Yes.  When she came out to the unit, Griffin was standing

17  right in front of the desk.

18  **Q.**   Okay.  So when you told her to rip it up, it wasn't over

19  the phone, it was in person?

20  **A.**   It was both.

21  **Q.**   You told her twice to rip it up?

22  **A.**   I think when she called me from the control center I told

23  her to dismiss it.  I said, "Fine, dismiss it.  I didn't know

24  it was a duplicate ticket."

25  **Q.**   So it was your testimony that Randle Griffin was present

*11-14876; Griffin v. Condon, et al.*

*Gary McMurtrie - Cross*
*Thursday/January 19, 2017*

V3-Page 72

1    for one of these conversations with Sergeant Howard?

2    **A.**    Well, he wouldn't have been present for the conversation

3    between her and me on the phone.

4    **Q.**    Well, he was standing right there in your prior testimony

5    so I'm just trying to confirm what the story was.

6    **A.**    In the control center when she called me on the phone he

7    wouldn't have been present for that.  She subsequently came out

8    to 2 block.

9    **Q.**    So there was a second interaction with Sergeant Howard

10   that you didn't discuss this morning, correct?

11   **A.**    I discussed it right here in my ...

12   **Q.**    I'm just asking you, there was more than one interaction

13   with Sergeant Howard?

14   **A.**    Yeah, and I have already stated it today.

15   **Q.**    Okay.  Two more things, Officer McMurtrie.  Could you turn

16   to Exhibit 20, and let me know when you get there.

17   **A.**    I'm there.

18   **Q.**    Do you recognize this document?

19   **A.**    I recognize it from the, from the deposition.  I have

20   never seen one before that.

21   **Q.**    What is it?

22   **A.**    I think it's some kind of time tabulation sheet.

23   **Q.**    Does it have a punch in and punch out for certain days?

24   **A.**    Yes.

25   **Q.**    Do you have any reason to believe that's not your time

*11-14876; Griffin v. Condon, et al.*

*Gary McMurtrie - Cross*
*Thursday/January 19, 2017*

V3-Page 73

1    card?

2  **A.**   No.

3        **MR. FINK:**   Your Honor, I ask that Exhibit 20 be

4    admitted into evidence.

5        **MR. SCHNEIDER:**   No objection.

6        **THE COURT:**   It's received as --

7        **MR. FINK:**   Plaintiff's Exhibit 20.

8        **THE COURT:**   -- as Exhibit 20 for the plaintiff.

9        **MR. FINK:**   Thank you, Your Honor.

10 **BY MR. FINK:**

11 **Q.**   If you -- on March 2nd, 2011 -- I understand on the left

12   side of the page they are a little faded, and I see that you

13   filled them in.   If you look for 3-2-11, and tell me when you

14   are there.

15 **A.**   I don't know what you mean by the "filled in."   I don't

16   have the month dates in here.

17 **Q.**   On the left side of the paper you don't see March 2nd,

18   2011?

19 **A.**   No, there's no month.   It didn't copy.

20        **MR. FINK:**   May I approach the witness, Your Honor?

21       **THE COURT:**   Excuse me?

22       **MR. FINK:**   May I approach the witness to --

23       **THE COURT:**   Yes.

24       **MR. SCHNEIDER:**   I'll just stipulate to whatever he

25   wants to say it says.   That's fine.   Go ahead, tell him what it

*Gary McMurtrie - Cross*
*Thursday/January 19, 2017*

V3-Page 74

 1  says.

 2          **THE COURT:**  You apparently can assert something --

 3          **MR. FINK:**  Easy enough.

 4          **THE COURT:**  Mr. Schneider is --

 5  **BY MR. FINK:**

 6  **Q.**   Officer McMurtrie, do you have any reason to believe that

 7  this exhibit -- on March 2, 2011 that you left the facility,

 8  you checked out of work at 10:01 p.m.?

 9  **A.**   It's right here.

10  **Q.**   Okay.  Do you have any reason to believe that that's not

11  true?

12  **A.**   No.

13  **Q.**   Do you have any reason to believe that the time sheet, if

14  it indicated that Officer Downard also left at 10:01 p.m.,

15  would you have any reason to believe that wasn't true?

16  **A.**   No.

17  **Q.**   So you guys walked out together on March 2nd, 2011 at the

18  exact same minute, correct?

19  **A.**   Sure.

20  **Q.**   In fact, we came to learn this at the deposition, that

21  that was a little less than 30 minutes after Officer Downard

22  wrote the ticket against Griffin; isn't that true?

23  **A.**   Sure.

24  **Q.**   My final question is, Officer McMurtrie, you agree with

25  me, do you not, that when a prisoner loses their job, gets laid

*11-14876; Griffin v. Condon, et al.*

*Gary McMurtrie - Redirect*
*Thursday/January 19, 2017*

V3-Page 75

1    in, that cuts away at their dignity as a human being?

2    **A.**    Sure.

3          **MR. FINK:**    Thanks.    Nothing further at this time,

4    Your Honor.

5          **THE COURT:**    Mr. Schneider, do you have something?

6          **MR. SCHNEIDER:**    Yes, Your Honor.    Brief redirect.

7                      **-    -    -**

8                                      (11:05 a.m.)

9                    **REDIRECT EXAMINATION**

10   **BY MR. SCHNEIDER:**

11   **Q.**    What time was your shift in the prison, Officer McMurtrie?

12   **A.**    Repeat.

13   **Q.**    What time was your shift in the prison, the hours?

14   **A.**    1400 to 2200, 2:00 to 10:00.

15   **Q.**    Two o'clock p.m. to ten o'clock p.m.?

16   **A.**    Yes.

17   **Q.**    What time was ARUS Condon's shift?

18   **A.**    I'm not sure exactly what time in the morning he starts,

19   but he ends at 4:00 more or less.

20   **Q.**    Between two and three hours after you get there he leaves?

21   **A.**    Yes.

22   **Q.**    Did you have the same regular days off as Officer Downard?

23   **A.**    No.    We had rotating days off back then.

24   **Q.**    Do you still have that deposition transcript in front of

25   you?

*11-14876; Griffin v. Condon, et al.*

*Gary McMurtrie - Redirect*
*Thursday/January 19, 2017*

V3-Page 76

1      **MR. SCHNEIDER:**  Or, you know what, Your Honor, may I

2    approach the witness?

3           **THE COURT:**  You may.

4    **BY MR. SCHNEIDER:**

5    **Q.**   Okay.  You were directed to Page 88 on cross-exam.  Would

6    you please turn back to Page 88, please.

7    **A.**   I've got it.

8    **Q.**   Okay.  Starting at Line 17, the question you were asked:

9    "Maybe Randle Griffin's mother passed away.  You didn't ask,

10   did you?"

11          Your answer:  "No."

12          Correct?

13   **A.**   Correct.

14   **Q.**   The next question:  "How come you didn't ask with

15   Randle Griffin?"

16          "A.  I wouldn't ask anybody.  I would just be aware that

17   something like that had happened."

18          "Q.  But you did consider the possibility that he could

19   have been somewhere that he was supposed to be and you didn't

20   even inquire?

21          "A.  He was in his cell.  When I called him out, I saw him

22   walk out of his cell."

23          That was your testimony at the deposition, correct?

24   **A.**   Yes.

25   **Q.**   Okay.  There's nothing inconsistent between that and what

*11-14876; Griffin v. Condon, et al.*

*Gary McMurtrie - Redirect*
*Thursday/January 19, 2017*

V3-Page 77

1   you have said today, correct?

2   **A.**   No, correct.

3          **MR. SCHNEIDER:**  Thank you.  No further questions.

4          **THE COURT:**  Do you have something further?

