UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


**RANDLE GRIFFIN,**

               Plaintiff,

      v.

**LOUIS CONDON, et al.,**

               Defendants.

_____/

                       **HONORABLE JOHN CORBETT O'MEARA**

                       **No. 11-14876**


**JURY TRIAL - VOLUME 4**

**Monday, January 23, 2017**


Appearances:

Brandon C. Hubbard
Wade Fink
Nolan John Moody
Jessica L. Russell
Dickinson Wright, PLLC
500 Woodward Avenue, #4000
Detroit, Michigan  48226
(313) 223-3500
  On behalf of Plaintiff

Clifton B. Schneider
Michigan Dept. of Att. General
P.O. Box 30736
Lansing, MI  48909
(517) 373-6434
  On behalf of Defendants

-   -   -

*To obtain a certified transcript, contact:*
*Sheri K. Ward, Official Court Reporter*
*Theodore Levin United States Courthouse*
*231 West Lafayette Boulevard, Room 219*
*Detroit, Michigan  48226*
*(313)965-4401 · ward@transcriptorders.com*

*Transcript produced using machine shorthand and CAT software.*

*Jury Trial*
*Monday/January 23, 2017/Vol. 4*

**I N D E X**

Defendant's Case in Chief                          Page   Vol.

   **Louis Condon**

        Direct Exam Cont'd By Mr. Schneider:       11     4

        Cross-Examination By Mr. Moody:            15     4

        Redirect Examination By Mr. Schneider:     28     4

        Recross-Examination By Mr. Moody:          29     4

        Redirect Examination By Mr. Schneider:     30     4

        Recross-Examination By Mr. Moody:          31     4

        Redirect Examination By Mr. Schneider:     32     4

Defense Rests ...................................33     4

Renewed M/Judgment as a Matter of Law ..........34     4

Plaintiff's Closing Argument ...................37     4

Defendants' Closing Argument ...................60     4

Plaintiff's Rebuttal Closing Argument ..........72     4

Final Jury Instructions ........................75     4

Jury Question ..................................98     4

Change of Jury Deliberations ..................103     4

Certification of Reporter .....................106

- - -

Plaintiff's Exhibits

        Number                              Rcvd  Vol.

        5         ...................................15     4

- - -

*11-14876; Griffin v. Condon, et al.*

*Jury Trial*
*Monday/January 23, 2017/Vol. 4*

V4-Page 3

1              Detroit, Michigan

2              Monday, January 23, 2017

3              9:09 a.m.

4                  -   -   -

5       **THE CLERK:**  The court calls the matter of

6  *Randle Griffin v. Louis Condon, et al.*, Case Number 11-14876.

7       **THE COURT:**  Counsel, please start the day with

8  putting your appearances on the record.

9       **MR. MOODY:**  Good morning, Your Honor.  Nolan Moody on

10  behalf of the Plaintiff, Randle Griffin.  To my right is

11  Brandon Hubbard, Wade Fink, and Jessica Russell, also on behalf

12  of plaintiff.

13       **MR. SCHNEIDER:**  Good morning, Your Honor.

14  Cliff Schneider on behalf of Defendants Condon, Downard and

15  McMurtrie.

16       **THE COURT:**  Thank you.  You may sit down at least for

17  the time being.

18      I have a response to the plaintiff's pocket brief, which

19  is cogent and well written but for a variety of reasons will be

20  denied.

21      And we have jury instructions, which you should have on

22  both plaintiff and defendants' side in your position, and we

23  have one proposed addition or amendment, I guess, to what we

24  have in the way of jury instructions, which, as near as I can

25  tell, adds the age of one of the nonparties, and I'm not sure I

*Jury Trial*
*Monday/January 23, 2017/Vol. 4*

V4-Page 4

1  understand exactly why that's important and, if it's important,

2  why it wasn't added earlier when the rules say that jury

3  instructions, joint jury instructions will be in fact given to

4  the Court by the time the trial starts, which is a little late,

5  but I -- in any event, we're not going to add that to the jury

6  instructions, even though it was interesting and peculiar to me

7  anyway at least, all of a sudden both parties realize they

8  would benefit from the addition of the age of one of the

9  nonparties.

10      Is there something else?  We have a witness still on

11  direct, as I recall.  There he is, Mr. Condon.  Yes.

12          **MR. HUBBARD:**  Your Honor, Mr. Condon is actually

13  subject to cross.

14          **THE COURT:**  But there apparently was an assertion by

15  Mr. Schneider that he had a couple more questions on direct.

16          **MR. SCHNEIDER:**  I do, Your Honor.

17          **THE COURT:**  Is there anything wrong with that?

18          **MR. HUBBARD:**  Respectfully, there is.  We believe

19  that the couple of other questions are going to go to

20  two additional "rebuttal exhibits," Your Honor.  We challenge

21  the admission of those two rebuttal exhibits for reasons that I

22  can explain to the Court, and respectfully we ask that

23  Mr. Condon be immediately subject to cross-examination and that

24  those supposed rebuttal exhibits not be brought into this case

25  as evidence.

*11-14876; Griffin v. Condon, et al.*

*Jury Trial*
*Monday/January 23, 2017/Vol. 4*

V4-Page 5

1      We did just this morning, I think within the last ten

2   minutes, plus or minus, depending upon how quick my assistant

3   is, file a quick three-page brief regarding why those

4   two exhibits should be excluded.  I do have a copy of that

5   brief here with me this morning, and if I may approach, I would

6   be pleased to give it to the Court.

7          **THE COURT:**  Well, one of the things about briefs that

8   I picked up someplace along the line in 33 years is they are

9   good if the person who is going to read them and resolve things

10  on that basis gets them in advance and not submitted it -- I'm

11  being harsh.  This is a little late.  I don't -- you are saying

12  that it's inconvenient and it's inconvenient to the point that

13  it's objectionable.

14         **MR. HUBBARD:**  It is, Your Honor, and I have a good

15  answer as to why we filed it this morning.  The answer to that

16  inquiry is because we didn't actually get notified from

17  defendants' counsel until 4:25 p.m.on Saturday that he was

18  going to seek to introduce two new exhibits that were not on

19  the final pretrial order.  In fact, the exhibits have been in

20  their possession since at least 2011.

21         **THE COURT:**  And what does it do for you, ultimately

22  what the jury sees or hears that they -- we can't in advance

23  have the attempt by the defendants to make use of these?  It

24  might be objected, they might be denied, but what is there that

25  you are trying to get hold of?

*11-14876; Griffin v. Condon, et al.*

*Jury Trial*
*Monday/January 23, 2017/Vol. 4*

1    **MR. HUBBARD:**  Well, frankly, Judge, the exhibits are

2  prejudicial to our position because, one, it's trial by

3  surprise.  The defendants have been in possession of these

4  two particular exhibits that address the ongoing laundry issue,

5  I'll refer to it as.

6       The Court will recall that Larry Anthony, one of the

7  previously incarcerated prisoners at the Gus Harrison Facility,

8  testified that he overheard the ongoing conversation between

9  the three defendants while he was undergoing laundry duties.

10  Now the defendants seek to introduce on the last day of trial

11  two exhibits that bear upon when in fact laundry duties can and

12  cannot be undertaken at Gus Harrison Facility.

13       The problem with this is two fold.  One, we have already

14  submitted an affidavit from Larry Anthony back in October of

15  2015 in opposition to their motion for summary judgment, and

16  that affidavit explicitly stated that in fact he was undergoing

17  laundry duties at the time that he overheard the alleged

18  conversation regarding the conspiracy undertaken by the

19  defendants.  So they have known for more than a year that the

20  laundry issue was going to be an issue in this trial and that

21  Mr. Anthony was going to testify to it.

22       Now, on Saturday they proposed to admit two "rebuttal

23  exhibits," but it's not rebuttal at all.  They have known about

24  it all along.  Larry Anthony's testimony to the defendants is

25  no surprise, and this is what's worse.

*11-14876; Griffin v. Condon, et al.*

*Jury Trial*
*Monday/January 23, 2017/Vol. 4*

V4-Page 7

1      These exhibits aren't new to the defendants.  They have

2   known about these exhibits.  One is dated in 2011, and the

3   other in 2009.  This case was filed in 2011.  Here we are

4   six years later.  They have been sitting on the exhibits for

5   six years.  They have known about Larry Anthony's testimony for

6   over a year.  Why didn't they bring it up at the time that

7   Larry Anthony testified?

8          **THE COURT:**  I don't know, but certainly things like

9   this happen in all trials or at least most, and it is the

10  plaintiff's position here that they should not be allowed to go

11  ahead because if they do they will be able to get something in

12  that they shouldn't have in the record and shouldn't let the

13  jury hear it.  You may be right about that part.  You certainly

14  are making persuasive points by indicating that these things

15  were known to and in the possession of the defendants for a

16  long period of time.  And I think I will let Mr. Schneider

17  argue.  He's been standing there patiently.

18         **MR. SCHNEIDER:**  Thank you, Your Honor.  After hearing

19  Mr. Anthony's testimony where he for the first time ever gave a

20  time that this alleged conversation he witnessed occurred, RUM

21  Condon went back to work on Friday and he pulled the old

22  schedules for the laundry room, which show that the laundry

23  room was closed at the time that Mr. Anthony on the stand said

24  he was working and heard this conversation.

25         So, yes, he submitted an affidavit previously, Mr. Anthony

*11-14876; Griffin v. Condon, et al.*

*Jury Trial*
*Monday/January 23, 2017/Vol. 4*

V4-Page 8

1   did, saying he was working in laundry and witnessed this

2   conversation, but on the stand is the first time where he's put

3   a time to that.  Now that we have a time, RUM Condon took it on

4   himself to go find the document that proves, no, he could not

5   have been working at that time.

6           **MR. HUBBARD:**  That is absolutely not true.

7           **THE COURT:**  All right.  I'm not going to spend a lot

8   of time having you assert and disassert things that one side or

9   another says.  I think, although it may be important for the

10  moment with the parties, that we're talking about something

11  that is not a key to who prevails in this case, at least in my

12  mind.  I'm going to I guess grant the motion of the plaintiff

13  and say that the defense presentation as proposed is untimely

14  and is unfair to the other side, and we'll go on from there.

15      Do you still have things to say?

16          **MR. SCHNEIDER:**  Yes, Your Honor.

17          **THE COURT:**  To Mr. Condon?

18          **MR. SCHNEIDER:**  Yes, Your Honor.

19          **THE COURT:**  Not those things though?

20          **MR. SCHNEIDER:**  Not those exhibits, correct, other

21  things, Your Honor.

22          **THE COURT:**  What do you have to say about that?

23          **MR. HUBBARD:**  Well, frankly, Your Honor, Counsel, and

24  I think the Court will recall, that when we concluded on

25  Thursday Mr. Schneider had rested with the direct examination

*11-14876; Griffin v. Condon, et al.*

*Jury Trial*
*Monday/January 23, 2017/Vol. 4*

V4-Page 9

1   of Mr. Condon, and in fact my colleague, Mr. Moody, was up

2   there at the podium and expressed his concern about his ability

3   to get through cross-examination within a matter of

4   seven minutes.

5       Our proposal is that we go directly into cross.  The fact

6   that Mr. Schneider may have thought of additional questions

7   over the weekend that he desires to ask of his witness is no

8   reason to change the status quo as to where we were at in trial

9   on Thursday.  So --

10         **THE COURT:**  Well, it might be, and all of these

11   technical give-ups from one side or another shouldn't control

12   the substance of what goes on before the jury.

13       You may ask further questions, Mr. Schneider, and do so in

14   consideration of the fact that I have ruled on the things that

15   were concerning the plaintiff.

16         **MR. SCHNEIDER:**  Yes, Your Honor.

17         **MR. HUBBARD:**  Thank you, Judge.

18         **THE COURT:**  We're still, we're still in direct

19   apparently, right?

20         **MR. SCHNEIDER:**  Yes, Your Honor.

21         **THE COURT:**  Put your witness on, and we'll get the

22   jury in here.

23         **MR. SCHNEIDER:**  Thank you, Your Honor.

24         **THE COURT:**  And you are still under oath, as I'm sure

25   you know.

*11-14876; Griffin v. Condon, et al.*

*Louis Condon - Direct Cont'd*
*Monday/January 23, 2017/Volume 4*

V4-Page 10

1      **THE CLERK:**  All rise for the jury.

2      (Jury in at 9:21 a.m.)

3      **THE COURT:**  Members of the jury, please be seated.

4   Thank you for being here and being here promptly, more promptly

5   than we were because we had to talk about a few things before

6   we got you in here, but I was -- frankly, I don't know what I

7   can do about it.  As I sometimes say, there aren't any prizes

8   or monetary awards for jurors who are on time, but you've been

9   on time pretty much all the time and you're really on time with

10  bad weather today and thank you for that.

11      We are still in the process of direct examination of

12  Defendant Condon, and you may, Mr. Schneider, continue.

13      **MR. SCHNEIDER:**  Thank you, Your Honor.

14                          -   -   -

15                                             (9:22 a.m.)

16              **DIRECT EXAMINATION CONTINUED**

17      (Direct Examination began on Thursday, January 19, 2017)

18  **BY MR. SCHNEIDER:**

19  **Q.**    Okay.  ARUS Condon, the incident with Prisoner Bryant

20  where he got all the tickets?

21  **A.**    Yes.

22  **Q.**    What was the date of that?

23  **A.**    That was January 26th of '11.

24  **Q.**    Okay.  And how long after that did you have the grievance

25  interview with the Assistant Deputy Warden?

                    *11-14876; Griffin v. Condon, et al.*

*Louis Condon - Direct Cont'd*
*Monday/January 23, 2017/Volume 4*

V4-Page 11

1   **A.**   Approximately 10 days later.

2   **Q.**   All right.   Those January 26 incidents, do you recall what

3   time that was going on?

4   **A.**   Yes, it was the later part of first shift.   Started at

5   roughly, a little bit after 1300, which would be one o'clock.

6   **Q.**   Okay.   And then after the grievance interview with the ADW

7   you said he cleared you on the grievance, correct?

8   **A.**   Correct.

9   **Q.**   And did Prisoner Bryant appeal that?

10  **A.**   No.

11  **Q.**   During this incident was the unit locked down at all?

12  **A.**   During the beginning of it it was opened up.   There was

13  actually three separate incidents, incidences, but the latter

14  part, the final creating a disturbance, the unit was locked

15  down by the officers and then locked down as a matter of time

16  for shift change.

17  **Q.**   What does that mean when the unit is locked down?

18  **A.**   For shift change or for the creating of a disturbance?

19  **Q.**   For a disturbance.

20  **A.**   In this specific incidence a prisoner was on base creating

21  a bunch of attention by his actions.   The officers secured the

22  activity room doors because the numerous prisoners were

23  gathering up against the glass.   Prisoners were coming off of

24  the wings and looking out their cell doors in the wings to see

25  what was going on.   So the officers locked down the unit,

*Louis Condon - Direct Cont'd*
*Monday/January 23, 2017/Volume 4*

V4-Page 12

1   secured the activity room doors, had all the prisoners return

2   to their cells because of what was going on.

3   **Q.**   Okay.   The ombudsman's analyst who was here in court,

4   Ms. Zimbelman, had you ever seen her before?

5   **A.**   No.

6   **Q.**   The ARUS office where she may have met with Prisoner

7   Bryant --

8   **A.**   Yes.

9   **Q.**   -- how far is that from where your office was?

10  **A.**   36 feet.

11  **Q.**   You measured that this weekend?

12  **A.**   I had maintenance staff come in because we don't have

13  access to tape measures, but after you mentioned it, I had

14  maintenance staff come in and it was actually 36 feet.

15  **Q.**   All right.   You testified on Thursday that the laundry

16  room was closed during that part of the day when the

17  conversation was allegedly overheard, correct?

18  **A.**   Correct.

19  **Q.**   How far is the laundry room from the officers' desk?

20  **A.**   27 feet.   There is also a cement pillar similar to what I

21  have between the laundry room right in front of the door to the

22  officers' podium as well, just like my office is.   They are a

23  mirror reflection of one another.

24  **Q.**   We have heard a little bit about formal count in this

25  case.   Can you just briefly explain what that is?

*11-14876; Griffin v. Condon, et al.*

1    **A.**   It's a process where we account for all of the prisoners

2    in the unit.  The unit is shut down prior, about ten minutes

3    prior to it.  All of the prisoners return to their cells.  The

4    staff physically go around and they check to make sure

5    everybody -- there is breathing, living flesh in each and every

6    cell.  Any prisoners that are absent due to being on some

7    assignment or visit, they are marked down, and it's reconciled

8    facility wide to make sure that each and every prisoner is

9    accounted for.

10   **Q.**   What time does that occur?

11   **A.**   On second shift when the officers were working that would

12   be at 16:20, which is 4:20 p.m.

13   **Q.**   Is there a lot of prisoner movement before the formal

14   count?

15   **A.**   Immediately prior to it, say about four o'clockish, just

16   prior to that actually, is when everybody is returning from

17   their assignments, from the yard, details and everything, and

18   the base area is incredibly busy during that period of time.

19   **Q.**   In that unit, Housing Unit 2 back in 2011, did each

20   prisoner have their own cell or were they bunked with other

21   prisoners?

22   **A.**   There was two prisoners per cell.

23   **Q.**   In the large exhibit book in front of you marked

24   Plaintiff's Exhibits, could you flip to Exhibit 5, please.

25   **A.**   Okay.

*Louis Condon - Cross*
*Monday/January 23, 2017/Volume 4*

1  **Q.**  Can you identify what that exhibit is?

2  **A.**  This would be the logbook for -- a copy of the logbook for

3  Housing Unit 2.

4  **Q.**  Okay.