5          **MR. FINK:**  All set, Your Honor.  Thank you.

6          **THE COURT:**  Thank you.

7       And, Officer McMurtrie, you are excused.  You can go back

8   to counsel table.  Thank you.

9          **MR. SCHNEIDER:**  Your Honor, the defense would call

10  Officer Downard.

11         **THE COURT:**  I think we'll probably let him take the

12  witness chair, but I -- you have two more witnesses scheduled.

13         **MR. SCHNEIDER:**  Correct, Your Honor.  The other

14  two defendants and then we'll be done.

15         **THE COURT:**  I wonder, is this a good, from

16  everybody's point of view, a good time to continue rather than

17  break?

18         **MR. FINK:**  The plaintiff will accept whatever the

19  jury and Your Honor's preference is.

20         **MR. SCHNEIDER:**  Your Honor, I would suggest, that

21  took half an hour for Officer McMurtrie, if the other

22  two officers go that quick, we will be done with the proofs by

23  noon.  So I don't know if you're asking for a break for the day

24  or just a temporary break.

25         **THE COURT:**  Well, I don't know either, but probably

*11-14876; Griffin v. Condon, et al.*

*Joseph Downard - Direct*
*Thursday/January 19, 2017*

1   nothing like a temporary break, break for the day.

2       Everybody in the jury box, I think you have considered

3   this before and not necessarily had an absolute opinion.  If

4   I'm wrong about that, you will tell Mr. Barkholtz, who keeps

5   track of this.  Right now I think we go ahead if we're ready to

6   put the next witness on.

7           **MR. SCHNEIDER:**  Thank you, Your Honor.  In that case

8   the defendant will call -- the defense will call Defendant

9   Downard.

10          **THE COURT:**  And, Officer Downard, come up and take

11  the oath, please.

12                      **-   -   -**

13                  **JOSEPH DOWNARD,**

14      being first duly sworn to tell the truth,

15      was examined and testified upon his oath

16      as follows:

17                      **-   -   -**

18                                          (11:09 a.m.)

19                  **DIRECT EXAMINATION**

20  BY MR. SCHNEIDER:

21  **Q.**  Good morning.

22  **A.**  Good morning.

23  **Q.**  Would you tell us your name for the record, please.

24  **A.**  Joseph Downard.

25  **Q.**  Where are you currently employed, Mr. Downard?

*11-14876; Griffin v. Condon, et al.*

*Joseph Downard - Direct*
*Thursday/January 19, 2017*

1   **A.**   Gus Harrison Correctional Facility.

2   **Q.**   And your position there?

3   **A.**   Corrections officer.

4   **Q.**   Okay.  You heard the testimony about the academy before?

5   **A.**   Yes.

6   **Q.**   You did that as well when you started?

7   **A.**   Yes, sir.

8   **Q.**   You have had annual training?

9   **A.**   Yep.

10  **Q.**   You also know the other defendants, I take it?

11  **A.**   Yes, sir.

12  **Q.**   Did you meet them at the facility or did you meet them --

13  did you know them before?

14  **A.**   I met them at the facility.

15  **Q.**   When did you meet Officer McMurtrie?

16  **A.**   When I started work on 2 block.

17  **Q.**   Do you remember which year that was?

18  **A.**   No, I don't.

19  **Q.**   Do you still work with Officer McMurtrie?

20  **A.**   No.

21  **Q.**   How long did you work with him on 2 block?

22  **A.**   It might have been three or four years.

23  **Q.**   All right.  You heard Officer McMurtrie's testimony as to

24  the duties of a corrections officer?

25  **A.**   Yes.

*11-14876; Griffin v. Condon, et al.*

*Joseph Downard - Direct*
*Thursday/January 19, 2017*

V3-Page 80

1  **Q.**   Do you have anything to add to that?

2  **A.**   No.

3  **Q.**   All right.  How many prisoners were in Housing Unit 2?

4  **A.**   I think 240, I believe.

5  **Q.**   And how many officers would be working at once?

6  **A.**   Three.

7  **Q.**   How many shifts per day?

8  **A.**   Three.

9  **Q.**   So you would work one eight-hour shift?

10 **A.**   Correct.

11 **Q.**   You've heard in court this allegation that ARUS Condon

12 assaulted prisoner Bryant.  Did you know of that allegation

13 before this lawsuit?

14 **A.**   No.

15 **Q.**   You never heard about that in the prison?

16 **A.**   No.

17 **Q.**   Do you know what an ombudsman is aside from what you've

18 heard here in court?

19 **A.**   Then I didn't.  Now I do.

20 **Q.**   Okay.  Back in 2011 did you know what an ombudsman was?

21 **A.**   No.

22 **Q.**   Did you know what they do?

23 **A.**   It's in between the State of Michigan and prisoners.

24 That's about all I know about it.

25 **Q.**   Had you ever met Ms. Zimbelman before who was here in

*11-14876; Griffin v. Condon, et al.*

*Joseph Downard - Direct*
*Thursday/January 19, 2017*

V3-Page 81

1    court?

2    **A.**   No.

3    **Q.**   You didn't recognize her?

4    **A.**   No.

5    **Q.**   On March 2nd, 2011 did you have a conversation with the

6    other defendants agreeing to write false tickets?

7    **A.**   No.

8    **Q.**   It never happened?

9    **A.**   No.

10   **Q.**   Have you ever written false tickets against a prisoner?

11   **A.**   No.

12   **Q.**   Ever agreed to do that?

13   **A.**   No.

14   **Q.**   You did write Mr. Griffin a ticket on March 2nd, 2011,

15   correct?

16   **A.**   If that's what ...

17   **Q.**   I'm sorry?

18   **A.**   If that's what the ticket says, yeah.

19   **Q.**   Okay.  Do you have the exhibit book in front of you there,

20   the small one.  Would you turn to Exhibit E, please.

21   **A.**   Okay.  Yes, then I wrote a ticket on Mr. Griffin.

22   **Q.**   This is a copy of a ticket that you wrote, correct?

23   **A.**   Yes.

24   **Q.**   This is your signature here?

25   **A.**   Yes.

*11-14876; Griffin v. Condon, et al.*

*Joseph Downard - Direct*
*Thursday/January 19, 2017*

V3-Page 82

1  **Q.**  In the middle of the page?

2  **A.**  Yes.

3  **Q.**  Okay.  Why did you write him this ticket on March 3rd?

4  I'm sorry, on March 2nd.

5  **A.**  Because he didn't come to work nor check in for his

6  detail.

7  **Q.**  Okay.  Did you see him go to work at all that day?

8  **A.**  No.  I must not have because that's what the ticket says.

9  **Q.**  What time was the violation listed as by you on this

10  ticket?

11  **A.**  2:30.

12  **Q.**  Okay.  And that's up here in the left-hand corner where it

13  says -- can you read that for us?

14  **A.**  It's 1430.

15  **Q.**  Okay.  That's military time?

16  **A.**  Yep.

17  **Q.**  And that's 2:30 in the afternoon?

18  **A.**  Correct.

19  **Q.**  And then down here it says, "Date and time written."  What

20  time was the ticket written?

21  **A.**  2131.

22  **Q.**  Okay.  Why, if the ticket occurred at 1430, did you wait

23  until 2130 to write it?

24  **A.**  Two reasons.  One, because we could have had something

25  going on the whole day, and the second reason is because

*Joseph Downard - Direct*
*Thursday/January 19, 2017*

1   sergeants have directed us to write them that way so they have

2   24 hours to review them so they don't have to come out at the

3   beginning of their shift in case something is happening to

4   review it.