5        **MR. SCHNEIDER:**  Your Honor, I would move for the

6  admission of Plaintiff's Exhibit 5.

7        **MR. MOODY:**  No objection, Your Honor.

8        **THE COURT:**  It's received as Plaintiff's 5.

9  **BY MR. SCHNEIDER:**

10  **Q.**  This logbook, that's where -- well, what is it?  What is

11  this used for in the prison?

12  **A.**  Any incidences, such as formal counts, are always logged.

13  That's a pertinent part of their job.  But anything that

14  happens, from shift changes, the officers going to chow, and

15  any unroutine actions within the unit that occur during the day

16  get logged into this throughout the day.

17        **MR. SCHNEIDER:**  Thank you.  No further questions.

18        **THE COURT:**  And on the plaintiff's side, cross.

19        **MR. MOODY:**  Thank you, Your Honor.

20                    -    -    -

21                                          (9:28 a.m.)

22                    **CROSS-EXAMINATION**

23  **BY MR. MOODY:**

24  **Q.**  Good morning, Officer Condon.  Is that how you prefer I

25  address you, Officer?

                    *11-14876; Griffin v. Condon, et al.*

*Louis Condon - Cross*
*Monday/January 23, 2017/Volume 4*

V4-Page 15

1   **A.**   Actually, ARUS Condon.  Good morning to you.

2   **Q.**   ARUS Condon, okay.  ARUS Condon, you testified on Thursday

3   about an incident with Mr. Bryant, right?

4   **A.**   Correct.

5   **Q.**   Okay.  So you agree with me that an incident occurred.

6   You just disagree with my client as to what happened, right?

7   **A.**   Correct.

8   **Q.**   Okay.  You then went on to testify on Thursday that you

9   were cleared of any wrongdoing by Assistant Deputy Warden

10   DeLeeuw, right?

11   **A.**   Right.

12   **Q.**   Assistant Deputy Warden DeLeeuw interviewed you with

13   regard to that incident, right?

14   **A.**   In part.

15   **Q.**   I didn't hear you.

16   **A.**   In part, in part.  He interviewed -- first he interviewed

17   the prisoner, other staff working, he had access to the videos,

18   and then he interviewed me finally.  I was the last person

19   included in the interview process.

20   **Q.**   Okay.  You were the last one interviewed in that process,

21   right?

22   **A.**   Correct.

23   **Q.**   And he interviewed you one time?

24   **A.**   Correct.

25   **Q.**   Okay.  And you described that interview as very brief,

*11-14876; Griffin v. Condon, et al.*

*Louis Condon - Cross*
*Monday/January 23, 2017/Volume 4*

1  right?

2  **A.**    Yes.

3  **Q.**    And you also said in fact that during that interview it

4  was your belief that he didn't even know really what happened,

5  correct?  That's Warden DeLeeuw.  That's what your testimony

6  was about what he knew?

7  **A.**    That's not accurate.

8  **Q.**    Okay.  Let's go to your -- you were deposed in this case,

9  right?

10  **A.**    Correct.

11  **Q.**    Okay.  Can you turn to Exhibit 19, please.

12  **A.**    Okay.

13  **Q.**    Could you go to Page 98.  I want to direct you to Line 4.

14  You were asked the question:

15         "What specifically did he, Warden DeLeeuw, ask you

16         about?"

17      Your answer:

18         "If there was any physical contact, if I assaulted

19         him.  And I remember at the time that I asked him --

20         I stated that I didn't have any physical contact and

21         I inquired about what type of assault was being

22         referenced, and he, Warden DeLeeuw, didn't even know

23         like what the alleged assault was."

24      You went on further:

25         "I think it was pretty, I'm assuming here, a pretty

*11-14876; Griffin v. Condon, et al.*

*Louis Condon - Cross*
*Monday/January 23, 2017/Volume 4*

V4-Page 17

1          generic statement that I assaulted him so, you then

2          concluded, Mr. DeLeeuw to the best of my recollection

3          didn't know what the assault really was."

4     Did I read that correctly?

5   **A.**   Correct.

6   **Q.**   Thank you.  Now, a moment ago your counsel got up and

7   corrected you as to some dates.  He pointed you to January 26

8   as the date of the alleged assault of Mr. Bryant, right?

9   **A.**   Correct.

10  **Q.**   But on Thursday you said something different, didn't you?

11  **A.**   Correct, that was the --

12  **Q.**   You said that you believed the assault occurred on

13  February 9th, 2011.  Wasn't that your testimony from Thursday?

14  **A.**   Correct.  That was the date I was interviewed by our ADW.

15  I was mistaken.

16  **Q.**   Oh, February 9th was the date you were interviewed by the

17  investigator?

18  **A.**   Approximately, yes.

19  **Q.**   February 9th, you said, 2011?

20  **A.**   Approximately.

21  **Q.**   Okay.  Now, you are aware that Mr. Griffin reported what

22  he witnessed to Jessica Zimbelman at the ombudsman's office,

23  correct?

24  **A.**   I am through this case.

25  **Q.**   All right.  You claim that you didn't know at the time,

                    *11-14876; Griffin v. Condon, et al.*

*Louis Condon - Cross*
*Monday/January 23, 2017/Volume 4*

V4-Page 18

1  but as you sit here today, you are aware of that fact?

2  **A.**   Correct.

3  **Q.**   And you also claim that at the time that Mr. Griffin

4  reported the incident that you had no idea the ombudsman was

5  investigating the assault of Bryant, correct?

6  **A.**   Correct.

7  **Q.**   Okay.  And you say that you don't even usually know when

8  the ombudsman is in the prison at all?

9  **A.**   Correct.

10  **Q.**   Would it surprise you to learn that the date February 9,

11  2011, when you were investigated by the warden, is the same day

12  that my client had an interview with Jessica Zimbelman about

13  the assault?

14  **A.**   It wouldn't surprise me.  I wasn't aware of that.

15  **Q.**   So your position is you had no idea this investigation was

16  going on, you had no idea the ombudsman was even in the office,

17  but on the same day they were in the prison you were

18  interviewed by the deputy warden about the same event?

19  **A.**   Correct.

20  **Q.**   Now, you were working on February 9th, 2011, right?

21  **A.**   Correct.

22  **Q.**   Okay.  I heard you testify a moment ago.  You clarified

23  that the counselor's office is 36 feet from your office, right?

24  **A.**   Correct.

25  **Q.**   Okay.  And then you went on to testify that around

*11-14876; Griffin v. Condon, et al.*

*Louis Condon - Cross*
*Monday/January 23, 2017/Volume 4*

V4-Page 19

1  four o'clock, around count, it's very busy, there's a lot of
2  commotion, something to that effect, right?
3  **A.**  Yes.
4  **Q.**  So you don't have any idea where Larry Anthony was during
5  that time, do you?
6  **A.**  Correct.
7  **Q.**  From January to March 2011 you worked directly with
8  Defendant Officers McMurtrie and Downard, right?
9  **A.**  Part of the day I did, correct.
10  **Q.**  You were acting as the RUM at the time?
11  **A.**  Correct.
12  **Q.**  Okay.  You heard that Mr. Anthony and Mr. Davis both
13  separately alleged that they overheard you having a
14  conversation with the two defendants about writing false
15  misconduct tickets for Mr. Griffin.  You heard that testimony,
16  right?
17  **A.**  I did hear that.
18  **Q.**  Okay.  You also heard Mr. Griffin testify that you told
19  him that his testimony to Ms. Zimbelman was going to "bite him
20  in the ass."  You heard that, too, correct?
21  **A.**  I heard that, correct.
22  **Q.**  Okay.  You deny all of that happened, right?
23  **A.**  That's accurate.
24  **Q.**  Okay.  You claim a conversation with Mr. Griffin never
25  occurred on March 2nd, right?

*11-14876; Griffin v. Condon, et al.*

*Louis Condon - Cross*
*Monday/January 23, 2017/Volume 4*

V4-Page 20

1   **A.**   That's correct.  I spoke with him on February 23rd in the

2   presence of others.

3   **Q.**   Okay.  You heard Officer Downard and Officer McMurtrie

4   testify that they were also working on March 2nd, right?

5   **A.**   Correct.

6   **Q.**   And you were working on March 2nd, right?

7   **A.**   Correct.

8   **Q.**   Okay.  And you are aware now that Officer Downard wrote a

9   misconduct ticket against Mr. Griffin on March 2nd, right?

10  **A.**   I became aware of that, yes.

11  **Q.**   And Officer McMurtrie wrote a ticket on March 3rd, right?

12  **A.**   I became aware of that, yes.

13  **Q.**   So we have testimony from two different people that

14  overhead a conversation.

15  **A.**   Yes.

16  **Q.**   We have testimony from our witness that overheard -- that

17  states you had a conversation with him?

18  **A.**   Yes.

19  **Q.**   And it's all denied by you, but we still have two false

20  misconduct tickets on March 2nd and March 3rd, but you're going

21  to stick with your testimony that none of that is true, none of

22  those conversations happened, right?

23  **A.**   I believe the statement of false misconducts is

24  inaccurate.  He had a hearing.

25  **Q.**   But you are going to maintain, despite all of that, that

                    *11-14876; Griffin v. Condon, et al.*

*Louis Condon - Cross*
*Monday/January 23, 2017/Volume 4*

V4-Page 21

1    you had no conversation with him on March 2nd?

2    **A.**    That's accurate.

3    **Q.**    Officer Condon, during the time period -- I'm sorry, ARUS

4    Condon, during the time period of December 2010 to February of

5    2011 did other inmates report you for wrongdoing?

6    **A.**    I have no idea.

7    **Q.**    Did an inmate allege in 2010 that you harassed and

8    threatened him?

9    **A.**    I don't know what you're referring to.

10    **Q.**    Well, let me ask you this.  Do you write false misconduct

11    tickets against prisoners?

12    **A.**    No.

13    **Q.**    Do you do unnecessary shakedowns?

14    **A.**    No.

15    **Q.**    Have you been accused by other inmates of that?

16    **A.**    I don't know, but I have worked there for 21 years.

17    **Q.**    Okay.  I want to direct you to Exhibit 41 in the binder

18    right here.

19    **A.**    Okay.

20    **Q.**    Okay.  I want to go to the "Case Description."  Do you see

21    in the top left --

22         **MR. SCHNEIDER:**  I object to the exhibit as

23    nonrelevant, having nothing to do with this case.

24         **THE COURT:**  I will wait to rule on that.  If it's not

25    relevant and I agree with it, then we'll exclude it.

                    *11-14876; Griffin v. Condon, et al.*

1    Go ahead.

2         **MR. MOODY:**  All right.  Thank you, Your Honor.

3  **BY MR. MOODY:**

4  **Q.**   Do you see at the top here it says "Legislative

5  Corrections Ombudsman," correct?

6  **A.**   I see that.

7  **Q.**   And then four paragraphs down there's "Case Detail."  Do

8  you see that?

9  **A.**   Yes.

10 **Q.**   Okay.  It says "P," which presumably is prisoner, "is

11 being harassed and threatened by RUM Condon as well as other

12 officers with shakedowns and silly orders."  Do you see that?

13 **A.**   Yes, I do.

14 **Q.**   And do you see just under that it says, "Letter received

15 from P."  Do you see that?

16 **A.**   Yes, I do.

17 **Q.**   And the date next to it is 2-14-11?

18 **A.**   Correct.

19 **Q.**   Which is just five days after your investigation with

20 Warden DeLeeuw, correct?

21 **A.**   Correct.

22 **Q.**   Okay.  Let's go to Exhibit 40.

23 **A.**   Okay.

24 **Q.**   Okay.  Again, at the top do you see Legislative

25 Corrections Ombudsman?

*Louis Condon - Cross*
*Monday/January 23, 2017/Volume 4*

V4-Page 23

1   **A.**   Yes, I do.

2           **MR. SCHNEIDER:**   Same objection as to 41, 403 plus

3   nonrelevance, Rule 403.

4           **THE COURT:**   The same objection being irrelevance?

5           **MR. SCHNEIDER:**   Essentially, Your Honor.   It also

6   falls under 403.

7           **THE COURT:**   I'm not sure I understand, but go ahead.

8   Overruled.

9           **MR. MOODY:**   Thank you, Your Honor.

10  **BY MR. MOODY:**

11  **Q.**   We were looking, again, at Exhibit 40, ARUS Condon, and I

12  want to direct your attention down to near the bottom of the

13  page.   There's the paragraph of "Actions."   Do you see that?

14  **A.**   Yes, I do.

15  **Q.**   Okay.   And then there's a 2-9-11 date.   Do you see that?

16  **A.**   I do.

17  **Q.**   Okay.   And about the second- and third-to-last sentences

18  state:

19           "Constant shakedowns and taking his stuff.   He was --

20           this is the prisoner -- ticket free since 2005.

21           Received a minor because no number on his pants.   RUO

22           Downard and McMurtrie are the problems as well as RUM

23           Condon."

24       Do you see that?

25  **A.**   I do.

*11-14876; Griffin v. Condon, et al.*

*Louis Condon - Cross*
*Monday/January 23, 2017/Volume 4*

V4-Page 24

1  **Q.**   Okay.  Do either of these instances refresh your

2  recollection as to shakedowns of other prisoners?

3  **A.**   No.  This was the ombudsman's office.  This isn't

4  something within the department, and this isn't something

5  that's brought to our attention.

6  **Q.**   Well, did either of these events occur, if you recall?

7  **A.**   No.

8  **Q.**   Are you saying they didn't occur?

9  **A.**   I'm saying I'm unaware of anything like this occurring.

10  **Q.**   Okay.  So you are denying the incident with Mr. Bryant

11  January 29th, 2011.  You're denying the incident that's the

12  subject of this lawsuit --

13        **THE COURT:**  Maybe I misunderstood Officer Condon, but

14  I didn't think he denied.  He said he didn't know.

15        **THE WITNESS:**  I'm unaware of any of this taking

16  place.

17        **MR. MOODY:**  That's correct.

18        **THE COURT:**  That's different from today.

19        **MR. MOODY:**  Judge, I was referencing Inmate Bryant's

20  incident in my latest question, but I'll ask again to clarify.

21  **BY MR. MOODY:**

22  **Q.**   You deny assaulting Inmate Bryant in January of '11,

23  right?

24  **A.**   Correct.

25  **Q.**   You deny retaliating against my client in March of '11,

*11-14876; Griffin v. Condon, et al.*

*Louis Condon - Cross*
*Monday/January 23, 2017/Volume 4*

V4-Page 25

1    correct?

2    **A.**    Correct.

3    **Q.**    You claim to have no knowledge in December of '10 of a

4    shakedown of another prisoner, correct?

5    **A.**    Shakedowns aren't something that I perform.

6    **Q.**    And you also deny another shakedown in February of '11 of

7    another prisoner, right?

8    **A.**    Correct.

9    **Q.**    ARUS Condon, you have worked over 20 years in the MDOC,

10   correct?

11   **A.**    Correct.

12   **Q.**    You have testified that you have seen co-employees be

13   abusive to inmates a total of three times in 20 years, right?

14   **A.**    At the time of this deposition, that's correct.

15   **Q.**    Okay.  And you did see Ms. Zimbelman's report that listed

16   over 40 officers, 42 to be exact, listing much more than

17   three instances of abuse of conduct, correct?

18   **A.**    Allegations of such, yes.

19   **Q.**    Okay.  Have you ever reported Officer Downard or Officer

20   Condon for any wrongdoing?

21   **A.**    I'm Officer Condon, but --

22   **Q.**    Excuse me, Officer McMurtrie or Officer Downard for any

23   wrong doing.

24   **A.**    No.

25   **Q.**    Okay.  But you did testify when asked if Officer Downard

*11-14876; Griffin v. Condon, et al.*

*Louis Condon - Cross*
*Monday/January 23, 2017/Volume 4*

V4-Page 26

1   had a temper, you said no, but he has "elevated reacting to

2   situations."  Didn't you testify to that?

3   **A.**   We all do, that's correct.

4   **Q.**   Okay.  And when you were asked for specific instances when

5   you had reported other officers, you had two instances.

6   One was when you reported a coworker for --

7            **MR. SCHNEIDER:**  Your Honor, I would object to this

8   line of questioning as not relevant.

9            **THE COURT:**  I am beginning to wonder whether and how

10  it's relevant, but I'm not going to shut down on it right now,

11  but keep that in mind as you go further.

12           **MR. MOODY:**  Thank you, Your Honor.

13  **BY MR. MOODY:**

14  **Q.**   With regard to one instance, you reported a coworker, a

15  co-employee, for opening a door to take off the handcuffs of a

16  prisoner in a wheelchair instead of using the slot that the

17  other prisoners are supposed to use to put their handcuffs

18  through; isn't that correct?

19  **A.**   That's what officers are supposed to use, that's correct.

20  **Q.**   You reported an officer for doing that?

21  **A.**   Correct.

22  **Q.**   Okay.  And you also reported an officer for helping an

23  inmate write a grievance; isn't that right?

24  **A.**   That wasn't the exact details.

25  **Q.**   But an officer helped an inmate write a grievance, and you

                    *11-14876; Griffin v. Condon, et al.*

*Louis Condon - Redirect*
*Monday/January 23, 2017/Volume 4*

V4-Page 27

1  reported that officer; isn't that correct?

2  **A.**   He --

3  **Q.**   Will you please just answer my question.  Did you report

4  another officer for assisting another prisoner in writing a

5  ticket?

6  **A.**   He persuaded a group of prisoners to meet with him rather

7  than resolve any issues.

8  **Q.**   And you said that that was "not the right thing to do"

9  because "he wanted to generate paperwork for administration to

10  deal with."

11      Is that accurate as to what your testimony was?

12  **A.**   When I discussed it with him, he said his only purpose was

13  to generate paperwork and be a pain in the butt for

14  administration, that's correct.