5   **Q.**   So this is like that ticket review we heard with Sergeant

6   Howard, correct?  That's the process you're talking about?

7   **A.**   Right.

8   **Q.**   And the sergeant has 24 hours after the ticket is written

9   to do the review?

10  **A.**   Correct.

11  **Q.**   Did you ever threaten Mr. Griffin with physical harm?

12  **A.**   No.

13  **Q.**   Did you ever threaten him with tickets?

14  **A.**   No.

15  **Q.**   Did you ever call him a rat?

16  **A.**   No.

17  **Q.**   Did you have any reason to do any of those things?

18  **A.**   No.

19  **Q.**   In the large binder in front of you, could you please turn

20  to Exhibit 6.

21  **A.**   Okay.

22  **Q.**   Okay.  That's the grievance that Mr. Griffin wrote against

23  you, correct?

24  **A.**   Okay.

25  **Q.**   Did you ever see that?

*11-14876; Griffin v. Condon, et al.*

*Joseph Downard - Cross*
*Thursday/January 19, 2017*

V3-Page 84

1    **A.**    No.

2    **Q.**    Okay.  If you went around threatening prisoners and

3    calling them names, what would the prisoners do about that?

4    **A.**    They would most likely start writing grievances, more

5    grievances, more grievances, and you may even get assaulted.

6    **Q.**    They could assault you?

7    **A.**    Yeah.

8    **Q.**    You are one of three in a housing unite of 240 prisoners,

9    correct?

10   **A.**    Right.

11          **MR. SCHNEIDER:**  No further questions, Your Honor.

12          **THE COURT:**  Thank you.

13       Plaintiff, cross-examination.

14                   -   -   -

15                                        (11:15 a.m.)

16                  **CROSS-EXAMINATION**

17   **BY MS. RUSSELL:**

18   **Q.**    Good morning.

19   **A.**    Good morning.

20   **Q.**    Do you and other officers complete work evaluations of

21   prisoners that are employed in the housing unit on a regular

22   basis?

23   **A.**    Yes.

24   **Q.**    Could you please turn to -- well, I'll provide you a

25   binder.

*11-14876; Griffin v. Condon, et al.*

*Joseph Downard - Cross*
*Thursday/January 19, 2017*

V3-Page 85

1      **MS. RUSSELL:**  Your Honor, may I approach the witness?

2      **THE COURT:**  Yes, you may.

3   BY MS. RUSSELL:

4   **Q.**   Could you please turn to plaintiff's proposed Exhibit

5   Number 26.  Let me know when you are there.

6   **A.**   Okay.  I'm there.

7   **Q.**   Do you recognize this document?

8   **A.**   Yes.

9   **Q.**   Is this a standard work evaluation form that is used at

10  Gus Harrison?

11  **A.**   Yes.

12  **Q.**   And is that your signature at the bottom?

13  **A.**   Yes.

14  **Q.**   This is a work evaluation that you completed on behalf of

15  Mr. Griffin on March 2nd, 2011, isn't it?

16  **A.**   Yes.

17      **MS. RUSSELL:**  Your Honor, I would like to move to

18  admit plaintiff's proposed Exhibit Number 26 into evidence.

19      **MR. SCHNEIDER:**  No objection.

20      **THE COURT:**  It's received as Plaintiff's Exhibit 26.

21  BY MS. RUSSELL:

22  **Q.**   On this form it lists 13 work performance standards that

23  you measure a prisoner employee, correct?

24  **A.**   Correct.

25  **Q.**   And then next to each standard there are three columns,

*11-14876; Griffin v. Condon, et al.*

*Joseph Downard - Cross*
*Thursday/January 19, 2017*

V3-Page 86

1   one indicating three or more exceptions, one to two exceptions

2   or no exceptions, correct?

3   **A.**   Correct.

4   **Q.**   And an exception is one instance where that employee has

5   not met the performance standard listed, correct?

6   **A.**   Correct.

7   **Q.**   When you completed this work evaluation, it was from the

8   date range of February 26, 2011 to March 2nd, 2011; is that

9   correct?

10  **A.**   Correct.

11  **Q.**   That's a five-day period, correct?

12  **A.**   Right.

13  **Q.**   And when you filled out this evaluation, you indicated

14  that Mr. Griffin should be terminated because of the misconduct

15  ticket he received on March 2nd, 2011, correct?

16  **A.**   Correct.

17  **Q.**   And that's at the bottom?

18  **A.**   Correct.

19  **Q.**   Didn't you indicate on this work evaluation that

20  Mr. Griffin failed to come in on the correct days on three or

21  more occasions in that five-day period?

22  **A.**   Usually we would put all zeros.

23  **Q.**   Just a yes or no answer is fine.

24  **A.**   Yes.

25  **Q.**   And didn't you also indicate that Mr. Griffin had over

*11-14876; Griffin v. Condon, et al.*

*Joseph Downard - Cross*
*Thursday/January 19, 2017*

V3-Page 87

1   30 work performance infractions in that five-day period if you

2   add them up?

3   **A.**   Actually I didn't indicate when I put -- under that when I

4   recommended I didn't check anything.

5   **Q.**   How many did he have?

6   **A.**   I would have to count them.

7   **Q.**   You indicated he had three or more exceptions in 11 of the

8   13 categories; is that correct?

9   **A.**   Yeah, correct.

10   **Q.**   You previously testified that you were aware of Department

11   Work Rule 47, which requires that you do not falsify documents;

12   is that correct?

13   **A.**   Correct.

14   **Q.**   And you comply with this rule when you fill out all forms

15   in the course of your employment, correct?

16   **A.**   Correct.

17   **Q.**   But the information on this form is false, isn't it?

18   **A.**   I shouldn't have put anything there because that's common

19   practice not to put anything when you are terminating a

20   prisoner.

21   **Q.**   So you admit that the information on this form is

22   incorrect because you previously testified that Mr. Griffin

23   only missed one day of work and that one day of work was the

24   one time that led to the misconduct ticket and his termination;

25   is that correct?

*11-14876; Griffin v. Condon, et al.*

*Joseph Downard - Cross*
*Thursday/January 19, 2017*

V3-Page 88

1  **A.**   That ticket was for the one --

2  **Q.**   Did you testify that Mr. Griffin missed work one day and

3  that one day was the one time that led to him having a

4  misconduct ticket issued?

5  **A.**   Correct.

6  **Q.**   Did you also testify with respect to his work performance

7  that you had no issues with his poor performance other than the

8  one time that he missed work?

9  **A.**   I don't recall that.

10  **Q.**   If you could turn to Exhibit 30, and then turn to Page 37,

11  Line 20, and let me know when you are there.

12      Are you there?

13  **A.**   Yep, I'm there.

14  **Q.**   I asked you, and I quote:  "You never had a problem with

15  his performance?

16      Your response:  "No.  If you don't work though, you get

17  fired."

18      Did I read that correctly?

19  **A.**   No, you did not read that correctly.

20  **Q.**   Are those the words that are on the page?

21  **A.**   Oh, wait.  You said Line 20?

22  **Q.**   Did I give you the wrong line?  I apologize.

23  **A.**   Yes, you did.

24      Line 23 is the one you are looking at.

25  **Q.**   Well, it starts on Line 20 where I asked you:  "What did

*11-14876; Griffin v. Condon, et al.*

*Joseph Downard - Cross*
*Thursday/January 19, 2017*

V3-Page 89

1   you think of his job performance?"

2       And then Line 21, answer:  "He was a porter.  If we had a

3   problem, we got with someone."

4       Question on Line 23:  "So you never had a problem with his

5   work performance?"

6       "A.  No.  If you don't work though, you get fired."

7   **A.**   Right.

8   **Q.**   Is that correct?