15  **Q.**   Oh, so you didn't testify to that at your deposition, but

16  now you state that he told you that; is that right?

17  **A.**   He told me that.  He told me that then, correct.

18           **MR. MOODY:**  No further questions.

19           **THE COURT:**  Mr. Schneider.

20           **MR. SCHNEIDER:**  Thank you, Your Honor.

21                      -   -   -

22                                          (9:43 a.m.)

23                **REDIRECT EXAMINATION**

24  **BY MR. SCHNEIDER:**

25  **Q.**   And that's exactly what you said at your deposition, he

*11-14876; Griffin v. Condon, et al.*

*Louis Condon - Recross*
*Monday/January 23, 2017/Volume 4*

V4-Page 28

1    told you that, correct?

2    **A.**   Correct, because I was involved in the process, reporting

3    process and questioned him at that time.

4    **Q.**   As to those two exhibits you were just shown, 40 and 41,

5    that claim that you were doing improper shakedowns, you don't

6    even do shakedowns, do you?

7    **A.**   That's not part of my assigned duties, no.

8    **Q.**   The corrections officers do that, right?

9    **A.**   Correct.

10              **MR. SCHNEIDER:**  Thank you.

11              **THE COURT:**  Do you have anything?

12              **MR. MOODY:**  Your Honor, may I just have 30 seconds,

13   please?  Thank you.

14                          -   -   -

15                                        (9:44 a.m.)

16                   **RECROSS-EXAMINATION**

17   BY MR. MOODY:

18   **Q.**   Just one brief line of questioning.  You just testified at

19   your deposition, you said that you were told by the officer

20   that he just wanted to generate paperwork writing, right?

21   **A.**    Initially by Officer Henricks, and then under direct

22   conversation with the officer --

23   **Q.**   My question is directed toward your deposition.  Your

24   counsel just got up here and asked you if you said that the

25   other officer told you that he was just trying to generate

                    *11-14876; Griffin v. Condon, et al.*

*Louis Condon - Redirect*
*Monday/January 23, 2017/Volume 4*

V4-Page 29

1   paperwork.  You didn't say that at your deposition, did you?

2   **A.**   That would be accurate in part.

3         **MR. MOODY:**  Okay.  Thank you.

4         **THE COURT:**  Mr. Schneider.

5         **MR. SCHNEIDER:**  Your Honor, I need a minute to find

6   it in the deposition, I guess.

7         **THE COURT:**  I'm sorry, what did you say?

8         **MR. SCHNEIDER:**  Your Honor, can we have five minutes

9   so I can find the portion of the deposition transcript and

10  clear this up?

11        **THE COURT:**  Five minutes is much too long for this

12  jury to sit here.

13        **MR. SCHNEIDER:**  All right.

14                  -   -   -

15                                        (9:45 a.m.)

16              **REDIRECT EXAMINATION**

17  BY MR. SCHNEIDER:

18  **Q.**   All right.  Just to clarify, Mr. Condon, at your

19  deposition you explicitly said the other officer told you that

20  he was just trying to generate paperwork.  Is that accurate?

21  **A.**   That is accurate.

22        **MR. SCHNEIDER:**  Okay.  Thank you.

23        **THE COURT:**  Nothing from the plaintiff?

24        **MR. MOODY:**  Judge, if I may, I would just like to

25  read the transcript into the record, if that's all right.

                *11-14876; Griffin v. Condon, et al.*

*Louis Condon - Recross*
*Monday/January 23, 2017/Volume 4*

V4-Page 30

1    **THE COURT:**  You are sort of straining at gnats now,

2  but maybe those gnats are important gnats.  Go ahead.

3                          **-    -    -**

4                                              (9:45 a.m.)

5                   **RECROSS-EXAMINATION**

6  BY MR. MOODY:

7  **Q.**   Page 58, Line 4.

8  **A.**   Of which exhibit?

9  **Q.**   Exhibit 19.

10 **A.**   Thank you.  Which page was that, please?

11 **Q.**   Page 58, Line 4.

12 **A.**   Okay.

13 **Q.**   Your answer to a question was:

14          "Your argument was based upon the guy not doing the

15          right thing because rather than trying to

16          appropriately resolve the issue and get handled, he

17          wanted to generate paperwork for administration to

18          deal with."

19 That's read accurately, right?

20 **A.**   Correct.

21 **Q.**   That's your opinion there, right?  That's not somebody

22 else's?

23 **A.**   No, that's what he told me.

24 **Q.**   That's what you said in the deposition though, and you

25 don't state anywhere that he told you that in that line, right?

                   *11-14876; Griffin v. Condon, et al.*

*Louis Condon - Redirect*
*Monday/January 23, 2017/Volume 4*

1  **A.**   I was never asked that.

2  **Q.**   But you stated your specific opinion in what I just read,

3  didn't you?

4  **A.**   Not my specific opinion.  What I was told.

5           **MR. MOODY:**  Thank you.

6           **MR. SCHNEIDER:**  All right.

7           **THE COURT:**  I'll tell you that I can tell, on

8  plaintiff's side and defendants' side, that I'm getting tired.

9  I have been doing this a long time, and I suspect the jury is

10  getting tired of one silly spectacularly unimportant question

11  after another being asked by one side or the other, but go

12  ahead.

13                          -   -   -

14                                              (9:47 a.m.)

15                   **REDIRECT EXAMINATION**

16  BY MR. SCHNEIDER:

17  **Q.**   ARUS Condon, can you flip a few pages forward to Page 58

18  of your deposition transcript.

19  **A.**   58?

20  **Q.**   Yes.

21  **A.**   Okay.  I'm there.  Which line?

22  **Q.**   Lines 9 through 20.  I'm just going to go ahead and read

23  it.  You tell me if I read it accurately.

24  **A.**   Okay.

25  **Q.**   The question was:

                   *11-14876; Griffin v. Condon, et al.*

*Louis Condon - Redirect*
*Monday/January 23, 2017/Volume 4*

V4-Page 32

1          "And you view that as a problem when a corrections

2          officer assists an inmate in the grievance process?"

3     Your answer:

4          "In that format that happened there?  Yes, because he

5          could have called the quartermaster on Monday morning

6          and got some clothing issued for the prisoner.  The

7          grievance, his attempt, as he admitted, was to

8          generate paperwork for administration to handle or to

9          be tied up with rather than --"

10    Did I read that correctly?

11 **A.**    You did.

12         **MR. SCHNEIDER:**  Thank you.

13         **THE COURT:**  No further questions?

14         **MR. MOODY:**  No further questions.

15         **THE COURT:**  Very well.  Mr. Condon, Officer Condon,

16 you are excused, and thank you.

17         **THE WITNESS:**  Thank you.

18         **THE COURT:**  Mr. Schneider.

19         **MR. SCHNEIDER:**  Your Honor, the defense rests.

20         **THE COURT:**  And plaintiff has rested and is not

21 contemplating immediately any rebuttal, I take it?

22         **MR. HUBBARD:**  We do rest, Your Honor.

23         **THE COURT:**  Thank you.

24    Well, we are at the point now where we're going to have

25 closing arguments.  I don't know if this is a time we should

                    *11-14876; Griffin v. Condon, et al.*

*Renewed Motion for Judgment as a Matter of Law*
*Monday/January 23, 2017/Volume 4*

V4-Page 33

 1   take a break or not, and to a certain extent that would be up

 2   to counsel if you wanted to take a short break and to a certain

 3   extent it would be up to me, of course.  I don't think it's

 4   absolutely necessary, but if it's more convenient than

 5   otherwise, we probably could consider it.

 6       **MR. FINK:**  Your Honor, I'm prepared to proceed.  If I

 7   could ask for five minutes to review the jury instructions that

 8   I received this morning, that's all I would need, but I am

 9   prepared to proceed.

10       **THE COURT:**  All right.  We'll take a ten-minute

11   break, and then we're going to wind this thing up with closing

12   arguments.  Thank you for your patience.

13       (Jury out at 9:49 a.m.)

14       **THE COURT:**  While court is in recess, you want to

15   study something?

16       **MR. FINK:**  The jury instructions, Your Honor.  I

17   appreciate it.  I don't need much time.  Thank you.

18       **MR. SCHNEIDER:**  Your Honor, at some point I would

19   like to renew my motion for judgment as a matter of law and

20   directed verdict.

21       **THE COURT:**  It's denied.

22       **MR. SCHNEIDER:**  Thank you, Your Honor.

23       **THE COURT:**  As is true of most of those things, it

24   doesn't mean that you can't renew it later.

25       **MR. SCHNEIDER:**  Thank you, Your Honor.

               *11-14876; Griffin v. Condon, et al.*

*Renewed Motion for Judgment as a Matter of Law*
*Monday/January 23, 2017/Volume 4*

V4-Page 34

1        **MR. FINK:**  Thank you, Your Honor.

2        (Recess from 9:50 a.m. to 9:57 a.m.)

3        **MR. FINK:**  May I set up this easel as a

4    demonstrative?

5        **THE COURT:**  You may.

6        **MR. FINK:**  Thank you.

7        **THE COURT:**  When that is done, are you ready for --

8        **MR. FINK:**  Yeah.  My cocounsel I think is in the

9    restroom, but I'm prepared.

10       Will Your Honor be able to see it?

11       **THE COURT:**  I can see it, but not the letters.  Don't

12   worry too much about me.  I'll tell you if I can't.

13       **MR. FINK:**  Okay.

14       **THE COURT:**  Mr. Fink, you are doing all right on your

15   time estimate, but cocounsel --

16       **MR. FINK:**  I was going to ask you, Judge, would you

17   like me to reserve the time I would need for rebuttal or do you

18   want me to keep an eye on the clock as I go?

19       **THE COURT:**  You can within reason.  I don't know what

20   you have in mind for closing argument, if it's within the half

21   hour contemplated, and if it is, a bit of that could be

22   reserved if you choose to do so.

23       **MR. FINK:**  I am fine with the 30 minutes, Your Honor.

24   If this Court is okay with it and it's not otherwise

25   objectionable, if I could have 40 minutes and 5 minutes of it

*11-14876; Griffin v. Condon, et al.*

*Renewed Motion for Judgment as a Matter of Law*
*Monday/January 23, 2017/Volume 4*

V4-Page 35

1  for rebuttal in total, I would be grateful, but I can do it

2  certainly within the guidelines of this Court.

3       **THE COURT:**  I would prefer that you stay within the

4  guidelines, but I probably am going to tolerate a little bit of

5  excess.

6       **MR. FINK:**  Thank you, your Honor.

7       **THE COURT:**  But not much.

8       **MR. FINK:**  I totally understand, and I'll reserve

9  five minutes of it for rebuttal and I'll keep a close eye on

10  the clock as I go.

11       **THE COURT:**  Is everybody here?

12       **MR. FINK:**  Plaintiff is, yes, Your Honor.

13       **MR. SCHNEIDER:**  Yes.

14       **MR. HUBBARD:**  Yes, indeed, we are.

15       **THE COURT:**  If we're ready for the jury, I want to

16  say one more thing that I don't think I said before, but I

17  could be wrong about that.  You had -- counsel had a piece of

18  paper or it was different and you had agreed apparently and I

19  have received it.  It's in here now.

20       **MR. FINK:**  Yes.  The verdict form, Your Honor?

21       **THE COURT:**  Yeah.

22       **MR. FINK:**  It's substantially similar to defendant

23  counsel's proposal, and we agreed this morning.

24       **THE COURT:**  Okay.  We'll bring in the jury.

25       **MR. FINK:**  Thank you.

                    *11-14876; Griffin v. Condon, et al.*

*Plaintiff's Closing*
*Monday/January 23, 2017/Volume 4*

V4-Page 36

1    **COURT SECURITY OFFICER:**  All rise for the jury.

2    (Jury in at 10:01 a.m.)

3    **THE COURT:**  Thank you for being here, and thank you

4    for your patience.  We are now ready for closing arguments, and

5    the first closing argument, of course, will be the closing

6    argument of the plaintiff.

7    You can go ahead with that if you are prepared to do so,

8    Mr. Fink.

9    **MR. FINK:**  I am, Your Honor.  Thank you.

10   Good morning, ladies and gentlemen.  First of all, I want

11   to say thank you on behalf of the plaintiff's team and the

12   plaintiff himself.  We are incredibly grateful for your time.

13   I know some of you had long commutes, and I know everybody has

14   their own concerns and their own lives, but you took a lot of

15   time to listen to somebody else's story.  And for that -- I

16   think it might be the only thing we agree on, defense counsel

17   and I, but we can agree that we are very grateful to you for

18   taking the time to listen.  Thank you.

19   This is a closing argument, ladies and gentlemen, and

20   unlike an opening statement, this is an opportunity for the

21   lawyers to put the puzzle pieces together, what you have heard

22   into argument form, into a story.

23   The evidence is what you will decide this case on, what

24   you heard on the witness stand, the documents and exhibits that

25   will be back in the jury room with you.

*11-14876; Griffin v. Condon, et al.*

*Plaintiff's Closing*
*Monday/January 23, 2017/Volume 4*

V4-Page 37

1    You will be instructed by the judge on what the law is,
2  what our burden is, what we have to prove and how we have to
3  prove it.  That is how the law works.  And what I'm going to do
4  is put together a story of what I think we have shown you and
5  ultimately ask what we want you to do today.  But it's not my
6  statements nor Mr. Schneider's statements that are the most
7  important.  It's the evidence and the instructions from the
8  judge.  I may give you a story during this argument or a quote
9  hopefully to make a point.
10    It's been said, ladies and gentlemen, that power tends to
11  corrupt.  It's also been said that absolute power corrupts
12  absolutely.  It's with this in mind that the framers of the
13  Constitution wrote probably the most magnificent document ever
14  written, the Constitution.
15    And in the Constitution, I'm sure you are very well aware,
16  is the Bill of Rights, and one of the Bill of Rights is the
17  First Amendment.  Contained in the First Amendment is the right
18  of citizens, of individuals, including prisoners like
19  Mr. Griffin, to petition the Government for redress of
20  grievances and for free speech to speak out on matters of
21  public concern.
22    In order to enforce these rights, to make them have any
23  meaning so it's not just parchment, it's not just paper,
24  Congress gave juries like yourselves the power to enforce them
25  and that's why this is one of the, probably the highest calling

*11-14876; Griffin v. Condon, et al.*

*Plaintiff's Closing*
*Monday/January 23, 2017/Volume 4*

V4-Page 38

1   for a private citizen of civic service is serving on a jury.

2       The reason we're here today is Section 1983, a statute

3   that was enacted by Congress to give meaning to the First

4   Amendment and the other rights in the Constitution.  What

5   Section 1983 allows an individual with rights under the

6   Constitution like Mr. Griffin to do is sue individuals who are

7   acting under the color of state law.  In other words,

8   individuals who are enrobed with some state authority and they

9   take some action that is contrary to a person's First Amendment

10  rights.

11      These gentlemen over here are wearing uniforms that have a

12  United States flag on them and the Michigan Department of

13  Corrections on their shirt.  They are clothed in the authority

14  of this state of which we all live and in this country we all

15  live, and Section 1983 allows a prisoner to, an individual

16  including a prisoner to bring an action to enforce his civil

17  rights.  And very important in that, what Congress decided to

18  do in that statute is make available punitive damages.

19  Punitive damages, the judge is going to instruct you on exactly

20  what it means, but essentially there's two purposes to punitive

21  damages.  The first is to punish individuals for violating

22  constitutional rights, and the second is to deter the

23  individuals and others similarly situated from engaging in the

24  same type of conduct.  Those are the two purposes.  It's

25  punishment and deterrence that gives power to the Constitution

*11-14876; Griffin v. Condon, et al.*

*Plaintiff's Closing*
*Monday/January 23, 2017/Volume 4*

V4-Page 39

1    and you to enforce it.

2         At the end of my closing I'm going to ask that for

3    two reasons you make a substantial award today.  The first

4    reason is because the actions of these defendants took away

5    what little dignity a prisoner had.  The little life he made

6    for himself in prison, they took it with a couple of tickets

7    and threatened him.

8         The other reason is because the culture in which they are

9    operating under Exhibit 44, the Gus Harrison Correctional

10   Facility, is horrific.  It's a situation and a culture of

11   harassment, retaliation, degradation, humiliation and abuse.

12        I would ask that before you start your deliberations --

13   this is a 13-page report, and it's not as dense as it may

14   sound.  It's actually quite short.  If you take the time to

15   look through this exhibit and understand the lens from which or

16   the environment from which these guards were operating, it

17   needs to be stopped.  You need to deter the behavior that was

18   engaged in by these defendants and others similarly situated.

19        It's been said, ladies and gentlemen, and actually my

20   father, who was a criminal defense attorney for 50 years,

21   unfortunately he passed away a couple of months ago, Neil Fink,

22   he used to tell me this quote when I was like eight years old,

23   and it's ever since been kind of a calling for me.  It's

24   Dostoevsky's quote, some attribute it to Tocqueville, but it

25   says, "The degree of civilization in a society can be judged by

*11-14876; Griffin v. Condon, et al.*

*Plaintiff's Closing*
*Monday/January 23, 2017/Volume 4*

V4-Page 40

1    entering one of its prisons."  Essentially meaning, you know,

2    who we are as people can be judged by how we treat the

3    ostensibly least deserving.  Who are we?

4         That's not okay.  This is not punishment for prisoners.

5    This is beyond what we decided punishment is for.

6         Randle Griffin is incarcerated for a very serious crime.

7    He told you that he accepts the fact that it's very likely he

8    will be in prison for the rest of his life.  He hopes not, but

9    it's probably the case.