9   **A.**   Correct.

10  **Q.**   Thank you.

11      So you just testified in your deposition that Mr. Griffin

12  only missed work one day and that he otherwise had no issues

13  with his work performance other than missing work one day and

14  yet you filled out an official MDOC form indicating that he

15  missed work on three or more occasions and had over 30 work

16  performance infractions in a five-day period; is that correct?

17  **A.**   Sure.

18  **Q.**   So you would like the jury to believe that you filled

19  out -- did you fill out this form -- strike that.

20      So you violated Work Rule 47 when you completed this work

21  evaluation; is that correct?

22  **A.**   Not that I know of.

23  **Q.**   Didn't you just testify that you were aware that Work

24  Rule 47 requires that you do not falsify documents in the

25  course of your employment?

*11-14876; Griffin v. Condon, et al.*

*Joseph Downard - Cross*
*Thursday/January 19, 2017*

1   **A.**   Yes.

2   **Q.**   Is this -- this document is false, isn't it, because it

3   has incorrect information about Mr. Griffin's work performance?

4   **A.**   I don't know anything else about it besides I wrote him

5   that ticket.  So there might have been 30 infractions in those

6   five days.

7   **Q.**   Then why did you testify that you had no problem with his

8   performance; what is true, the deposition or today?

9   **A.**   There could have been other people that told me about the

10  problems.

11  **Q.**   So it's your testimony that somebody else perhaps told you

12  about the problems that they were having with him?

13  **A.**   Correct.

14  **Q.**   And that is potentially the reason why this document is

15  incorrect, correct?

16  **A.**   Right.

17  **Q.**   When I asked you why you filled out the form in this way

18  in your deposition -- if you could please turn to Page 43,

19  Line 9.

20  **A.**   In the deposition?

21  **Q.**   Yes.

22  **A.**   Okay.

23  **Q.**   I asked you, and I quote:  "So you have no idea why you

24  would circle the wrong number of exceptions?

25      "A.  No.

*11-14876; Griffin v. Condon, et al.*

*Joseph Downard - Cross*
*Thursday/January 19, 2017*

V3-Page 91

1    "Q.  It had nothing to do with the fact that you were

2  dissatisfied with Mr. Griffin in some way, perhaps because you

3  didn't like how he was involved with an investigation of the

4  ombudsman?

5    "A.  No.  Like I said, I should have just put termination

6  and not filled anything else out."

7  **A.**   Right.

8  **Q.**   So your testimony in your deposition, which was in July of

9  2015, was that you didn't know why you put the incorrect

10  information on the form; is that correct?

11  **A.**   Correct.

12  **Q.**   And today you are providing a different answer?

13  **A.**   I mean I still don't know why I put those on there.

14  **Q.**   You have no idea?

15  **A.**   No.

16  **Q.**   And you are speculating as to whether or not perhaps you

17  had asked around to get more information?

18  **A.**   Correct.

19  **Q.**   You changing your sworn testimony from your deposition has

20  nothing to do with the fact that you knew that you were caught

21  in a lie in your deposition and the jury would be expecting an

22  explanation?

23  **A.**   No.

24  **Q.**   No.  I'm going to go next to March 3rd of 2011.  You were

25  working that day, weren't you?

*11-14876; Griffin v. Condon, et al.*

*Joseph Downard - Cross*
*Thursday/January 19, 2017*

V3-Page 92

1   **A.**   My time sheet showed it.

2   **Q.**   Yes.  And on a regular workday shift you conduct rounds

3   with the other people on your shift every half an hour; is that

4   correct?

5   **A.**   Correct.

6   **Q.**   And rounds involves you essentially making sure that all

7   prisoners are accounted for?

8   **A.**   Correct.

9   **Q.**   And when you do the rounds, you walk up and down the wings

10   to check the cells?

11   **A.**   Correct.

12   **Q.**   Is it usually you by yourself going down one wing and then

13   another officer going down another wing?  Do you walk together?

14   Is it --

15   **A.**   We switch it up.

16   **Q.**   You switch it up and it varies?

17   **A.**   Yes.

18   **Q.**   But it is possible if you were doing rounds you might walk

19   down one of the cell block wings?

20   **A.**   Correct.

21   **Q.**   And it's very likely that you conduct rounds at least once

22   or twice that day, is that correct, or almost every half hour

23   you probably were involved with the rounds?

24   **A.**   Yeah.

25   **Q.**   And it's possible when you conducted rounds at one point

*11-14876; Griffin v. Condon, et al.*

*Joseph Downard - Cross*
*Thursday/January 19, 2017*

V3-Page 93

1   you could have walked past Mr. Griffin's cell?

2   **A.**   Yeah.

3   **Q.**   And when you walked past Mr. Griffin's cell, he would have

4   been there because he had been laid in from work, is that

5   correct, on the 3rd?

6   **A.**   This is the day after I wrote that misconduct?

7   **Q.**   Yes.

8   **A.**   Yeah, sure.

9   **Q.**   So Mr. Griffin, who was laid in from work after the

10  misconduct ticket you issued on March 2nd, would be in his cell

11  laid in on March 3rd, and when you were conducting rounds, if

12  you did, which I believe your testimony is you don't remember,

13  it's very possible that you could have walked past his cell?

14  **A.**   Yeah.

15  **Q.**   Okay.  I want to ask you a couple questions about the

16  cameras in the unit.

17  **A.**   Okay.

18  **Q.**   In your deposition you testified that there is a camera in

19  Housing Unit 2 and it's right in the center of base, correct?

20  **A.**   It's right by the officers' desk.

21  **Q.**   It's right by the officers' desk?

22  **A.**   Yes.

23  **Q.**   It's a 360-degree camera, correct?

24  **A.**   So it doesn't show you 360 degrees.  It only showed you

25  one direction.

*11-14876; Griffin v. Condon, et al.*

*Joseph Downard - Redirect*
*Thursday/January 19, 2017*

1  **Q.**   It only points in one direction, and you don't know what

2  direction it's pointing, do you?

3  **A.**   Correct.

4  **Q.**   So it could be pointed anywhere in that housing unit?

5  **A.**   Correct.

6  **Q.**   And you wouldn't know what the camera footage is

7  collecting?

8  **A.**   Correct.

9  **Q.**   And it may not be directed at one of the rec rooms?

10 **A.**   Correct.

11 **Q.**   It could be directed somewhere else?

12 **A.**   Correct.

13        **MS. RUSSELL:**  No further questions, Your Honor.

14        **THE COURT:**  Mr. Schneider, redirect.

15                 -   -   -

16                                    (11:27 a.m.)

17              **REDIRECT EXAMINATION**

18 **BY MR. SCHNEIDER:**

19 **Q.**   Okay.  On the screen in front of you this is Exhibit 26

20 you were just asked about, correct?

21 **A.**   Correct.

22 **Q.**   Okay.  And the title of that says, "Prisoner Program and

23 Work Assignment Evaluation," correct?

24 **A.**   Correct.

25 **Q.**   When a prisoner gets a new job, how long is it before they

*Joseph Downard - Redirect*
*Thursday/January 19, 2017*

1   get an evaluation?

2   **A.**   I think it's -- I think you've got to do it every

3   six months normally.

4   **Q.**   Okay.  And how long had Mr. Griffin had this job?

5   **A.**   Five days.

6   **Q.**   All right.  Was this meant as an evaluation form?

7   **A.**   No.

8   **Q.**   What was the purpose of this form?

9   **A.**   To tell the classification director that he received a

10  misconduct for not showing up and for the classification

11  director to refill the position.

12  **Q.**   Okay.  And these exceptions that were discussed, that's

13  just all of these zeros that you circled here, right?