10        So what he did, the reason to get out of bed in the

11   morning was carve out some sort of semblance of a life.  His

12   incarceration, his punishment is that he can't decide when to

13   go outside when he wants, he can't decide when he's going to go

14   to the bathroom, when he's going to shower, when he eats.  I

15   mean those are all things that are punishment.  That's part of

16   being incarcerated, and we don't deny that.

17        What's not punishment is to take away any reason for

18   getting out of bed in the morning.  What's not punishment is to

19   take away from Randle Griffin the ability to be on the warden's

20   forum, to have a job cleaning up board games that just gave him

21   some purpose, something to accomplish.

22        To put him in fear, to threaten him, to tell him he can't

23   speak out on abuse, otherwise he's going to get his ass beat

24   and put in the hole, that's not punishment.  That's not the

25   punishment that comes with incarceration.  That's abuse.

*11-14876; Griffin v. Condon, et al.*

*Plaintiff's Closing*
*Monday/January 23, 2017/Volume 4*

V4-Page 41

1    So with that in mind, ladies and gentlemen, we have

2    two counts in this case.  The first count are individual claims

3    against each of these three defendants.  We allege that each

4    defendant in their individual capacity violated Mr. Griffin's

5    First Amendment rights by their own actions.

6        Now, in this first count each individual officer, Condon,

7    McMurtrie and Downard, took specific actions, and we're going

8    to ask that you hold them accountable for their conduct.

9        There are three basic elements that we have to prove to

10   you by a preponderance of the evidence.  As my colleague,

11   Mr. Moody, told you in opening statement, that means more

12   likely than not.  If that's 50.1 percent or 65 percent or

13   70 percent certain that something happened, it's just slightly

14   more probable than not that it happened.  We have to prove each

15   of these elements by that standard.

16       The first is protected conduct.  Protected conduct, you

17   will be instructed by the judge, means engaging in some kind of

18   constitutionally protected conduct.  The judge will instruct

19   you that participating in the ombudsman's investigation is

20   protected current.  So if you believe that happened, that is

21   protected conduct.

22       The second is that adverse actions were taken against

23   Mr. Griffin.  Now, an adverse action is defined very simply.

24   It means was the action taken, if you believe it happened, was

25   the action taken enough to deter an ordinary person from

*11-14876; Griffin v. Condon, et al.*

*Plaintiff's Closing*
*Monday/January 23, 2017/Volume 4*

V4-Page 42

1    engaging in the protected conduct?  That's number one.  So, in

2    other words, did the actions of each individual guard deter

3    Mr. Griffin, would it deter him from cooperating with the

4    ombudsman in the future?

5         And finally causation is the third element of this first

6    count.  Causation means that we have to show by a preponderance

7    that the actions taken in number two were motivated at least in

8    part, it doesn't have to be the total reason, at least in part

9    by Mr. Griffin's engagement in the protected conduct.  Did they

10   take those actions because he talked to the ombudsman?

11        That's the first count, ladies and gentlemen, each

12   individual officer being accountable for their actions.

13        The second count, ladies and gentlemen, is a conspiracy,

14   and a conspiracy means that all three of these defendants got

15   together, as you heard in the testimony, and agreed to violate

16   Mr. Griffin's First Amendment rights.  There are four elements,

17   and I'll go through them briefly because they are rather

18   straightforward.

19        A conspiracy means -- it looks like my board is about to

20   go down.

21        A conspiracy means that there was a plan by two or more

22   defendants and that plan was shared by those two or

23   three defendants, that someone took an action on that plan,

24   one act, three acts, four acts, and that as a result of those

25   three elements Mr. Griffin's First Amendment rights were

                    *11-14876; Griffin v. Condon, et al.*

1   violated.

2   　　So, in other words, ladies and gentlemen, if you

3   understand or believe that we have proven to you that this plan

4   existed, that this conversation happened, that they agreed to

5   write tickets, that they agreed to take action against him for

6   his cooperation with the ombudsman, then only one of the

7   actions taken by the guards, the threat from Officer Downard,

8   the threat from Officer Condon, the ticket from Officer

9   Downard, the ticket from Officer McMurtrie, any of those in and

10  of itself is enough to make everybody liable for a conspiracy.

11  And we punish conspiracies because it's particularly evil when

12  you get together and have that intent.  So, to the extent there

13  was any Constitutional violation and you think there was an

14  agreement, then we have proven to you a conspiracy.

15  　　So that's the law from which we're working, ladies and

16  gentlemen, and I'll talk about if we have proven those elements

17  to you, if you are satisfied that this violation occurred, what

18  we are going to ask of you today in terms of damages.

19  　　You heard, ladies and gentlemen, that Mr. Griffin is a

20  48-year-old man.  He's married, has four kids.  He's been in

21  jail for 26 years.  He was in jail when he was 22.  You heard

22  him tell you that it's likely to be the rest of his life and he

23  ran with the wrong folks in Detroit.  That's what he told you.

24  　　But now, having lived in 15 different facilities, he's

25  become somewhat content in this being the rest of his life.

*Plaintiff's Closing*
*Monday/January 23, 2017/Volume 4*

1  It's a small life, but to Randle it's meaningful.  Like I said,

2  he gets up, has tea, walks outside, eats lunch.  He has a job,

3  and it's a little job, to clean up board games, but it's

4  somewhere for him to be, something for him to accomplish.  Then

5  he goes to the library, then he mentors some younger inmates,

6  then he goes to bed.

7       That's it.  That was Randle Griffin's purpose for getting

8  out of bed in the morning.  That's what he told you.  It's a

9  small life, but any dignity that he has left being inside the

10  walls, that's what he had.

11      When he was transferred to Gus Harrison, as he told you,

12  in the summer of 2010, he entered an environment that you heard

13  Jessica Zimbelman, an attorney and former investigator for the

14  Legislative Corrections Ombudsman, which you also learned is

15  kind of the watchdog of the prison.  It's a State agency

16  created by the legislature.

17      You learned that Mr. Griffin walked into an environment

18  that had a systemic problem with harassment, humiliation and

19  abuse.  A common scheme was going on in this prison that if you

20  did something that the guards didn't like, whether it was

21  proper or not, they were going to get you back.

22      And you heard Officer McMurtrie say that.  His philosophy

23  is you get what you have coming to you, good or bad.  That's

24  the philosophy of theses correctional officers.

25      So Mr. Griffin nonetheless created this life that I just

*11-14876; Griffin v. Condon, et al.*

*Plaintiff's Closing*
*Monday/January 23, 2017/Volume 4*

1    described, and then one winter afternoon in January of 2011 he

2    sees Officer Condon, at that time the RUM, the supervisor, he

3    sees him assault an inmate.  Now, Mr. Griffin told you this

4    inmate wanted to go to protective custody, and ordinarily when

5    you hear that, the right of a prisoner to go to protective

6    custody is to protect himself from other inmates.  Maybe they

7    are in a gang or something.  This prisoner wanted to go to

8    protective custody because he was scared of the guards.  So he

9    took his duffel bag on base and said I want to go to protective

10   custody.

11        The bulldog that Mr. Griffin described, Officer Condon,

12   not the same Officer Condon that you saw on the stand today,

13   got in Mr. Bryant's face, snatched the duffel bag out of his

14   hand, and dragged his wrist toward the ground and shook him.

15   Was this the most egregious assault of all time?  Probably not,

16   but Mr. Griffin saw it and he knew exactly why it was

17   happening.  He wanted to get away from the guards.

18        So this kid being a small -- he described him as a kid,

19   being small in stature, 5'7", 170 pounds, early 30s at the

20   time.  Griffin says, "I'll be a witness for you.  I'll support

21   your grievance.  I'll support you writing to the ombudsman,

22   whatever."  He does write an affidavit.

23        In response to that, the ombudsman comes to visit the

24   prison.  As you heard from Jessica Zimbelman, she does

25   investigations on the more legitimate of complaints.

*11-14876; Griffin v. Condon, et al.*

*Plaintiff's Closing*
*Monday/January 23, 2017/Volume 4*

V4-Page 46

1    So she comes to the prison on February 9th.  We know that
2    from her documents and from her testimony.  Interestingly, the
3    same exact day that RUM Condon is interviewed by the deputy
4    warden of the facility about the incidents with Bryant.  The
5    same day.  The same day Jessica Zimbelman was in the housing
6    unit right next to RUM Condon's office meeting with
7    Randle Griffin and meeting with Jeffrey Bryant, RUM Condon was
8    called into a meeting with his deputy warden to discuss the
9    Bryant assault.

10    Deputy Warden at one point didn't know anything, but this
11    morning he had interviewed everybody, he was really well
12    versed.  Who knows what the real story is?

13    But RUM Condon on that day had a meeting about Bryant, and
14    he claims to not know that the ombudsman was there.  I submit
15    to you that that makes little sense.  The housing unit where
16    the meeting took place, ladies and gentlemen, you have heard
17    described.  The officers' desk sees everything.  There are only
18    three offices in the housing unit, and someone in plain clothes
19    would be recognized.

20    Mr. Griffin described this meeting, that he was called
21    over by an officer, went in and told his story to
22    Ms. Zimbelman, and Ms. Zimbelman, a lawyer, an investigator of
23    the State, confirmed and corroborated that story.

24    In the interim after this meeting happens with
25    Ms. Zimbelman, Mr. Griffin goes and secures a job as a porter,

*11-14876; Griffin v. Condon, et al.*

*Plaintiff's Closing*
*Monday/January 23, 2017/Volume 4*

V4-Page 47

1  as we discussed, cleaning up board games.  He goes and gets

2  elected to the warden's forum by his peers to serve as the

3  prison population spokesman.

4       The facility at that point didn't stop him from being on

5  the warden's forum, didn't stop him from getting a job.  So

6  everything you have heard about, oh, he was a threat to the

7  good order of the facility from that innocuous letter that

8  Mr. Griffin read to you or there was other reasons that he

9  couldn't be on the forum or having a job, there was no problem

10  securing the job.

11       So March 2nd comes around, ladies and gentlemen, and

12  Randle Griffin leaves his warden's forum meeting, which is

13  undisputed, 2:30 or 2:35.  Two officers told you it could take

14  about 20 minutes to get to the facility, which Randle Griffin

15  says it took him 20, 30 minutes by the time he got to the

16  facility through a couple gates, put his clothes down, and he

17  went to work.  No problem.  In fact, Officer McMurtrie opened

18  the door for him.  So he went to work, no problems.  He did his

19  job.

20       Later that afternoon he hears an announcement that the

21  mail is going to be passed out in a different way than the

22  warden's forum had asked that it be passed out.  So he takes

23  Larry Anthony, who you also heard from, and they go up to

24  Defendant Condon's office and they say, "Hey, the mail is

25  supposed to be passed out this way."

*Plaintiff's Closing*
*Monday/January 23, 2017/Volume 4*

V4-Page 48

1    And RUM Condon doesn't remember, brushes them aside.  But
2  he's summoned back to RUM Condon's office.  RUM Condon all of a
3  sudden agrees that the mail will be passed out the way he
4  wants, but he says, "Talking to the ombudsman is going to come
5  back to bite you in the ass."

6    You can see the anger now building up.  Mr. Griffin told
7  him about the mail problem, he's upset about the ombudman's
8  report, now he's angry.  "It's going to bite you in the ass."

9    After he threatens him, a few minutes later he comes out
10  of his office and he goes to the officers' desk to meet with
11  these two other officers, Downard and McMurtrie, and he says,
12  "I'm tired of Griffin.  We have got to get rid of him."

13    One of them says, "Well, I've got an idea.  We'll write
14  some tickets on him.  We'll take care of it."

15    Two witnesses hear this same conversation, two prisoner
16  witnesses.  One is currently a prisoner.  One is out on parole.
17  They hear this conversation.

18    Larry Anthony told you he was in the laundry room,
19  overheard the conversation.  He didn't remember when, if he was
20  picking up a pen for his laundry duty or walking back to the
21  laundry room, but he knew what he heard.

22    And their story with regard to Mr. Anthony is, oh, he
23  couldn't have heard it because the dryers were too loud.  But
24  then it changed to, no, the laundry room must have been closed
25  all of a sudden.  They don't have a real answer for it.

*Plaintiff's Closing*
*Monday/January 23, 2017/Volume 4*

V4-Page 49

1    And, Mr. Davis, his testimony goes completely unimpeached,

2   that he heard the same conversation, and Mr. Davis, of all

3   people, someone still incarcerated by the Michigan Department

4   of Corrections, has absolutely no reason to lie.  He has to go

5   back to prison.  He's got no reason to lie.  So Mr. Griffin's

6   story unimpeached is corroborated by two witnesses that this

7   conversation happened.

8       March 3rd comes around.  Mr. Griffin finds out he's got a

9   ticket.  He's got a ticket from Officer Downard for not showing

10  up to work the prior day.  It was a false misconduct ticket.

11  They didn't say anything about it the day before.  The day

12  after they had this conversation corroborated by two witnesses

13  they write a ticket against him because they know the

14  consequences.  He's going to lose his job.  He's going to get

15  kicked off the forum.  He's going to be on top lock or laid in,

16  stuck in his cell.  They know what they are doing.  They all

17  testified they knew what happened to prisoners when these

18  tickets were issued.

19      He goes to work that day after he gets the ticket, and

20  McMurtrie says, "You no longer work here."  Officer McMurtrie

21  over here, "You no longer work here, go back to your cell."

22      Later that day, Officer Downard, a tall and larger

23  gentleman, comes to his cell where he said he had every

24  opportunity during rounds to pass Randle's cell, and he says,

25  "You keep talking and I'm going to beat your ass and put you in

*11-14876; Griffin v. Condon, et al.*

*Plaintiff's Closing*
*Monday/January 23, 2017/Volume 4*

V4-Page 50

 1   the hole until you heal up, you fucking rat."

 2        Putting him in the hole, as explained by Mr. Griffin,

 3   until he heals up is so no one can see him until he's healed,

 4   and "you fucking rat" had a design to put him in danger.  And

 5   Mr. Griffin described to you what kind of danger that puts you

 6   in in prison being a "rat."  One can imagine just from common

 7   sense.

 8        Then March 4th comes around.  Randle Griffin is called to

 9   ticket review again.  Now he's got a ticket from Officer

10   McMurtrie, the same guy who told him not to be at work, for not

11   being at work.

12        McMurtrie is caught when the sergeant calls him, "I just

13   got this ticket.  What's going on?"

14        "Oh, rip it up."

15        Now, Officer McMurtrie can't remember if the conversation

16   happened at control center.  He says Griffin was there, but

17   then he wasn't there.  He doesn't really know his story other

18   than to say, no, I didn't do it or I didn't do it to retaliate.

19        Officer McMurtrie also said to you on this witness stand,

20   he said I didn't have a problem with Griffin.  He acted like he

21   almost didn't know him.  That was the tone that I took.  But

22   then, when confronted with his deposition, he had told me last

23   year, oh, they had to watch him, he was a problem.

24        He has a problem with him; he doesn't have a problem with

25   him.  He was at ticket review.  Randle was there.  He doesn't

*Plaintiff's Closing*
*Monday/January 23, 2017/Volume 4*

V4-Page 51

 1  know his story.  Just, oh, I didn't do it.

 2      So what resulted?  He lost his job, he lost the warden's

 3  forum, and he was stuck in his cell losing the other privileges

 4  that he had:  Library, being able to walk around the yard, the

 5  things that give a human dignity.

 6      Nothing in our story was meaningfully impeached.

 7  Mr. Griffin told you a story.  It was corroborated by a State

 8  Appellate Defender Office attorney, a former investigator, and

 9  two prisoner witnesses who have no reason to lie.

10      You know, in six years of litigation, the first question

11  that defense counsel asked of Mr. Griffin was whether he was

12  married in 2002 or 2003.  He asked him, "You said on the stand

13  2002, and here is a marriage license.  It was actually 2003."

14  That was the big "gotcha" moment after six years of litigation.

15  That's because Randle is telling the truth, why they couldn't

16  impeach him.  The corroboration is there from the witnesses.

17  They were unimpeached.

18      Now, defendants, on the other hand, quite the other story

19  in terms of their credibility.  You heard Officer Downard

20  testify on the witness stand that he falsified a report.  He

21  lied on a document.  First he says, "I don't know why I filled

22  it out that way."  Then he says, "Oh, other people must have

23  told me that Randall was doing other things wrong so I circled

24  the exceptions."  But then he quickly switched back when

25  pressured by my co-counsel that I really don't know.

                *11-14876; Griffin v. Condon, et al.*

*Plaintiff's Closing*
*Monday/January 23, 2017/Volume 4*

V4-Page 52

1    He was trying to make Randle look like he did a terrible

2    job.  There was the incident that was the main ticket, but he

3    wanted to make it look like Randall was doing a bad job.  So he

4    lied to you about that on the stand clearly.

5        And, as I said before, Officer McMurtrie was dishonest.

6    He said he didn't have a problem with Griffin, but he very

7    clearly had a problem with Griffin at his deposition.  He said

8    he had to watch him.  He was a problem --

9        **MR. SCHNEIDER:**  Your Honor, I would object to this.

10   The evidence of sexual misconducts have been excluded, and now

11   for him to make this argument is just completely improper.

12       **THE COURT:**  I'm not sure I understand what your

13   objection is.

14       **MR. FINK:**  Your Honor, he can't repeat what he just

15   said, Your Honor.  That is absolutely unsubstantiated,

16   uncorroborated and excluded from evidence, and he jumps up and

17   tosses that into the jury box.  It's completely inappropriate

18   and complete without any factual basis.

19       **MR. SCHNEIDER:**  To argue that he can't talk about

20   these incidents he knew about after having them excluded is

21   improper in a closing argument, Your Honor.

22       **MR. FINK:**  I asked Officer McMurtrie about this, Your

23   Honor.

24       **THE COURT:**  All right.  If that's an objection, it's

25   overruled, and you can continue.