14  **A.**   Correct.

15  **Q.**   And you actually did circle 3 on a couple of them?

16  **A.**   Correct.

17  **Q.**   Why did you do that?

18  **A.**   Because he followed most of the rules, and he kept a neat,

19  clean appearance.

20  **Q.**   Did you have any information on any of these other

21  categories?

22  **A.**   I must have.  I mean not that I remember because it was

23  2011.

24  **Q.**   Had you warned him previously about being late for work?

25  **A.**   I don't remember.  I must have.

*11-14876; Griffin v. Condon, et al.*

*Joseph Downard - Recross*
*Thursday/January 19, 2017*

V3-Page 96

1   **Q.**   All right.  Did you write that in your ticket?

2   **A.**   Yes.  "Prisoner was warned that he needed to check in and

3   work previously."

4   **Q.**   Just real quick, going back to this evaluation form, is it

5   standard practice to use this form to communicate to the

6   classification director about termination?

7   **A.**   Yes.

8   **Q.**   Who makes that decision, about termination?

9   **A.**   The classification director.

10  **Q.**   You can't decide that yourself?

11  **A.**   I cannot decide that, no.

12  **Q.**   You just make a recommendation?

13  **A.**   Correct.

14          **MR. SCHNEIDER:**  No further questions.

15          **THE COURT:**  Thank you.  Any further questions for the

16  plaintiff?

17          **MS. RUSSELL:**  One question hopefully.

18          **THE COURT:**  Okay.

19                          -   -   -

20                                      (11:29 a.m.)

21                      **RECROSS-EXAMINATION**

22  **BY MS. RUSSELL:**

23  **Q.**   Mr. Downard, you testified that you filled out this form

24  because it's how you were directed to fill out the form by your

25  superiors?  Is that what you testified?

*11-14876; Griffin v. Condon, et al.*

*Joseph Downard - Recross*
*Thursday/January 19, 2017*

V3-Page 97

1   **A.**    No.

2   **Q.**    So you just don't know why you filled out the form in this

3   way?

4   **A.**    Correct.

5          **MS. RUSSELL:**  Okay.  Thank you.

6          **THE COURT:**  Anything further from you, Mr. Schneider?

7          **MR. SCHNEIDER:**  No, Your Honor.

8          **THE COURT:**  Officer Downard, you are excused.

9   Thank you.  You can go back to counsel table.

10         Right now we have one more witness for the defendants, and

11  we might be able to get that person on and off in a short

12  period of time.  And then we would be faced with the question

13  of do we do anything further, and I'm inclined not to do it

14  even though there are probably good arguments to finish up

15  anything that's going on.

16         But we would be faced then with closing arguments for both

17  plaintiff and defendants and my jury instructions.  I don't

18  know about closing arguments, which are set for no longer than

19  30 minutes.  Usually they make that schedule.  Jury

20  instructions will be something like 45 minutes, which seems to

21  me to put the matter over another day.

22         Why don't we go ahead and put your last witness on and try

23  to, try to get through that first.

24         **MR. SCHNEIDER:**  Thank you, Your Honor.

25         **THE COURT:**  And get the jury sent out on whatever

*11-14876; Griffin v. Condon, et al.*

*Joseph Downard - Recross*
*Thursday/January 19, 2017*

V3-Page 98

1   basis.

2          **MR. SCHNEIDER:**  Mr. Fink and myself have discussed

3   this.  We want to leave it up to the Court and the jury, let

4   the jury decide if we want to come back tomorrow or next week,

5   okay?

6          **MR. FINK:**  Whatever this Court's preference is is the

7   plaintiff's position, judge and jury, as to whether you want to

8   finish tomorrow or Monday.

9          **THE COURT:**  Well, I hate to confuse anybody with what

10  goes on, but probably the judge is going to decide.

11         **MR. FINK:**  Yes, Your Honor.

12         **THE COURT:**  But I would like to keep you happy, too,

13  but I mean that I have structural questions with starting

14  deliberations at the beginning of the day.  If we go to closing

15  arguments tomorrow, it's going to be roughly, roughly pretty

16  close to noon before we're done with everything verbal, and I

17  think that all of you are going to think, probably some of you

18  are, that your day ends well before noon.

19       So I'm thinking about that.  I haven't heard any arguments

20  coming from the other side, but I haven't heard anything

21  inconsistent with what I just said so let's put Mr. Condon on.

22         **MR. SCHNEIDER:**  Yes, Your Honor.  The defense calls

23  ARUS Condon.

24         **THE COURT:**  And would you come forward and take the

25  oath.

*11-14876; Griffin v. Condon, et al.*

*Louis Condon - Direct*
*Thursday/January 19, 2017/Volume 3*

1                    -   -   -

2                **LOUIS CONDON,**

3         being first duly sworn to tell the truth,

4         was examined and testified upon his oath

5         as follows:

6            **THE COURT:**  Thank you.

7                    -   -   -

8                                    (11:33 a.m.)

9              **DIRECT EXAMINATION**

10  BY MR. SCHNEIDER:

11  **Q.**   Good morning.

12  **A.**   Good morning.

13  **Q.**   State your name for the record, please.

14  **A.**   Louis Condon.

15  **Q.**   Where are you currently employed, Mr. Condon?

16  **A.**   Gus Harrison Correctional Facility.

17  **Q.**   What is your job title there?

18  **A.**   Assistant Resident Unit Supervisor.

19  **Q.**   What was your job title back in 2011?

20  **A.**   It was Acting Resident Unit Manager.

21  **Q.**   You were filling in for somebody else?

22  **A.**   Yes.  I have done that on a few occasions when they have

23  been on sick leave for extended periods of times or other

24  leaves of absence.

25  **Q.**   So under the civil service rules you are classified as an

*11-14876; Griffin v. Condon, et al.*

*Louis Condon - Direct*
*Thursday/January 19, 2017/Volume 3*

V3-Page 100

1   ARUS, correct?

2   **A.**    Correct.

3   **Q.**    You are allowed to serve as an "acting" in other positions

4   sometimes?

5   **A.**    Correct.

6   **Q.**    How long have you been employed by the Michigan Department

7   of Corrections?

8   **A.**    21 1/2 years.

9   **Q.**    Were you ever a corrections officer?

10  **A.**    Yes.

11  **Q.**    In the prison is it true that you have custody and

12  non-custody staff?

13  **A.**    Correct.

14  **Q.**    Which side of the aisle does the ARUS or RUM fall on?

15  **A.**    That would be the non-custody.

16  **Q.**    So you go to work in plain clothes?

17  **A.**    Correct.

18  **Q.**    You are not uniformed?

19  **A.**    Correct.

20  **Q.**    What were the duties -- what were your duties as acting

21  RUM in 2011?

22  **A.**    That would be overseeing the ARUSs, and it changed during

23  that period of time because at one point in time during that I

24  was overseeing two housing units and then there was an

25  elimination of a RUM's position so I became overseeing

*Louis Condon - Direct*
*Thursday/January 19, 2017/Volume 3*

V3-Page 101

1   three housing units, overseeing the staff, the ARUSs, within

2   those units, and both myself and custody staff shared

3   supervisory capacity over the officers in those units.  We

4   dealt with day-to-day issues, interactions with the prisoners,

5   problems, a lot of case management because there's -- each

6   prisoner has a commitment file.  There's a lot of PER

7   preparation, which is parole eligibility.  There's a lot of

8   paperwork that's dealt with in those offices.

9   **Q.**   Did you have a lot of contact with the prisoners?

10  **A.**   Yes.

11  **Q.**   Did they come into your office?

12  **A.**   They would come and go all day long.

13  **Q.**   What were the hours that you worked in 2011?