            *11-14876; Griffin v. Condon, et al.*

*Plaintiff's Closing*
*Monday/January 23, 2017/Volume 4*

V4-Page 53

1          **MR. FINK:**  Thank you, Your Honor.

2          So McMurtrie contradicted himself, didn't have a problem

3    but did have a problem.

4          And then Officer Condon tells you that he had a meeting

5    the same day as Jessica Zimbelman came to the prison, on

6    February 9th, but he doesn't know what an ombudsman is or kind

7    of knows but doesn't know.  Doesn't know when she's there.

8    He's meeting in the office next to her.  He's working that day

9    but doesn't know who the plain clothes lady is in the prison.

10   It also doesn't make sense.

11         The same day also that Defendant Downard wrote his ticket

12   on March 2nd, the first false misconduct ticket, at exactly

13   10:01 p.m. Officer Downard and Officer McMurtrie walked out of

14   the prison together, the exact same minute.  That was

15   30 minutes after Defendant Downard had written the ticket, and

16   they work in the same housing unit at the same desk.  The

17   notion that they weren't talking about Mr. Griffin is hard to

18   believe.

19         Then the defendants put on Mr. Evers, who, despite the

20   fact that his testimony is obviously self-serving, to say that

21   he found him guilty, there are many contradictions in his

22   testimony.

23         The first, he testified he didn't review this tape of

24   whether Griffin was there or not.  Somebody else reviewed it.

25   We have never seen it.  They didn't produce who it was.  They

                    *11-14876; Griffin v. Condon, et al.*

*Plaintiff's Closing*
*Monday/January 23, 2017/Volume 4*

 1    didn't put the witness who reviewed the tape.  He just talked

 2    to somebody who viewed this magical tape.

 3         Then you heard from Officer Downard that the camera points

 4    in one direction only.  It doesn't see all around the facility.

 5    We have no idea which way the camera was pointing at the time.

 6         And then he says that he reviewed 15 minutes after and 15

 7    minutes before he was late for work.  Well, Mr. Griffin said he

 8    didn't get there until 3:00 p.m., we acknowledge that, so the

 9    tape wouldn't even cover whether Mr. Griffin was there or not.

10    So that testimony is of little weight, in our opinion.

11         He also said he was a hearing officer of 23 years and he's

12    never heard of any prisoner abuse.  You have heard all of these

13    officers say they have never seen a guard abusing a prisoner.

14    It's a systemic problem at the facility.

15         So it's clear what the defense is.  It's two fold.  It's

16    no, no, no, we didn't do this and getting each other's back,

17    the thin blue line to support the other officers, and because

18    there's so many contradictions, they have another defense,

19    which you just heard from that objection.  He's a prisoner.

20         How many, how many women did you have children with,

21    Randle?  What were you convicted of, Randle?  What were you

22    convicted of, Mr. Davis?  What were you convicted of,

23    Mr. Anthony?  These are prisoners.  That's their defense.  And

24    that objection was clear that that's their defense, to throw

25    something that prejudicial at you, no evidence of it.

                    *11-14876; Griffin v. Condon, et al.*

1    So, ladies and gentlemen, what does that bring me to in

2  the few minutes I have left here?  I will have a chance to talk

3  to you one more time after Mr. Schneider talks because I have

4  the burden of proof so I get the last word on rebuttal, but in

5  the next couple of minutes here I want to explain to you what

6  we're asking given all of that.

7    Given all of the contradictions, the corroborations of

8  Mr. Griffin's story, and everything I have laid out for you we

9  submit to you this happened to Mr. Griffin.  False tickets,

10  threats because he cooperated with the ombudsman's report.

11    If you agree, the question is what do we do about it?

12  Well, there are two important categories of damages that are at

13  play in this case.  There's actual damages and there's punitive

14  damages.

15    Now, the actual damages, and you will hear the instruction

16  from Judge O'Meara, has compensatory damages, which means

17  giving Randle any money that he may have lost because of the

18  actions, but it also has something called presumed damages, and

19  presumed damages is an important category.  What presumed

20  damages means is where it's hard to calculate what somebody may

21  have lost, and here it is because losing a job in prison,

22  losing any meaningful purpose in prison, that's kind of hard to

23  measure.  That's not a dollar figure.  But you are allowed to

24  consider with your reasonable and calm judgment what would

25  fairly compensate someone for losing those privileges.

*Plaintiff's Closing*
*Monday/January 23, 2017/Volume 4*

V4-Page 56

1    Now, as far as compensatory damages go and presumed

2    damages, I would ask you, listen to the instruction and use

3    your judgment.  I'm not going to give you a number.  I am going

4    to give you a number on punitive damages.  But on compensatory

5    I ask that you use your judgment and think about someone who is

6    incarcerated probably for the rest of their life serving their

7    time.  Think about who we are as a society.  Is he entitled to

8    a little dignity?  A job, ability to be on the warden's forum,

9    go read in the library, go outside, those little things.  They

10   took it away from him, and I ask that you think about what

11   would be fair to compensate Randle for those losses.

12   Now, punitive damages, ladies and gentlemen, is what I'm

13   going to discuss with you here.  I have told you before there

14   are two purposes of punitive damages.  The first is punishment.

15   You must prove -- we must prove that there was intentional

16   conduct or some kind of evil conduct.  Intentional or evil.  We

17   submit to you that we have shown you that.

18   So it's less about awarding the plaintiff and more about

19   punishing the defendants, this award.  Punish them for what

20   they did.  Punish them for lying to you on the witness stand.

21   Punish them for the effect it's had on Randle.

22   Now, the second is probably the most important

23   justification for punitive damage and in this case.  So, if

24   nothing else, I want you to remember this.  This report, along

25   with the actions of these officers, in order to stop this

*11-14876; Griffin v. Condon, et al.*

*Plaintiff's Closing*
*Monday/January 23, 2017/Volume 4*

V4-Page 57

1   behavior from, not just happening to Mr. Griffin, but clearly

2   many of the prisoners in Gus Harrison Correctional Facility,

3   you need to deter this conduct with a substantial award.  You

4   know, if you give a small award, 100 bucks, 1,000 bucks, no

5   officer is going to turn their head and change any of their

6   behavior.  It has to be substantial to stop the behavior.

7        It affects people's parole, it affects their dignity, and

8   it will lead to other abuses.  If other prisoners are deterred

9   from talking to the ombudsman or other state investigators,

10  further abuses will result clearly and people like Mr. Griffin

11  won't speak up because they are afraid of their own

12  retaliation.  Imagine what would happen.  You have an ability,

13  an important ability, the highest civil service serving on a

14  jury, and you can send a message and you can have a major

15  impact on what goes on inside Gus Harrison Correctional

16  Facility.

17            **THE COURT:**  You are up against the clock.

18            **MR. FINK:**  If I may, Your Honor, two more minutes is

19  all I need, as I crash the --

20            **THE COURT:**  Go ahead.

21            **MR. FINK:**  Thank you.

22        I have a human easel so that will make it easier.

23        Ladies and gentlemen, on Count One on punitive damages I

24  ask that you award Mr. Griffin and against each defendant

25  $15,000.  This is Count One so each individual action, Officer

*Plaintiff's Closing*
*Monday/January 23, 2017/Volume 4*

V4-Page 58

1   Downard's ticket, Officer Downard's threat, Officer McMurtrie's
2   ticket, and Officer Condon's threat and his planning this whole
3   thing.
4       It's not lost on us that this is a lot of money, I want to
5   be honest with you, and it's not lost on me the idea that the
6   money is going to a prisoner.  That is not lost on us.
7   Punitive damages serve two purposes, punishment and deterrence.
8       On Count Two, ladies and gentlemen, on conspiracy, we ask
9   you to award a total of $25,000 divvied up amongst the
10  defendants as you see their culpability level.  So if we have
11  proven a conspiracy to you, I ask that you award a total of
12  $25,000 and divvy it up as you see fit.
13      And I'll conclude with this, Your Honor.
14      I'm good with that Brandon.  Thank you.
15      Alexis de Tocqueville said, "America is great because she
16  is good, and if America ever ceases to be good, she will cease
17  to be great."
18      That means that at our core we are decent and we will lend
19  a hand to people who need help.  Mr. Griffin had his dignity
20  taken away from him.  I know he's a prisoner, but he's still a
21  human, and the abuses that went on inside Gus Harrison are
22  atrocious.
23      I ask that you read this report and punish these
24  defendants and deter other defendants by awarding the amounts
25  that I have asked you for.

              *11-14876; Griffin v. Condon, et al.*

*Defendants' Closing*
*Monday/January 23, 2017/Volume 4*

V4-Page 59

1    I'll speak to you in a few minutes, ladies and gentlemen.

2  Thank you.

3         **THE COURT:**  Thank you, Mr. Fink.

4    Mr. Schneider.

5         **MR. SCHNEIDER:**  Thank you, Your Honor.

6    Good morning.

7    All right.  As I stated before, we are back here now for

8  our closing arguments.  It's my job to go over the elements of

9  the specific claims here that you have to decide and to discuss

10  the facts that you have heard in light of those elements.

11    I would like you to keep in mind, and you will be

12  instructed by the judge during the reading of the jury

13  instructions, it's the plaintiff's burden of proof in a case

14  like this.  It's not the defendants' burden to disprove it.

15    Now, I'm going to talk about adverse action first.  You

16  have heard about all three of these elements already.  You have

17  the protected conduct, the adverse action, and the causation.

18  I'm going to take them a little bit out of order here.

19    With the adverse action, as to the McMurtrie ticket, this

20  ticket was dismissed the next day with no negative consequences

21  to the plaintiff.  That ticket, that's not something that would

22  deter a person from cooperating with the ombudsman or anything

23  else.

24    Now, the Downard ticket, this was the ticket on March 2nd,

25  as a result of that ticket the plaintiff had to do ten days

*Defendants' Closing*
*Monday/January 23, 2017/Volume 4*

V4-Page 60

1   loss of privileges, so essentially he had to stay in his cell

2   except for meals and law library.  He got a hearing on that

3   ticket where a hearings officer decided whether he was guilty

4   or not.  Again, having a ticket like that and going to a

5   hearing, that's not something that would deter a person from

6   exercising their First Amendment rights.

7        The same thing with the threat at the cell door.  The

8   plaintiff alleges that Officer Downard came to his cell door

9   and made some sort of threat to him.  All of these actions are

10  not actions in a prison that would deter prisoners from making

11  complaints.

12       We have evidence of that.  We have a 13-page report from

13  the ombudsman's office full of similar allegations from other

14  prisoners against other officers.  None of them were deterred.

15  They still made their complaints.  The question you have to ask

16  is whether an action would deter a person from continuing to

17  make those complaints, and we can see that these actions did

18  not.  The plaintiff himself states that he continued to contact

19  the ombudsman, continued to file grievances, continued to file

20  lawsuits.  Not just this one, but subsequent to this.

21       Now, as to causation, this is where the plaintiff has to

22  prove that, because of his protected conduct, adverse action

23  was taken against him.  Now, the first part of this evidence as

24  to causation, the plaintiff says that RUM Condon told him in

25  his office your cooperating with the ombudsman is going to come

1    back to bite you in the ass.

2         Now, you heard RUM Condon deny that that conversation ever

3    occurred.  He said he had no way to know that the plaintiff was

4    involved with the ombudsman.  Certainly the ombudsman didn't

5    know any of the defendants.  When she was in court, she was

6    asked if she recognized them.  She did not.  They all testified

7    they did not know her.  And the ombudsman testified those

8    interviews were secret.  She never disclosed the identities of

9    those people to the prison.

10        Her report, this is the 13-page report.  If you go to

11   Exhibit 44 in the exhibit book and you go just behind it,

12   there's a couple of responses from the actual prison staff.

13        So if we go down to the second memorandum after that, this

14   is a memorandum from the warden, Warden Klee, to Denny Straub,

15   deputy director of the whole department.  He lists the date.

16   The warden lists the date he actually received the report,

17   March 9th, after these alleged tickets.  It's not as if the

18   prison had possession of this report prior to these alleged

19   instances on March 2nd and 3rd.

20        I don't want to go through this whole thing, but the gist

21   of it, and you can read it yourself if you want, is the warden

22   says he brought in his executive staff, the deputy warden, a

23   couple ADWs, and an inspector.  No other staff, but he brought

24   in the top staff, and they were dumbfounded by what they were

25   read in this report.

*Defendants' Closing*
*Monday/January 23, 2017/Volume 4*

V4-Page 62

1   The report goes on to explain why they were dumbfounded

2   about it.  The warden at some point said he asked Zimbelman,

3   "Can you at least tell us who is making these allegations so we

4   can do some kind of investigation?"  Zimbelman declined.  She

5   wouldn't provide any of that information to the prison, and

6   that's in these memos that you can read, Exhibit 44.

7        Now, as to the timing of this conversation that allegedly

8   occurred in RUM Condon's office on March 2nd, it was the

9   plaintiff's testimony that he was at a warden's forum meeting

10  until 2:35.  It then took him 20 or 30 minutes to get back to

11  his unit, and he went right to work.

12       Now, he says that that March 2nd ticket he got was a false

13  ticket because he claims he actually went to work that day.  He

14  also says that he was in the RUM's office at 3:30.  So if he

15  got back from the warden's forum meeting at three o'clock and

16  went to work, he can't be somewhere else having a meeting with

17  the RUM.  He can't be in two places at once.

18       Now, this is the conversation where allegedly he was told

19  by RUM Condon that his ombudsman cooperation would bite him in

20  the ass.  That just never happened.

21       Now, we also had RUM Evers come in.  He was the person who

22  heard the plaintiff on the ticket.  He had the video reviewed.

23  Let me just pull this up.

24       So the plaintiff's story to RUM Evers was that he went to

25  work at three o'clock.  RUM Evers had the video reviewed

*11-14876; Griffin v. Condon, et al.*

*Defendants' Closing*
*Monday/January 23, 2017/Volume 4*

V4-Page 63

 1   15 minutes before and after three o'clock, and the plaintiff

 2   was never shown working.  This is Defendant's Exhibit E.  You

 3   have both the ticket and the hearing report that RUM Evers

 4   completed.

 5        We also have the witnesses Anthony and Davis we heard from

 6   about a separate conversation.  Anthony and Davis both

 7   testified that after this meeting in the RUM's office they

 8   heard all three of the defendants discussing together, plotting

 9   at the desk.

10        Now, first of all, neither Anthony nor Davis testified

11   that they heard any plot related to the ombudsman in any way.

12   It was related to forum duties, some mail issue, nothing to do

13   with the ombudsman.  It's a separate issue.  The alleged

14   protected conduct here, his cooperation with the ombudsman, not

15   participation with the warden's forum complaining about the

16   mail issues.

17        Neither Anthony nor Davis heard anything about the

18   ombudsman.  They both said it was about the mail issues.

19        Now, Anthony, he's the laundry guy who said he heard this

20   conversation from the laundry room.  We now know the laundry

21   room was closed at the time.  He couldn't have been there.

22        The laundry room was also 27 feet away from the officers'

23   desk.  Just before count during a time of mass movement when

24   you've got all of the prisoners walking through going back to

25   their cells, you can imagine, it's very loud.  You are not

*Defendants' Closing*
*Monday/January 23, 2017/Volume 4*

V4-Page 64

 1   going to hear a conversation from 27 feet away even if you

 2   could be there in the closed laundry room.

 3        Davis was the witness who eventually identified Officer

 4   Downard I think by reading his name tag there.  He still

 5   couldn't identify the other two defendants when he was up there

 6   on the stand.  He was testifying as to what ARUS Condon said

 7   but didn't know who he was.

 8        Now, again, Davis' story was that he was coming in from

 9   yard for formal count.  This is when all of the prisoners come

10   in together.  They have got to go back in their cells and get

11   locked up so they can be counted.  It's mass movement.  It's

12   very loud in the unit again.  Davis claims to have heard a lot

13   of conversation for just walking by during a time like this in

14   the prison.

15        Now, the plaintiff, he said that when he got back from his

16   warden's forum meeting he didn't check in with anybody, he

17   didn't tell anybody he was late for his job, but he claimed

18   that Officer McMurtrie let him into the supply closet sometime

19   after three o'clock, which is consistent with his story that he

20   left the warden's forum at 2:35, and it was 25 or 30 minutes

21   later to get back to his cell.

22        So this is the Plaintiff's Exhibit 5.  This is the logbook

23   for the unit.  And what we have here, March 2nd, 14 to 2200.

24   So this is the second shift.  1400 is when the officers came on

25   shift.

*11-14876; Griffin v. Condon, et al.*

*Defendants' Closing*
*Monday/January 23, 2017/Volume 4*

V4-Page 65

1      Now, where is it?  Okay.  At 1455 we have got RUO

2    McMurtrie leaving the unit to go do mail and get chow.  He

3    doesn't come back until 1525.  "McMurtrie in," right there.  He

4    wasn't even in the unit when the plaintiff claims to have been

5    let into the supply closet by McMurtrie.

6      The last part of the story that the plaintiff has that he

7    went to work is I asked him on the stand, "Well, how many other

8    prisoners were in the dayroom?"  What I wanted to get at was,

9    "Well, maybe you were in there and they just couldn't see you."

10      The plaintiff had no idea how many people were in there.

11    So I asked him, "Was it more than two?  He couldn't even answer

12    that question.  He had no idea how many people were in there

13    because he wasn't there because he didn't go to work.

14      Now, you heard testimony from Downard and McMurtrie they

15    have worked together only since 2011.  This happened in March

16    of 2011 so it was less than two months that they worked

17    together.  They have different regular days off.  So you have a

18    five-day shift, and the other person's two days don't line up

19    with yours.  You are working together three days a week.