14  **A.**   That would be 8:00 until 4:30.

15  **Q.**   So you had some overlap with Officers Downard and

16  McMurtrie?

17  **A.**   Correct.

18  **Q.**   About three hours, two, three hours?

19  **A.**   2 1/2 hours, yeah.

20  **Q.**   When is the last time you worked with Officers Downard and

21  McMurtrie?

22  **A.**   That would be mid to late 2011 when I returned to my ARUS

23  duties when the person that was on leave of absence at that

24  time returned to their assignment.

25  **Q.**   All right.  Have you, aside from your normal job duties,

*Louis Condon - Direct*
*Thursday/January 19, 2017/Volume 3*

1  have you assumed other duties at the prison as well?

2  **A.**   Yes.  This last time -- I have been assigned to the --

3  administration has assigned me to acting RUM position on

4  three separate occasions under three different administrations.

5  During the last most recent one I was assigned to be the

6  facility's PREA coordinator, which is the Prison Rape

7  Elimination Act coordinator for the entire facility.

8  **Q.**   How much time did you put into those duties?

9  **A.**   A lot.  As a matter of fact, when I returned to my normal

10 duties of ARUS my wife was extremely ecstatic that I was being

11 removed from it because it meant the other person was coming

12 back to work because to get us in compliance I was putting in

13 anywhere from 16 to 20 hours every week of my own time at home

14 and meetings outside of work that the deputies were aware of.

15 **Q.**   Were you paid for that time?

16 **A.**   No.

17 **Q.**   Have you taught classes in the prison?

18 **A.**   Yes.  "Thinking for a Change" I have taught for several,

19 several years.

20 **Q.**   What's "Thinking for a Change"?

21 **A.**   "Thinking for a Change" is a 25-session programming that's

22 done by programming staff and ARUSs included.  We go to

23 training for it ahead of time a week or two.  I think it was

24 two weeks actually in Jackson.

25      It's 25 sessions of basic, elementary skills that a lot of

*Louis Condon - Direct*
*Thursday/January 19, 2017/Volume 3*

V3-Page 103

1   people pick up, but it's communications, it's interaction with

2   other people, and the premise behind the whole program is we

3   have built a lot of these skills like problem solving,

4   communication, thinking of others, putting yourself in other

5   people's shoes and thinking where they are at, stress

6   management and problem solving, all of these things.

7        When they are in that program, it's to get them to slow

8   down because a lot of times they make rash decisions and end up

9   in the situation that they are in.

10  **Q.**   I'm going to cut you off.  I don't want you to go on too

11  long with this.

12  **A.**   All right.

13  **Q.**   Are you currently required to teach that course?

14  **A.**   I'm required to teach it on occasion, at least one time a

15  year.

16  **Q.**   Okay.  And how many times a year do you teach that course?

17  **A.**   My partner and I, ARUS Gibbs, we teach it continuously,

18  full time, all year round, four times a year.

19  **Q.**   Okay.  And you do that to help the prisoners?

20  **A.**   Yeah, it's voluntary that we do the extra.  We go above

21  and beyond because we are devoted to the class, to give them

22  the skills.

23  **Q.**   I want to ask you about prisoner Bryant.  Do you remember

24  him at all?

25  **A.**   Yes.

*11-14876; Griffin v. Condon, et al.*

*Louis Condon - Direct*
*Thursday/January 19, 2017/Volume 3*

1   **Q.**   What was going on on this day where you allegedly

2   assaulted prisoner Bryant?

3   **A.**   When that allegedly happened I was in my office to begin

4   with.   I became aware of it as the situation grew because it

5   happened over about a period of about an hour.   He was out on

6   base having troubles with numerous officers.

7        It started out with insolence because he was trying to

8   instruct an officer.   He was on sanctions at the time, top

9   watch, from numerous previous misconducts he had from other

10  officers, but he was telling the officers not to keep track of

11  him --

12             **MR. MOODY:**   Objection, Your Honor, hearsay.

13             **THE COURT:**   What was the witness testifying?

14             **MR. MOODY:**   He was testifying as to what Mr. Bryant

15  said.

16             **THE COURT:**   And I didn't hear the question, I guess.

17  What --

18             **MR. SCHNEIDER:**   The question was just tell us what

19  was going on that day with Mr. Bryant.   Whatever he said that

20  Bryant said, it's not being offered for the truth of the

21  matter.   He's just testifying about what he saw, what was going

22  on for context about this whole situation, Your Honor.

23             **THE COURT:**   On that basis I will let it go ahead and

24  will deny the motion.

25             **MR. SCHNEIDER:**   Thank you, Your Honor.


                    *11-14876; Griffin v. Condon, et al.*

*Louis Condon - Direct*
*Thursday/January 19, 2017/Volume 3*

V3-Page 105

1          **THE WITNESS:** He had started with telling an officer,

2    I believe it was Officer Mary, a female -- he was on top watch,

3    supposed to be in his cell. He was telling her -- he was

4    cursing at her and telling her not to pay attention to him.

5    **BY MR. SCHNEIDER:**

6    **Q.**   Let me see if I can shorten this up.

7    **A.**   Yep.

8    **Q.**   Counsel will object if he has a problem with this, but

9    over the course of about an hour Mr. Bryant had three

10   misconduct tickets?

11   **A.**   Yes, for insolence, for cussing at her, for disobeying a

12   direct order, out of place because he was told by another staff

13   member to return to his cell while he was on sanctions. That

14   was about 20 minutes later, and then again, approximately 20,

15   30 minutes later again, this is when I became involved, he was

16   written a creating a disturbance misconduct.

17   **Q.**   By you?

18   **A.**   No.

19   **Q.**   By one of the officers?

20   **A.**   Correct.

21   **Q.**   How old is Mr. Bryant, if you know?

22   **A.**   Now or then?

23   **Q.**   Now.

24   **A.**   Late 30s, I would guess.

25   **Q.**   You don't know?

*11-14876; Griffin v. Condon, et al.*

*Louis Condon - Direct*
*Thursday/January 19, 2017/Volume 3*

V3-Page 106

1   **A.**    Not exactly.

2   **Q.**    Have you reviewed his OTIS sheet?

3   **A.**    I have seen it once just for identification.  I have seen

4   it for that.  I believe, if memory serves me correct, he's 39

5   or something now.

6   **Q.**    39 now?

7   **A.**    Correct.

8   **Q.**    How old would he have been back in 2011 then?

9   **A.**    Six years off, so 33.

10  **Q.**    Okay.  33 years old?

11  **A.**    Yes.

12  **Q.**    Okay.  So you got involved in this incident after the

13  third ticket was written?

14  **A.**    During the process of what was ongoing for the third

15  ticket.

16  **Q.**    Okay.  What did you do?

17  **A.**    I became aware because there was a lot of noise going on

18  on base and staff were locking up the activity rooms, which it

19  doesn't happen real frequently.  I went out there and became

20  aware that he was refusing to go back to his cell.  I realized

21  at that time he had had numerous other problems with staff.

22       So he had his duffel bag sitting on the floor near the

23  unit, close to the unit entrance and was demanding that he was

24  going to go -- he was telling staff he was going to go to

25  segregation.

*Louis Condon - Direct*
*Thursday/January 19, 2017/Volume 3*

V3-Page 107

1    One of the things that needs to occur in a prison facility

2    is accountability of prisoners' property.  Whenever a prisoner

3    goes to segregation or something they need to inventory it so

4    that nothing gets lost or stolen.  For that sake I ordered him

5    to -- he was holding it by a strap.  He was telling staff time

6    and time again he was going to go to segregation, do it his

7    way.

8    **Q.**   Let me stop you.  What was he holding?