20      They also only overlapped RUM Condon's shift by two to

21    three hours.  We can also see in this logbook, I think, what

22    time RUM Condon left on this day.  It's a little tough to read,

23    but at 16:27, that's 4:30, "Condon out of unit."

24      What the plaintiff wants you to believe is that after only

25    working together for a short time like this these defendants,

*11-14876; Griffin v. Condon, et al.*

*Defendants' Closing*
*Monday/January 23, 2017/Volume 4*

V4-Page 66

1    they would get together and conspire and be out to get him over

2    essentially nothing.

3         RUM Condon had a grievance filed on him by Prisoner

4    Bryant.  The assistant deputy warden looked into it, and he

5    cleared RUM Condon.  He didn't get into trouble, nothing like

6    that.

7         During that interview process the plaintiff's name never

8    came up.  He was certainly not part of the grievance process.

9    His involvement was just something else.  That was the

10   ombudsman's investigation.

11        None of these defendants had any reason to be mad at the

12   plaintiff, and I submit to you the plaintiff hasn't met his

13   burden to prove that he was written this ticket because of his

14   conduct with the ombudsman.  Rather, he was written a ticket

15   because he didn't go to work and he was being paid to do that

16   job and he has to be there.

17        Now, after the conversation at the desk later in the day,

18   we are still on March 2nd, the plaintiff testified that Officer

19   Downard came to his cell and called him a rat.

20        Now, you heard there were cellmates in every room.

21   Plaintiff had a cellmate.  There were cells next door,

22   prisoners all over the place, and Officer Downard allegedly

23   makes these threats loudly and there's not a single other

24   witness of this.  The plaintiff's cellmate didn't hear it.  No

25   other prisoners heard it.  Again, it's just something that did

                    *11-14876; Griffin v. Condon, et al.*

*Defendants' Closing*
*Monday/January 23, 2017/Volume 4*

V4-Page 67

1   not happen.

2       The plaintiff, he filed a grievance about his allegations

3   in this case, and that's Plaintiff's Exhibit 6.  A grievance in

4   the prison is where the prisoner gets to write down some

5   problem that he's had and submits it.  The prison considers it,

6   they give him an answer, and then he can appeal if he wants to.

7       So on -- let me find the date here.  Okay.  The plaintiff

8   wrote this on March 7th.  So this is a few days after the

9   events we're talking about.

10      You can look through here, what the plaintiff wrote

11  happened.  There's no mention of "rat" anywhere in there.

12  There's no mention of a conversation with Condon anywhere in

13  here.  The plaintiff didn't make those allegations up until

14  afterwards when he was ready to file his lawsuit.

15      Day two, on March 3rd.  This is the day the plaintiff got

16  the second ticket for not showing up to work.  This one was by

17  Officer McMurtrie.

18      The plaintiff testified that at 2:05 he received a copy of

19  his ticket from the day before, and he knew at that point he

20  was laid in.  Now, being laid in at prison, that means you

21  don't go to work.  So at 2:05, before shift starts, the

22  plaintiff finds out about the ticket from the day before, he

23  knows he's laid in, and now he's come here to court and says,

24  "Yeah, I went to work that day, too, or tried to."

25      No, the plaintiff knew he was laid in.  There's no way he

*11-14876; Griffin v. Condon, et al.*

1  would try to go to work.  He already knew he was confined to

2  his cell.  That just doesn't make any sense.

3      I'm sorry, the mouse is a little temperamental here on the

4  big screen.

5      If there's any question about when he met with Sergeant

6  Howard, it's right here in the ticket.  Review date and time,

7  March 3rd, 15:02, prior to his shift starting on March 3rd.  So

8  he knew right then and there he was laid in.

9      Now, the plaintiff would have you believe that McMurtrie

10  wrote this ticket because of this grand conspiracy.  In fact,

11  McMurtrie wrote the ticket because he didn't know the plaintiff

12  was laid in.  Once he found out, he talked to Sergeant Howard,

13  McMurtrie himself told Howard, "Yeah, just rip up the ticket,

14  we'll be done with it."

15      Now, as to protected conduct, the plaintiff had a story

16  where RUM Condon grabbed Prisoner Bryant's arm and snatched his

17  bag out of his hand and that's it.  That was his deposition

18  testimony, if you remember.

19      Now in court suddenly it's Condon came out like a bull,

20  grabbed his arm, snatched his shirt, grabbed his shirt, balled

21  it up in his hand and was shaking the kid.

22      Mr. Bryant is 39 years old, by the way.  He was 33 back

23  then.  He was not a kid.

24      Now, of the 240 prisoners that you heard were housed in

25  this unit, no other witnesses.  Plaintiff admitted on the stand

*Defendants' Closing*
*Monday/January 23, 2017/Volume 4*

V4-Page 69

1   he didn't tell anybody in the prison, not another prisoner or

2   another officer or anybody until he stopped in on that

3   ombudsman meeting with Mr. Bryant on February 9.

4        Now, that's the alleged protected conduct, that

5   February 9th meeting with the ombudsman.  Plaintiff hasn't

6   presented any evidence that defendants knew about that meeting.

7   And if they did and they are mad about it, he hasn't shown any

8   reason why this alleged adverse action, the tickets, occurred a

9   month later in March.  The plaintiff just hasn't shown any

10  connection between that meeting and what he's here today to

11  claim happened bad to him.

12       Now I'm going to briefly address damages.  The plaintiff

13  says he lost his job.  Well, he only had the job for four days,

14  you heard.  Two months later he got the same job at another

15  prison.

16       In prison, you heard testimony, you are required to go to

17  work or go to school.  You don't have a choice.  You've got to

18  do one or the other.  Losing a job that you had for four days,

19  again, that's not something that would deter a prisoner from

20  continuing to file grievances or anything else.

21       The plaintiff is also accusing the defendants for causing

22  him to be kicked off the warden's forum.  Now, you saw Exhibits

23  A and F of the defense.  I don't need to pull them up here

24  again.

25       What they show is that the plaintiff was kicked off at a

*11-14876; Griffin v. Condon, et al.*

1   different prison, kicked off the forum and he was banned from

2   coming back for a year.  Now, the plaintiff knew about that

3   when he ran in February.  He wasn't supposed to, and it took a

4   couple of weeks for the inspector to catch that, but they did

5   and they removed him as a result.  It had nothing to do with

6   the defendants here, and you can look at those memorandums.

7   One is from the deputy warden, one is from the warden at the

8   past facility, and they explain that.

9       Now it's also time for you to deliberate.  You are going

10   to hear from the plaintiff's counsel briefly again, and then

11   the judge is going to read you all of the jury instructions.

12   Hopefully they line up with the law as the attorneys have laid

13   it out.  If not, what the judge says controls.  You don't have

14   to listen to us.

15       Now, once you have heard all of the jury instructions, you

16   can go back in the room finally to deliberate.  The case is in

17   your hands at that point.

18       You are going to have a verdict form.  The first question

19   is going to be whether the defendants violated the plaintiff's

20   First Amendment rights.  I would ask that you check no as to

21   each one and go ahead and return a verdict in the defendants'

22   favor.  Thank you.

23       **THE COURT:**  Thank you, Mr. Schneider.

24   You have a tiny bit of time left.

25       **MR. FINK:**  I'm sorry, Judge?

*Plaintiff's Rebuttal Closing*
*Monday/January 23, 2017/Volume 4*

V4-Page 71

1    **THE COURT:** You have a tiny bit of time left.

2    **MR. FINK:** I appreciate that. I will be brief.

3    As I told the judge, I will be brief. There's a couple

4    points that I want to address that Mr. Schneider brought up,

5    and of course, like I said before, it's because I have the

6    burden of proof that I'm speaking with you.

7    I want to address the logbooks for a moment. First of

8    all, Mr. Schneider made the assertion that if McMurtrie was out

9    14:55 to 3:30 or so, so 2:55 to 3:30, that Mr. Griffin couldn't

10   have been let into the supply closet. For obvious reasons,

11   there are a number of reasons where it could have been

12   three o'clock, shortly after three o'clock when he signs the

13   book, leaves. There was no testimony from Officer McMurtrie on

14   this at all. You know, they just suddenly put together a

15   closing argument. "Oh, he was out of the unit." Officer

16   McMurtrie never said that.

17   And also, if we are going to rely on the logbooks, ladies

18   and gentlemen, I want to make one very important point.

19   Officer Downard on March 2nd said that Randle Griffin was out

20   of place and he didn't show up for work, presumably didn't know

21   where he was. This logbook says nothing about a missing

22   prisoner. In fact, it says, I forgot the word that's used, but

23   everybody is accounted for. If Prisoner Griffin was missing,

24   they didn't know where he was or why he didn't show up for

25   work, it would be in the logbook. So if we're going to rely on

*Plaintiff's Rebuttal Closing*
*Monday/January 23, 2017/Volume 4*

V4-Page 72

1    the logbook, let's take note of the fact that everybody was

2    accounted for when Randle was supposed to be at work on

3    March 2nd, which he was.

4        Also, defense counsel makes the point that they had only

5    been working together for a few days and I'm presenting this

6    story that they all are now lining up against Griffin.  Let's

7    just not forget that Officer McMurtrie drove his car over to

8    Officer Downard's house one weekend to fix the muffler.

9    Clearly they had a relationship.  It wasn't just some guy he

10   worked with three days a week.

11       You know, I think it's really particularly important in

12   this case, Mr. Schneider mentioned that nothing came of the

13   complaint with Bryant, he got cleared.  That's the problem.

14   That's the problem.  The internal ticket found Randle guilty.

15   The internal investigation of Condon, nothing wrong.  That's

16   why the award has to be substantial today because nothing is

17   going to change from Exhibit 44, which I ask that you read

18   before you deliberate, if you don't deter them.

19       Two more quick things, ladies and gentlemen.  They are

20   trying to make some legitimate ticket out of both Downard and

21   McMurtrie's tickets, yet totally ignores the fact that Officer

22   Downard said that Randle Griffin had 30 violations of his work

23   duty in five days.  There's no purpose to fill out the form

24   that way other than trying to get at Randle Griffin, trying to

25   make it look worse.  There's no other reason to write the

*Plaintiff's Rebuttal Closing*
*Monday/January 23, 2017/Volume 4*

V4-Page 73

1   report that way or the work evaluation that way.

2       It took some time for Randle to get a job.  So it wasn't

3   just a job that he had five days.  Randle told you it's hard to

4   get a job in prison, and it took him several months after to

5   get a job.  That's $43 a month for several months of not having

6   a job.  Yes, you can go to school, but if you don't have an

7   assignment, you are in your cell and it's hard to get a job in

8   prison.  So it wasn't just five days.  It's that he finally

9   secured one, and they took it from him.

10      And, finally, you would think that the administration

11  would have stopped him from getting on the warden's forum if

12  the real reason was because he had been kicked off of the

13  warden's forum before.  So instead, after all of this happens,

14  Randle Griffin is such a problem talking to the ombudsman, they

15  use this innocuous letter where he promises diligent and

16  professional redress from the regional prison administrator,

17  that that's somehow a threat to the good order of the facility.

18  It's pretext, ladies and gentlemen.  It's pretext.  It happened

19  eight days after the conversation happened with Condon they

20  kicked him off the forum.

21      In sum, there is no accountability within the system,

22  none.  They all protect their own.  They all tote the party

23  line like they did in court.  No, no, no, we didn't do this.

24  They are prisoners.  They are lying.  This can't be.  That's

25  why we are here today asking you to put a stop to it.

*11-14876; Griffin v. Condon, et al.*

*Final Jury Instructions*
*Monday/January 23, 2017/Volume 4*

V4-Page 74

1    I appreciate your time very much.  I wish you the best in

2  deliberations, and talk to each other, listen to each other,

3  and thank you again.

4         **THE COURT:**  Thank you, Mr. Fink, Mr. Schneider.

5    It's now 11 o'clock essentially, and I'm looking at the

6  jury instructions.  I think they will take about 50 minutes,

7  50, 5-0.  Do you need to go to the jury room and come back in

8  here in a few minutes?  If you don't, we'll go right ahead.

9         **THE JURORS:**  No, go ahead.

10         **THE COURT:**  Go ahead, thank you.

11    Members of the jury, the evidence and arguments in this

12  case have been completed, and now I will instruct you as to the

13  law.  Faithful performance of you of your duties is vital to

14  the administration of justice.  The law you are to apply in

15  this case is contained in these instructions, and it's your

16  duty to follow them.  You must consider them as a whole and not

17  pick out one or some instructions and disregard the others.

18    One of the mysteries of life for someone at my age is what

19  do you do with electronic sounds that you don't know where they

20  are.  I don't -- I believe Mr. Barkholz may come down here and

21  fix this, but right now my question is:  Can you hear me?  If

22  you can, I'll try to keep this out of the way.

23    Following my instructions, you will go to the jury room

24  and deliberate and decide on your verdict.

25    Probably two or three people in the jury can help me, but

*11-14876; Griffin v. Condon, et al.*

1   I think you just need to turn down the --

2           **MR. FINK:**  Do you want me to take a look, Your Honor?

3           **THE COURT:**  Anybody can take a look.  I don't --

4           **MR. SCHNEIDER:**  Do you have speakers you can turn

5   down?  I think you are getting a little feedback.  If you turn

6   the volume down on the speakers, I think that would help.

7           **THE COURT:**  That makes sense except I don't know

8   where it is.

9       (Brief discussion held off the record.)

10      I apologize for the delay.  Let's continue.

11      Facts to be determined from evidence.  It's your duty to

12  determine the facts from evidence received in open court.  You

13  are to apply the law to the facts and in this way decide the

14  case.

15      Sympathy or prejudice must not influence your decision,

16  nor should your decision be influenced by prejudice regarding

17  race, sex, religion, national origin, age, handicap or any

18  other factor irrelevant to the rights of these parties.

19      The evidence you are to consider consists of testimony of

20  witnesses and the exhibits offered and received.  The admission

21  of evidence in the court is governed by the rules of evidence,

22  and from time to time it's been my duty as a judge to rule on

23  the admissibility of evidence.  You must not concern yourself

24  with the reasons for these things, and you must not consider

25  any exhibit to which an objection was sustained.

                    *11-14876; Griffin v. Condon, et al.*

*Final Jury Instructions*
*Monday/January 23, 2017/Volume 4*

V4-Page 76

1    Arguments, statements and remarks of attorneys are not

2   evidence, and you should disregard anything said by an attorney

3   which is not supported by evidence or by your own general

4   knowledge and experience.  However, an admission of a fact by

5   an attorney is binding on his or her client.

6    One type of evidence is known as the admission of a party.

7   The admission may be a statement made in a pleading filed in

8   the case, a statement on the record during testimony or a

9   statement on a written exhibit.  Attorneys may also make an

10   admission on behalf of their clients.

11    This case should be considered and decided by you as a

12   dispute between persons of equal standing in the community, of

13   equal worth and holding the same or similar stations in life.

14   All persons stand equal before the law and are to be treated as

15   equals.

16    I have not meant to indicate any opinion as to the facts

17   in my rulings, conduct or remarks during the trial, but if you

18   think I have, you should disregard it because you are the sole

19   judges of the facts.

20    In determining whether any fact has been proved, you shall

21   consider all of the evidence bearing on that fact without

22   regard to which party produced the evidence.

23    There are, generally speaking, two types of evidence from

24   which a jury may properly find the truth as to the facts of the

25   case.  One is direct evidence, such as the testimony of an

1  eyewitness.  The other is indirect or circumstantial evidence,
2  the proof of a chain of circumstances pointing to the existence
3  or nonexistence of certain facts.

4      It's not necessary that every facts be proven directly by
5  a witness or an exhibit or a fact may be proven indirectly by
6  other facts and circumstances from which it usually and
7  reasonably follows according to the common experience and
8  observation of mankind.  This is called circumstantial
9  evidence, which you are to consider along with other evidence
10  in the case.

11      As a general rule, the law makes no distinction between
12  direct and circumstantial evidence but simply requires that the
13  jury find the facts in accordance with all the evidence in the
14  case, both direct and circumstantial.

15      You have a right to consider all of the evidence in light
16  of your own general knowledge and experience in the affairs of
17  life and take into account whether any particular evidence
18  seems reasonable and probable.  However, if you have personal
19  knowledge of any particular fact in this case, such knowledge
20  may not be used as evidence.

21      You, as the jurors, are the sole judges of the credibility
22  of the witnesses and the weight their testimony deserves.  You
23  may be guided by the appearance and conduct of the witness or
24  by the manner in which the witness testified or by the
25  character of the testimony given or by the evidence contrary to

*Final Jury Instructions*
*Monday/January 23, 2017/Volume 4*

V4-Page 78

1    the testimony given.

2        You should carefully scrutinize all of the testimony

3    given, the circumstances under which each witness has

4    testified, and every matter in evidence which tends to show

5    whether a witness is worthy of belief.

6        Consider each witness's intelligence, motive, state of

7    mind, demeanor or manner while on the stand.

8        Consider each witness's ability to observe the facts as to

9    which he or she has testified and whether he or she impresses

10   you as having an accurate recollection of these matters.

11       Consider also any relation each witness may bear to either

12   side of the case, the manner in which each witness might be

13   affected by the verdict, and the extent to which each witness

14   is either supported or contradicted by other evidence in the

15   case.

16       Inconsistencies or discrepancies in the testimony of a

17   witness or between the testimony of different witnesses may or

18   may not cause you, the jury, to discredit the testimony.

19   Two or more persons witnessing an incident or a transaction may

20   see and hear it differently.  An innocent misrecollection is

21   not an uncommon experience.  In weighing the effect of a

22   discrepancy, always consider whether it pertains to a matter of

23   importance or an unimportant detail and whether the discrepancy

24   results from innocent error or intentional falsehood.