9    **A.**   He was holding the strap of the duffel bag.

10   **Q.**   Okay.  And then what did you tell him?

11   **A.**   I gave him three orders to leave the duffel bag by the

12   wall, to leave it there, to let go of the duffel bag.

13   **Q.**   Okay.  Did he eventually comply with that order?

14   **A.**   Yeah.

15   **Q.**   Did you grab his arm at all?

16   **A.**   No.

17   **Q.**   Shake him?

18   **A.**   Nope.

19   **Q.**   Assault him in any way?

20   **A.**   No.

21   **Q.**   Did you snatch the duffel bag out of his hands?

22   **A.**   No.

23   **Q.**   Did Mr. Bryant file a grievance on this against you at the

24   prison?

25   **A.**   He did.

*11-14876; Griffin v. Condon, et al.*

*Louis Condon - Direct*
*Thursday/January 19, 2017/Volume 3*

V3-Page 108

1  **Q.**   Okay.  Were you questioned about that grievance?

2  **A.**   Yes, by Acting Deputy Warden -- or, excuse me, Assistant

3  Deputy Warden DeLeeuw.

4  **Q.**   That's your boss?

5  **A.**   Correct.

6  **Q.**   Where is he in the prison hierarchy?  If you have a

7  warden, how far down from that is the assistant?

8  **A.**   You have the warden, the deputy warden, and then the

9  assistant deputy warden.

10 **Q.**   Okay.  Does the ADW have access to the video system?

11 **A.**   Yes.

12 **Q.**   Okay.  Access to witnesses?

13 **A.**   Yes.

14 **Q.**   And he cleared you on that grievance, correct?

15 **A.**   Correct.

16 **Q.**   How long after this alleged incident was it that you spoke

17 with the assistant deputy warden about this?

18 **A.**   I'm not exactly sure.  It would have been ten days to

19 two weeks maybe, somewhere.

20 **Q.**   And this -- do you know the date that this allegedly

21 occurred?

22 **A.**   I believe it was on February 9th.

23 **Q.**   When the assistant deputy warden spoke to you about the

24 grievance, did Mr. Griffin's name ever come up at all?

25 **A.**   No.

*11-14876; Griffin v. Condon, et al.*

*Louis Condon - Direct*
*Thursday/January 19, 2017/Volume 3*

V3-Page 109

1   **Q.**   Did you ever become aware that Mr. Griffin was claiming he

2   was helping Bryant with this in some manner?

3   **A.**   No.

4   **Q.**   Were you ever aware that Mr. Griffin or Mr. Bryant spoke

5   to the ombudsman about this?

6   **A.**   No.

7   **Q.**   Did you recognize Ms. Zimbelman when she was here?

8   **A.**   No.

9   **Q.**   If an ombudsman did come into the prison, did anybody ever

10  tell you about it?

11  **A.**   No.

12  **Q.**   That report, Exhibit 44, had you ever seen that before?

13  **A.**   Which one was that?  Can you --

14  **Q.**   It was the ombudsman's 13-page report.

15  **A.**   No.

16  **Q.**   You had never seen that before?

17  **A.**   No.

18  **Q.**   Did you ever have a conversation with Mr. Griffin about a

19  mail issue related to the warden's forum?

20  **A.**   Yes.

21  **Q.**   When was that?

22  **A.**   That was on February 23rd.

23  **Q.**   How do you know that date?

24  **A.**   I -- when we do the warden's forum minutes for the units,

25  we type up block rep meeting minutes and it's done at that

*Louis Condon - Direct*
*Thursday/January 19, 2017/Volume 3*

V3-Page 110

1   time.  It would have that date on there.  It's done in a memo

2   form for the department.

3   **Q.**   Okay.  Now, Mr. Griffin says you had a second conversation

4   about that issue on March 2nd.  Did that happen?

5   **A.**   No.

6   **Q.**   You never had any second conversation with him about that

7   issue?

8   **A.**   No.  It was a resolved issue at that time.

9   **Q.**   Did you ever know he had a meeting with an ombudsman?

10  **A.**   No.

11  **Q.**   Did you ever have a conversation with Officers Downard and

12  McMurtrie about writing false tickets?

13  **A.**   No.

14  **Q.**   How far is it from the laundry room to the officers' desk?

15  **A.**   Roughly 20 feet.

16  **Q.**   Is it loud in the unit?

17  **A.**   Very.

18  **Q.**   Is it even louder if the laundry machines are running?

19  **A.**   Yes.

20  **Q.**   Explain why.

21  **A.**   We, we are under a contract now for laundry machines.  At

22  the time we owned our equipment.  Now we are getting near the

23  end of a five-year lease so at that time we would have had the

24  old equipment that was -- the facilities opened in '89 and '91

25  so they were 20 years old.  They were commercial big equipment,

*Louis Condon - Direct*
*Thursday/January 19, 2017/Volume 3*

V3-Page 111

1   and they were falling apart.  That's why we are under a lease

2   now.  And they would rattle and make tremendous amounts of

3   noise in there.

4   **Q.**   Okay.  Were there certain times of the day that the

5   laundry wasn't allowed to be run?

6   **A.**   Yeah, we are under -- with Consumer's Power, the energy

7   company, to conserve energy we were under an agreement with

8   them to save money that we would not operate our laundry room

9   between the hours of 11:00 a.m. and 1700 [sic] hours we

10  wouldn't run our electric dryers.

11  **Q.**   So if a prisoner said that he was in the laundry room

12  working between those hours, is that true?

13        **MR. MOODY:**   Objection, calls for speculation.

14        **THE COURT:**   If you know.

15        **THE WITNESS:**   If I know?

16        **THE COURT:**   If you have any basis for knowing whether

17  he was or he wasn't.

18        **THE WITNESS:**   That would be right outside my office

19  door so I would be very familiar with that.

20        **THE COURT:**   You may testify.

21        **THE WITNESS:**   They would not be working laundry

22  services.  After formal count they would collect prisoners'

23  clothing, clothes to start cleaning after 1900 hours, which is

24  7:00 p.m.

25

*Louis Condon - Direct*
*Thursday/January 19, 2017/Volume 3*

1  **BY MR. SCHNEIDER:**

2  **Q.**   Did you have any reason to be upset with Mr. Griffin?

3  **A.**   No.

4  **Q.**   How long does it take to walk from the chapel to Housing

5  Unit 2?

6  **A.**   Myself or prisoners?

7  **Q.**   Prisoners.

8  **A.**   It depends on any given day.  It could be 10, 15,

9  20 minutes with the opening and closing of gates.

10  **Q.**   Okay.  Did you remove Mr. Griffin from the warden's forum?

11  **A.**   No.

12  **Q.**   Do you have the authority to do that in the prison?

13  **A.**   No.

14  **Q.**   Do officers have that authority?

15  **A.**   No.

16  **Q.**   Do you know who did remove Mr. Griffin from the warden's

17  forum?

18  **A.**   Yes.  That was the warden.

19  **Q.**   Do you know why?

20  **A.**   Yes.  There was an ongoing investigation that was

21  conducted by Inspector Goldberg and the --

22          **MR. MOODY:**  Objection, Your Honor.  What Mr. Condon

23  is about to testify to has already been ruled by you as

24  inadmissible.  I would request a side bar to discuss it.

25          **THE COURT:**  I take it that this witness doesn't have

*11-14876; Griffin v. Condon, et al.*

*Louis Condon - Direct*
*Thursday/January 19, 2017/Volume 3*

V3-Page 113

1   any at least announced contact with the investigation or what

2   the result was so I believe that you should go on to something

3   else.