25       In making your own judgment you will give the testimony of

*11-14876; Griffin v. Condon, et al.*

*Final Jury Instructions*
*Monday/January 23, 2017/Volume 4*

V4-Page 79

1   each witness such weight as you determine it deserves.  You

2   may, in short, accept or reject the testimony of any witness in

3   whole or in part.

4       It has been brought out that an attorney or its

5   representative has talked with a witness.  An attorney or an

6   attorney's representative may properly talk with a witness for

7   the purpose of learning what the witness knows about the case

8   and what testimony he or she will give.

9       Although you may consider the number of witnesses

10  testifying on one side or the other when you weigh the evidence

11  as to a particular fact, the number of witnesses alone should

12  not persuade you if the testimony of a lesser number of

13  witnesses is more convincing.

14      During trial certain evidence was presented to you by the

15  reading and viewing of depositions.  A deposition is a record

16  of the sworn testimony of the parties or witnesses taken before

17  an authorized person.  All parties and their attorneys have the

18  right to be present and to examine and cross-examine the

19  witnesses.  The evidence is entitled to the same consideration

20  as you would give the same testimony had the witness or

21  witnesses testified in open court.

22      If you determine that a party at some earlier time said

23  something that does not agree with what the party testified to

24  here about an important point, you may consider the earlier

25  statement, not only in deciding whether you should believe the

*Final Jury Instructions*
*Monday/January 23, 2017/Volume 4*

1    party, but also as evidence of the facts in this case.

2         The law does not require any party to call as witnesses

3    all persons who may have been present at any time or place

4    involved in the case or who may appear to have some knowledge

5    of the matters at issue in this trial, nor does the law require

6    any party to produce as exhibits all papers and things

7    mentioned in the evidence in the case.

8         The burden is on the plaintiff in a civil action such as

9    this to prove every essential element of his claim by a

10   preponderance of the evidence.  If the proofs should fail to

11   establish any essential elements of the plaintiff's claim by a

12   preponderance of the evidence in the case, the jury should find

13   for the defendants as to that particular claim.  In this case

14   for the defendants because there are multiple defendants.

15        To establish by a preponderance of the evidence means to

16   prove that something is more likely so than not so.  In other

17   words, a preponderance of the evidence in the case means such

18   evidence as when considered and compared to what evidence that

19   is opposed to it has more convincing force and produces in your

20   mind's belief that what is sought to be proved is more likely

21   true than not true.

22        This rule does not, of course, require proof to an

23   absolute certainty since proof to an absolute certainty is

24   seldom possible in any case.

25        In determining whether any fact at issue has been proved

*11-14876; Griffin v. Condon, et al.*

| | |
|---|---|
| 1 | by a preponderance of the evidence in the case, the jury may, |
| 2 | unless otherwise instructed, consider the testimony of all |
| 3 | witnesses regardless of who may have called them and all |
| 4 | exhibits in evidence regardless of who may have produced them. |
| 5 | Charts and summaries have been showed to you in order to |
| 6 | help explain facts disclosed by books, records or other |
| 7 | documents in evidence in the case.  These charts and summaries |
| 8 | are not themselves evidence of proof of any facts.  If the |
| 9 | charts or summaries don't correctly reflect the facts or |
| 10 | figures shown by the evidence in the case, you should disregard |
| 11 | them.  Charts and summaries are used only as a matter of |
| 12 | convenience.  To the extent that you find they are not |
| 13 | truthful, some of the summaries of facts or figures shown by |
| 14 | the evidence in the case, you are to disregard them entirely. |
| 15 | You are to consider only the evidence in the case. |
| 16 | However, you are not limited to the statements of the |
| 17 | witnesses.  You may draw from the facts you find -- you may |
| 18 | draw from the facts you find have been -- let me see if I can |
| 19 | get this sentence all together. |
| 20 | You may draw from the facts you find have been proved such |
| 21 | reasonable inferences as seem justified in light of your |
| 22 | experience.  Interferences are deductions or conclusions that |
| 23 | reason and common sense lead you to draw from the facts |
| 24 | established by the evidence in the case. |
| 25 | Although there is more than one defendant in this action, |

*Final Jury Instructions*
*Monday/January 23, 2017/Volume 4*

V4-Page 82

1   it does not follow from the facts alone -- from that fact alone

2   that if one defendant is liable to the plaintiff all defendants

3   are liable.  Each defendant is entitled to a fair consideration

4   of the evidence.  Neither defendant is to be prejudiced if you

5   find against the other.  All instructions I give you cover the

6   case as to each defendant.

7        You are not required to accept testimony even though the

8   testimony is uncontradicted and the witness is not impeached.

9   You may decide because of the witness's bearing and demeanor or

10  because of the inherent improbability of the witness's

11  testimony or for other reasons you find sufficient that such

12  testimony is not worthy of belief.

13       I shall now give you the definitions of some important

14  legal terms.  Please listen carefully to these definitions so

15  that you will understand the terms when they are used later.

16       Before the trial of this case there were certain

17  stipulations or agreements in which the parties agreed to facts

18  that could be taken as true without further proof.  The

19  stipulated facts are as follows:

20       On March 2nd, 2011, Defendant Joseph Downard wrote a

21  misconduct ticket against the plaintiff for being out of place.

22       On March 3rd, 2011, Defendant Gary McMurtrie wrote a

23  misconduct ticket against the plaintiff for being out of place.

24  This ticket was dismissed on March 4, 2011.

25       Plaintiff lost his job as a porter as a result of the

*11-14876; Griffin v. Condon, et al.*

1 misconduct ticket written by Defendant Joseph Downard as of
2 March 2, 2011.

3      These are three different stipulated facts which the
4 parties have agreed to and stipulated as to at the beginning of
5 the trial.

6      Generally speaking, the Federal Civil Rights Act under
7 which plaintiff brings this suit was enacted by Congress to
8 enforce the 14th Amendment to the United States Constitution.
9 The 14th amendment to the Constitution provides that:

10           "No state shall make or enforce any law which shall
11           abridge the privileges or immunities of citizens of
12           the United States, nor shall any state deprive any
13           person of life, liberty or property without due
14           process of law, nor deny to any person within its
15           jurisdiction the equal protection of the laws."

16      As a matter of law, the Constitution of the United States,
17 every citizen has the right to his liberty, that is, the right
18 not to be wrongly denied his First Amendment rights.  Every
19 person has the right under the Constitution to the freedom of
20 speech, the freedom to raise matters of public concern, and the
21 freedom to petition the Government for a redress of grievances.

22      Section 1983 of the Civil Rights Act -- of the Civil
23 Rights statute under which plaintiff sues provides that a
24 person may seek relief in this court by way of damages against
25 any person or persons who under color of any state law or

*Final Jury Instructions*
*Monday/January 23, 2017/Volume 4*

1  custom subjects such person to the deprivation of any rights,

2  privileges or immunities secured or protected by the

3  Constitution or laws of the United States.

4      Plaintiff in this case claims that the evidence shows that

5  he participated in the Legislative Corrections Ombudsman's

6  investigation of the Gus Harrison Correctional Facility, which,

7  if true, is protected by First Amendment rights.  Plaintiff

8  claims he was retaliated against for exercising these rights.

9      In order to prove his claim, the burden is upon Plaintiff

10  Griffin to establish by a preponderance of the evidence each of

11  the following elements:

12      First, that the defendant was engaged in constitutionally

13  protected activity;

14      Second, that the defendants took adverse actions against

15  the plaintiff which would likely deter a person of ordinary

16  firmness from continuing to engage in the protected conduct;

17      Third, that the defendants' adverse actions against him

18  were motivated at least in part by plaintiff's protected

19  conduct.

20      If you find that plaintiff has proved by a preponderance

21  of the evidence each of these elements, your verdict will be

22  for the plaintiff.  If you find the plaintiff has not proven by

23  a preponderance of the evidence each of these elements, your

24  verdict will be for the defendants.

25      Count One of the plaintiff's complaint, in that count

*Final Jury Instructions*
*Monday/January 23, 2017/Volume 4*

V4-Page 85

1   plaintiff claims that all three of the defendants in this case

2   violated Section 1983 of his civil rights individually.

3   Accordingly, I give you the instructions on each element that

4   the plaintiff must prove, and you are instructed to decide if

5   each individual defendant based on his own actions is liable to

6   the plaintiff.  You may find that none, one, two or all

7   three defendants are liable to plaintiff for plaintiff's direct

8   claims.

9        The first element plaintiff must prove is that he engaged

10  in protected activity.  Well, the first element plaintiff must

11  prove is that he engaged in protected conduct under the First

12  Amendment of the United States Constitution.  Protected conduct

13  under the First Amendment includes informing appropriate

14  government bodies of improper conduct by prison officials.  A

15  prisoner also retains a First Amendment right to respond to

16  questions by a prison investigator as long as he does not

17  intentionally or recklessly make false statements.

18       The second element he must prove is that one, two or

19  three or all three of the defendants took an adverse action or

20  took adverse actions against the plaintiff which would deter a

21  person of ordinary firmness from continuing to engage in the

22  protected conduct under the First Amendment.

23       In other words, in order to satisfy the

24  Second Amendment -- the second element, not the

25  Second Amendment -- in order to satisfy the second element,

                    *11-14876; Griffin v. Condon, et al.*

*Final Jury Instructions*
*Monday/January 23, 2017/Volume 4*

1  plaintiff must demonstrate that the actions plaintiff alleges

2  were taken by one, two or all of the defendants would have the

3  effect of deterring an ordinary prisoner from informing

4  appropriate government bodies of alleged misconduct by prison

5  officials by responding to questions posed to an ordinary

6  prisoner by a prison investigator.

7       The third and final element plaintiff must prove in order

8  to prevail against any or all individual defendants by his

9  claims is that the adverse actions that you find occurred were

10 motivated at least in part by plaintiff's protected conduct

11 under the First Amendment.  This element centers on the

12 defendant's motives because direct evidence of retaliatory

13 intent is rare.

14      Circumstantial evidence may be used to establish a

15 connection between each defendant's action and the plaintiff's

16 protected conduct.  For example, you are permitted to infer

17 retaliatory motive based upon a close temporal proximity

18 between the protected conduct and the alleged retaliatory acts.

19      If you find that any or all of the adverse actions were

20 causally related, at least in part, to plaintiff's alleged

21 protected conduct, then this element has been met.  However, if

22 a defendant proves that he would have taken the same action in

23 the absence of a protected activity, the element of causation

24 is not met with respect to that adverse action.

25      Count Two of plaintiff's complaint.  In that count

                 *11-14876; Griffin v. Condon, et al.*

*Final Jury Instructions*
*Monday/January 23, 2017/Volume 4*

1  plaintiff claims that all three defendants collectively

2  conspired to violate plaintiff's First Amendment rights.  A

3  conspiracy under 1983 exists where there's an agreement by

4  two or more defendants to injure plaintiff by violating his

5  constitutional rights.  In order to succeed on this conspiracy

6  claim, plaintiff must prove the following elements:

7       First, that a single plan or agreement by two or more --

8  or it was a single plan or agreement by two or more defendants;

9       Second, a shared conspiratorial objective by two or more

10  defendants occurred; and

11       Third, that an overt act committed by one or more

12  defendants in furtherance of the conspiracy -- that an overt

13  act was committed by one or more in furtherance of the

14  conspiracy; and

15       Four, that injury to the plaintiff occurred, that is, the

16  plaintiff suffered a constitutional violation.

17       The fourth element requires you to find that at least

18  one of the constitutional violations complained of occurred.

19       You are instructed that each conspirator need not have

20  known all of the details of the illegal plan or all of the

21  participants involved, but rather that each coconspirator

22  shared in the general conspiratorial objective and that

23  objective was accomplished by one or more of the coconspirators

24  violating plaintiff's constitutional rights.

25       In order to find for the plaintiff on his conspiracy

*11-14876; Griffin v. Condon, et al.*

*Final Jury Instructions*
*Monday/January 23, 2017/Volume 4*

V4-Page 88

1  claim, you must find that plaintiff suffered a violation of his

2  First Amendment rights as described in prior instructions.

3  However, you are not required to find that all of plaintiff's

4  theories of constitutional violations have occurred in order to

5  find for plaintiff on the conspiracy.

6       For example, you may believe that all of the defendants

7  conspired to violate plaintiff's First Amendment rights but

8  that only one defendant actually violated plaintiff's rights.

9  If that was the case, as an example only, you would find for

10  the plaintiff.

11       You are instructed that if you find plaintiff has proved a

12  conspiracy, you must find two or all of the defendants are

13  liable to the plaintiff.

14       If you find the plaintiff, Randle Griffin -- if you find

15  in favor of Randle Griffin, then you must award him such sum as

16  you find from a preponderance of the evidence will fairly and

17  justly compensate him for any damages you find he sustained as

18  a direct result of the alleged unconstitutional conduct.

19       There are two types of damages involved in this category

20  of actual damages:  Compensatory damages and presumed damages.

21       In making a damages determination, you can consider the

22  category compensatory damages, which are actual losses suffered

23  by the defendant.  For this issue you should consider the

24  plaintiff's wages lost due to the alleged constitutional

25  violation.

                    *11-14876; Griffin v. Condon, et al.*

*Final Jury Instructions*
*Monday/January 23, 2017/Volume 4*

V4-Page 89

1    The law also provides for presumed damages when a First
2  Amendment violation occurs.  Presumed damages are appropriate
3  when the plaintiff suffers an actual injury but damages are
4  difficult to establish or measure.  There is no definite
5  standard or method by which you are to calculate any presumed
6  damages.  If you believe plaintiff should be awarded damages,
7  you may use your common reasonable judgment in light of the
8  evidence as to the amount of reasonable compensation.  You must
9  not include any amount for emotional or mental distress but
10  rather the value of plaintiff's losses.

11    Plaintiff claims he lost a number of liberties that he had
12  before the alleged misconduct took place in this case.  You are
13  permitted to approximate compensation for real injuries, if
14  any, you believe occurred as a result of the constitutional
15  violation.  These damages are designed to compensate actual
16  losses that are difficult to measure in dollar amounts and must
17  reflect the real injury sustained, not the abstract value of
18  the constitutional right at issue or the importance of the
19  right to our system of government.

20    Throughout your deliberations you must not engage in any
21  speculation, guess or conjecture, and you must not award any
22  damages under this instruction by way of punishment or through
23  sympathy.

24    If you find the plaintiff, Mr. Randle Griffin -- if you
25  find plaintiff's damages have no monetary value, then you must

*11-14876; Griffin v. Condon, et al.*

1    return a verdict for plaintiff in the nominal amount of $1.

2        In addition to the damages mentioned in the other

3    instructions, the law permits you to award an injured person

4    punitive damages under certain circumstances in order to punish

5    defendants for some extraordinary misconduct and to serve as an

6    example or a warning to others not to engage in such conduct.

7        If you find in favor of the plaintiff, Randle Griffin, and

8    against any or all of the defendants, Louis Condon,

9    Gary McMurtrie and/or Joseph Downard, and/or if you -- and/or

10   you find liability or a conspiracy against two or more

11   defendants, and if you find the conduct of any or all

12   defendants as submitted was recklessly and callously

13   indifferent to plaintiff's First Amendment rights, then, in

14   addition to any other damages for which you may find the

15   plaintiff is entitled, you may but are not required to award

16   plaintiff an additional amount as to punitive damages if you

17   find it, if you find it is appropriate to punish any and all

18   defendants or deter any or all defendants and others from like

19   conduct in the future.  Whether to award punitive damages and

20   the amount of those damages are within your sound discretion.

21       You may assess punitive damages against any or all

22   defendants or you may refuse to impose punitive damages.  If

23   punitive damages are assessed against one -- against more than

24   one defendant, the amounts assessed against each defendant may

25   be the same or they may be different.

*Final Jury Instructions*
*Monday/January 23, 2017/Volume 4*

1    If you find the defendants violated plaintiff's rights

2   more than once, plaintiff is entitled to be compensated only

3   for the injuries plaintiff actually suffered.

4    Unless the defendants violated plaintiff's rights more

5   than once but the resulting injury was no greater than it would

6   have been had the defendant violated his rights one time, you

7   should award an amount of compensatory damages no greater than

8   you would award if defendants had violated plaintiff's rights

9   only one time.  If defendants violated plaintiff's rights more

10   than once and you can identify separate injuries resulting from

11   separate violations, you should award an amount of compensatory

12   damages equal to the total of the damages you believe will

13   fairly and justly compensate plaintiff for the separate

14   injuries plaintiff suffered.

15    Finally, this instruction does not apply to punitive

16   damages.  Punitive damages may be awarded against any or all of

17   the defendants in any amount you deem appropriate given your

18   instructions on punitive damages.

19    The following instructions concern the matter of your

20   deliberations.

21    Upon retiring to the jury room, you will elect one of your

22   number to act as a foreperson, as the foreperson.  The

23   foreperson will preside over your deliberations and will be

24   your spokesperson here in court.

25    The verdict with respect to the considered judgment -- it

*11-14876; Griffin v. Condon, et al.*

must represent the considered judgment of each juror.  In order to return a verdict, it's necessary that each juror agree.

Your verdict must be unanimous.  It's your duty as jurors to consult with one another and to deliberate with a view to reaching an agreement if you can do so without violence to individual judgment.

You must each decide the case for yourself but only after an impartial consideration of the evidence in the case with your fellow jurors.  In the course of your deliberations, do not hesitate to examine your own views and change your opinion if convinced it is erroneous, but don't surrender your honest conviction as to the weight or effect of the evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict.

Remember at all times that you are not partisans, you are judges, judges of the facts.  Your sole interest is to seek the truth from the evidence in the case.

If it becomes necessary during deliberations, your deliberations, to communicate with the Court, you may send a note signed by the foreperson by way of one of the Court's staff members.  When you reach an agreement as to the verdict, you should send a note to the staff signed by the foreperson on which you state only that a verdict has been reached.