4       **MR. SCHNEIDER:**  Okay.  Your Honor, what I would like

5   to do at this time is make an offer of proof for Defendants'

6   Exhibits C and D, which again explain why he was removed from

7   the forum.  You excluded them from evidence yesterday, but I

8   would like to make an offer of proof at this time.

9       **THE COURT:**  Yes.

10      **MR. MOODY:**  Both of these exhibits were discussed at

11  side bar yesterday, and you previously ruled that both were

12  inadmissible as irrelevant.  They still are the same documents

13  they were yesterday.  I would request you make the same ruling

14  again.

15      In addition, the defense is attempting to admit these

16  documents through Officer Condon, who cannot authenticate them.

17  He didn't draft the document.  He wasn't sent the document.  He

18  has no ability to authenticate this document or bring it into

19  evidence.

20      So, in sum, Your Honor, there's no reason to change your

21  ruling from yesterday.

22      And, Judge, I just would ask as well, because we did this

23  at side bar, if there is further discussion, I would ask that

24  it again be done at side bar.

25      **THE COURT:**  Mr. Schneider.

*11-14876; Griffin v. Condon, et al.*

*Louis Condon - Direct*
*Thursday/January 19, 2017/Volume 3*

V3-Page 114

1    **MR. SCHNEIDER:**  I'm not sure if you want me to

2    respond or not.  There's been a request for a side bar.

3         **THE COURT:**  I'm not sure either.  If you've got some

4    response, you can make it.

5         **MR. SCHNEIDER:**  Yes, Your Honor.

6         The plaintiff has argued that his prior removal from the

7    warden's forum at a different prison was not brought up at his

8    current prison until after these defendants' tickets.  These

9    documents show that's just not true, he was already being

10   investigated for certain misconduct.

11        He has accused the defendants of removing him from the

12   forum.  These documents show that they did not and that

13   investigation precedes these alleged activities here.

14        **THE COURT:**  The same argument that took place before?

15        **MR. MOODY:**  That's exactly right, Your Honor, and I

16   would point out that the date of the document is after

17   Mr. Griffin was already removed from the forum.  It's the same

18   argument as yesterday.

19        **THE COURT:**  Well, I have heard Mr. Schneider's

20   explanation, but I think the ruling is consistent with the

21   Court's ruling yesterday and I will grant the motion.

22        **MR. SCHNEIDER:**  Okay.  So the exhibits are excluded,

23   correct?

24        **THE COURT:**  Excuse me?

25        **MR. SCHNEIDER:**  The exhibits are not admitted,

*11-14876; Griffin v. Condon, et al.*

*Louis Condon - Direct*
*Thursday/January 19, 2017/Volume 3*

V3-Page 115

1   correct?

2         **THE COURT:**  Yes.

3         **MR. SCHNEIDER:**  Okay.  In that case I have no further

4   questions.  Thank you.

5         **THE COURT:**  Anything further for this witness?

6         **MR. MOODY:**  Yes, Your Honor.  Thank you.

7         **THE COURT:**  I don't know how much you have, but I see

8   that Mr. O'Brien is in the -- at the end of the -- we have got

9   something else on the Court's schedule, which doesn't

10  necessarily control everything, but I do have the pressure of

11  some other things to do here.

12        **MR. MOODY:**  I understand, Your Honor.  I don't intend

13  to take a long time, but certainly I don't want to

14  underestimate here.  I would think 10 to 15 minutes probably.

15        **THE COURT:**  I guess perhaps we are going to have

16  Mr. Condon with us anyway whenever we reconvene.  Why don't we

17  spend until about noon, 12:00, which isn't very long.

18        **MR. MOODY:**  Okay.  Your Honor, I'm happy to proceed

19  that way.  I'm also happy to -- I know I'll go past noon so

20  it's certainly for the Court's discretion -- I'm happy to pick

21  up later if you prefer that just because I know it'll go more

22  than seven minutes.

23        **THE COURT:**  Unless there's some major persuasive

24  objection, I think that makes sense.  Thank you.

25        **MR. MOODY:**  Okay.

*11-14876; Griffin v. Condon, et al.*

*Louis Condon - Direct*
*Thursday/January 19, 2017/Volume 3*

V3-Page 116

1      **THE COURT:**  Then we're done, that is, for the week.

2  We'll be back Monday.  I hope that doesn't disappoint you or

3  ruin your schedules, but we're going to go to you I think,

4  without any question, on Monday, and the matter will be in your

5  hands.

6      We have got maybe another witness or two to deal with,

7  then we've got closing arguments for both sides, and then

8  you've got me you've got to deal with with my instructions to

9  the jury.  And that will probably get us to 11:30 or something,

10  and at that point it will be in your hands.

11      The other thing is, and I hope it's true, I think we'll

12  get you lunch if you're deliberating, if you want lunch,

13  otherwise you will come back the next day, something like that.

14      But please, if you can stand to hear this without getting

15  too impatient, you've been wonderfully patient, you shouldn't

16  discuss the case with anyone, including family, neighbors,

17  friends, business associates -- you can sit down -- and fellow

18  jurors at any time during the trial.  You must not permit

19  anyone to attempt to discuss it with you or in your presence.

20  If they try to or won't stop, send a note to me.  In order to

21  avoid the appearance of impropriety, don't have any

22  conversation with the parties, lawyers or anyone who you may

23  come to recognize as having some connection with the case.  The

24  parties are entitled to the appearance, and even though we

25  trust and usually accurately that nobody would attempt to

*11-14876; Griffin v. Condon, et al.*

*Louis Condon - Direct*
*Thursday/January 19, 2017/Volume 3*

V3-Page 117

1  violate these instructions and discuss with somebody what's

2  going on in the trial, they shouldn't even put the parties to

3  the case in a situation where observing you would make it

4  likely or somebody might conclude that you were doing something

5  that involved the case.

6      No electronic geer, no newspaper articles, no research or

7  television.  And, beyond that, I think eight o'clock --

8  nine o'clock on Monday morning.  That's right.  I guess I was

9  wondering if I had an earlier schedule.

10     But please have a good weekend.  Thank you very much for

11  being good jurors and being patient and for being here through

12  this whole thing, and I hope, it's up to you, I hope you make

13  it through this on Monday but pretty soon if it isn't Monday.

14  Please have a good weekend, a safe weekend out there.

15          **THE CLERK:**  All rise for the jury.

16      (Jury out at 11:57 a.m.)

17          **THE COURT:**  Obviously Mr. Condon is not done yet, and

18  you are going to be here anyway, which was the basis upon which

19  I thought we could conclude this without hurting anybody very

20  much today.

21      And you're not excused.  You are still under oath.

22      Does anybody have anything else they want the record to

23  reflect at this point?

24          **MR. SCHNEIDER:**  Nothing from the defense, Your Honor.

25          **MR. MOODY:**  Nothing from plaintiff.

*11-14876; Griffin v. Condon, et al.*

*Louis Condon - Direct*
*Thursday/January 19, 2017/Volume 3*

V3-Page 118

1      **MR. SCHNEIDER:**  Nothing for the defense.

2      **THE COURT:**  Yes, yes, thank you.

3      Thank you for your patience and your cooperation.

4  Thank you for your professionalism.  Have a good weekend.

5  We'll see you Monday at 9:00.

6      The Court is in recess.

7      (Proceedings adjourned at 11:59 a.m.)

8                      -   -   -

9

10              **C E R T I F I C A T I O N**

11      I certify that the foregoing is a correct transcription of

12  the record of proceedings in the above-entitled matter.

13

14  s/ Sheri K. Ward_____                    2/6/2017
    Sheri K. Ward                               Date
15  Official Court Reporter

16                      -   -   -

17

18

19

20

21

22

23

24

25