It is proper to add the caution that nothing said in these instructions, nothing in any form of verdict prepared for your

*Final Jury Instructions*
*Monday/January 23, 2017/Volume 4*

V4-Page 93

1    convenience is to suggest or convey in any way or manner any

2    inclination as to what verdict I think you should find.  What

3    the verdict shall be is the sole and exclusive duty and

4    responsibility of the jury.

5         I will give you a copy of these instructions for your use

6    while deliberating.  It's available to each of you.  If you

7    have any questions about the law or your duties as jurors, you

8    should consult the instructions as given to you.

9         I am also sending all of the exhibits with you for your

10   use while deliberating.  I think -- I don't know anything that

11   is not deliverable.  It usually makes it clear that it will

12   have to be the kind of exhibit that can be transported to the

13   jury room, and usually they -- I think we'll be talking about

14   that here.

15        A verdict form is attached to these instructions.  You

16   will take this form to the jury room, and when you have reached

17   an agreement as to the answers in accordance with these

18   instructions, you will have your foreperson, foreman fill in

19   the date and sign the form.  You will then notify the Court's

20   staff that you have reached a verdict and bring the verdict

21   form with you upon your return to the court.  I will now

22   explain the form of verdict to you.

23        This is with the court and cause, Randle Griffin is the

24   plaintiff and Louis Condon, Joseph Downard and Gary McMurtrie

25   are the defendants.  It's entitled Form of Verdict.

*11-14876; Griffin v. Condon, et al.*

*Final Jury Instructions*
*Monday/January 23, 2017/Volume 4*

V4-Page 94

1      The first question:  Do you find the plaintiff proved by a

2    preponderance of the evidence that any of the defendants

3    violated the plaintiff's First Amendment rights?

4      For each of the defendants, Condon, Downard and McMurtrie,

5    you have a space to mark yes or no.  For each of them yes or no

6    as you go down the list.  If you answered "no" as to all of the

7    defendants, you have reached a verdict.  You can have your

8    foreperson sign the verdict form and inform the bailiff.  If

9    you answered "yes" as to any defendant, complete Questions 2

10   and 3.

11     Question 2:  Do you find that the plaintiff has proved by

12   a preponderance of the evidence that two or more of the

13   defendants committed a conspiracy to violate the plaintiff's

14   first amendment rights?

15     Again, each of the defendants, Condon, Downard and

16   McMurtrie, are listed and by each of them a place to put yes or

17   no, whichever you decide.

18     And 3:  We find the plaintiff has proved his claim by a

19   preponderance of the evidence in Count One and/or Count Two and

20   we award damages in the following amounts.

21     And then for each of these defendants, Condon, Downard and

22   McMurtrie, you have a place where you can fill in the blank of

23   presumed or nominal damages -- actual compensatory, presumed or

24   nominal damages and also a line for that defendant for filling

25   in any punitive damages you believe are appropriate for that

*11-14876; Griffin v. Condon, et al.*

*Final Jury Instructions*
*Monday/January 23, 2017/Volume 4*

V4-Page 95

1    defendant.

2        The same is true for the other two defendants, Downard and

3    McMurtrie.  You may have for each of them actual compensatory,

4    presumed or nominal damages on one line, and on another line

5    with another dollar sign in front of it, if you make a decision

6    in that direction, for punitive damages.

7        And that's true of the third defendant as well,

8    Mr. McMurtrie.

9        You have now reached a verdict.  Have your foreperson sign

10   the verdict form and inform the bailiff.  It is signed by the

11   jury foreperson and dated today.

12       I usually before I send the jury to the jury room ask if

13   lawyers for either plaintiff or defendants believe that I, I'm

14   not talking about do you agree with everything I said in the

15   jury instructions, but did I misstate anything by putting a not

16   where there shouldn't have been or putting something in that

17   changed the meaning entirely?

18       **MR. FINK:**  Plaintiff is satisfied with the reading of

19   the jury instructions, Your Honor.

20       **MR. SCHNEIDER:**  The same from the defendants,

21   Your Honor.  I believe they were read accurately.

22       **THE COURT:**  Thank you.  We will now swear in the

23   bailiffs and you will be sent to the jury room to do your

24   sacred duty, and thank you so much for being good citizens and

25   being here and doing this so far.  Now you've got the real

*11-14876; Griffin v. Condon, et al.*

V4-Page 96

1   work.

2        Let's see.

3        (The bailiffs were sworn.)

4        **THE COURT:**  Thank you.  Go to the jury room and

5   commence your deliberations.  Thank you.

6        (Jury out at 11:45 a.m.)

7        **THE COURT:**  I hope counsel will at least for the

8   first hour and a half or so, it might take longer than that, if

9   you will keep yourselves available to telephones or whatever,

10  cell phones I think, to be notified by within a half an hour to

11  come back.  As you know, most of what the jury wants to talk to

12  lawyers about happens right away.

13       At any rate, thank you for being here.  Thank you for your

14  cooperation.

15       **MR. SCHNEIDER:**  Your Honor, do you want eight exhibit

16  books from each side for the jury or just one?  We have to pull

17  out all the non-admitted exhibits still to create some jury

18  books.

19       **MR. FINK:**  Plaintiff has our exhibits ready to be

20  submitted to the jury, Your Honor.  These are the ones that we

21  admitted.

22       **THE COURT:**  That's going to take some work by the

23  defendants?

24       **MR. SCHNEIDER:**  If it's just one book, then it will

25  just take a couple of minutes, Your Honor.  If it's eight

                    *11-14876; Griffin v. Condon, et al.*

*Jury Question*
*Monday/January 23, 2017/Volume 4*

V4-Page 97

1    books --

2            **THE COURT:**  One book sounds good to me, but if they

3    insist that they want more, we'll have to do something else.

4            **MR. SCHNEIDER:**  These are all of the defendants'

5    exhibits that we admitted so we are ready to go with that.

6            **THE COURT:**  All right.  Thank you all, and I will let

7    you know as soon as we hear something.

8            **MR. SCHNEIDER:**  Thank you, Your Honor.

9            **MR. HUBBARD:**  Your Honor, in terms of logistics in

10   submitting the actual exhibits, do you wish for us to approach

11   and present them to the Court?

12           **THE COURT:**  Present them to one of the people who

13   have been sworn in as representatives.

14           **MR. HUBBARD:**  Certainly.  Thank you, Judge.

15           **THE COURT:**  That would usually be Mr. Barkholz, but

16   it doesn't have to be.

17           **MR. FINK:**  For the record, we have shown our exhibits

18   to opposing counsel so I'm going to submit these to the

19   bailiff.

20           **THE COURT:**  Thank you.

21       (Recess from 11:48 a.m. to 2:32 p.m.)

22           **THE CLERK:**  Court is reconvened in the case of

23   *Randle Griffin v. Louis Condon, et al.*, Case Number 11-14876.

24           **THE COURT:**  You may be seated.  I have a note from

25   the person who apparently is the foreperson, who is in Seat

*11-14876; Griffin v. Condon, et al.*

*Jury Question*
*Monday/January 23, 2017/Volume 4*

V4-Page 98

1  Number 5, I'm told.  I can't read his name, but I know -- well,

2  I've got it here someplace.  Here we go.  Mr. Fotchuk.  And he

3  says in this note, "We are unable to reach unanimous decision

4  or verdict on Item Number 1 for any of the defendants.  We do

5  not feel that we will be able to reach a unanimous decision

6  regardless of the time."  And it's signed by Mr. Fotchuk.

7       I am going to call them in and read them the Allen charge

8  and send them back out.  I'm not sure exactly what the chances

9  are that they will find some resolution, but we will urge them

10  to do so.  All right?

11          **MR. FINK:**  Yes, Your Honor.

12          **MR. SCHNEIDER:**  Yes, Your Honor.

13          **THE COURT:**  Bring in the jury.

14          **THE CLERK:**  All rise for the jury.

15      (Jury in at 2:35 p.m.)

16          **THE COURT:**  Please be seated, members of the jury.

17  Thank you for your hard work and your patience.  I have a note

18  from the foreperson, Mr. Fotchuk.  Have I got that right?

19          **JUROR NO. 5:**  Yes.

20          **THE COURT:**  "We are unable to reach a unanimous

21  decision or verdict on Item Number 1 for any defendant.  We do

22  not feel that we will be able to reach a unanimous decision

23  regardless of the time."

24       I must urge you, consistent with what I'm going to say

25  next, to return to the jury room and do it again, try to get by

*11-14876; Griffin v. Condon, et al.*

*Jury Question*
*Monday/January 23, 2017/Volume 4*

V4-Page 99

1  the effort that you have not been successful at so far and

2  arrive at a unanimous verdict.

3      Member of the jury, I am going to ask you to return to the

4  jury room and deliberate further.  I realize you are having

5  some difficulty reaching unanimous agreement, but that's not

6  unusual, and sometimes after further discussion jurors are able

7  to work out their differences and agree.

8      Please keep in mind how very important it is for you to

9  reach unanimous agreement.  If you can't agree and this case is

10 tried again, there is no reason to believe that any new

11 evidence will be presented or that the next 12 -- in this case

12 eight jurors will be any more conscientious or impartial than

13 you are.

14     But may I remind you that it's your duty as jurors to talk

15 to each other about the case and listen carefully and

16 respectfully to each other's views and keep an open mind as you

17 listen to what your fellow jurors have to say.

18     Let me remind you it's your duty to make every reasonable

19 effort to reach a unanimous agreement, each of you, whether or

20 not they -- you are in the majority or the minority.  You ought

21 to seriously reconsider your position in light of the fact that

22 other jurors, who are just as conscientious and impartial as

23 you are, have come to a different conclusion.  Those of you who

24 believe the Government has proved the defendant guilty beyond a

25 reasonable doubt should stop and ask yourself if the evidence

*11-14876; Griffin v. Condon, et al.*

*Jury Question*
*Monday/January 23, 2017/Volume 4*

V4-Page 100

1    is really convincing enough.

2         And given that the other members of the jury are convinced

3    and those of you who believe the government has not proved the

4    defendant guilty beyond a reasonable doubt should stop and ask

5    yourself --

6              **MR. SCHNEIDER:**  Your Honor?

7              **MR. HUBBARD:**  Your Honor, I sincerely apologize for

8    interrupting the Court while giving an instruction.  I believe

9    the most two recent sentences given by the Court are in the

10   context of --

11             **THE COURT:**  I'm not understanding what you're saying.

12   Yes.

13             **MR. HUBBARD:**  Your Honor, respectfully, I believe

14   that the last two sentences that the Court read to the jury are

15   in the context of a criminal case.

16             **THE COURT:**  I believe you are right.

17             **MR. HUBBARD:**  And I sincerely apologize for

18   interrupting.

19             **THE COURT:**  Don't apologize.  I believe you are

20   right, and I was about to hang up on that myself.

21             **MR. HUBBARD:**  Thank you, Judge.

22             **THE COURT:**  And to modify what I had said, to those

23   of you who believe the Government has not proved its case

24   should stop -- not that the Government has not proved its

25   case -- I guess that works here -- should stop and ask

*11-14876; Griffin v. Condon, et al.*

*Jury Question*
*Monday/January 23, 2017/Volume 4*

V4-Page 101

1   yourselves if the doubt you have is a reasonable one given that

2   other members of the jury don't share your doubt.  None of you

3   should hesitate to change your mind if after reconsidering

4   things you are convinced that other jurors are right and that

5   the original position was wrong.

6       But remember this.  Don't ever change your mind just

7   because other jurors see things differently or to get the case

8   over with.  As I told you before, in the end your vote must be

9   exactly that, your own vote.  As important as it is for you to

10  reach unanimous agreement, it's just as important that you do

11  so honestly and in good conscience.

12      Does that solve the problem that was a real problem?

13          **THE DEFENDANT:**  I believe Your Honor referenced the

14  government proving its case.  I would just remind the Court

15  that the plaintiff is not actually the Government and his

16  burden of proof is by a preponderance of the evidence and not

17  beyond a reasonable doubt.  That's the only clarification that

18  we wish to --

19          **THE COURT:**  You are right about that, and I'm reading

20  the official language of the Allen charge.  Thank you.

21          **MR. HUBBARD:**  You bet.  Thank you, Your Honor.

22          **THE COURT:**  What has been said has been modified and

23  I hope was understood by all of you.  Thank you.  Please go to

24  the jury room and try again.

25      (Jury out at 2:41 p.m.)

                    *11-14876; Griffin v. Condon, et al.*

*Change of Jury Deliberations*
*Monday/January 23, 2017/Volume 4*

V4-Page 102

1      **THE COURT:**  I think one of these, one of these

2  charges that are fit for Allen charge usually is perhaps a

3  little bit more flexible than I think this one is, although

4  that's just my opinion.

5      And I suspect it may be a little harder to get them to

6  move off where they are right now, but I hope they can do it,

7  and thank you for your patience.

8      **MR. SCHNEIDER:**  Your Honor, I'll talk to my clients

9  about a 7 and 1, accepting a 7 and 1.  I don't know if they

10  will agree to it, but I'll discuss it and talk with plaintiff's

11  counsel as well.

12      **THE COURT:**  I'm not sure what you just said, but

13  that's my fault.

14      **MR. SCHNEIDER:**  Sure, Your Honor.  I'm going to

15  discuss the possibility with my clients of accepting a 7 and 1

16  verdict as opposed to unanimous, and I'll discuss that with

17  plaintiff's counsel as well.

18      **THE COURT:**  The Court is in recess.  Stay close.

19      (Recess from 2:43 p.m. until 3:34 p.m.)

20      **THE CLERK:**  Case Number 11-15876.  Court is

21  reconvened in the matter of *Randle Griffin v Louis Condon,*

22  *et al.*

23      **THE COURT:**  The Court understands that the parties

24  have agreed to a less-than-unanimous decision.  How would that

25  be articulated by either or both sides?

                    *11-14876; Griffin v. Condon, et al.*

*Change of Jury Deliberations*
*Monday/January 23, 2017/Volume 4*

V4-Page 103

1    **MR. HUBBARD:**  Your Honor, on behalf of the plaintiff,

2  Brandon Hubbard for the record.  We are at this point

3  comfortable with a 7 and 1 verdict from the jury.  If that does

4  not get it done, so to speak, the parties I think are willing

5  to revisit the issue of doing a 6 and 2, but we desire to do a

6  7 and 1 at the outset.

7            **THE COURT:**  Is that true, Mr. Schneider?

8            **MR. SCHNEIDER:**  Yes, Your Honor.

9            **THE COURT:**  I don't know exactly how to say that to

10  the jury and get them to understand what you are doing and

11  where you are going, but why don't we bring them in and we'll

12  talk to them.

13      (Jury in at 3:36 p.m.)

14            **THE CLERK:**  All rise for the jury.

15            **THE COURT:**  Members of the jury, please be seated.

16      The parties have had an opportunity to examine the

17  situation and come to possible other conclusions or at least

18  one other conclusion.  I don't know that this is, anything like

19  this has been said to you so far, but what we are ready to do

20  or the parties are ready to do is tell you if you can have

21  seven people voting one way even though there is one person

22  that isn't that that is satisfactory to the parties and they

23  will go on that basis.

24      Is there any reason to be hopeful about that?

25            **THE FOREPERSON:**  Yes.

                 *11-14876; Griffin v. Condon, et al.*

*Change of Jury Deliberations*
*Monday/January 23, 2017/Volume 4*

V4-Page 104

1    **THE COURT:**  There is?  Why, unless you have a better

2    way to approach this, why don't you go back to the jury room

3    and see if you can put that in writing and come in with a

4    verdict.

5        Do you have something else?

6            **THE FOREPERSON:**  No.  At that point we can proceed.

7            **THE COURT:**  Thank you.

8        (Jury out at 3:37 p.m.)

9            **THE COURT:**  I'm not sure whether it makes any sense

10   for us to continue to keep the court in session, but you can

11   sit down anyway.  It looked from the point of view of the

12   optimism, if that's what it is, of the foreperson that he would

13   be pretty much in the direction of saying if that's the way we

14   need to have it vote we'll have it vote that way and we'll have

15   a conclusion, and we'll have to see how they come out, but

16   anybody have any other ideas?  I don't --

17           **MR. HUBBARD:**  No further ideas, Your Honor, from the

18   plaintiff other than I will note for the Court that

19   irrespective of the outcome of the verdict we'll probably poll

20   the jury if Your Honor could --

21           **THE COURT:**  We'll poll the jury, of course.

22           **MR. HUBBARD:**  Certainly.  Thank you, Judge.

23           **THE COURT:**  Yes.

24       Court is in recess, and we'll let you know if there's any

25   reason not to be.  The information coming from the jury room is

*11-14876; Griffin v. Condon, et al.*

*Change of Jury Deliberations*
*Monday/January 23, 2017/Volume 4*

V4-Page 105

1   that it isn't a walkaround, okay, you've got 7 and 1 and let's

2   fill the box in.  They have got to do more than that, there's

3   more substance, which is just as well.

4        **MR. FINK:**  Of course, Your Honor.

5     I said of course, Your Honor.  We're here and ready

6   whenever we get any word.  Thank you.

7        **MR. HUBBARD:**  Thank you, Judge.

8     (Proceedings adjourned at 3:41 p.m.)

9                 -   -   -

10

11           **C E R T I F I C A T I O N**

12     I certify that the foregoing is a correct transcription of

13   the record of proceedings in the above-entitled matter.

14

15   s/ Sheri K. Ward_____          2/7/2017
      Sheri K. Ward               Date

16   Official Court Reporter

17                 -   -   -

18

19

20

21

22

23

24

25

*11-14876; Griffin v. Condon, et al.*